181057

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ANTHONY GAY,

          Plaintiffs,

    v.

THE STATE OF ILLINOIS, JOHN
BALDWIN, JEFF SIMS, SHANE REISTER,
DR. DOE 1, MELVIN HINTON, SYLVIA
BUTLER, KELLY ANN RENZI, WILLIAM
PUGA, DR. CHESS, DR. NUNEZ,
WEXFORD HEALTH SOURCES, INC. and
DOES 2-5,

          Defendants.

No. 1:18-cv-07196

Hon. Sara L. Ellis

## ANSWER TO COMPLAINT OF DR. PIERRE NUNEZ

NOW COMES defendant DR. PIERRE NUNEZ, by and through his attorneys in this regard, Stetson F. Atwood, Laura Coffey Ieremia and DONOHUE BROWN MATHEWSON & SMYTH LLC, and for his answer to plaintiff's complaint, states as follows:

### INTRODUCTION

When Anthony Gay was a teenager, he got into a fight with another teen who had insulted his sister. The teen claimed that Anthony had stolen his hat and a $1 bill in the process, so Anthony was charged with robbery. Anthony pleaded guilty, received a suspended prison sentence, and was placed on probation. Then, in another youthful error, Anthony violated his probation by driving a car without a license. As a result of these two events, in 1994 Anthony – then only 20 years old – was imprisoned by the Illinois Department of Corrections ("IDOC"). With good behavior, he should have been released in 3½ years.

But Anthony suffers from borderline personality disorder. After he was imprisoned the symptoms of this mental illness manifested, and he began to act out. Instead of providing

treatment for his mental illness, the IDOC cited him for a variety of violations. Eventually, in 1998, the IDOC placed Anthony in solitary confinement—and it kept him there for the next twenty years. For twenty years, Anthony lived alone in a small, bare, stifling cell, where he was deprived of all human contact for close to 24 hours per day.

The impact of solitary confinement on Anthony was catastrophic. Deprived of any sustained human interaction, Anthony's mental condition deteriorated, and he began to engage in horrific acts of self-mutilation. He cut his forearm and his neck. He cut into his left inner thigh and wove the wound together with strips of a blanket. He cut into his scrotum and embedded a zipper there. He cut off a testicle and hung it on his cell door. He cut open his scrotum again and pierced it with paperclips. He mutilated his penis on multiple occasions, embedding a pen, plastics, and a zipper into the cuts. He stuck a pen into his eyelid and stabbed his thigh with a spoon, so deep that it had to be removed surgically. His documented acts of self-mutilation number in the dozens and continued for nearly the entirety of his solitary confinement.

It was plain for anyone to see that solitary confinement was ravaging Anthony's mind, and that he was in desperate need of appropriate mental healthcare. But instead of placing Anthony in a setting that would alleviate the impact on his mind, or providing him treatment to get better, the Defendants responded by prolonging Anthony's extreme isolation, depriving him of access to human contact, programming, mental health care, and activities—for decades.

As a result, Anthony's torture was both compounded and extended. Solitary confinement had triggered Anthony's mental illness, causing him to act erratically and irrationally. One manifestation was Anthony's self-mutilation. Another was irrational "assaults" on prison staff, in which Anthony would do things like throw his body fluids at prison guards through cracks in his cell door. Instead of recognizing these acts for the manifestations of mental illness that they

were, the Defendants doubled down. Anthony was given "tickets" that punished him with consecutive sentences of solitary confinement until the year 2152 – or two lifetimes of solitude. Anthony was also charged criminally for his "attacks" on prison staff, which ultimately extended his actual prison sentence by about fifteen years, with all but a few weeks of it to be served in solitary.

This extreme isolation continued even though in Rasho v. Baldwin, No. 07-cv-1298 (C.D. Ill.), an ongoing class action concerning the IDOC's treatment of mentally ill prisoners, the Defendants acknowledged that Anthony was among a handful of IDOC prisoners who were so mentally ill that they needed acute, inpatient psychiatric care. Defendants refused to provide this care. Instead, they continued to hold Anthony in extreme isolation, with the devastating impact that Anthony continued to mutilate himself.

All told, Anthony spent nearly two decades in solitary confinement in a state of acute mental decompensation. By the time he was finally released from prison in 2018, he had mutilated himself hundreds of times. Throughout his solitary confinement, it was obvious to the Defendants that Anthony was in desperate need help. And at any point during his confinement, they could have rescued him, either by providing adequate services within prison or by transferring him to inpatient psychiatric hospital. For the Defendants, however, it was simply more convenient to deal with a difficult inmate by keeping him locked away in an isolation cell. That "solution" inflicted decades of unthinkable pain on Anthony, and continues to harm him after his release.

Through their actions and inaction in the face of Anthony's obvious mental decompensation, the Defendants tortured Anthony. This lawsuit seeks to hold the Defendants

accountable for the injuries that they inflicted on Anthony by holding him in solitary confinement for two decades.

