IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY GAY, | )<br>)<br>) |
| Plaintiff, | )<br>) Case No. 1:18-cv-07196 |
| v. | )<br>) Hon. Sara L. Ellis |
| THE STATE OF ILLINOIS, *et al.*, | )<br>)<br>) |
| Defendants. | )<br>) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
CERTAIN DEFENDANTS' MOTION TO DISMISS**

Plaintiff Anthony Gay here responds in opposition to the motion to dismiss filed by defendants State of Illinois, John Baldwin, Jeff Sim, Shane Reister, Melvin Hinton, Sylvia Butler, and Jamie Chess (collectively "Defendants") (ECF 37), which seeks to dismiss Plaintiff's claims brought against them under the Eighth Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA").

## INTRODUCTION

Defendants makes three basic arguments.  ***First***, the individual defendants assert that as IDOC administrators they are not liable under the Eighth Amendment because they cannot be expected to know about the conditions of a particular inmate.  But the Complaint charges that the conditions that caused Plaintiff's injuries were systemic, and it is well established that administrators can be presumed to know about systemic deficiencies.  ***Second***, Defendants argue that Plaintiff's ADA and RA claims are not viable because it was his own misconduct that landed him in solitary confinement.  This amounts to a claim that Defendants were not required to make even reasonable accommodations for Plaintiff's mental illness in deciding to place him in solitary confinement, in setting the conditions of that confinement, or deciding when he should

1

be released from that confinement. Yet it is axiomatic that the ADA and RA require such accommodations, and Plaintiff's charge is that Defendants failed to make them. ***Third*** and finally, Defendants argue that even though Plaintiff's solitary confinement spanned two decades, the statute of limitations cuts off all but the last two years of his claim. But this argument requires Defendants to ignore the two controlling Seventh Circuit cases on the subject, including one specifically holding that claims arising from wrongful extended confinement in a small prison cell are continuing violations that do not accrue until such confinement ends.

Defendants' motion, in short, fails in all respects. The Complaint pleads facts which plausibly suggest that for twenty years the Defendants subjected Plaintiff to cruel and unusual punishment and that they violated his rights as a disabled person—with horrific results. The Court should deny Defendants' motion and allow Plaintiff to show that these allegations are true.

## STANDARD OF REVIEW

Under the federal notice pleading system a complaint need only assert a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This requirement is satisfied if the complaint (1) describes the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests and (2) plausibly suggests that the plaintiff has a right to relief. *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

**I.      Plaintiff states an Eighth Amendment claim for cruel and unusual punishment.**

    **A.      Prison administrators are presumed to know about systemic conditions.**

The individual defendants—Director Baldwin in his individual capacity, along with defendants Reister, Hinton, Butler, and Cross—move to dismiss Plaintiff's Eighth Amendment

2

claim against them on grounds that the Complaint does not sufficiently allege their personal involvement in or knowledge of the conditions of Plaintiff's confinement. All these defendants are supervisors of one stripe or another (*see* ECF 1 ¶¶ 11, 13-14, 16-18), and in their motion they argue that, as supervisors, they cannot be presumed to have known about the conditions of Plaintiff's incarceration. (*See* ECF 37 at 3-6.)

This argument ignores the relevant law of Section 1983 liability. While the individual defendants point to case law holding that wardens and similar supervisors cannot be presumed to know about an individual prisoner's plight, the Complaint alleges that Plaintiff's are the result of ***systemic*** deficiencies, not idiosyncratic problems that affected him alone. And the case law is clear that "[a]t the motion to dismiss stage," the personal knowledge and involvement of senior prison officials "can be inferred . . . where . . . the plaintiff alleges potentially systemic, as opposed to clearly localized, constitutional violations." *Smith v. Dart*, 803 F.3d 304, 310 n.2 (7th Cir. 2015) (quotations omitted). *See also Perkins v. Williams*, No. 15-cv-6186, 2018 WL 453743, at *3 (N.D. Ill. Jan. 17, 2018) ("[A] jury may infer that senior prison officials are aware of 'systemic, as opposed to localized,' conditions." (quoting *Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1999) (supervisors "can be expected to know of or participate in creating systemic, as opposed to localized, situations.")))·

