IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| Anthony Gay, | ) |
|     Plaintiff, | ) Case No. 1:19-CV-01133 |
| v. | ) Judge Harold A. Baker |
| | ) Magistrate Judge Eric I. Long |
| John Baldwin *et al.*, | ) |
|     Defendants. | ) |

**PLAINTIFF'S REPLY MEMORANDUM REGARDING ESI PROTOCOL**

Pursuant to the Court's December 6, 2019 Order, Plaintiff submits this reply to the ESI Protocol memorandums submitted by the Wexford defendants (ECF 61) and the State defendants (ECF 62).

**I.    Search Terms.**

***The defendants fail to explain how searching for Plaintiff's name and prison number is likely to lead to the discovery of information about management-level policy decisions***.  As Plaintiff explained in his opening memorandum, he alleges that his mistreatment occurred because of management-level policy decisions, made by upper-level managers within the State and Wexford, about how to treat hundreds of severely mentally ill prisoners—a group that included Plaintiff, but in which he was one among legions of others.  (*See* ECF 60 at 2, 7.)  There is no reason to think that in discussing these alleged policy choices, any such manager would have a reason to discuss Anthony Gay's situation in particular—indeed, as Plaintiff has pointed out, the manager-defendants moved to dismiss Plaintiff's claims against them precisely on the grounds that there was no reason that they would know about Anthony Gay at all.  (*See id.* at 2 (quoting defendants' dismissal brief).)  Thus, according to the defendants themselves, there is no reason to think that documents with Anthony Gay's name or prison number are likely to contain responsive policy communications.  Indeed documents mentioning Anthony

#
1
#

Gay would seem less likely to contain management-level discussions, since the manager-defendants have already disclaimed knowing who he is.

As such, it fell to defendants to explain in their responsive memorandums why communications discussing State-level policy are likely to refer to Anthony Gay. The defendants' responses fail to do this. Instead they simply declare that documents relevant to Plaintiff's policy claims will refer to Anthony Gay. Wexford claims that "Any relevant 'systemic failure' . . . would necessarily be evident in emails related to Plaintiff individually," (ECF 61 at 6-7), and the State defendants argue that "Any relevant ESI that would go to Plaintiff's systemic claims would likely be included in the ESI related to Plaintiff individually." (ECF 62 at 7.) Unsupported declarations like this simply are not enough. Anthony Gay was merely one among hundreds of detainees subject to the defendants' allegedly unlawful policies. There is no reason to believe that policy-level documents would mention him.

Instead, it much more plausible to believe that manager-level communications focused on the general system of mental health care, including statewide class actions like *Rasho* that challenged the constitutionality of that care. That claim has survived the defense motion to dismiss, in which the manager-defendants argued that they would have no reason to know about (and thus, to discuss) Plaintiff. As such the federal rules now empower Plaintiff to take discovery to prove that policy failures he alleges actually existed. There is no reason to think that communications about those policies would mention Plaintiff specifically; indeed Wexford and the State were given the opportunity to explain otherwise, and they did not do so.

**The ESI Protocol is not "unduly burdensome*."*** Defendants next claim that the number of documents captured by the search terms contained in the discovery protocol are unduly burdensome, on the grounds that they are likely to capture many thousands of documents, some of which are likely to be irrelevant. (*See* ECF 61 at 1, 3; ECF 62 at 6.)

As an initial matter, Defendants are not claiming that simply running the proposed search terms is unduly burdensome, and of course it is not.  Executing the search terms is an automated process that is performed by computer; it does not, obviously, require persons to spend time manually searching for the terms in various documents.  Thus the execution of the terms is not the burden that the defendants claim.

