## IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF ILLINOIS, URBANA DIVISION

| | | |
|---|---|---|
| ANTHONY GAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 C 1133 |
| | ) | |
| JOHN BALDWIN, et al., | ) | Hon. Harold A. Baker, Judge |
| | ) | |
| Defendants. | ) | Hon. Eric I. Long, Mag. Judge |

### PLAINTIFF'S MOTION FOR ENTRY OF AMENDED ESI PROTOCOL

Plaintiff, Anthony Gay, by his attorneys, hereby respectfully requests that this Court enter Plaintiff's Amended ESI Protocol, attached to this motion as Exhibit A. In support of his request, Plaintiff states as follows:

### INTRODUCTION

This case centers on the decades of solitary confinement that Anthony Gay was forced to endure in the Illinois Department of Corrections (IDOC) as he was being denied any minimally adequate mental health treatment. Rather than provide Anthony the basic mental health treatment that he required as a seriously mentally ill prisoner, the IDOC instead placed him in solitary confinement. As Anthony's solitary confinement took its predictable course of action, leading him to act out and commit horrendous acts of self-harm, Defendants punished him with still more solitary confinement, which eventually lasted more than twenty years.

Plaintiff's treatment was no isolated incident. Instead, it is part of a broader scheme that Defendants created and tolerated, replacing constitutionally adequate mental health treatment with total isolation and segregation for hundreds of mentally ill IDOC prisoners. Plaintiff's Complaint accordingly names those supervisory Defendants who were in a position to take action to stop the regime of torture inflicted on Anthony and other seriously mentally ill

prisoners like him.

In denying Defendants' motion to dismiss, the District Court recognized that the deliberate indifference at issue in this case focuses on a *systemic* lack of mental health care, as well as a *system* of solitary confinement for mentally ill prisoners in IDOC custody. Accordingly, Plaintiff should be permitted the discovery reasonably necessary to develop and prepare his case, including his claims against Defendants for maintaining a system of unconstitutional conduct. Limiting discovery of electronically stored information (ESI) to just those documents which mention Anthony Gay by name or IDOC number denies Plaintiff any fair opportunity to prepare his case. Plaintiff acknowledges that this Court rightly criticized some of the terms included in Plaintiff's initial ESI proposal, and has made every effort to craft a narrow ESI protocol that permits discovery into these centrally relevant issues. Because Plaintiff's amended ESI protocol is narrowly tailored to uncover ESI that is relevant and proportional to the needs of this important civil rights case, this Court should grant Plaintiff's motion and enter the proposed amended ESI protocol, attached as Exhibit A.

## BACKGROUND

In his Complaint, Plaintiff has brought claims under the Eighth and Fourteenth Amendments to the United States Constitution, as well as the Americans with Disabilities Act and Rehabilitation Act. Dkt. 1 at 17-22. Plaintiff's Eighth Amendment claim specifically names the following individuals as Defendants: John Baldwin, then-Director of the IDOC; Jeff Sim, a regional psychology supervisor employed by the IDOC; Melvin Hinton, IDOC's Statewide Mental Health Supervisor; Shane Reister, another regional psychology supervisor; Sylvia Butler, director of mental health services at Menard; Kelly Ann Renzi, director of mental health services at Pontiac; Dr. Chess, director of mental health services at Dixon; William Puga, a physician at

Pontiac; Dr. Nunez, a physician at Dixon; and Wexford Health Sources, Inc., the for-profit company paid by the State of Illinois to provide medical and mental health care to prisoners in IDOC custody. *Id.* ¶¶ 11-21.

Defendants Baldwin, Sim, Hinton, Reister, Butler, and Chess previously moved to dismiss Plaintiff's Eighth Amendment claims against them, arguing that they were not proper defendants because they were not personally involved in Plaintiff's mental health care. Dkt. 37 at 2-6. The District Court rejected Defendants' argument, finding that "[t]he crux of Plaintiff's claims against Defendants concerns the lack of mental health care within IDOC and placement in solitary confinement . . . ." Dkt. 44 at 3. The Court found that even though the supervisory Defendants identified above were not personally involved in Plaintiff's mental health care in particular, Plaintiff's Complaint raised allegations that they were aware of and tolerated an "alleged *systemic* deficiency" of mental health care within IDOC "given their respective senior position within IDOC." *Id.* at 6. Because Plaintiff had sufficiently alleged that the systemic deficiency caused him to suffer harm, the District Court found that Plaintiff's section 1983 claims against the supervisory Defendants survived Rule 12(b)(6). *Id.* at 6-7.

