E-FILED
Saturday, 07 March, 2020  12:22:45 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| ANTHONY GAY, | ) | Case No. 1: 19-cv-1133 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| JOHN BALDWIN, ROB JEFFREYS, JEFF | ) | Hon. Harold A. Baker, Judge |
| SIMS, SHANE REISTER, DR. DOE 1, | ) | |
| MELVIN HINTON, SYLVIA BUTLER, | ) | |
| KELLY ANN RENZI, WILLIAM PUGA, DR. | ) | Hon. Eric I. Long, Mag. Judge |
| CHESS, DR. NUNEZ, WEXFORD HEALTH | ) | |
| SOURCES, INC. and MICHAEL MELVIN, | ) | |
| TERRI KENNEDY, EMILY RUSKIN, JOHN | ) | |
| VARGA, JUSTIN WILKS, SONJA | ) | |
| NICKLAUS, and DOES 2-5 | ) | |
| Defendants. | | |

**FIRST AMENDED COMPLAINT[1]**

Plaintiff, ANTHONY GAY by his undersigned attorneys, complains against the above-named Defendants as follows:

**INTRODUCTION**

When Anthony Gay was a teenager, he got into a fight with another teen who had insulted his sister. The teen claimed that Anthony had stolen his hat and a $1 bill in the process, so Anthony was charged with robbery. Anthony pleaded guilty, received a suspended prison sentence, and was placed on probation. Then, in another youthful error, Anthony violated his probation by driving a car without a license. As a result of these two events, in 1994 Anthony –

---

[1] Pursuant to Federal Rule of Civil Procedure 15(a)(2), Plaintiff is filing this amended pleading with the written consent of the opposing parties.

then only 20 years old – was imprisoned by the Illinois Department of Corrections ("IDOC"). With good behavior, he should have been released in 3½ years.

But Anthony suffers from borderline personality disorder.  After he was imprisoned the symptoms of this mental illness manifested, and he began to act out.  Instead of providing treatment for his mental illness, the IDOC cited him for a variety of violations.  Eventually, in 1996, the IDOC placed Anthony in solitary confinement—and it kept him there for over twenty years.  For more than twenty years, Anthony lived alone in a small, bare, stifling cell, where he was deprived of all human contact for close to 24 hours per day.

The impact of solitary confinement on Anthony was catastrophic.  Deprived of any sustained human interaction, Anthony's mental condition deteriorated, and he began to engage in horrific acts of self-mutilation.  He cut his forearm and his neck.  He cut into his left inner thigh and wove the wound together with strips of a blanket.  He cut into his scrotum and embedded a zipper there.  He cut off a testicle and hung it on his cell door.  He cut open his scrotum again and pierced it with paperclips.  He mutilated his penis on multiple occasions, embedding a pen, plastics, and a zipper into the cuts.  He stuck a pen into his eyelid and stabbed his thigh with a spoon, so deep that it had to be removed surgically.  His documented acts of self-mutilation number in the dozens and continued for nearly the entirety of his solitary confinement.

It was plain for anyone to see that solitary confinement was ravaging Anthony's mind, and that he was in desperate need of appropriate mental healthcare.  But instead of placing Anthony in a setting that would alleviate the impact on his mind, or providing him treatment to get better, the Defendants responded by *prolonging* Anthony's extreme isolation, depriving him of access to human contact, programming, mental health care, and activities—for decades.

As a result, Anthony's torture was both compounded and extended.  Solitary confinement had triggered Anthony's mental illness, causing him to act erratically and irrationally.  One

manifestation was Anthony's self-mutilation.  Another was irrational "assaults" on prison staff, in which Anthony would do things like throw his body fluids at prison guards through cracks in his cell door.  Instead of recognizing these acts for the manifestations of mental illness that they were, the Defendants doubled down.  Anthony was given "tickets" that punished him with consecutive sentences of solitary confinement until the year 2152 – or two lifetimes of solitude. Anthony was also charged criminally for his "attacks" on prison staff, which ultimately extended his actual prison sentence by about fifteen years, with all but a few weeks of it to be served in solitary.

This extreme isolation continued even though in *Rasho v. Baldwin*, No. 07-cv-1298 (C.D. Ill.), an ongoing class action concerning the IDOC's treatment of mentally ill prisoners, the Defendants acknowledged that Anthony was among a handful of IDOC prisoners who were so mentally ill that they needed acute, inpatient psychiatric care.  Defendants refused to provide this care.  Instead, they continued to hold Anthony in extreme isolation, with the devastating impact that Anthony continued to mutilate himself.

All told, Anthony spent nearly two decades in solitary confinement in a state of acute mental decompensation.  By the time he was finally released from prison in 2018, he had mutilated himself hundreds of times.  Throughout his solitary confinement, it was obvious to the Defendants that Anthony was in desperate need help.  And at any point during his confinement, they could have rescued him, either by providing adequate services within prison or by transferring him to an inpatient psychiatric hospital.  For the Defendants, however, it was simply more convenient to deal with a difficult inmate by keeping him locked away in an isolation cell. That "solution" inflicted decades of unthinkable pain on Anthony, and continues to harm him after his release.