> **ANSWER:** **Dr. Nunez makes no answer to the introduction section of plaintiff's complaint as the remarks contained therein do not constitute allegations requiring an answer. To the extent that the introduction section could be construed as containing allegations against Dr. Nunez, said allegations are denied.**

## NATURE OF THE ACTION

1.   Anthony Gay asserts the following claims to redress the egregious abuse that the Defendants inflicted upon him:

> **ANSWER:** **Dr. Nunez admits that plaintiff asserts the claims set forth in Counts I-IV of his complaint. Dr. Nunez denies the remaining allegations contained in paragraph 1 of plaintiff's complaint.**

2.   *Count One*—Eighth Amendment. By placing Anthony in extended solitary confinement notwithstanding its obvious, devastating impact on his mental health, the Defendants inflicted cruel and unusual punishment on Anthony, exhibited deliberate indifference to his serious medical needs, and inflicted punishment on him for no legitimate penological purpose. This caused extreme mental anguish, suffering, and multiple physical injuries, in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

> **ANSWER:** **Dr. Nunez denies the allegations contained in paragraph 2 of plaintiff's complaint.**

3.   *Counts Two and Three*—Americans with Disabilities Act and Rehabilitation Act. The Defendants also discriminated against Anthony because of his mental illness, in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). Anthony's severe mental illness was a disability covered by the ADA and the RA. While the Defendants have policies to ensure that that IDOC prisoners with conventional medical needs (such as

- 4 -

physical injuries or illnesses) receive the medical treatment they need, the Defendants did not provide equivalent treatment for Anthony's mental condition. Instead, they followed a continuing discriminatory policy of forcing him to undergo extended torture in solitary confinement, without appropriate treatment, until his sentence was completed.

> **ANSWER:**     **Dr. Nunez makes no answer to the allegations contained in paragraph 3 of plaintiff's complaint because Counts II and III of plaintiff's complaint are not directed to him. To the extent the allegations in paragraph 3 or Counts II and III of plaintiff's complaint are construed against Dr. Nunez, said allegations are denied.**

4.     In further violation of the ADA and the RA, the Defendants failed to provide reasonable accommodations for Anthony's disability. The Defendants provide IDOC prisoners with a variety of programs and services, and they are obligated not to segregate disabled and non-disabled persons. Among these is furnishing the basic human need of interaction with other persons. With reasonable accommodations to his disability, the Defendants could have provided Anthony with these programs and services, but they chose not to. Instead they placed him in extended solitary confinement. Anthony served years in disciplinary solitary confinement because he exhibited behaviors that were a result of the fact that the Defendants had put a disabled person in solitary confinement. Defendants' continuing policy of failing to provide these accommodations to mentally ill prisoners like Anthony resulted in his entrapment in a cruel, endless cycle, and the devastating consequences described in this Complaint.

> **ANSWER:**     **Dr. Nunez makes no answer to the allegations contained in paragraph 4 of plaintiff's complaint because Counts II and III of plaintiff's complaint are not directed to him. To the extent the allegations in paragraph 4 or Counts II and III of plaintiff's complaint are construed against Dr. Nunez, said allegations are denied.**

5.     *Count Four*—Fourteenth Amendment. Under the Due Process Clause, Anthony had a right to meaningfully challenge his placement in solitary confinement and show that he

should not have been there. Had the Defendants provided this right, Anthony could have shown that his placement in solitary was improper, since it flowed from irrational acts arising from his mental illness, which was triggered by his confinement in solitary. The Defendants never afforded Anthony this opportunity, however, causing him to suffer the injuries described in this Complaint.

> **ANSWER:** **Dr. Nunez makes no answer to the allegations contained in paragraph 5 of plaintiff's complaint because Count IV of plaintiff's complaint is not directed to him. To the extent the allegations in paragraph 5 or Count IV of plaintiff's complaint are construed against Dr. Nunez, said allegations are denied.**

*       *       *

6.    Anthony had the right to be free from cruel and unusual punishment and he had the right not to be mistreated or discriminated against because of his disability. By this action, Anthony seeks to vindicate those rights and to have the Defendants answer for the way they treated a vulnerable man with a severe mental illness, first by inflicting horrific damage on him by throwing him in solitary, and then by failing to treat the devastating illness that they themselves had both caused and exacerbated.

> **ANSWER:** **Dr. Nunez denies that paragraph 6 of plaintiff's complaint accurately states plaintiff's constitutional rights. Dr. Nunez denies the remaining allegations contained in paragraph 6 of plaintiff's complaint.**

## II. JURISDICTION AND VENUE

7.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's causes of action are brought under the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

> **ANSWER:** **Dr. Nunez admits the allegations contained in paragraph 7 of plaintiff's complaint.**

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as one or more of the Defendants resides in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

> **ANSWER:**      **Dr. Nunez admits the allegations contained in paragraph 8 of plaintiff's complaint. Further answering, Dr. Nunez denies that this Court is a convenient venue for the reasons stated in Defendants' Motion to Transfer Venue Pursuant to 28 USC § 1404 (ECF No. 26).**

### III. PARTIES

9.      Plaintiff Anthony Gay is a resident of Illinois. Between 1994 and 2018, he was imprisoned by the IDOC at multiple prisons, including the Tamms, Dixon, Pontiac, Statesville, and Menard prisons. He now lives with his family in Rock Island, Illinois.

> **ANSWER:**      **Dr. Nunez admits that, between 1994 and 2018, plaintiff was imprisoned by the IDOC at multiple prisons. Dr. Nunez lacks sufficient information to admit or deny the remaining allegations contained in paragraph 9 of plaintiff's complaint; therefore, said allegations are denied.**

10.     Defendant State of Illinois operates the IDOC, which imprisoned Anthony and subjected him to solitary confinement, pursuant to a continuous policy, described herein, under which difficult, mentally ill prisoners were placed in prolonged solitary confinement instead of being provided with appropriate mental health treatment. The State of Illinois, and the IDOC, receive federal funding.