In turn, conditions are considered to be systemic "when they are unlikely to affect only one inmate in isolation . . . ." *Richard v. Baldwin*, No. 17-cv-4677, 2018 WL 6606037, at *4 (N.D. Ill. Dec. 17, 2018) (quotation omitted). The Complaint satisfies this standard. Plaintiff alleges that the State has identified him as one of a number of other inmates who needed full inpatient hospitalization, but that the IDOC has no facilities that provide such care. (*See* ECF 1 ¶ 35.) Indeed, as the Complaint recites, Director Baldwin himself has been involved in the *Rasho* case, an injunctive class action challenging systemic deficiencies within the IDOC going to the

solitary confinement of mentally-ill prisoners like Plaintiff; and in that case the State *conceded* that the IDOC lacked appropriate facilities for such inmates. (*See id.* ¶ 36(a).) In other words, the conditions giving rise to Plaintiff's claims did not affect just him alone, but rather affected a number of other inmates as well. His claims are therefore potentially systemic, and the Court may infer the individual defendants' knowledge of and involvement in creating them.[1]

      **B.**      **Plaintiff has sufficiently alleged that the individual defendants knew about the impact of solitary confinement on persons with mental illness.**

Plaintiff's Eighth Amendment claim charges both that the conditions of his confinement deprived him of basic human needs, and that Defendants were deliberately indifferent to his serious medical needs. The individual defendants further try to dismiss those charges by arguing that prison administrators cannot be presumed to know that the conditions of solitary confinement were dangerous for persons with mental illness. (*See* ECF 37 at 4.)

To the contrary: given what the Complaint alleges, no person charged with administering a prison system could be unaware that solitary confinement is harmful, particularly to those suffering from mental illness. Noting that "[i]t has long been recognized that the conditions of solitary confinement can both cause mental illness and be especially devastating to persons suffering from mental illness," (ECF 1 ¶ 27), the Complaint cites not only federal court decisions to that effect (*id.*), but also authoritative correctional industry standards directed specifically to the danger of placing mentally ill people in solitary confinement. (*Id.* ¶ 34.) Certainly those allegations are enough to permit the inference that administrators of one of the nation's largest prison systems were aware that placing mentally ill people in solitary confinement for extended periods was harmful to them.

---

[1] On the specific facts of this case, moreover, it is not unreasonable to expect that even supervisors would be personally, "non-systemically" aware of a prisoner who had engaged in the sustained, horrific course of self-mutilation that is described in the Complaint.

For this reason too, it is a nonstarter for Defendants to argue that prison administrators could simply relegate the matter of Plaintiff's solitary confinement to the prison's medical staff. (*See* ECF 37 at 4.)  For one thing, of course, solitary confinement is not a form of medical care, but rather a form of discipline.  More to the point, it is well established that prison officials are deliberately indifferent to a prisoner's serious medical needs if they have reason to know that those needs are not being met.  "The operative question is whether the non-medical defendants had any duty to do more than they did, in light of their knowledge of the situation." *Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1013 (N.D. Ill. 2015) (quotation omitted).  Here, the Complaint explains the common understanding that solitary confinement is exceptionally harmful to persons with mental illness (*supra*); and it alleges that the IDOC acknowledged at the highest levels that Plaintiff's serious medical needs (along with those of other mentally ill prisoners in solitary confinement) were not being met.  (*See* ECF 1 ¶ 36(a) (attorneys representing Baldwin conceded that IDOC lacks facilities for providing inpatient mental health care to group of acutely mentally ill prisoners, which included Plaintiff).)

The reality is that despite what they knew, Defendants simply chose to continue their practice of holding mentally ill prisoners in solitary confinement, including Plaintiff.  The Complaint sufficiently alleges the individual defendants' personal liability for the cruel and unusual punishment inflicted on him.