Rather, the defendants appear to argue that the universe of documents resulting from that automated search will just be too large.  This argument is hard to understand.  **First**, it is basic discovery practice that once an ESI search has been conducted, the parties examine the results and then work together to adjust keyword terms.  Defendants claim not to understand how this "funneling" process would work, but such adjustments are almost always necessary because "simple keyword searches end up being both over- and under-inclusive in light of the inherent malleability and ambiguity of spoken and written English," *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 261 (D. Md. 2008), and indeed adjusting keyword searches should be familiar to any attorney who has been involved in ESI discovery.  *See, e.g.*, *Osborne v. C.H. Robinson Co.*, No. 08-cv-50165, 2011 WL 5076267, at *7 (N.D. Ill. Oct. 25, 2011) ("Electronic discovery is often an iterative process and the parties should allow for refinement of search terms as their understanding of the issues develops." (*citing The Sedona Principles*, (2d ed. 2007), Cmt. 11.a.)); *In re Broiler Chicken Antitrust Litig.*, No. 1:16-CV-08637, 2018 WL 1146371, at *2 (N.D. Ill. Jan. 3, 2018) (issuing ESI protocol for "Keyword Searches" which notes that "[d]eveloping efficient keyword search terms is an iterative process and will require transparent and cooperative efforts by both the producing and requesting Party"); *Gov't Accountability Project v. U.S. Dep't of Homeland Sec.*, 335 F. Supp. 3d 7, 13 (D.D.C. 2018) ("The Court appreciates [the defendant's] concern that searches for commonly-used words like "cell," "phone," and "test" may return too many records . . .  But that concern dictates using more sophisticated search techniques, including additional filtering keywords or Boolean operators and connectors, to winnow the results to a manageable level.").

*Second*, because of responding parties enjoy commanding access to their own information, courts expect them to participate in the development of search terms, in order to make sure they are not overbroad. (*See* ECF 60 at 4-6.) But the defendants here flatly refused to do this—until they filed their opposition memorandums. Thus the State argues: "For example, terms such as 'impatient', 'mental', and 'solitary' are terms used on standard IDOC documents that will produce results that are wholly unrelated to Plaintiff and his claims." (ECF 62 at 6.) That is helpful information—which the State could have shared to help develop search terms that will efficiently capture information likely to be relevant to Plaintiff's policy claims. In the same vein, the defendants' observation that some of the proposed terms would be duplicative (*see* ECF 61 at 4; ECF 62 at 7) is likewise helpful—and could easily have been offered as part of the cooperative effort in which courts expect producing parties to participate.[1] Saving those objections until now is simply inappropriate.

*Third*, the defendants' alternative "proposal" manufactures entirely unnecessary delay. The parties have been working to develop an ESI protocol since they submitted their Rule 26(f) report on October 15. During that entire time, neither Wexford nor the State has suggested a single search term that would assist in identifying ESI going to Plaintiff's policy claims, nor have they offered any document in their possession from which Plaintiff might identify terms on his own. Now, months later, defendants take the position that Plaintiff should develop new search terms, once Wexford and the State have produced various written policies that Plaintiff has sought in his discovery—for which the defendants have sought a response extension going to the end of January. (*See* ECF 61 at 5-6; ECF 62 at

---

[1] Wexford's expression of puzzlement at the search term "*Davis v. Baldwin*," on the other hand (*see* ECF 61 at 6), misses the mark. That case is an injunctive challenge to the IDOC's policy of placing certain prisoners in "extreme isolation," and thus concerns policies likely to bear on the treatment of Plaintiff, who was subjected to such conditions. *See Davis v. Baldwin*, 3:16-cv-00600-SCW (S.D. Ill.).

7.) The defendants, of course, could have shared these policies to help develop search terms months ago, but they chose not to do so. Their suggestion now invites further delay, entirely of their own making.

It is certainly possible that terms in the defendants' policies could aid in future searches down the road—indeed, Plaintiff expects that to be true of other documents produced in the case as well. At the same time, though, there is little reason to think that many of the terms Plaintiff has suggested would be located in policy documents at all. Many of the proposed terms are designed to identify particular persons whom Plaintiff believes played central roles in the policies at issue (*See* ECF 66-1 Ex. B II nos. 25-41 (identifying various persons involved in policies relating to mentally ill prisoners)); others are terms targeted policy discussions concerning the possible use of facilities to house mentally ill prisoners (*see id.* nos. 8-12, 65-67); and many of others include terms that are featured prominently in the pleadings and orders of the *Rasho* litigation. While many these terms are likely to fall outside of the defendants' strict written policies, in other words, they are reasonably calculated to capture documents that are relevant to Plaintiff's policy claims.

Inevitably, some of the terms Plaintiff has proposed will capture an over-inclusive range of documents. And inevitably, some documents produced during discovery in this case will reveal new or different terms that the parties can use further to target their searches. That is the nature of ESI discovery. Defendants, however, cannot refuse for months to cooperate in developing search terms, and then insist at the motion stage that the parties should wait even longer while Plaintiff combs through documents that have been at the defendants' fingertips all along.