After the District Court denied Defendants' motion to dismiss, discovery in the case began. As part of the discovery in the case, the parties worked to craft a proposed order to govern how emails and electronic documents stored on Illinois and Wexford servers would be searched for review. Defendants refused to consider searches of any terms other than Plaintiff's name and IDOC number. Plaintiff repeatedly attempted to reach compromise, or at minimum, to receive feedback from Defendants (the individuals who wrote and read the emails and documents at issue) about what terms were most problematic or unlikely to yield results relevant to Plaintiff's

claims. Defendants consistently refused to discuss any of Plaintiff's specific terms, instead insisting on searches of only Plaintiff's name and IDOC number.

The parties reached agreement on the vast majority of the remainder of the proposed ESI protocol, including a safety valve provision that required the parties to confer further if any of the searches yielded more than 7,500 documents collectively, and to renegotiate terms if the searches yielded more than 80,000 documents collectively. Dkt. 72 at 5 (Section B.7). The Court resolved some disputes during a status conference on December 6, 2019. Dec. 6, 2019 Text Order. The parties briefed their remaining disputes, including the identities of custodians whose emails and servers would be searched, and the terms that would be included in the search of emails and servers. Dkt. 60 (Pl.'s ESI Brief); Dkt. 61 (Wexford's Resp.); Dkt. 62 (IDOC Defs.' Resp.); Dkt. 63 (Pl.'s Reply).

The Court ruled on the remaining disputes regarding the proposed ESI protocol on January 24, 2020. Dkt. 66. The Court found that Defendants' proposed custodians and servers were appropriate and rejected Plaintiff's proposal of additional custodians and servers.[1] *Id.* at 4-5. Regarding search terms, the Court ruled that some of the terms proposed by Plaintiff were too broad, and that some terms were duplicative of other terms. *Id.* at 4. The Court determined that because the only *harm* alleged in the case pertained to Plaintiff individually, only searches containing Plaintiff's name and IDOC number were appropriate. *Id.*

---

[1] The Court indicated that it was willing to revisit its ruling if the evidence adduced during discovery indicated that other organizations discussed Plaintiff. *Id.* at 5 n.2.

## DISCUSSION

I.    **Supreme Court and Seventh Circuit Precedents Permit Plaintiff to Prove His Claims with Evidence of Defendants' Systemic Deliberate Indifference.**

To prevail on his Eighth Amendment claims against the individual Defendants in this case, Plaintiff must prove three things. First, Plaintiff must prove that he suffers from an objectively serious medical condition. *Perez v. Fenoglio*, 792 F.3d 768, 776-77 (7th Cir. 2015). Second, he must prove that Defendants acted with deliberate indifference to his serious medical condition—that is, that Defendants "actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Third, Plaintiff must prove that Defendants' deliberate indifference caused him injury or damages. *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011).

As this Court recognized in its ESI ruling, the first and third elements focus individually on Plaintiff.[2] Dkt. 66 at 4. But the Supreme Court and Seventh Circuit have repeatedly held that deliberate indifference to a *group* of prisoners is actionable under the Eighth Amendment, even if officials do not know the precise identify of every person who will be harmed as a result. *Farmer*, 511 U.S. at 843 ("[I]t does not matter . . . whether a prisoner faces an excessive risk of [harm] for reasons personal to him or because all prisoners in his situation face such a risk."); *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005) (although deliberate indifference cannot be predicated merely on general risks of harm from prison, "a risk is not rendered [too] general

---

[2] Plaintiff expects that there will be virtually no dispute that Plaintiff suffered from an objectively serious medical condition, as IDOC staff repeatedly and consistently categorized him as seriously mentally ill. It also clear that Plaintiff suffered substantial injuries during his imprisonment, including partial castration, Dkt. 1 ¶ 29, although Defendants argue that the blame for these horrific injuries rests solely with Plaintiff, Dkt. 47 at 27. Accordingly, it is the second element—deliberate indifference—where Plaintiff's Eighth Amendment claims will be primarily disputed.

merely because it is not personal to plaintiff."); *see also Sinn v. Lemmon*, 911 F.3d 412, 421 (7th Cir. 2018).