Through their actions and inaction in the face of Anthony's obvious mental decompensation, the Defendants tortured Anthony. This lawsuit seeks to hold the Defendants accountable for the injuries that they inflicted on Anthony by holding him in solitary confinement for two decades.

## I.    NATURE OF THE ACTION

1.    Anthony Gay asserts the following claims to redress the egregious abuse that the Defendants inflicted upon him:

2.    *Count One*—Eighth Amendment. By placing Anthony in extended solitary confinement notwithstanding its obvious, devastating impact on his mental health, the Defendants inflicted cruel and unusual punishment on Anthony, exhibited deliberate indifference to his serious medical needs, and inflicted punishment on him for no legitimate penological purpose. This caused extreme mental anguish, suffering, and multiple physical injuries, in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

3.    *Counts Two and Three*—Americans with Disabilities Act and Rehabilitation Act. The Defendants also discriminated against Anthony because of his mental illness, in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). Anthony's severe mental illness was a disability covered by the ADA and the RA. While the Defendants have policies to ensure that that IDOC prisoners with conventional medical needs (such as physical injuries or illnesses) receive the medical treatment they need, the Defendants did not provide equivalent treatment for Anthony's mental condition. Instead, they followed a continuing discriminatory policy of forcing him to undergo extended torture in solitary confinement, without appropriate treatment, until his sentence was completed.

4.      In further violation of the ADA and the RA, the Defendants failed to provide reasonable accommodations for Anthony's disability.  The Defendants provide IDOC prisoners with a variety of programs and services, and they are obligated not to segregate disabled and non-disabled persons.  Among these is furnishing the basic human need of interaction with other persons.  With reasonable accommodations to his disability, the Defendants could have provided Anthony with these programs and services, but they chose not to.  Instead they placed him in extended solitary confinement.  Anthony served years in disciplinary solitary confinement because he exhibited behaviors that were a result of the fact that the Defendants had put a disabled person in solitary confinement.  Defendants' continuing policy of failing to provide these accommodations to mentally ill prisoners like Anthony resulted in his entrapment in a cruel, endless cycle, and the devastating consequences described in this Complaint.

5.      *Count Four*—Fourteenth Amendment.  Under the Due Process Clause, Anthony had a right to meaningfully challenge his placement in solitary confinement and show that he should not have been there.  Had the Defendants provided this right, Anthony could have shown that his placement in solitary was improper, since it flowed from irrational acts arising from his mental illness, which was triggered by his confinement in solitary.  The Defendants never afforded Anthony this opportunity, however, causing him to suffer the injuries described in this Complaint.

*       *       *

6.      Anthony had the right to be free from cruel and unusual punishment and he had the right not to be mistreated or discriminated against because of his disability.  By this action, Anthony seeks to vindicate those rights and to have the Defendants answer for the way they treated a vulnerable man with a severe mental illness, first by inflicting horrific damage on him

by throwing him in solitary, and then by failing to treat the devastating illness that they themselves had both caused and exacerbated.

## II.    JURISDICTION AND VENUE

7.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's causes of action are brought under the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as one or more of the Defendants resides in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## III.    PARTIES

9.    Plaintiff Anthony Gay is a resident of Illinois.  Between 1994 and 2018, he was imprisoned by the IDOC at multiple prisons, including the Tamms, Dixon, Pontiac, Stateville, and Menard prisons.  He now lives with his family in Rock Island, Illinois.

10.    Defendant Rob Jeffreys is the director of the IDOC, which imprisoned Anthony and subjected him to solitary confinement, pursuant to a continuous policy, described herein, under which difficult, mentally ill prisoners were placed in prolonged solitary confinement instead of being provided with appropriate mental health treatment.  Defendant Jeffreys is sued in his official capacity.  The IDOC receives federal funding.

11.    Defendant John R. Baldwin was the acting director of the IDOC.  Defendant Baldwin is sued in his individual capacity.  Defendant Baldwin had actual knowledge that solitary confinement both causes and exacerbates mental illness.  He also knew that multiple severely mentally ill prisoners, among them Anthony Gay, were in critical need of inpatient psychiatric care and appropriate treatment that the IDOC was failing to provide.  At all relevant times Defendant Baldwin had the power to ensure this treatment was provided by the IDOC, or

to secure the transfer of these prisoners to mental health facilities operated by the Illinois Department of Human Services ("IDHS").  Defendant Baldwin took neither course of action.

12.     Defendant Wexford Health Sources, Inc. ("Wexford") is a private company that was under contract to provide medical care and mental healthcare to the prisoners of the IDOC, including Anthony, during a number of years of Anthony's imprisonment.  This care included the obligation to provide comprehensive and specialized mental health services, including any specialty and emergency care that was not provided at IDOC facilities.  Despite its contractual obligations, however, by policy and practice Wexford did not provide on-site mental health services necessary to meet the needs of persons with severe mental illnesses like Anthony, nor did it transfer prisoners who needed such care to appropriate outside mental health facilities.