> **ANSWER:**      **Dr. Nunez makes no answer to the allegations contained in paragraph 10 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 10 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient information to admit or deny them; therefore, said allegations are denied.**

11.     Defendant John R. Baldwin is the acting director of the IDOC. Defendant Baldwin is sued in his official and individual capacities. Defendant Baldwin had actual

knowledge that solitary confinement both causes and exacerbates mental illness. He also knew that multiple severely mentally ill prisoners, among them Anthony Gay, were in critical need of inpatient psychiatric care and appropriate treatment that the IDOC was failing to provide. At all relevant times Defendant Baldwin had the power to ensure this treatment was provided by the IDOC, or to secure the transfer of these prisoners to mental health facilities operated by the Illinois Department of Human Services ("IDHS"). Defendant Baldwin took neither course of action.

> **ANSWER:** **Dr. Nunez makes no answer to the allegations contained in paragraph 11 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 11 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient information to admit or deny them; therefore, said allegations are denied.**

12.     Defendant Wexford Health Sources, Inc. ("Wexford") is a private company that was under contract to provide medical care and mental healthcare to the prisoners of the IDOC, including Anthony, during a number of years of Anthony's imprisonment. This care included the obligation to provide comprehensive and specialized mental health services, including any specialty and emergency care that was not provided at IDOC facilities. Despite its contractual obligations, however, by policy and practice Wexford did not provide on-site mental health services necessary to meet the needs of persons with severe mental illnesses like Anthony, nor did it transfer prisoners who needed such care to appropriate outside mental health facilities.

> **ANSWER:** **Dr. Nunez makes no answer to the allegations contained in paragraph 12 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 12 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient information to admit or deny them; therefore, said allegations are denied.**

13.     Defendant Jeff Sims is the IDOC's Central Region Psychology Supervisor. He is sued in his individual capacity. While Anthony was confined in the prisons under Defendant Sims' supervision, Sims was personally aware of the harm Anthony was incurring from solitary confinement, and had actual knowledge that Anthony needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Sims had the power to seek appropriate treatment for Anthony, but did not do so.

> **ANSWER:      Dr. Nunez makes no answer to the allegations contained in paragraph 13 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 13 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient information to admit or deny them; therefore, said allegations are denied.**

14.     Defendant Shane Reister is the IDOC's Southern Region Psychology Supervisor. He is sued in his individual capacity. While Anthony was confined in the prisons under Defendant Reister's supervision, Reister was personally aware of the harm Anthony was incurring from solitary confinement, and had actual knowledge that Anthony needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Reister had the power to seek appropriate treatment for Anthony, but did not do so.

> **ANSWER:      Dr. Nunez makes no answer to the allegations contained in paragraph 14 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 14 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient information to admit or deny them; therefore, said allegations are denied.**

15.     Defendant Dr. Doe 1 is IDOC's Northern Region Psychology Supervisor. Dr. Doe 1 is sued in his or her individual capacity. While Anthony was confined in the prisons under Defendant Dr. Doe 1's supervision, he or she was personally aware of the harm Anthony was incurring from solitary confinement, and had actual knowledge that Anthony needed psychiatric

care and appropriate treatment that he was not receiving. At all relevant times Dr. Doe 1 had the power to seek appropriate treatment for Anthony, but did not do so.

>**ANSWER:**  **Dr. Nunez makes no answer to the allegations contained in paragraph 15 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 15 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient information to admit or deny them; therefore, said allegations are denied.**

16.    Defendant Dr. Melvin Hinton is the Acting Statewide Mental Health Supervisor for the IDOC. He is sued in his individual capacity. Dr. Hinton was personally aware of Anthony's confinement and its impact on his mental health condition. Dr. Hinton also knew that Anthony needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Dr. Hinton had the power to seek appropriate treatment for Anthony, but did not do so.

>**ANSWER:**  **Dr. Nunez makes no answer to the allegations contained in paragraph 16 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 16 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient information to admit or deny them; therefore, said allegations are denied.**

17.    Defendant Dr. Sylvia Butler is the Mental Health Director of Menard Correctional Center.  She is sued in her individual capacity. At all relevant times she was employed by Defendant Wexford. Dr. Butler was responsible for Anthony's psychiatric care at Menard when he was incarcerated there in 2015-2016, and she was aware that he needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Dr. Butler had the power to seek appropriate treatment for Anthony, but did not do so.

>**ANSWER:**  **Dr. Nunez makes no answer to the allegations contained in paragraph 17 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 17 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient**

**information to admit or deny them; therefore, said allegations are denied.**

18.     Defendant Dr. Kelly Ann Renzi is the Mental Health Director of Pontiac Correctional Center. She is sued in her individual capacity. Dr. Renzi was responsible for Anthony's psychiatric care at Pontiac when he was incarcerated there in 2017-2018, and she was aware that he needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Dr. Renzi had the power to seek appropriate treatment for Anthony, but did not do so.