## II.    The Complaint sufficiently alleges ADA and RA claims.

Defendants also argue that Plaintiff has not sufficiently alleged violations of the ADA or RA.  (ECF 37 at 6-10.)  Again their argument fails.

To establish discrimination under the ADA and RA, Plaintiff must show that (1) he suffered from a disability, (2) he was "otherwise qualified" to participate in the program or service in question, and (3) he was denied participation, by reason of his disability. *Jaros v.*

*Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). **First**, Defendants note that persons are only "otherwise qualified" if they are able to meet a program's requirements "in spite of" the handicap, and argue that Plaintiff is not "otherwise qualified" because ***without*** his mental illness (and thus his disability), "he would not have been eligible for inpatient psychiatric treatment or any other mental health treatment." (ECF 37 at 8.) This circular argument is hard to follow, but no matter: it ignores the Complaint's allegations. Mental health care is medical treatment, and the Complaint charges that Defendants failed to provide such treatment even though they "have and do make arrangements for other prisoners, who require hospitalization outside of the IDOC because of physical injuries or illnesses, to receive such outside hospitalization, or to receive effective care within the IDOC." (ECF 1 ¶ 62.) That allegation states a discrimination claim under the ADA and RA. *See Andrews v. Rauner*, No. 3:18-cv-1101, 2018 WL 3748401, at *5 (C.D. Ill. Aug. 6, 2018) ("In this case, Plaintiff alleges that the State Defendants discriminated against [the disabled prisoner] by denying her access to hospitalization outside of the prison but allowed prisoners with physical injuries or illnesses to receive outside hospitalization. . . . This is sufficient to state a claim under the ADA and the Rehabilitation Act.").

Furthermore, Plaintiff alleges that mental health treatment is also an *accommodation*, since it would have allowed him to benefit from *other* programs and services:

> Due to the failure of Defendants to provide Anthony with the reasonable accommodation of inpatient intensive psychiatric treatment, Anthony was deprived of access to services, programs, and activities, including education, programming, recreation, exercise, human interaction, and mental health treatment and services.

(ECF 1 ¶ 64.) Defendants do not contest that providing Plaintiff with adequate mental health treatment would have been reasonable, and Plaintiff sufficiently alleges that such treatment would have allowed him to take advantage of other programming. Dismissal fails.

6

***Second***, Defendants argue that Plaintiff's ADA and RA claims fail because he was placed in solitary confinement, and subject the conditions there, as the result of his own disciplinary infractions. (*See* ECF 37 at 7-10.) This argument requires Defendants to misconstrue Plaintiff's ADA and RA claims—which they do quite literally.

The ADA and RA offer three different avenues by which plaintiffs can establish that they were denied access to a program or service by reason of their disability: (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable accommodation, ***or*** (3) the defendant's rule disproportionally impacts disabled people. *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999). In their motion, Defendants announce that they are "constru[ing]" Plaintiff's claims under the third prong—disproportionate impact—and then cite a series of ADA decisions in which courts upheld terminations of employees for misconduct on the job that was allegedly caused by the employee's disabilities. (*See* ECF 37 at 9-10.) Since those employees were held accountable for their disability-related misconduct, Defendants argue, Plaintiff should be as well, since his solitary confinement was merely the prison's way of holding him accountable for *his* misconduct. (*Id.* at 10.) In other words, the fact that the prison's rules happened to have a disparate impact on Plaintiff because of his own misbehavior does not amount to an ADA claim.

The problem with this argument is that Plaintiff explains, over and over again, that the Complaint asserts ADA and RA claims under the ***second*** theory identified in *Washington*: failure to provide reasonable accommodation of Plaintiff's disabilities. (*See* ECF 1 ¶¶ 58-66.) "A claim of discrimination based on a failure reasonably to accommodate is distinct from a claim of discrimination based on disparate impact." *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (quotation omitted). And under a failure-to-accommodate analysis, Defendants' "misconduct" argument is fatal to their motion.