*    *    *

The search terms that Plaintiff has proposed are a reasonable place to start. Plaintiff would have welcomed the defendants' help in refining these terms (and in identifying custodians), but in months of discussions the defendants have refused to do so. The defendants' only proposal is to draw out even the

5

beginning of ESI discovery months into the future, after flatly refusing to cooperate for months beforehand. Plaintiff respectfully suggests that the ESI terms can be run (with modifications to eliminate duplicative terms that the defendants identified in their responses) and then the parties work together to winnow down the resulting ESI "hits" that are gathered through the automated keyword search process.

## II.    Custodians and Data Repositories.

Plaintiff has identified as custodians persons they believe are likely to possess ESI relevant to Plaintiff's claims. Defendants, despite years of litigating *Rasho*, offered not a single custodian. Instead in its responsive memorandum, the State challenges several of the custodians offered by Plaintiff.

The State challenges the inclusion of Jason Garnett, for example (ECF 62 at 9), but Mr. Garnett was previously the commander of IDOC District 5 and was involved in the transfer of inmates to the notorious Tamms prison, where Plaintiff was housed for an extended period. The State also challenges inclusion of the CFO of the IDOC and the Executive Director of the Capital Development Board (*id.*), but both those officials would have been involved in the project of complying with the Rasho injunction, including construction of a stand-alone IDOC mental health facility for seriously mentally ill inmates, like Plaintiff. *See Rasho v. Walker*, No. 1:07-cv-1298 ECF 2633 at 14 (C.D. Ill. Apr. 23, 2019) (describing IDOC expenditures and funding for the construction and refurbishing of mental health facilities). Communications from these witnesses, among other things, may shed light on why the State did not fund such facilities years earlier, when they could have helped Plaintiff. Plaintiff's list of custodians was not chosen haphazardly. While Plaintiff would have welcomed collaboration with the defendants, the custodians he identified are reasonably targeted to lead to the discovery of probative evidence.

As to data repositories, this is an incidental dispute. Plaintiff proposes to include in the ESI protocol certain custodians who happen to have worked either with the Governor's office or the Illinois

#
6

#

Department of Human Services. These custodians are relevant to Plaintiff's claims because the policy at issue included the failure to transfer mentally ill prisoners from the IDOC to the IDHS, an inter-agency matter that involved both agencies and their overseeing authority, the Governor's office. Indeed, as Plaintiff has explained, there is direct evidence that personnel within the Governor's office have been involved with the Rasho matter. (*See* ECF at 7.) Other than the incorrect claim that the State was "dismissed" as a party to this case,[2] the State offers no reason why these custodians should not be included in the automated ESI Protocol.

### III.    Proportionality.

The defendants have raised the matter of proportionality, suggesting that this case is not worth significant expenditure on their part. (ECF 62 at 1-2.) But Plaintiff's injuries are catastrophic. The defendants subjected him to solitary confinement for more than twenty years which, because of his mental illness, caused Plaintiff to engage in a sustained and horrific course of self-mutilation. (*See, e.g.*, ECF ¶¶ 28-29.) Plaintiff charges that the defendants caused him to suffer these injuries. If a jury agrees, any damages award is likely be substantial. Such an award, in turn, is likely to deter the defendants and other jailers from dealing with inconvenient, mentally ill prisoners like Plaintiff by simply locking them away alone in cells for years on end. On the defendants' own terms, therefore, this case is one of exceptional importance.

---

[2] Judge Bruce dismissed the State as a redundant party to Director Baldwin in his official capacity, since a suit against a state officer in his official capacity "'is no different than a suit against the State itself.'" (ECF 44 at 10 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).)

January 8, 2020

Antonio Romanucci - aromanucci@rblaw.net
Nicolette Ward - nward@rblaw.net
Romanucci & Blandin LLC
321 N Clark Street
Suite 900
Chicago, IL 60654
312-458-1000

Maggie E Filler - maggie.filler@macarthurjustice.org Roderick and Solange MacArthur Justice Center
375 E. Chicago
Avenue, Chicago, IL
60611
(312) 503-1271

Respectfully submitted,

*/s/ Stephen H. Weil*
Stephen H. Weil – weil@loevy.com
Jon Loevy – jon@loevy.com
Sarah Grady – sarah@loevy.com
Loevy & Loevy
311 N. Aberdeen Street
3rd Floor
Chicago, IL 60607
312-243-5900

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

    I hereby certify that on January 8, 2020, a true and correct copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

                                                    /s/ Stephen H. Weil