The Seventh Circuit has further clarified that supervisors may be liable under section 1983 even if they do not "participate[] directly in the deprivation" at issue, if they nevertheless acted "deliberate, reckless indifference to the misconduct of subordinates." *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (internal quotation marks omitted); *see also Childress v. Walker*, 787 F.3d 433, 440 (7th Cir. 2015) ("In the case of those responsible for setting policy, liability will result from the institution of a policy that, when enforced, causes a constitutional deprivation." (internal quotation marks omitted)). In *Childress*, the Seventh Circuit permitted a prisoner to maintain a section 1983 claim against a prisoner administrator who knew of a practice by his subordinates that harmed the plaintiff, and was aware of the risk of harm that the practice posed to prisoners in the plaintiff's situation but did not act. 787 F.3d at 439-40; *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 870 (7th Cir. 2011) (supervisors may be personally liable under section 1983 if they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see"); *Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001) (same); *Jones v. City of Chicago*, 856 F.2d 985-992-93 (7th Cir. 1988) (same); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (same; rejecting prison superintendent's argument against personal liability).

In other words, Plaintiff can prevail on his claims against Defendants Baldwin and Hinton, and other supervisory defendants, with evidence that they knew of a policy or practice of withholding adequate mental health treatment to mentally ill prisoners, and then subsequently throwing them into indefinite solitary confinement when their mental illness causes them to break prison rules. Dkt. 1 ¶¶ 29-31; *Ellis v. Pfister*, 2017 WL 1436967, at *4 (N.D. Ill. Apr. 24,

2017) (plaintiff may maintain claim against prison administrators who knew of problematic practice regarding use of force). Plaintiff does *not* need to prove—and indeed has not alleged—that these supervisory Defendants singled him out for mistreatment. The District Court recognized as such when it denied the supervisory Defendants' motion to dismiss for lack of personal involvement because Plaintiff properly stated a claim against them for a "systemic" and "fundamental deficiency within IDOC—namely, the lack of appropriate mental health care . . . ." Dkt. 44 at 6 (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1428-29 (7th Cir. 1996) (recognizing claims for deliberate indifference to "systemic . . . situations")). As such, documents and communications—including emails—discussing IDOC's mental health program for seriously mentally ill prisoners, backlogs and staffing shortages regarding mental health caseloads, Defendants' practice of sentencing prisoners to lengthy or indefinite periods of solitary confinement without any consideration of their mental illness or its relevance to the misconduct, the practice of determining which disciplinary infractions should be referred to local external prosecutors for criminal prosecution, and other relevant topics may become centrally relevant in this case *even though they contain no express reference to Anthony Gay.* Indeed, there is no reason to think that such documents—though highly probative of Plaintiff's allegations—would mention him at all.

Plaintiff's claim against Wexford Health Sources, Inc. not only permits evidence of a practice that transcends Plaintiff's particular mental health care, it *requires* it. Because the Seventh Circuit has afforded private, for-profit corporations the same protection from section 1983 liability as those granted to municipalities, *see Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982), Plaintiff must prove one of five things in order to prevail on his Eighth Amendment claim against Wexford: (1) that Wexford maintained an express policy that caused

Plaintiff harm; (2) that it maintained a widespread practice that, although not expressly

authorized by policy, was so permanent and well-settled as to constitute a custom; (3) that it

knowingly failed to implement a policy despite knowing its potential harmful consequences; (4)

that one of its final policymakers acted with deliberate indifference to Plaintiff's serious medical

condition; or (5) that it failed to train or supervise its employees with deliberate indifference to

the need for more or better training or supervision. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372,

379 (7th Cir. 2017); *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407-

08 (1997).

 Nearly all of these paths to liability require Plaintiff to elicit evidence that Wexford

maintained a system of constitutionally inadequate mental health care. And the most common

(and in some instances, only available) way to establish that system is through a series of prior

constitutional violations. *See, e.g., Bryan Cnty.*, 520 U.S. at 407 ("If a program does not prevent

constitutional violations, municipal decisionmakers may eventually be put on notice that a new

program is called for."); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)

("There is no clear consensus as to how frequently such conduct must occur to impose *Monell*

liability [for a widespread practice], except that it must be more than one instance, or even

three." (internal quotation marks and citations omitted)).