13.     Defendant Jeff Sims is the IDOC's Central Region Psychology Supervisor.  He is sued in his individual capacity.  While Anthony was confined in the prisons under Defendant Sims' supervision, Sims was personally aware of the harm Anthony was incurring from solitary confinement, and had actual knowledge that Anthony needed psychiatric care and appropriate treatment that he was not receiving.  At all relevant times Sims had the power to seek appropriate treatment for Anthony, but did not do so.

14.     Defendant Shane Reister is the IDOC's Southern Region Psychology Supervisor.  He is sued in his individual capacity.  While Anthony was confined in the prisons under Defendant Reister's supervision, Reister was personally aware of the harm Anthony was incurring from solitary confinement, and had actual knowledge that Anthony needed psychiatric care and appropriate treatment that he was not receiving.  At all relevant times Reister had the power to seek appropriate treatment for Anthony, but did not do so.

15.     Defendant Dr. Doe 1 is IDOC's Northern Region Psychology Supervisor.  Dr. Doe 1 is sued in his or her individual capacity.  While Anthony was confined in the prisons

under Defendant Dr. Doe 1's supervision, he or she was personally aware of the harm Anthony was incurring from solitary confinement, and had actual knowledge that Anthony needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Dr. Doe 1 had the power to seek appropriate treatment for Anthony, but did not do so.

16.    Defendant Dr. Melvin Hinton is the Acting Statewide Mental Health Supervisor for the IDOC. He is sued in his individual capacity. Dr. Hinton was personally aware of Anthony's confinement and its impact on his mental health condition. Dr. Hinton also knew that Anthony needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Dr. Hinton had the power to seek appropriate treatment for Anthony, but did not do so.

17.    Defendant Dr. Sylvia Butler is the Mental Health Director of Menard Correctional Center. She is sued in her individual capacity. At all relevant times she was employed by Defendant Wexford. Dr. Butler was responsible for Anthony's psychiatric care at Menard when he was incarcerated there in 2015-2016, and she was aware that he needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Dr. Butler had the power to seek appropriate treatment for Anthony, but did not do so.

18.    Defendant Dr. Kelly Ann Renzi is the Mental Health Director of Pontiac Correctional Center. She is sued in her individual capacity. Dr. Renzi was responsible for Anthony's psychiatric care at Pontiac when he was incarcerated there in 2017-2018, and she was aware that he needed psychiatric care and appropriate treatment that he was not receiving. At all relevant times Dr. Renzi had the power to seek appropriate treatment for Anthony, but did not do so.

19.    Defendant Dr. William Puga was a physician at Pontiac Correctional Center. At all relevant times, he was employed by Defendant Wexford. He is sued in his individual

capacity.  Dr. Puga personally provided psychiatric care to Anthony at Pontiac from 2016-2018.
Along with Dr. Renzi, Dr. Puga was responsible for Anthony's psychiatric care and was aware
that he needed to be removed from solitary confinement, and needed psychiatric care and
appropriate treatment that he was not receiving.  At all relevant times Dr. Puga had the power to
seek appropriate treatment for Anthony, but did not do so.

20.     Defendant Dr. Chess is the Mental Health Director of Dixon Correctional Center.
He is sued in his individual capacity.  At all relevant times he was employed by Defendant
Wexford.  Dr. Chess was responsible for Anthony's psychiatric care at Dixon in 2018 and was
aware that he needed psychiatric care and appropriate treatment that he was not receiving.  At all
relevant times Dr. Chess had the power to seek appropriate treatment for Anthony, but did not do
so.

21.     Defendant Dr. Nunez is a physician at Dixon Correctional Center.  At all relevant
times, Dr. Nunez was employed by Defendant Wexford.  He is sued in his individual capacity.
Dr. Nunez personally provided psychological care to Anthony at Dixon in 2018.  Along with Dr.
Chess, Dr. Nunez was responsible for Anthony's psychiatric care and was aware that he needed
psychiatric care and appropriate treatment that he was not receiving.  At all relevant times Dr.
Nunez had the power to seek appropriate treatment for Anthony, but did not do so.

22.     Michael Melvin was the warden at Pontiac Correctional Center during Anthony's
imprisonment there in 2017-2018, and was responsible for the implementation, oversight, and
supervision of policies and practices at Pontiac.  Melvin also knew that as a result of Defendants'
policies, including at Pontiac, multiple severely mentally ill prisoners, among them Anthony
Gay, were placed in prolonged solitary confinement instead of being provided with appropriate
mental health treatment.  At all relevant times Melvin had the power to seek appropriate
treatment for Anthony, but did not do so.

23.     Terri Kennedy was an assistant warden at Pontiac Correctional Center during Anthony's imprisonment there in 2017-2018, and was responsible for the implementation, oversight, and supervision of policies and practices at Pontiac.  Kennedy also knew that as a result of Defendants' policies, including at Pontiac, multiple severely mentally ill prisoners, among them Anthony Gay, were placed in prolonged solitary confinement instead of being provided with appropriate mental health treatment.  At all relevant times Kennedy had the power to seek appropriate treatment for Anthony, but did not do so.