>    **ANSWER:     Dr. Nunez makes no answer to the allegations contained in paragraph 18 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 18 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient information to admit or deny them; therefore, said allegations are denied.**

19.     Defendant Dr. William Puga was a physician at Pontiac Correctional Center. At all relevant times, he was employed by Defendant Wexford. He is sued in his individual capacity. Dr. Puga personally provided psychiatric care to Anthony at Pontiac from 2016-2018. Along with Dr. Renzi, Dr. Puga was responsible for Anthony's psychiatric care and was aware that he needed to be removed from solitary confinement, and needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Dr. Puga had the power to seek appropriate treatment for Anthony, but did not do so.

>    **ANSWER:     Dr. Nunez makes no answer to the allegations contained in paragraph 19 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 19 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient information to admit or deny them; therefore, said allegations are denied.**

20.     Defendant Dr. Chess is the Mental Health Director of Dixon Correctional Center. He is sued in his individual capacity. At all relevant times he was employed by Defendant

Wexford. Dr. Chess was responsible for Anthony's psychiatric care at Dixon in 2018 and was aware that he needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Dr. Chess had the power to seek appropriate treatment for Anthony, but did not do so.

> **ANSWER:** **Dr. Nunez makes no answer to the allegations contained in paragraph 20 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 20 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient information to admit or deny them; therefore, said allegations are denied.**

21.     Defendant Dr. Nunez is a physician at Dixon Correctional Center. At all relevant times, Dr. Nunez was employed by Defendant Wexford. He is sued in his individual capacity. Dr. Nunez personally provided psychological care to Anthony at Dixon in 2018. Along with Dr. Chess, Dr. Nunez was responsible for Anthony's psychiatric care and was aware that he needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Dr. Nunez had the power to seek appropriate treatment for Anthony, but did not do so.

> **ANSWER:** **Dr. Nunez admits that he was employed by Wexford Health Sources, Inc. in 2018. Dr. Nunez admits that he provided, or offered to provide, psychological care to plaintiff at Dixon Correctional Center between March and July 2018. Dr. Nunez further admits that plaintiff needed mental health treatment between March and July 2018. Dr. Nunez denies the remaining allegations contained in paragraph 21 of plaintiff's complaint.**

22.     Defendant Does 2-5 are sued herein by fictitious names for the reason that their true names are unknown to Plaintiff. These Doe defendants are administrators overseeing facilities where Anthony was held in solitary confinement, and who had a duty to provide inmates with a meaningful opportunity to challenge their solitary confinement placement. Despite their obligation to do so, the Doe defendants failed to provide such an opportunity to Anthony, prolonging his solitary confinement.

> **ANSWER:**     **Dr. Nunez makes no answer to the allegations contained in paragraph 22 of plaintiff's complaint because said allegations are not directed to him. To the extent the allegations in paragraph 22 of plaintiff's complaint are construed against Dr. Nunez, he lacks sufficient information to admit or deny them; therefore, said allegations are denied.**

## IV.    FACTS

23.    In 1994, while he was still a teenager, Anthony Gay was charged with robbery— the result of an incident in which he got in a fight with another teen who had insulted his sister, and the teen claimed Anthony had stolen the teen's hat and a $1 bill. He pleaded guilty, was given a suspended prison sentence, and was placed on probation.

> **ANSWER:**     **Dr. Nunez lacks sufficient information to admit or deny the allegations contained in paragraph 23 of plaintiff's complaint; therefore, said allegations are denied.**

24.    Later that year, while still on probation, Anthony was pulled over and found to be driving without a license. He was adjudicated as having violated his probation, and a few days before Christmas 1994, at the age of 20, Anthony checked himself into the IDOC to begin serving a seven-year sentence. With credit for good behavior, he was eligible for release in 3½ years.

> **ANSWER:**     **Dr. Nunez lacks sufficient information to admit or deny the allegations contained in paragraph 24 of plaintiff's complaint; therefore, said allegations are denied.**

25.    Anthony could not maintain good behavior, however. He suffers from mental illnesses, including borderline personality disorder. The illness manifested in prison, causing Anthony to act erratically and to break prison rules. As a result of these infractions he lost his time credit for good behavior.

> **ANSWER:**     **Dr. Nunez admits that plaintiff suffered from mental illness during the time Dr. Nunez was involved in plaintiff's care. Dr. Nunez denies**

the remaining allegations contained in paragraph 25 of plaintiff's complaint.

*By holding Anthony in prolonged solitary confinement, the Defendants tortured him.*

26.     In March 1998, as a result of his infractions, Anthony was placed in solitary confinement. He was confined to a cell roughly half the size of a parking space. He typically was not allowed outside the cell, even for meals, and his cell doors were constructed in a manner that made it virtually impossible to see outside. Anthony was sometimes let out of his cell for short periods of "exercise" in a small, confined space. Otherwise, he was confined to his cell and could not see, talk with, or interact with any other human being, even a guard. Between 1998 and 2018 Anthony was transferred among a series of similar small, stifling solitary confinement cells in the IDOC's Tamms, Dixon, Pontiac, Statesville, and Menard prisons. During this time period, Defendants conspired to ensure that Anthony was transferred from one solitary confinement cell to another, even when he was moved among prisons. He did not have sustained contact with another human being for twenty years.