7

The conceit of the "misconduct" argument is that Defendants treated Plaintiff like any other inmate: he broke prison rules that are neutrally applied, and in response Defendants sanctioned him in proportion to that misconduct, just like they would any other prisoner. In Plaintiff's case—because of the nature of his misconduct—this resulted in decades of solitary confinement.

That position "misses the point of a reasonable accommodation claim." *Id*. "[T]he crux of a reasonable accommodation claim is a facially neutral requirement that is consistently enforced," which ***thereby*** deprives a disabled person from the provision of programs and services. *Id*. (quotation omitted). Indeed multiple courts have stated that a failure to accommodate disabled inmates in administering discipline can be a Title II violation. *See, e.g.*, *Biselli v. Cty. of Ventura*, No. 09-cv-8694, (ECF 119), 2012 U.S. Dist. Lexis 79326, at **44-45 (C.D. Cal June 4, 2012) (placement in administrative segregation based on conduct specifically linked to mental illness, without input from mental health staff, may constitute a violation of the ADA); *Scherer v. Pennsylvania Dep't of Corr.*, No. 2004-cv-191, 2007 WL 4111412, at *44 (W.D. Pa. Nov. 16, 2007) (because the misconduct that resulted in his placement in segregation may have been "a result of his mental illness. . . . the lack of modification of [prison's] disciplinary procedures to account for . . . his mental illness . . . possibly resulted in a violation of Title II of the ADA . . . ."). In short, the "misconduct" argument fails on its own terms.[2]

---

[2] Defendants make a version of the "misconduct" argument earlier in their brief, claiming that Plaintiff was not "otherwise qualified" to participate in prison programs and services because he was in disciplinary segregation as a result of his own actions. (*See* ECF 37 at 8). But such arguments are really the other "side[] of a single coin; the ultimate question is the extent to which a [covered entity] is required to make reasonable modifications in its programs for the needs of the handicapped." *Alexander v. Choate*, 469 U.S. 287, 300 n. 19 (1985). Thus "[t]he appropriate focus . . . is not whether [plaintiff] is "otherwise qualified" for [the service at issue], but the extent to which the defendants are required by the [ADA and RA] to modify their programs" to accommodate his disability. *Doe v. Pfrommer*, 148 F.3d 73, 83 (2d Cir. 1998)

8

The Complaint, however, is not just about Defendants' immediate disciplinary choices. Plaintiff asserts a broader challenge to his extended placement in solitary confinement with no accommodation of his disabilities. As the Complaint explains, extended solitary confinement is especially devastating to people with mental illness, and Plaintiff's solitary confinement both compounded and worsened his mental illness. (*See* ECF 1 ¶¶ 27-32.) Adequate time out of a segregation cell, along with other ameliorations of the conditions of solitary confinement, is an accommodation that was necessary in light of Plaintiff's mental illness. It would have allowed Plaintiff to avoid symptoms so extreme that he was rendered unable to participate in any aspect of prison life, including to be able to get out of solitary confinement and to avoid further misconduct that resulted in yet more segregation

Such accommodations are like any other accommodation to people with disabilities that provide modifications needed for the person to participate in programs, services, and activities offered by the entity—in prison those being things like recreational, medical, educational, and vocational prison programs, as well as the opportunity for contact with other humans. *See, e.g., Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998). Under the ADA, such accommodations for a prisoner with mental illness are analogous to providing interpretive services for a deaf person, a magnifier or reader for a person with low vision, or a wheelchair so that a paraplegic person can leave his cell to attend chapel.

In Plaintiff's case, the accommodations were necessary to allow him to remain free enough from delusion, depression, and self-harm in order to participate in the limited programs or services that are available in solitary confinement, such as yard, showers and treatment

---

(citing *Alexander*). *Accord Washington*, 181 F.3d at 847 (same, quoting *Alexander*). And Plaintiff has alleged he was not afforded reasonable accommodation for his disability.

participation. They also would have helped him to avoid decompensation while in solitary confinement, so that in time he could be released and return to the programming available in general population—rather than compound his mental illness, leading to further violations of prison rules, leading to yet more time in solitary confinement.