 Together, these precedents establish that discovery into Defendants' systems of locking

people with serious mental illnesses in solitary confinement and denying them adequate mental

health treatment is not only relevant to Plaintiff's claims, it is necessary to prove them.

## II. Plaintiff Should Be Given a Fair Opportunity to Conduct the Discovery Necessary to Prepare His Case.

 The Supreme Court has recognized that deliberate indifference is a "stringent standard"

of proof. *Bryan Cnty.*, 520 U.S. at 410-411. Accordingly, it is critical that Plaintiff be given "a

full and fair opportunity to discover information" necessary to satisfy his burden at summary

judgment or trial. *Winfrey v. San Jacinto Cnty.*, 481 F. App'x 969, 982 (5th Cir. 2012) (reversing

summary judgment against plaintiff who had been denied meaningful discovery into civil rights

claims); *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 866 (7th Cir. 2019) (discussing

"importance of allowing a party the opportunity to take meaningful discovery" into the claims at

issue). In *Smith*, the Seventh Circuit reversed a district court's decision to grant summary

judgment, warning courts that granting summary judgment without permitting discovery "based

on an erroneous view of the applicable substantive law" is likely to constitute an abuse of

discretion. 933 F.3d at 868; *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961

(4th Cir. 1996) (summary judgment not proper "where the [plaintiff] has not had the opportunity

to discover information that is essential to his opposition"). District courts across the country

have routinely recognized the need for discovery into systemic practices in cases involving

supervisory liability or *Monell* claims. *See, e.g., Groark v. Timek*, 989 F. Supp. 2d 378, 393-94

(D.N.J. 2013) (granting plaintiff's motion to compel production of other complaints against

entity, given "plaintiff's burden of proof regarding his *Monell* claim"); *Wolfe v. Green*, 257

F.R.D. 109, 113-14 (S.D. W. Va. 2009) (compelling production of complaints against entity's

employees because documents would be relevant to plaintiff's failure-to-supervise *Monell*

claim); *Scott v. Edinburg*, 101 F. Supp. 2d 1017, 1021 (N.D. Ill. 2000) ("[T]he standard for

discovery under Rule 26(b)(1) is widely recognized as one that is necessarily broad in its scope

in order to allow the parties essentially equal access to the operative facts.").

In *Fields v. City of Chicago*, 2015 WL 13578989, at *5 (N.D. Ill. Apr. 7, 2015), the

district court granted a new trial to a plaintiff following a verdict in the city's favor because it

determined that it had earlier unfairly limited the scope of discovery into the plaintiff's *Monell*

claim against the city, thereby depriving him of a fair trial on the issue. The Court found that its

ruling prohibiting discovery into the city's practices regarding file maintenance and disclosure in

cases *other than the plaintiff's* "made it virtually impossible for him to establish that the City had

a 'policy' of concealing exculpatory evidence, an element required to prove his *Monell* claim."

*Id.* After the district court permitted Mr. Fields to obtain the evidence relevant to his *Monell*

claim, the plaintiff prevailed on the claim against the city. *Fields v. City of Chicago*, 2017 WL

4553411, at *1 (N.D. Ill. Oct. 12, 2017). In this case, Plaintiff, just like the plaintiff in *Fields*, has

raised allegations that *require* him to prove both a systemically deficient system of mental health

care, *and* Defendants' deliberate indifference to that system. As such, it is critical that Plaintiff

be given access to discovery, including ESI, that discusses the system of mental health care and

Defendants' awareness of its deficiencies.

### III. Plaintiff's Amended ESI Protocol Satisfies the Proportionality Concerns of Rule 26(b).

As this Court properly recognized, Rule 26(b) imposes limits on discovery. Specifically,

it requires discovery into non-privileged matters that are relevant and proportional to the needs of

the case. Rule 26(b) requires courts to consider proportionality in terms of a number of factors:

the importance of the issues at stake in the litigation, the amount in controversy, the parties'

relative access to the information, the parties' resources, the importance of the discovery in

resolving disputes, and whether the burden on the producing party outweighs the likely benefit of

the items requested. Fed. R. Civ. P. 26(b); Dkt. 66 at 2. In this case, each of these Rule 26(b)

factors counsels in favor of entering Plaintiff's amended ESI protocol.