24.     Emily Ruskin was an assistant warden at Pontiac Correctional Center during Anthony's imprisonment there in 2017-2018, and was responsible for the implementation, oversight, and supervision of policies and practices at Pontiac.  Ruskin also knew that as a result of Defendants' policies, including at Pontiac, multiple severely mentally ill prisoners, among them Anthony Gay, were placed in prolonged solitary confinement instead of being provided with appropriate mental health treatment.  At all relevant times Ruskin had the power to seek appropriate treatment for Anthony, but did not do so.

25.     John Varga was the warden of Dixon Correctional Center during Anthony's imprisonment there in 2018, and was responsible for the implementation, oversight, and supervision of policies and practices at Dixon.  Varga also knew that as a result of Defendants' policies, including at Dixon, multiple severely mentally ill prisoners, among them Anthony Gay, were placed in prolonged solitary confinement instead of being provided with appropriate mental health treatment.  At all relevant times Varga had the power to seek appropriate treatment for Anthony, but did not do so.

26.     Justin Wilks was an assistant warden of Dixon Correctional Center during Anthony's imprisonment there in 2018, and was responsible for the implementation, oversight, and supervision of policies and practices at Dixon.  Wilks also knew that as a result of

Defendants' policies, including at Dixon, multiple severely mentally ill prisoners, among them Anthony Gay, were placed in prolonged solitary confinement instead of being provided with appropriate mental health treatment.  At all relevant times Wilks had the power to seek appropriate treatment for Anthony, but did not do so.

27.     Sonja Nicklaus was an assistant warden of Dixon Correctional Center during Anthony's imprisonment there in 2018, and was responsible for the implementation, oversight, and supervision of policies and practices at Dixon.  Nicklaus also knew that as a result of Defendants' policies, including at Dixon, multiple severely mentally ill prisoners, among them Anthony Gay, were placed in prolonged solitary confinement instead of being provided with appropriate mental health treatment.  At all relevant times Nicklaus had the power to seek appropriate treatment for Anthony, but did not do so.

28.     Defendant Does 2-5 are sued herein by fictitious names for the reason that their true names are unknown to Plaintiff.  These Doe defendants are administrators overseeing facilities where Anthony was held in solitary confinement, and who had a duty to provide inmates with a meaningful opportunity to challenge their solitary confinement placement. Despite their obligation to do so, the Doe defendants failed to provide such an opportunity to Anthony, prolonging his solitary confinement.

## IV.     FACTS

29.     In 1994, while he was still a teenager, Anthony Gay was charged with robbery— the result of an incident in which he got in a fight with another teen who had insulted his sister, and the teen claimed Anthony had stolen the teen's hat and a $1 bill.  He pleaded guilty, was given a suspended prison sentence, and was placed on probation.

30.     Later that year, while still on probation, Anthony was pulled over and found to be driving without a license.  He was adjudicated as having violated his probation, and a few days

before Christmas 1994, at the age of 20, Anthony checked himself into the IDOC to begin

serving a seven-year sentence. With credit for good behavior, he was eligible for release in 3½

years.

31.     Anthony could not maintain good behavior, however.  He suffers from mental

illnesses, including borderline personality disorder.  The illness manifested in prison, causing

Anthony to act erratically and to break prison rules.  As a result of these infractions he lost his

time credit for good behavior.

### By holding Anthony in prolonged solitary confinement, the Defendants tortured him.

32.     In March 1998, as a result of his infractions, Anthony was placed in solitary

confinement.  He was confined to a cell roughly half the size of a parking space.  He typically

was not allowed outside the cell, even for meals, and his cell doors were constructed in a manner

that made it virtually impossible to see outside.  Anthony was sometimes let out of his cell for

short periods of "exercise" in a small, confined space.  Otherwise, he was confined to his cell and

could not see, talk with, or interact with any other human being, even a guard.  Between 1998

and 2018 Anthony was transferred among a series of similar small, stifling solitary confinement

cells in the IDOC's Tamms, Dixon, Pontiac, Stateville, and Menard prisons.  During this time

period, Defendants conspired to ensure that Anthony was transferred from one solitary

confinement cell to another, even when he was moved among prisons.  He did not have sustained

contact with another human being for twenty years.

33.     It has long been recognized that the conditions of solitary confinement can both

cause mental illness and be especially devastating to persons suffering from mental illness.