> **ANSWER:**   **Dr. Nunez lacks sufficient information to admit or deny the allegations in paragraph 26 of plaintiff's complaint regarding events that occurred before March 2018; therefore, said allegations are denied. Dr. Nunez admits that plaintiff was transferred to Dixon Correctional Center in 2018. Dr. Nunez denies that the defendants conspired to transfer plaintiff from one solitary confinement cell to another. Dr. Nunez denies the remaining allegations contained in paragraph 26 of plaintiff's complaint.**

27.     It has long been recognized that the conditions of solitary confinement can both cause mental illness and be especially devastating to persons suffering from mental illness. Indeed several years before Anthony was placed in solitary confinement, one federal court observed that "placing [mentally ill prisoners in solitary confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe," *Madrid v. Gomez*, 889 F. Supp. 1146,

1265 (N.D. Cal. 1995), because such prisoners "are at a particularly high risk for suffering very serious or severe injury to their mental health, including overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions" in solitary confinement. Id. Federal courts around the country have recognized the same thing; the Court of Appeals for the Seventh Circuit has observed that the conditions of solitary confinement "aggravate[] the symptoms of [a prisoner's] mental illness and by doing so inflict[] severe physical and especially mental suffering," *Scarver v. Litscher*, 434 F.3d 972, 977 (7th Cir. 2006), and there is a "scientific consensus . . . that prisoners held in solitary confinement experience serious, often debilitating—even irreparable—mental and physical harm[] . . . ." *Wallace v. Baldwin*, 895 F.3d 481, 484-85 (7th Cir. 2018) (citation omitted)). That was abundantly true for Anthony: in layman's terms, placing him in solitary confinement caused him to lose his mind.

> **ANSWER:** **Dr. Nunez admits that the Court of Appeals for the Seventh Circuit's opinions in *Wallace* and *Scarver* contain the quoted phrases, absent plaintiff's modifications, referenced in paragraph 27 of plaintiff's complaint at law. Dr. Nunez further admits that the United States District Court for the Northern District of California's opinion in *Madrid* contain the quoted phrases, absent plaintiff's modifications, referenced in paragraph 27 of plaintiff's complaint. Dr. Nunez denies the remaining allegations contained in paragraph 27 of plaintiff's complaint.**

28.     The primary manifestation of Anthony's mental decompensation in solitary confinement was repeated, severe self-mutilation. He began to cut and re-cut wounds on his testicles, penis, neck, arms, legs, and groin. He cut open his scrotum, pierced it with paperclips, embedded it with cloth strips, a zipper, and staples. He castrated portions of his testicles. He cut his left inner thigh and tied it up with strips of blanket. He cut his penis repeatedly.

> **ANSWER:** **Dr. Nunez admits that plaintiff performed acts of self-mutilation while incarcerated. Dr. Nunez denies the remaining allegations in paragraph 28 of plaintiff's complaint.**

29.     This self-mutilation began shortly after Anthony was placed in solitary confinement in 1998. It lasted throughout Anthony's imprisonment in solitary confinement, and was sustained, continuous, and severe. This is a partial sampling of self-mutilation events between August 2016 and May 2018:

- August 2016: Anthony cuts his scrotum and bleeds severely on his cell floor, requiring evacuation to an outside hospital.

- October 28, 2016: Anthony cuts his arm, thigh, and scrotum and inserts five staples, two ink pen reservoirs, and a spoon into the wounds.

- November 4, 2016: Anthony cuts his arm, thigh, and scrotum. He puts a plastic fork, ink pen, piece of fingernail clippers, and three pieces of metal in his scrotum.

- November 10, 2016: Anthony cuts his arm and scrotum. He puts nails and mop thread in his scrotum.

- November 12, 2016: Anthony re-cuts his scrotum.

- November 15, 2016: Anthony cuts his scrotum and inserts foreign objects.

- March 1, 2017: Anthony cuts himself with two sharpened ink pens, and receives a disciplinary ticket for possessing contraband.

- June 8, 2017: Anthony cuts his leg and scrotum with pieces from a broken fan. He sews wire through his leg. He puts a fan motor through his leg. He puts foreign objects in his scrotum and stabs the fan guard through his scrotum.

- June 16, 2017: Anthony cuts his arm and inserts a spoon in the wound far enough to require surgical removal.

- February 3, 2018: Anthony cuts open his right thigh. Later, he reopens the cut and embeds the following inside: three spork handles, an ink pen, an ink pen tube, the top of a spork, metal, and staples. He also stabs an ink pen through his eyelids.

- February 20, 2018: Anthony cuts himself.

- March 2, 2018: Anthony cuts his thigh and stabs an ink pen through his eyelid.

- April 7, 2018: Anthony cuts himself again.

- April 15, 2018: Anthony cuts his scrotum and puts apple seeds in it.

- April 16, 2018: Anthony again cuts his scrotum and puts foreign objects inside.

- April 17, 2018: Anthony refuses medical treatment on his scrotum, and is put in restraints.

- April 19, 2018: Anthony cuts his scrotum again, and loses so much blood that he becomes unconscious

- May 27, 2018: Anthony puts a razor in his eye and cuts his scrotum.

The Defendants were well aware of the devastating impact solitary confinement has on persons suffering from mental illness, and they were well aware of its catastrophic impact on Anthony in particular. Indeed, the Defendants meticulously recorded Anthony's self-mutilation in his medical records.