The question that remains is whether Plaintiff has sufficiently alleged that such accommodations were "reasonable." He has. As the Complaint explains, Defendants finally provided Plaintiff with such accommodations in the last few weeks of his imprisonment, at Dixon CC, and he improved dramatically during this time. (ECF 1 ¶ 37.) Thus, the allegations of the complaint plainly show that accommodating Plaintiff's disability was feasible. Certainly this is enough to permit the inference that it would have been reasonable for Defendants to offer Plaintiff this accommodation years before, avoiding the damages described in the Complaint. The Complaint alleges facts stating claims under the ADA and RA.

**III.     Plaintiff's claims accrued when Defendants released him from solitary confinement.**

Finally, citing the two-year statute of limitations applicable to Section 1983 claims, Defendants seek dismissal of Plaintiff's claims to the extent they arise out of anything occurring before October 28, 2016, two years before he filed this suit. (ECF 37 at 10.) But these statute of limitation arguments require Defendants to ignore the two leading Seventh Circuit decisions on the subject—*Heard v. Sheahan*, 253 F.3d 316 (7th Cir. 2001), and *Turley v. Rednour*, 729 F.3d 645 (7th Cir. 2013)—both of which foreclose their arguments.

Defendants first characterize Plaintiff's claim as one of "continuing effects from a particular improper act," and note that such "continuing effects" claims do not toll the statute of limitations. (ECF 37 at 11; 10-12.) They cite *Love v. Cook County*, 82 F. Supp. 2d 911 (N.D. Ill. 2000) for the proposition that extended solitary confinement may be analyzed as a "continuing effect." This argument ignores the first Seventh Circuit decision, *Heard v. Sheahan*,

which articulated the "continuing violation" rule of accrual. Plaintiff's claims do not arise solely from a single, long-ago act that affects him to this day; rather, they arise from Defendants' continuing imposition of solitary confinement on Plaintiff, and the continuing failure to render him appropriate care and accommodations, despite the obvious damage which that confinement was causing him. This aligns his claims with *Heard*'s continuing violation rule.

In *Heard*, a plaintiff-prisoner had been suffering from a hernia that jail doctors ignored for years; the district court held that the statute should begin to run when the plaintiff realized he had a medical problem that required attention. *Id.* at 317. That was wrong, the Court of Appeals explained:

> the suit charges that the defendants inflicted cruel and unusual punishment on the plaintiff by refusing to treat his condition. This refusal continued for as long as the defendants had the power to do something about his condition, which is to say until he left the jail. Every day that they prolonged his agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew.

*Id.* at 318. *Heard* went on to distinguish between claims arising from the effects of a single event and those based on a continuing course of misconduct. It explained that "[w]hen a single event gives rise to continuing injuries, the plaintiff can bring a single suit based on an estimation of his total injuries . . . ." *Id.* at 319 (citation omitted). "But in this case every day that the defendants ignored the plaintiff's request for [hernia] treatment increased his pain." *Id.* Requiring a plaintiff subject to such continuing violations of his rights to bring separate suits every two years would not only be "unreasonable," it would force "courts to entertain an indefinite number of suits and apportion damages among them." *Id.* at 320. That aptly describes the events giving rise to Plaintiff's claims; indeed what Defendants effectively propose is that Plaintiff should have filed no less than 10 separate lawsuits over the course of his solitary confinement. *Heard* teaches that such an absurd imposition is not the law.