#### A. Plaintiff's Case Raises Issues of Substantial Public Importance.

The issues at stake in this litigation are serious. Plaintiff has alleged that he was forced to

endure *decades* of solitary confinement in lieu of adequate treatment for his obvious mental

health condition. Current and former Supreme Court Justices have recognized that solitary confinement presents one of the most important issues of our time. *See, e.g., Davis v. Ayala*, 576 U.S. ___, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) ("[T]he condition in which prisoners are kept simply has not been a matter of sufficient public inquiry or interest."); *Ruiz v. Texas*, 580 U.S. ___, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissent from denial of certiorari) ("[A] terrible human toll is wrought by extended terms of isolation and that years on end of near-total isolation exact a terrible psychiatric price." (internal quotation marks omitted)). Scientists and mental health experts have found that long-term solitary confinement causes terrible, lasting damage, even in individuals with no pre-existing mental health issues. Joseph Stromberg, *The Science of Solitary Confinement*, SMITHSONIAN MAG., Feb. 19, 2014, *available at* https://www.smithsonianmag.com/science-nature/science-solitary-confinement-180949793/ (last visited Feb. 6, 2020). The United Nations classifies long-term solitary confinement as torture. U.N. Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules), Rules 43-44 (banning "torture or other cruel, inhuman or degrading treatment or punishment" including specifically more than 15 straight days of solitary confinement).

The denial of treatment to people with serious mental health issues in custody is similarly important. *See, e.g., Rasho v. Walker*, 2018 WL 2392847, at *8 (C.D. Ill. May 25, 2018) (finding that the IDOC's current mental health program poses "immense harm to inmates"—"particularly those in segregation"—who are "at the mercy of the IDOC to provide them with the constitutionally minimal level of [mental] health care" which "is simply not being done . . . ."); Alisa Roth, *A "Hellish World": The Mental Health Crisis Overwhelming America's Prisons*, THE GUARDIAN, Mar. 31, 2018, *available at* https://www.theguardian.com/society/2018/mar/31/mental-health-care-crisis-overwhelming-prison-jail (last visited Feb. 6, 2020) (comparing

today's system of correctional mental health care to the mental health care provided by state psychiatric institutions in the 1950s and 1960s, and declaring that "[a]cross the country, correctional facilities are struggling with the reality that they have become the nation's de facto mental healthcare providers . . . now contending with tens of thousands of people with mental illness who, by some counts, make up as much as half of their populations.").

Moreover, whatever can be said of the impact of solitary confinement in general, the injuries Plaintiff alleges are simply horrific.  Consider Paragraph 29 of Plaintiff's Complaint, which catalogues some of the injuries he suffered during his twenty years of solitary confinement:

–    August 2016: Anthony cuts his scrotum and bleeds severely on his cell floor, requiring evacuation to an outside hospital.

–    November 4, 2016: Anthony cuts his arm, thigh, and scrotum. He puts a plastic fork, ink pen, piece of fingernail clippers, and three pieces of metal in his scrotum.

–    November 10, 2016: Anthony cuts his arm and scrotum. He puts nails and mop thread in his scrotum.

–    June 8, 2017: Anthony cuts his leg and scrotum with pieces from a broken fan. He sews wire through his leg. He puts a fan motor through his leg. He puts foreign objects in his scrotum and stabs the fan guard through his scrotum.

–    February 3, 2018: Anthony cuts open his right thigh. Later, he reopens the cut and embeds the following inside: three spork handles, an ink pen, an ink pen tube, the top of a spork, metal, and staples. He also stabs an ink pen through his eyelids.

–    May 27, 2018: Anthony puts a razor in his eye and cuts his scrotum.

Dkt. 1 ¶ 29. These are catastrophic injuries. And Plaintiff has alleged, over Defendants' Rule 12(b)(6) objection, that they were caused by policies and practices applied to mentally ill IDOC prisoners *writ large*.

Notably, the Chicago Tribune itself deemed Plaintiff's story sufficiently important and of public interest that it ran a feature story on him shortly after his release. Jeff Coen and Stacy St.