Indeed several years before Anthony was placed in solitary confinement, one federal court

observed that "placing [mentally ill prisoners in solitary confinement] is the mental equivalent of

putting an asthmatic in a place with little air to breathe," *Madrid v. Gomez*, 889 F. Supp. 1146,

1265 (N.D. Cal. 1995), because such prisoners "are at a particularly high risk for suffering very serious or severe injury to their mental health, including overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions" in solitary confinement. *Id.* Federal courts around the country have recognized the same thing; the U.S. Court of Appeals for the Seventh Circuit has observed that the conditions of solitary confinement "aggravate[] the symptoms of [a prisoner's] mental illness and by doing so inflict[] severe physical and especially mental suffering," *Scarver v. Litscher*, 434 F.3d 972, 977 (7th Cir. 2006), and there is a "scientific consensus . . . that prisoners held in solitary confinement experience serious, often debilitating—even irreparable—mental and physical harm[] . . . ." *Wallace v. Baldwin*, 895 F.3d 481, 484-85 (7th Cir. 2018) (citation omitted)). That was abundantly true for Anthony: in layman's terms, placing him in solitary confinement caused him to lose his mind.

34.    The primary manifestation of Anthony's mental decompensation in solitary confinement was repeated, severe self-mutilation. He began to cut and re-cut wounds on his testicles, penis, neck, arms, legs, and groin. He cut open his scrotum, pierced it with paperclips, embedded it with cloth strips, a zipper, and staples. He castrated portions of his testicles. He cut his left inner thigh and tied it up with strips of blanket. He cut his penis repeatedly.

35.    This self-mutilation began shortly after Anthony was placed in solitary confinement in 1998. It lasted throughout Anthony's imprisonment in solitary confinement, and was sustained, continuous, and severe. This is a partial sampling of self-mutilation events between August 2016 and May 2018:

- August 2016: Anthony cuts his scrotum and bleeds severely on his cell floor, requiring evacuation to an outside hospital.
- October 28, 2016: Anthony cuts his arm, thigh, and scrotum and inserts five staples, two ink pen reservoirs, and a spoon into the wounds.

- November 4, 2016: Anthony cuts his arm, thigh, and scrotum. He puts a plastic fork, ink pen, piece of fingernail clippers, and three pieces of metal in his scrotum.

- November 10, 2016: Anthony cuts his arm and scrotum. He puts nails and mop thread in his scrotum.

- November 12, 2016: Anthony re-cuts his scrotum.

- November 15, 2016: Anthony cuts his scrotum and inserts foreign objects.

- March 1, 2017: Anthony cuts himself with two sharpened ink pens, and receives a disciplinary ticket for possessing contraband.

- June 8, 2017: Anthony cuts his leg and scrotum with pieces from a broken fan. He sews wire through his leg. He puts a fan motor through his leg. He puts foreign objects in his scrotum and stabs the fan guard through his scrotum.

- June 16, 2017: Anthony cuts his arm and inserts a spoon in the wound far enough to require surgical removal.

- February 3, 2018: Anthony cuts open his right thigh. Later, he reopens the cut and embeds the following inside: three spork handles, an ink pen, an ink pen tube, the top of a spork, metal, and staples.  He also stabs an ink pen through his eyelids.

- February 20, 2018: Anthony cuts himself.

- March 2, 2018: Anthony cuts his thigh and stabs an ink pen through his eyelid.

- April 7, 2018: Anthony cuts himself again.

- April 15, 2018: Anthony cuts his scrotum and puts apple seeds in it.

- April 16, 2018: Anthony again cuts his scrotum and puts foreign objects inside.

- April 17, 2018: Anthony refuses medical treatment on his scrotum, and is put in restraints.

- April 19, 2018: Anthony cuts his scrotum again, and loses so much blood that he becomes unconscious

- May 27, 2018: Anthony puts a razor in his eye and cuts his scrotum.

The Defendants were well aware of the devastating impact solitary confinement has on persons suffering from mental illness, and they were well aware of its catastrophic impact on Anthony in particular.  Indeed, the Defendants meticulously recorded Anthony's self-mutilation in his medical records.

36.     Nonetheless, the Defendants did little to help Anthony.  Anthony was given psychotropic drugs off and on during his incarceration, but they did not stop his self-harm.  And at different prisons, a counselor would sometimes shout questions at Anthony through his cell door.  This "treatment" was essentially performative.  The Defendants were well aware that it was solitary confinement that was driving Anthony insane, but throughout nearly his entire incarceration they did almost nothing to ameliorate it.  Instead, the Defendants conspired to simply move him from one solitary confinement cell to another, among the IDOC's sprawling system of prisons.

37.     Indeed, far from conceding what they knew—*i.e.*, that Anthony's solitary confinement had driven him insane—Anthony was prosecuted vigorously for manifestations of his mental illness.  In addition to self-harming, Anthony's mental illness caused him to lash out at others by throwing his own body fluids through the heavy steel door of his isolation cell.  This was a well-recognized symptom of mental illness, which was being compounded and worsened by Anthony's inability to withstand the conditions of isolated confinement.  Instead of treating his mental illness, prison officials began referring each such act to the local prosecutor so that Anthony would be charged criminally for the outbursts.  The resulting prosecutions were entirely unnecessary and had little purpose beyond ensuring that Anthony would continue to suffer in solitary confinement well beyond his original release date.  As a judge who presided over one of these prosecutions remarked, "I would think a $2.00 piece of plastic draping [in front of Anthony's cell] would have prevented all of" the incidents.