**ANSWER:**    **Dr. Nunez lacks sufficient information to admit or deny the events alleged to have occurred before March 31, 2018; therefore, said allegations are denied. Dr. Nunez also lacks sufficient information to admit or deny the events alleged to have occurred on May 27, 2018; therefore, said allegations are denied. Dr. Nunez admits that plaintiff opened a wound on his forearm causing it to bleed on or about April 7, 2018. Dr. Nunez further admits that plaintiff cut his scrotum and inserted foreign objects in or about mid-April 2018. Dr. Nunez further admits that, in or about mid-April 2018, plaintiff refused medical treatment and suffered blood loss after cutting himself. Dr. Nunez denies the remaining allegations contained in paragraph 29 of plaintiff's complaint.**

30.    Nonetheless, the Defendants did little to help Anthony. Anthony was given psychotropic drugs off and on during his incarceration, but they did not stop his self-harm. And at different prisons, a counselor would sometimes shout questions at Anthony through his cell door. This "treatment" was essentially performative. The Defendants were well aware that it was solitary confinement that was driving Anthony insane, but throughout nearly his entire incarceration they did almost nothing to ameliorate it. Instead, the Defendants conspired to simply move him from one solitary confinement cell to another, among the IDOC's sprawling system of prisons.

**ANSWER:**    **Dr. Nunez denies the allegations contained in paragraph 30 of plaintiff's complaint.**

31.    Indeed, far from conceding what they knew—i.e., that Anthony's solitary confinement had driven him insane—Anthony was prosecuted vigorously for manifestations of his mental illness. In addition to self-harming, Anthony's mental illness caused him to lash out at others by throwing his own body fluids through the heavy steel door of his isolation cell. This

was a well-recognized symptom of mental illness, which was being compounded and worsened by Anthony's inability to withstand the conditions of isolated confinement. Instead of treating his mental illness, prison officials began referring each such act to the local prosecutor so that Anthony would be charged criminally for the outbursts. The resulting prosecutions were entirely unnecessary and had little purpose beyond ensuring that Anthony would continue to suffer in solitary confinement well beyond his original release date. As a judge who presided over one of these prosecutions remarked, "I would think a $2.00 piece of plastic draping [in front of Anthony's cell] would have prevented all of" the incidents.

> **ANSWER:** **Dr. Nunez lacks sufficient information to admit or deny the allegations contained in paragraph 31 of plaintiff's complaint regarding the actions of prison officials, the criminal prosecutions, and comments of the judge; therefore, said allegations are denied. Dr. Nunez denies the remaining allegations contained in paragraph 31 of plaintiff's complaint.**

32.     The criminal convictions Anthony received for actions caused by his mental illness added another 92 years to Anthony's original seven-year sentence. In addition, Anthony had racked up more than 150 years of "solitary time" meted out by IDOC as a result of his disciplinary infractions – meaning he could serve time until the year 2152 without ever leaving solitary. In short, Anthony was destined to serve the rest of his natural life in solitary confinement.

> **ANSWER:** **Dr. Nunez lacks sufficient information to admit or deny the allegations contained in paragraph 32 of plaintiff's complaint; therefore, said allegations are denied.**

33.     Eventually, criminal attorneys who took up Anthony's cause were able to file a habeas petition and ultimately succeed in shortening Anthony's sentence. Even so, Anthony was not released from the IDOC until August 27, 2018. By that point, he had spent 24 years in prison, enduring the last 20 consecutive years in the isolating torture of solitary confinement.

**ANSWER:** **Dr. Nunez lacks sufficient information to admit or deny the allegations contained in paragraph 33 of plaintiff's complaint; therefore, said allegations are denied.**

*The Defendants could have stopped Anthony's torture at any time*

34.     It is universally recognized that isolation and solitary confinement for any significant period of time is likely to make a person suffering from mental illness even worse, creating a substantial and increased risk of harm to the patient. It is also well known that the impact of solitary confinement is cumulative, in that it causes more damage to a person's mind over time—and that these cumulative impacts can themselves cause mental illness. For this reason, leading correctional standard-setting bodies provide specifically that such confinement should not occur. For example, the National Commission on Correctional Health Care Standards for Mental Health Services in Correctional Facilities states that "[i]nmates who are seriously mentally ill should not be confined under conditions of extreme isolation." The American Correctional Association has concluded that seriously mentally ill prisoners such as Anthony should not be placed in solitary confinement for more than 30 days. The Association of State Correctional Administrators "believe[s] that lengthy stays [in solitary confinement] manufacture or increase mental illness." And the American Bar Association Treatment of Prisoner Standards similarly advises that "[p]risoners diagnosed with serious mental illness should not be housed in settings that exacerbate their mental illness or suicide risk, particularly in settings involving sensory deprivation or isolation."

**ANSWER:** **Dr. Nunez lacks sufficient information to admit or deny the allegations in paragraph 34 of plaintiff's complaint.**

35.     Early on in Anthony's confinement, prison medical staff examined him and confirmed that he suffered from an acute mental health crisis and was at severe risk of self-harm. And years before his eventual release, Anthony was identified by the State of Illinois in court

- 19 -

papers as one of only a few dozen prisoners within the entire IDOC whose mental illnesses were so acute and dangerous that they required full inpatient mental healthcare.