11

Not surprisingly, *Heard* overrules *Love v. Cook County*, the "continuing effects" case cited by Defendants. *Love* was decided in 2000, before *Heard*. Since then, *Heard*'s "continuing violation" doctrine has been understood to modify the authority upon which *Love* relied. *Love* drew the "continuing effects" rule from *Wilson v Giesen*, 956 F.2d 738 (7th Cir. 1992), but *Heard* is understood to modify *Wilson*. *See, e.g.*, *Pedrote-Salinas v. Johnson*, No. 17-cv-5093, 2018 WL 2320934, at *3 (N.D. Ill. May 22, 2018) ("Generally, a civil rights claim accrues when the plaintiff knows or has reason to know of the injury giving rise to his claim. *Wilson []*. However, 'when the violation of the plaintiff's constitutional rights is a continuing one, the statute of limitations does not start to run any earlier than the last day of the ongoing injury.' *[] Heard []*"). *Love* does not supply the rule of decision for this case. Under *Heard*, Plaintiff states a continuing violation claim.

Furthermore, the Complaint specifically alleges that the damages imposed by solitary confinement was cumulative, because the **length** of time Plaintiff spent in solitary made his injuries worse. (*See, e.g.*, ECF 1 ¶ 34.) That charge is well founded. *See, e.g.*, *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017) ("[T]he deprivations of protracted solitary confinement so exceed the typical deprivations of imprisonment as to be the kind of atypical, significant deprivation which can create a liberty interest." (quotation and ellipses omitted)). *Accord Braggs v. Dunn*, No. 2:14-cv-601, 2019 WL 539050, at *2 (M.D. Ala. Feb. 11, 2019) (noting the "robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement" (internal quotation omitted)). The Seventh Circuit has recognized that the statute of limitations begins running upon the conclusion of such cumulative impact—and indeed, it did so specifically with respect to restrictive confinement akin to solitary confinement.

In *Turley v. Rednour*, 729 F.3d 645 (7th Cir. 2013) the plaintiff, an IDOC prisoner, alleged that his prison repeatedly imposed lockdowns that confined him "in a small cell" for extended periods, causing him to suffer physical ailments and extreme stress. *Turley*, 729 F.3d at 648. As Defendants do here, the *Turley* defendants argued that the prisoner's claims going back more than two years were barred by the statute of limitations. *Id.* at 651. The court disagreed. Citing *Heard*, it explained:

> The nature of Turley's allegations [is] that prison officials repeatedly and regularly imposed lockdown for improper purposes, and with each continuing day and period of lockdown, Turley's injuries increased. The statute of limitations began running from the last date of lockdown, or last day confined to the tiny cell, and consequently, Turley is well within the two-year statute of limitations.

*Id.* at 651. This passage might as well describe Plaintiff's claims.

For their part, Defendants—essentially conceding that the "continuing effects" rule from *Love* does not apply to this case—do not actually dispute that Plaintiff's allegations state a "continuing violation." Instead, they argue that the "continuing violation" doctrine might not exist at all in light of two Supreme Court's decisions, *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 625 (2007) and *National Passenger Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). (ECF 37 at 12.) In their brief Defendants review *Ledbetter* and *Morgan*, and argue that the two decisions suggest that the "continuing violation" doctrine no longer exists—even where injuries are cumulative. (ECF 37 at 14.)

What would the Seventh Circuit think of this argument? Defendants say that "the Seventh Circuit has not specifically addressed the issue" of whether the continuing violation doctrine exists post-*Ledbetter* and *Morgan*, but that "the Tenth Circuit has consistently held that the continuing violation exception does not apply to segregation or solitary confinement." (*Id.*) That argument is remarkable. *Turley*, which Plaintiff reviewed above, was decided in 2013— years after both *Ledbetter* and *Morgan*. *Turley* specifically concerned allegations of extended

13

confinement in a small cell—a claim functionally indistinguishable from Plaintiff's. *Turley*, 729 F.3d at 648. Turley **specifically** addressed *Morgan*'s application to that claim, cited *Heard*'s "continuing violation" doctrine as good law, and approvingly cited a sister court of appeals' holding that *Heard* is consistent with *Morgan*. *Id.* at 651 & n.4. Finally, *Turley*'s concurrence discussed the application of *Ledbetter* to the case, *id.* at 654 (Easterbrook, J., concurring), meaning the *Turley* majority unavoidably considered *Ledbetter*'s application the plaintiff's confinement claim as well—and decided that the continuing violation doctrine is good law.