Clair, *How Solitary Confinement Drove a Young Inmate to the Brink of Insanity*, CHI. TRIBUNE, Jan. 2, 2019, *available at* https://www.chicagotribune.com/news/ct-met-anthony-gay-solitary-confinement-suit-20181206-story.html (last visited Feb. 6, 2020). Plaintiff does not cite the Tribune article as evidence that his claims are somehow more meritorious than prisoners whose stories are not featured on the front page of a newspaper, but only to highlight that a prominent news organization itself has recognized that Anthony Gay's experience of solitary confinement fits into a larger narrative about how the IDOC treats its charges with serious mental illness.

Simply put, the issues raised by Plaintiff's Complaint—the regime of solitary confinement IDOC imposes on mentally ill prisoners like Plaintiff, and the simultaneous lack of any real mental health treatment—are weighty issues and Plaintiff is entitled to sufficient discovery, including ESI, to prove his claims against Defendants.

### B.   The Requested Terms Are Narrowly Designed to Uncover Discovery Centrally Relevant to the Question of Defendants' Deliberate Indifference.

As discussed above, the central issues in dispute in this case are the Defendants' widespread mental healthcare practices and Defendants' deliberate indifference to prisoners with serious mental health issues like Plaintiff. Plaintiff recognizes that his initial ESI protocol included terms that this Court reasonably believed were too broad or duplicative to prove useful.[3] Plaintiff has accordingly offered an amended ESI protocol that includes just 19 narrow search parameters designed to uncover communications centrally relevant to the issues in dispute.[4]

---

[3] Plaintiff intended the terms included in his initial proposed ESI protocol to be a starting point for discussions with Defendants about relevant search terms, but Plaintiff's repeated attempts to initiate those discussions were rebuffed.

[4] Plaintiff does not dispute this Court's ruling on the identify of custodians whose email accounts should be searched. *Compare* Dkt. 72 at 11, *with* Ex. A at 11.

As an initial matter, there can be little dispute that discovery of electronically stored information, including communications sent and received by Defendants and their agents, have great importance in resolving the issues in dispute in this litigation. Fed. R. Civ. P. 26(b)(1). Defendants' statements in emails about what they knew, when they knew it, and what actions they took in response to their knowledge are central questions in deliberate indifference cases. *See, e.g., Smego v. Mitchell*, 723 F.3d 752, 755 (7th Cir. 2013) (reversing summary judgment for dentist, based in part on email from counselor telling dentist about plaintiff's serious medical issues with no adequate action taken in response); *Littler v. Martinez*, 2020 WL 42776, at *6 (S.D. Ind. Jan. 3, 2020) (issuing sanctions against certain defendants for withholding centrally relevant email, among other discovery, that disproved defendant's denial of personal involvement); *Burke v. Regalado*, 935 F.3d 960, 987-88, 997 (10th Cir. 2019) (upholding $10 million verdict as having a sufficient evidentiary basis based, in part, on emails from multiple entities questioning medical contractor's inadequate medical care system prior to decedent's death). For this reason, multiple other courts in this District have entered ESI protocols requiring searches of terms that encompass more than just the plaintiff's name and IDOC number. *Farris v. Kohlrus*, No. 17 C 3279, Dkt. 143 at 10-14 (C.D. Ill. July 9, 2019) (rejecting IDOC argument that their ESI searches should be limited to the plaintiff's name and IDOC number because "some of [p]laintiff's claims are broader than just an alleged sexual assault in December 2015" including claims against supervisory defendants); *Heilman v. Burke*, No. 18 C 3260, Dkt. 41 (C.D. Ill. June 19, 2019) (entering ESI protocol that contained search terms more than just the plaintiff's name and IDOC number); *Andrews v. Rauner*, No. 18 C 1101, Dkt. 62 at 6-7, 12 (C.D. Ill. July 22, 2019) (upholding magistrate judge's finding that discovery into communications

about IDOC's mental health policies and practices was appropriate given plaintiff's supervisory liability claims for extended solitary confinement of mentally ill prisoners).

The terms in Plaintiff's proposed amended ESI protocol focus on communications discussing seriously mentally ill prisoners—a label Defendants have applied to Anthony Gay and other prisoners in particular need of mental health treatment—and the intersection between prisoners with mental health issues and segregation. *See* Ex. A at 12 (Exhibit B, Section II.1-8). Emails using these phrases are almost certain to be communications discussing groups of prisoners that include Plaintiff, even if he is not mentioned my name. These are the groups that, as explained above, Plaintiff contends were put at substantial risk of serious harm by Defendants' deliberate indifference. Communications like these have often provided powerful evidence in support of Defendants' liability. *See, e.g., Burke*, 935 F.3d at 987-88.