38.     The criminal convictions Anthony received for actions caused by his mental illness added another 92 years to Anthony's original seven-year sentence.  In addition, Anthony had racked up more than 150 years of "solitary time" meted out by IDOC as a result of his disciplinary infractions – meaning he could serve time until the year 2152 without ever leaving

solitary.  In short, Anthony was destined to serve the rest of his natural life in solitary confinement.

39.     Eventually, criminal attorneys who took up Anthony's cause were able to file a habeas petition and ultimately succeed in shortening Anthony's sentence. Even so, Anthony was not released from the IDOC until August 27, 2018.  By that point, he had spent 24 years in prison, enduring the last 20 consecutive years in the isolating torture of solitary confinement.

### The Defendants could have stopped Anthony's torture at any time

40.     It is universally recognized that isolation and solitary confinement for any significant period of time is likely to make a person suffering from mental illness even worse, creating a substantial and increased risk of harm to the patient.  It is also well known that the impact of solitary confinement is cumulative, in that it causes more damage to a person's mind over time—and that these cumulative impacts can themselves *cause* mental illness.  For this reason, leading correctional standard-setting bodies provide specifically that such confinement should not occur.  For example, the National Commission on Correctional Health Care Standards for Mental Health Services in Correctional Facilities states that "[i]nmates who are seriously mentally ill should not be confined under conditions of extreme isolation."  The American Correctional Association has concluded that seriously mentally ill prisoners such as Anthony should not be placed in solitary confinement for more than 30 days.  The Association of State Correctional Administrators "believe[s] that lengthy stays [in solitary confinement] manufacture or increase mental illness."  And the American Bar Association Treatment of Prisoner Standards similarly advises that "[p]risoners diagnosed with serious mental illness should not be housed in settings that exacerbate their mental illness or suicide risk, particularly in settings involving sensory deprivation or isolation."

41.     Early on in Anthony's confinement, prison medical staff examined him and confirmed that he suffered from an acute mental health crisis and was at severe risk of self-harm. And years before his eventual release, Anthony was identified by the State of Illinois in court papers as one of only a few dozen prisoners within the entire IDOC whose mental illnesses were so acute and dangerous that they required full inpatient mental healthcare.

42.     There are no facilities or services within the IDOC for providing such care.  But that should not have prevented Anthony from receiving the care he needed.  The Defendants were capable of ensuring that Anthony received appropriate mental healthcare outside the IDOC. Nevertheless, they failed to do so:

(a)     State law empowers the director of the IDOC to have a prisoner needing intensive psychiatric care to be transferred to the custody of the IDHS during the prisoner's sentence.  *See* 730 ILCS 5/3-8-5.  And the IDHS operates multiple mental health centers for treating such people.  Defendants Baldwin, Sims, Reister, Dr. Doe 1, Hinton, Butler, Renzi, Puga, Nunez, Chess, Melvin, Kennedy, Ruskin, Varga, Wilks, and Nicklaus,  were personally aware that there were a handful of IDOC prisoners, which included Anthony, who could not receive appropriate psychiatric care within the IDOC and therefore should have been transferred to the custody of the IDHS.  Attorneys representing Defendant Baldwin and the IDOC admitted as much during a court hearing in *Rasho v. Baldwin*, 07-cv-1298 (C.D. Ill. (Mihm, J.)), an ongoing injunctive class action against Defendant Baldwin concerning the care of mentally ill prisoners within the IDOC.  Despite this knowledge, however, no Defendant tried to have Anthony transferred to an IDHS facility before the completion of his sentence.  As a result, Anthony unnecessarily endured years of solitary confinement without adequate mental health treatment, and continued to mutilate himself.

(b)     Defendants Butler, Renzi, Puga, Nunez, and Chess, who provided care for Anthony, knew about his acute mental health condition, and knew that he needed inpatient psychiatric care that was not offered by the IDOC.  They could have sought Anthony's referral to an inpatient psychiatric facility through the "collegial review" process operated by Wexford, their employer.  They did not do so, however.

(c)     Defendant Wexford was capable of providing Anthony with the treatment he needed, or having him transferred out of IDOC facilities for inpatient mental health treatment.  Wexford was and is under contract with the State of Illinois to provide both medical and mental health care to all prisoners within the IDOC.  This included the provision of "[c]omprehensive and specialized mental health services" for IDOC prisoners, including off-site and hospitalization services as necessary to treat the medical and mental health needs of the IDOC's prisoners.  (Indeed, pursuant to this contract Wexford arranges every day for IDOC prisoners suffering from injuries and "physical" illnesses, like cancer, to be transported outside of IDOC prisons to medical facilities where they can receive the medical care they need.)  Wexford also employed doctors and mental health professionals to assess the mental condition of IDOC prisoners.  Its employees and agents examined Anthony and concluded that he was suffering from acute mental distress that required intensive care.  By policy and practice, however, Wexford had never developed such a hospitalization capacity within the IDOC's facilities, so this meant that Anthony required off-site hospitalization.  On information and belief, Wexford also had a policy and practice of ignoring its obligation to provide such off-site hospitalization for seriously mentally ill prisoners, and did not seek to transfer any prisoners—including Anthony—for the off-site mental healthcare that they needed.  As a

result of this policy and practice, Anthony remained in solitary confinement in a crisis cell, suffering the injuries described herein.