> **ANSWER:** **Dr. Nunez lacks sufficient information to admit or deny the allegations in paragraph 35 of plaintiff's complaint; therefore, said allegations are denied.**

36. There are no facilities or services within the IDOC for providing such care. But that should not have prevented Anthony from receiving the care he needed. The Defendants were capable of ensuring that Anthony received appropriate mental healthcare outside the IDOC. Nevertheless, they failed to do so:

(a) State law empowers the director of the IDOC to have a prisoner needing intensive psychiatric care to be transferred to the custody of the IDHS during the prisoner's sentence. See 730 ILCS 5/3-8-5. And the IDHS operates multiple mental health centers for treating such people. Defendants Baldwin, Sims, Reister, Dr. Doe 1, Hinton, Butler, Renzi, Puga, Nunez, and Chess were personally aware that there were a handful of IDOC prisoners, which included Anthony, who could not receive appropriate psychiatric care within the IDOC and therefore should have been transferred to the custody of the IDHS. Attorneys representing Defendant Baldwin and the IDOC admitted as much during a court hearing in *Rasho v. Baldwin*, 07-cv-1298 (C.D. Ill. (Mihm, J.)), an ongoing injunctive class action against Defendant Baldwin concerning the care of mentally ill prisoners within the IDOC. Despite this knowledge, however, no Defendant tried to have Anthony transferred to an IDHS facility before the completion of his sentence. As a result, Anthony unnecessarily endured years of solitary confinement without adequate mental health treatment, and continued to mutilate himself.

(b)     Defendants Butler, Renzi, Puga, Nunez, and Chess, who provided care for Anthony, knew about his acute mental health condition, and knew that he needed inpatient psychiatric care that was not offered by the IDOC. They could have sought Anthony's referral to an inpatient psychiatric facility through the "collegial review" process operated by Wexford, their employer. They did not do so, however.

(c)     Defendant Wexford was capable of providing Anthony with the treatment he needed, or having him transferred out of IDOC facilities for inpatient mental health treatment. Wexford was and is under contract with the State of Illinois to provide both medical and mental health care to all prisoners within the IDOC. This included the provision of "[c]omprehensive and specialized mental health services" for IDOC prisoners, including off-site and hospitalization services as necessary to treat the medical and mental health needs of the IDOC's prisoners. (Indeed, pursuant to this contract Wexford arranges every day for IDOC prisoners suffering from injuries and "physical" illnesses, like cancer, to be transported outside of IDOC prisons to medical facilities where they can receive the medical care they need.) Wexford also employed doctors and mental health professionals to assess the mental condition of IDOC prisoners. Its employees and agents examined Anthony and concluded that he was suffering from acute mental distress that required intensive care. By policy and practice, however, Wexford had never developed such a hospitalization capacity within the IDOC's facilities, so this meant that Anthony required off-site hospitalization. On information and belief, Wexford also had a policy and practice of ignoring its obligation to provide such off-site hospitalization for seriously mentally ill prisoners, and did not seek to transfer any prisoners—including Anthony—for the off-site mental healthcare that they needed. As a

result of this policy and practice, Anthony remained in solitary confinement in a crisis

cell, suffering the injuries described herein.

> **ANSWER:**   **Dr. Nunez denies the allegations contained in paragraph 36 of plaintiff's complaint, including subparagraphs (a) through (c).**

37.     Even short of providing Anthony with the care he needed, the Defendants could

simply have let Anthony out of his solitary confinement cell to interact with other people. This

they finally did, but only in the last few weeks of Anthony's incarceration, in 2018 at Dixon

Correctional Center. Not surprisingly, during even that short time, Anthony's mental health

improved dramatically.

> **ANSWER:**   **Dr. Nunez denies that he could let plaintiff out of his solitary confinement cell. Dr. Nunez admits that plaintiff was permitted out of his solitary confinement cell during his incarceration at Dixon Correctional Center in 2018 and that he showed improvement in his mental health. Dr. Nunez denies the remaining allegations contained in paragraph 37 of plaintiff's complaint.**

38.     For two decades, the Defendants knew that solitary confinement both causes and

exacerbates mental illness. They knew that allowing Anthony to be placed in solitary

confinement for any meaningful length of time was toxic to his mental health and would cause

him to suffer both mental anguish and—when he harmed himself as a result of that anguish—

intense physical pain. They also had the ability to prevent him from further harm by removing

him from solitary and to secure appropriate treatment for his acute and devastating mental

condition. But even though they knew Anthony would be devastated by solitary confinement,

and even though they could have treated him appropriately, the Defendants allowed him to

remain in solitary confinement anyway.

> **ANSWER:**   **Dr. Nunez denies the allegations contained in paragraph 38 of plaintiff's complaint.**

39.     In effect, confronted with a prisoner whose mental illness made him hard to deal with, the Defendants chose to address the problem by keeping Anthony in a penal tomb—even though they knew that to do so was to inflict torture on him, for years on end.

**ANSWER:    Dr. Nunez denies the allegations contained in paragraph 39 of plaintiff's complaint.**

## COUNT I:  Eighth Amendment

**Against: Baldwin (individual capacity), Sims (individual capacity), Reister (individual capacity); Dr. Doe 1 (individual capacity); Hinton (individual capacity), Butler (individual capacity), Renzi (individual capacity), Puga (individual capacity), Nunez (individual capacity), Chess (individual capacity), and Wexford**

40.     Each paragraph of this complaint is incorporated as if fully restated here.

**ANSWER:    Dr. Nunez incorporates his answers to each paragraph of plaintiff's complaint as his answer to paragraph 40 of plaintiff's complaint.**

41.     Anthony suffered from severe mental illnesses that were serious medical conditions and placed him at serious risk of harm and in need of intense medical treatment.