This Court of Appeals, in other words, has **specifically** assessed the application of both *Ledbetter* and *Morgan* to claims of injuries resulting from extended confinement in a small cell, and has held that the continuing violation is doctrine is both good law and that it applies to such claims. Yet Defendants' brief never mentions *Turley*, or *Heard* for that matter, or even concedes that either decision exits. Instead, it describes cases from another circuit,[3] making no effort to explain how those decisions can be reconciled with on-point controlling authority in this one.

"The Seventh Circuit—like all of the courts of appeals throughout the country—[has] been exceedingly critical of briefs that put out of view the existence of cases that are central to any informed, meaningful, and relevant analysis. In this regard, ignoring or overlooking potentially dispositive authority is pointless." *Gunn v. Stevens Sec. & Training Servs., Inc.*, No. 17 C 6314, 2018 WL 1737518, at *4 (N.D. Ill. Apr. 11, 2018) (citing *Hill v. Norfolk & Western*

---

[3] Defendants' lineup of "Tenth Circuit" authority is also not what they claim. Two cases, *Fogle* and *Silverstein*, are unpublished, while the third, *Matthews*, is from the District of Colorado, not the Court of Appeals. (*See* ECF 37 at 14.) In any event, if the Tenth Circuit does indeed not recognize the continuing violation doctrine, it is in a distinct minority. *See Heath v. Bd. of Supervisors*, 850 F.3d 731, 740 (5th Cir. 2017) (applying doctrine to Section 1983 claim and noting that the Sixth, Seventh, and Ninth Circuits have done so as well)*; DePaola v. Clarke*, 884 F.3d 481, 487 (4th Cir. 2018) (collecting "other circuits [which] have concluded that a prisoner may state a deliberate indifference claim for a continuing violation when prison officials have refused to provide medical attention for an ongoing serious condition," and "not[ing] that no circuits have held to the contrary."); *Ayala-Sepulveda v. Municipality of San German*, 671 F.3d 24, 30 n.6 (1st Cir. 2012) (applying continuing violation doctrine); *O'Connor v. City of Newark*, 440 F.3d 125, 127–29 (3d Cir. 2006) (same).

*Ry. Co.*, 814 F.2d 1192, 1198 (7th Cir. 1987)).  Indeed Defendants' failure even to acknowledge *Turley* or *Heard*—if only to try distinguishing them—can fairly be read as a concession that those two decisions are fatal to their arguments regarding the accrual of Plaintiff's claims.  Under controlling precedent, Plaintiff's claims accrued when Defendants released him from solitary confinement in 2018, several weeks before he was let out of prison.

## CONCLUSION

The Court should deny Defendants' motion to dismiss in its entirety.

Dated: March 22, 2019

Respectfully submitted,

/s/ *Stephen H. Weil*

Antonio Romanucci - aromanucci@rblaw.net
Nicolette Ward - nward@rblaw.net
Romanucci & Blandin, LLC
321 North Clark St., Suite 900
Chicago, IL 60654
(312) 458-1000

Stephen H. Weil – steve@weilchardon.com
Alexis G. Chardon – ali@weilchardon.com
Weil & Chardon LLC
333 S. Wabash Ave., Suite 2700
Chicago, IL 60604
312-585-7404

Maggie E. Filler*
Roderick & Solange MacArthur Justice Center
745 Atlantic Avenue, 8th Floor
Boston, MA 02111
(857) 284-1455
maggie.filler@macarthurjustice.org
*\* pro hac vice*

Daniel M. Greenfield
Roderick & Solange MacArthur Justice Center
Northwestern University - Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-8538
daniel-greenfield@law.northwestern.edu

*Attorneys for Plaintiff*

15

## CERTIFICATE OF SERVICE

I, Stephen H. Weil, a licensed attorney (ARDC No. 6291026) hereby certify that on March 22, 2019, I filed the foregoing with the Clerk of Court using the CM/ECF system.

/s/ Stephen H. Weil