Plaintiff's proposed amended ESI protocol also includes terms that focus on communications about visits and written reports from court-appointed experts in *Rasho* and *Davis v. Baldwin*, No. 16 C 0600 (S.D. Ill.), the putative class action lawsuit against IDOC alleging that its practice of solitary confinement violates the Constitution. Ex. A at 12 (Exhibit B, Section II.9-11). Defendants have repeatedly argued that Plaintiff should not be permitted discovery into these matters because those are separate cases and unlike *Rasho* and *Davis*, Plaintiff's case is not a class-action lawsuit. But Defendants miss the point: Defendants' communications about these cases and the expert opinions expressed as part of them is likely to be strong evidence in support of Plaintiff's claims that Defendants were made aware that their practices were harmful to prisoners like Plaintiff, and despite that awareness, acted with

deliberate indifference in doing nothing.[5] *Petties*, 836 F.3d at 728 ("[A] plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm."); *Farmer*, 511 U.S. at 843 (deliberate indifference is a "question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence"). Because the communications *about* these cases is likely to be relevant to Plaintiff's case, the inclusion of these terms in an ESI search is appropriate. *See, e.g., Burke*, 935 F.3d at 987-88 (emails about auditors' concerns highly relevant in individual plaintiff's *Monell* claim against private medical care provider).

The final set of terms in Plaintiff's amended ESI protocol focus on particular problems with the IDOC's mental healthcare system identified in the *Rasho* class action mental-health case, and the actions that the IDOC agreed to take to solve those problems. Ex. A at 12 (Exhibit B, Section II.12-19). Emails that contain terms like "quality improvement" or "mental health caseloads" are likely to uncover communications amongst Defendants about reviews of the allegedly deficient mental healthcare system as a whole. And emails containing terms like "residential treatment unit" or "treatment plans [while on] crisis watch" are likely to uncover communications amongst Defendants about the actions they agreed, but failed, to take to correct the deficient mental healthcare system. *See, e.g., Rasho v. Baldwin*, No. 07 C 1298, Dkt. 696 at 5 (residential treatment units), 9 (treatment plans while on crisis watch)  (C.D. Ill. May 10, 2016); *see also LaBrec v. Walker*, ___ F.3d ___, No. 18-1682, 2020 WL 400195, at *2 (7th Cir. Jan. 24,

---

[5] The expert reports in *Rasho* and *Davis* themselves may or may not be admissible evidence, depending on the purpose. *See Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019) (affirming exclusion of court-appointed expert report); *Dixon v. County of Cook*, 819 F.3d 343, 348-49 (7th Cir. 2016) (finding DOJ report relevant to establish defendant's "direct notice" of substantial risk of harm posed by current policies). But Defendants' communications *about* those reports are unquestionably party admissions that would be admissible at trial. Fed. R. Evid. 801(d)(2).

2020) (prison officials can defeat claims of deliberate indifference "if they responded reasonably to the risk, whether or not the harm was ultimately averted").

In crafting the amended ESI protocol, Plaintiff has tried to ensure that the search terms included are narrowly tailored to uncover only those communications most likely to have substantial relevance to the claims at issue in this case. To this end, Plaintiff asked counsel for Defendants to offer guidance on particular terms that they believed remained objectionable even after Plaintiff's modifications.[6] Ex. B (Pl.'s Email to Counsel re ESI protocol); *see also* Dkt. 72 (Defs.' Proposed ESI Protocol) at 2 ("The Parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith throughout the matter"). Counsel for Defendants refused to offer any such guidance.

Because Plaintiff does not have the same access to information about the ESI at issue as Defendants and their attorneys, it may be that one or more of these search terms still yields a high number of documents. But the amended ESI protocol contains a provision that expressly protects Defendants in the event of such a result. Specifically, Section B.7 of Plaintiff's proposed amended ESI protocol requires the parties to meet and confer if the search terms collectively yield more than 7,500 documents, and mandates that narrowed terms be crafted if the search terms collectively yield more than 80,000 documents. Ex. A at 5. This provision ensures that if Plaintiff's narrowed search terms still yield a high number of documents such that Defendants believe it to impose an unreasonable burden, they have the opportunity to discuss those terms with Plaintiff before undertaking *any* burden of review. As such, there is no indication that

---

[6] As part of her request, counsel for Plaintiff made clear that she would not construe any assistance as a waiver of Defendants' right to object to performing any searches beyond those for Plaintiff's name and IDOC number.