43.     Even short of providing Anthony with the care he needed, the Defendants, including all the individual defendants, could simply have had Anthony let out of his solitary confinement cell to interact with other people.  This they finally did, but only in the last few weeks of Anthony's incarceration, in 2018 at Dixon Correctional Center.  Not surprisingly, during even that short time, Anthony's mental health improved dramatically.

44.     For two decades, the Defendants knew that solitary confinement both causes and exacerbates mental illness. They knew that allowing Anthony to be placed in solitary confinement for any meaningful length of time was toxic to his mental health and would cause him to suffer both mental anguish and—when he harmed himself as a result of that anguish— intense physical pain.  They also had the ability to prevent him from further harm by removing him from solitary and to secure appropriate treatment for his acute and devastating mental condition.  But even though they knew Anthony would be devastated by solitary confinement, and even though they could have treated him appropriately, the Defendants allowed him to remain in solitary confinement anyway.

45.     In effect, confronted with a prisoner whose mental illness made him hard to deal with, the Defendants chose to address the problem by keeping Anthony in a penal tomb—even though they knew that to do so was to inflict torture on him, for years on end.

### COUNT I: Eighth Amendment

**Against: Baldwin (individual capacity), Sims (individual capacity), Reister (individual capacity); Dr. Doe 1 (individual capacity); Hinton (individual capacity), Butler (individual capacity), Renzi (individual capacity), Puga (individual capacity), Nunez (individual capacity), Chess (individual capacity), Melvin (individual capacity), Kennedy (individual capacity), Ruskin (individual capacity), Varga (individual capacity), Wilks (individual capacity), Nicklaus (individual capacity), and Wexford**

46.     Each paragraph of this complaint is incorporated as if fully restated here.

47.     Anthony suffered from severe mental illnesses that were serious medical conditions and placed him at serious risk of harm and in need of intense medical treatment.

48.     By holding Anthony in solitary confinement for years on end, Defendants caused or aggravated his mental illness.

49.     The Defendants knew that Anthony's serious medical needs were not being treated within IDOC's facilities, and that the isolation of solitary confinement would exacerbate his condition and cause him further damage over time.

50.     Despite what they knew, the Defendants failed to transfer Anthony out of IDOC to a facility where he could receive care for his serious mental health condition.  Nor did they ameliorate the conditions of his confinement in prison, or provide him with effective treatment. Instead, they allowed him to remain isolated in solitary confinement.

51.     Defendants conspired to keep Anthony in solitary confinement in institutions throughout the IDOC.

52.     In so doing, the Defendants were deliberately indifferent to Anthony's serious medical needs.

53.     As a result of the Defendants' failure to secure proper treatment for Anthony and their decision that he instead be consigned to solitary confinement, Anthony suffered physical and psychological injuries, severe pain, and acute mental anguish.

54.     Defendants' consignment of Anthony in solitary confinement constituted the infliction of cruel and unusual punishment in violation of the Eighth Amendment.

55.     Defendants' deliberate indifference to Anthony's medical needs violated his rights to be free from cruel and unusual punishment under the Eighth Amendment.

56.     As a direct and proximate result of Defendants' actions, Anthony suffered the mental and physical injuries described herein.

**COUNT II: Americans with Disabilities Act**

**Against: Jeffreys (official capacity**)

57.     Each paragraph of this complaint is incorporated as if fully restated here.

58.     Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).

59.     Title II of the ADA (codified at 42 U.S.C. § 12132) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

60.     To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

61.     The State of Illinois and the IDOC are public entities as defined in 42 U.S.C. § 12131(1).

62.     At all times relevant to this Complaint, in light of his severe mental illness, Anthony was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2).

63.     Due to his mental illnesses, Anthony had a mental impairment that substantially limited one or more major life activities, including but not limited to thinking, interacting with others, and controlling his behavior.  As a result of his mental disabilities, he required intensive inpatient psychiatric therapy.

64.     Anthony was wholly dependent upon Defendants for basic daily needs and appropriate accommodations.  As a state prisoner, he met the essential eligibility requirement for receipt of services or the participation in programs or activities provided by the IDOC and the State of Illinois.

65.     Under Title II of the ADA and 28 C.F.R. § 35.130(a), Defendants are responsible for ensuring that individuals in custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability.

66.     Despite Anthony's known and obvious disability—his severe mental illness, his repeated attempts to self-harm, and his classification among a handful of prisoners so mentally ill that they could not receive proper care within the IDOC—Defendants abided by a continuous policy of discrimination against mentally ill prisoners and failed to reasonably accommodate his disability and failing to provide him with access to human contact, rehabilitation opportunities, group therapy, adequate mental health treatment, and the numerous other programs and services that the IDOC offers to prisoners outside of their cells.