**ANSWER:    Dr. Nunez admits that plaintiff suffered from mental illness during the time of Dr. Nunez's involvement in plaintiff's care. Dr. Nunez denies the remaining allegations contained in paragraph 41 of plaintiff's complaint.**

42.     By holding Anthony in solitary confinement for years on end, Defendants caused or aggravated his mental illness.

**ANSWER:    Dr. Nunez denies the allegations contained in paragraph 42 of plaintiff's complaint.**

43.     The Defendants knew that Anthony's serious medical needs were not being treated within IDOC's facilities, and that the isolation of solitary confinement would exacerbate his condition and cause him further damage over time.

**ANSWER:    Dr. Nunez denies the allegations contained in paragraph 43 of plaintiff's complaint.**

44.     Despite what they knew, the Defendants failed to transfer Anthony out of IDOC to a facility where he could receive care for his serious mental health condition. Nor did they ameliorate the conditions of his confinement in prison, or provide him with effective treatment. Instead, they allowed him to remain isolated in solitary confinement.

**ANSWER:     Dr. Nunez denies the allegations contained in paragraph 44 of plaintiff's complaint.**

45.     Defendants conspired to keep Anthony in solitary confinement in institutions throughout the IDOC.

**ANSWER:     Dr. Nunez denies the allegations contained in paragraph 45 of plaintiff's complaint.**

46.     In so doing, the Defendants were deliberately indifferent to Anthony's serious medical needs.

**ANSWER:     Dr. Nunez denies the allegations contained in paragraph 46 of plaintiff's complaint.**

47.     As a result of the Defendants' failure to secure proper treatment for Anthony and their decision that he instead be consigned to solitary confinement, Anthony suffered physical and psychological injuries, severe pain, and acute mental anguish.

**ANSWER:     Dr. Nunez denies the allegations contained in paragraph 47 of plaintiff's complaint.**

48.     Defendants' consignment of Anthony in solitary confinement constituted the infliction of cruel and unusual punishment in violation of the Eighth Amendment.

**ANSWER:     Dr. Nunez denies the allegations contained in paragraph 48 of plaintiff's complaint.**

49.     Defendants' deliberate indifference to Anthony's medical needs violated his rights to be free from cruel and unusual punishment under the Eighth Amendment.

**ANSWER:** **Dr. Nunez denies the allegations contained in paragraph 49 of plaintiff's complaint.**

50.     As a direct and proximate result of Defendants' actions, Anthony suffered the mental and physical injuries described herein.

**ANSWER:** **Dr. Nunez denies the allegations contained in paragraph 50 of plaintiff's complaint.**

### COUNT II: Americans with Disabilities Act

### Against: The State of Illinois, Baldwin (official capacity)

Dr. Nunez makes no answer to the allegations contained in Count II of plaintiff's complaint because Count II does not pertain to Dr. Nunez. To the extent that the allegations in Count II of plaintiff's complaint are construed against Dr. Nunez, said allegations are denied.

### COUNT III: Rehabilitation Act of 1973

### Against: The State of Illinois and Baldwin (official capacity)

Dr. Nunez makes no answer to the allegations contained in Count III of plaintiff's complaint because Count III does not pertain to Dr. Nunez. To the extent that the allegations in Count III of plaintiff's complaint are construed against Dr. Nunez, said allegations are denied.

### COUNT IV: Fourteenth Amendment
### (Defendant Does 2-5)

Dr. Nunez makes no answer to the allegations contained in Count IV of plaintiff's complaint because Count IV does not pertain to Dr. Nunez. To the extent that the allegations in Count IV of plaintiff's complaint are construed against Dr. Nunez, said allegations are denied.

### V.     RELIEF REQUESTED

WHEREFORE, Plaintiff Anthony Gay respectfully requests judgment against Defendants, jointly and severally, for the following:

A.     An award of compensatory, punitive, and nominal damages;

B.   An award of full costs and attorneys' fees arising out of this litigation pursuant to

42 U.S.C. § 1988(b), the ADA, and the RA; and

C.   Any and other further relief this Court may deem just and appropriate.

**ANSWER:** **Dr. Nunez denies that plaintiff is entitled to judgment in any sum whatsoever and that he is entitled to recover the elements of damages set forth in Section V subparagraphs (a) through (c).**

WHEREFORE, defendant, DR. PEIRRE NUNEZ, prays for the entry of judgment in his favor, with costs assessed against the plaintiff.

## JURY DEMAND

Dr. Nunez demands a trial by jury.

DONOHUE BROWN MATHEWSON & SMYTH LLC


By:   /s/Stetson F. Atwood
Stetson F. Atwood


DONOHUE BROWN MATHEWSON & SMYTH LLC
Stetson F. Atwood
Laura Coffey Ieremia
140 South Dearborn Street, Suite 800
Chicago, IL  60603
(312) 422-0900
atwood@dbmslaw.com
ieremia@dbmslaw.com

## <u>NOTICE OF FILING AND CERTIFICATE OF SERVICE</u>

I hereby certify that on February 15, 2019, I electronically filed the foregoing Answer to Complaint of Dr. Pierre Nunez with the Clerk of the United States District Court for the Northern District of Illinois by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/Stetson F. Atwood
DONOHUE BROWN MATHEWSON & SMYTH LLC
Stetson F. Atwood (ARDC # 06224408)
Laura Coffey Ieremia (ARDC # 06317075)
140 South Dearborn Street, Suite 800
Chicago, IL  60603
(312) 422-0900
atwood@dbmslaw.com
ieremia@dbmslaw.com