Defendants will be forced to endure any burden that outweighs the likely benefit of the requested ESI.

Plaintiff's proposed amended ESI protocol includes only 19 additional searches that are narrowly tailored to uncover ESI most relevant to Plaintiff's claims against Wexford and the supervisory Defendants. And the resulting ESI, which is likely to contain communications that constitute notice or party admissions, is likely to be centrally relevant in resolving the disputed issue of Defendants' deliberate indifference. Accordingly, consideration of its importance to resolving the issues in dispute, and the weighing of the potential burden, counsel toward entry of the proposed amended ESI protocol.

### C. The Remaining Factors Articulated in Rule 26(b)(1) Counsel Toward Entering Plaintiff's Proposed Amended ESI Protocol.

The remaining factors—the amount in controversy, the parties' relative access to the information, and the parties' resources—all tilt toward permitting the ESI discovery that Plaintiff seeks. First, the amount in controversy is significant. Jury awards for long-term solitary confinement have reached into the millions of dollars. *Slevin v. Bd. of Comm'rs for Cnty. of Doña Ana*, No. 08 C 1185 (D.N.M. 2012) ($22 million judgment). And cases involving denial of treatment for severe mental illness have also resulted in million-dollar awards. *Farver v. Lake County*, No. 00 C 6010 (N.D. Ill. 2003) ($1.75 million). Accordingly, consideration of the amount in controversy supports entry of Plaintiff's proposed amended ESI order. *See, e.g., Arcelormittal Ind. Harbor LLC v. Amex Nooter, LLC*, 2016 WL 614144, at *7 (N.D. Ind. Feb. 16, 2016) (declining to limit requested discovery when amount in controversy "likely well exceeds $75,000.00").

Second, there can be no dispute that Defendants currently have far greater access to their ESI as compared to Plaintiff. *See, e.g., In re Broiler Chicken Antitrust Litig.*, 2018 WL 3586183,

at *8 (N.D. Ill. July 26, 2018). Similarly, the comparison between the resources enjoyed by Plaintiff and Defendants is stark. Although Plaintiff recognizes that the State of Illinois often faces budgetary issues, there can be no dispute that Defendants' resources—including Wexford Health Sources, Inc., which is paid more than a billion dollars by the State of Illinois for just a single contract—vastly exceed Plaintiff's resources.

In sum, the considerations of Rule 26(b)(1) support Plaintiff's motion. The limited ESI search terms that Plaintiff asks this Court to enter are narrow, and they are targeted specifically to focus on only that ESI which goes to the heart of the issues disputed by the parties. Plaintiff's proposed ESI protocol further contains a safety valve provision that expressly protects against any possibility that Defendants will be forced to suffer a burden that exceeds the relevance of the ESI Plaintiff seeks.

Accordingly, Plaintiff respectfully requests that this Court grant his motion and enter the proposed amended ESI protocol, attached to this motion as Exhibit A.

19

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff

Arthur Loevy
Jon Loevy
Stephen Weil
Sarah Grady
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
sarah@loevy.com

Antonio Romanucci
Nicolette Ward
ROMANUCCI & BLANDIN LLC
321 North Clark St.
Chicago, IL 60654
(312) 458-1000

Maggie Filler
RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER
375 East Chicago Ave.
Chicago, IL 60611
(312) 503-1271

## CERTIFICATE OF TYPE VOLUME LIMITATION COMPLIANCE

I, Sarah Grady, an attorney, hereby certify that the foregoing Plaintiff's Motion for Entry of Amended ESI Protocol complies with the type volume limitation set forth in Local Rule 7.1(B)(4)(b) of the Central District Local Rules. It has 6,157 words and 40,016 characters (including spaces), excluding this Certificate and the Certificate of Service. I relied on the "Word Count" feature of Microsoft Word to make this calculation.

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I, Sarah Grady, an attorney, hereby certify that on February 7, 2020, I caused the foregoing Plaintiff's Motion for Entry of Amended ESI Protocol to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

<u>/s/ Sarah Grady</u>
Sarah Grady
Attorney for Plaintiff