67.     Based on their ongoing discriminatory policies, Defendants further failed to accommodate Anthony's disabilities in the IDOC's disciplinary processes, and they discriminated against him by deliberately isolating him on account of his mental illness.

68.     The Defendants have and do make arrangements for other prisoners, who require hospitalization outside of the IDOC because of physical injuries or illnesses, to receive such outside hospitalization, or to receive effective care within the IDOC.

69.     The foregoing accommodations were reasonable and, if provided to mentally ill patients like Anthony, would have enhanced Anthony's quality of life, ameliorated his mental illness, and alleviated his suffering.  Instead, and precisely because of his mental illness,

Defendants placed Anthony in solitary confinement and removed his access to these necessary accommodations.

70.     Due to the failure of Defendants to provide Anthony with the reasonable accommodation of inpatient intensive psychiatric treatment, Anthony was deprived of access to services, programs, and activities, including education, programming, recreation, exercise, human interaction, and mental health treatment and services.

71.     The effects of social isolation and dehumanization of his conditions of solitary confinement were worsened by the Defendants' deprivation of Anthony's access to mental health programs and services to counteract the effects of the solitary confinement.

72.     As a result of the Defendants' failure to provide reasonable accommodation for his mental illness, and their continuous policies of discrimination against mentally ill prisoners, Anthony suffered extreme mental pain and anguish and physical harm, as described in this complaint.

## COUNT III: Rehabilitation Act of 1973

### Against: Jeffreys (official capacity)

73.     Each paragraph of this complaint is incorporated as if fully restated here.

74.     At all times relevant to this Complaint, in light of his severe mental illness, Anthony was a qualified individual with a disability as defined in Section 504 of the Rehabilitation Act of 1973.

75.     The State of Illinois and the IDOC receive federal financial assistance.

76.     Defendants discriminated against Anthony by failing to provide a reasonable accommodation for his mental disabilities.

77.     By placing Anthony in solitary confinement and depriving him access to appropriate services, programs, and activities, including education, programming, recreation,

exercise and mental health services, the Defendants discriminated against him on the basis of his disability in violation of the Rehabilitation Act.

78.    As a result of the Defendants' failure to provide reasonable accommodation for his mental illness, and their continuous policies of discrimination against mentally ill prisoners, Anthony suffered extreme mental pain and anguish and physical harm, as described in this complaint.

**COUNT IV:  Fourteenth Amendment**
**Against: Melvin (individual capacity), Kennedy (individual capacity), Ruskin (individual capacity), Varga (individual capacity), Wilks (individual capacity), Nicklaus (individual capacity), Defendant Does 2-5**

79.    Each paragraph of this complaint is incorporated as if fully restated here.

80.    Defendants have violated Anthony's rights under the due process clause of the Fourteenth Amendment to the United States Constitution by, among other things: failing to provide Anthony a meaningful opportunity to challenge or be heard about his solitary confinement; failing to provide information about the basis for any decision to continue his solitary confinement; denying Anthony any opportunity to provide information to and/or to influence the ultimate decision-maker regarding his continuing solitary confinement; and failing to inform Anthony of the requirements to be released from solitary confinement.

81.    As a result of these failures Anthony's solitary confinement was prolonged and he suffered the physical and psychological injuries described in this complaint.

**V.      RELIEF REQUESTED**

**WHEREFORE**, Plaintiff Anthony Gay respectfully requests judgment against Defendants, jointly and severally, for the following:

A.      An award of compensatory, punitive, and nominal damages;

24

B.    An award of full costs and attorneys' fees arising out of this litigation

pursuant to 42 U.S.C. § 1988(b), the ADA, and the RA; and

C.    Any and other further relief this Court may deem just and appropriate.

## VI.    DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury in this action of all issues so triable.

Dated: March 7, 2020                                  Respectfully submitted,

/s/ *Stephen H. Weil*

Antonio Romanucci - aromanucci@rblaw.net        Arthur Loevy – arthur@loevy.com
Nicolette Ward - nward@rblaw.net                Jon Loevy – jon@loevy.com
Romanucci & Blandin, LLC                        Sarah Grady – sarah@loevy.com
321 North Clark St., Suite 900                  Stephen Weil – weil@loevy.com
Chicago, IL 60654                               Loevy & Loevy
(312) 458-1000                                  311 N. Aberdeen Street
                                                Third Floor
                                                Chicago, IL 60607
                                                312-243-5900

Maggie E. Filler
Roderick & Solange MacArthur Justice Center
160 East Grand Avenue (6th Floor)
Chicago, IL 60611
maggie.filler@macarthurjustice.org

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Stephen H. Weil, a licensed attorney (ARDC No. 6291026) hereby certify that on

March 7, 2020, I filed the foregoing with the Clerk of Court using the CM/ECF system.


/s/ Stephen H. Weil .