IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| Anthony Gay, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19-CV-01133 |
| | ) | |
| v. | ) | Judge Harold A. Baker |
| | ) | |
| Rob Jeffreys *et al.*, | ) | Magistrate Judge Eric I. Long |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
CERTAIN GOVERNMENT DEFENDANTS' MOTION TO DISMISS IN PART**

Plaintiff Anthony Gay, through counsel, submits this response to the motion to dismiss in part filed by government defendants (collectively "IDOC Defendants") (ECF 104) and memorandum in support (ECF 105), as well as the defendants' request for a partial to stay of discovery.

**INTRODUCTION**

The IDOC Defendants already moved to dismiss Plaintiff's claims, before Judge Bruce. They lost that motion in its entirety. Since then, of course, this case has been transferred to this Court. The law of the case doctrine, which is described herein, forbids litigants from taking advantage of such transfers to re-litigate the questions that they already lost before the second judge. Yet that is what this motion does. After Plaintiff amended his complaint to add several defendants—but, as the IDOC Defendants acknowledge, not to change his allegations—the IDOC Defendants filed an entirely new motion to dismiss, lifting arguments verbatim from their original dismissal brief into a new one. Their evident hope is to undo Judge Bruce's legal conclusions, and to get rulings from this Court that they would prefer. That is flatly improper. As Plaintiff explains herein, the law of the case doctrine forbids litigants from manipulating an administrative change in judges to its advantage, and it forecloses the IDOC Defendants' motion at the threshold.

1

The IDOC Defendants' arguments for dismissal, furthermore, have not improved with time. ***First***, the IDOC Defendants argue that Plaintiff has not sufficiently alleged that upper-level administrators knew about his mistreatment. But Plaintiff has alleged that his mistreatment was caused by systemic misconduct, and it is well established that administrators can be presumed to know about systemic deficiencies. ***Second***, the defendants argue that Plaintiff does not state a claim under the Americans with Disabilities Act or the Rehabilitation Act, but this amounts to a claim that Defendants were not required to make even reasonable accommodations for Plaintiff's mental illness in deciding to place him in solitary confinement—a position that contravenes the ADA and RA. ***Third***, the IDOC Defendants argue that the statute of limitations cuts off all but the last two years of his claim. But the Seventh Circuit's established continuing violation doctrine establishes that this is not so.

These are not Plaintiff's arguments—they are Judge Bruce's rulings. The IDOC Defendants' motion to overturn those rulings is a request for extraordinary relief. In order for this Court to grant it, the IDOC Defendants would first have to satisfy a heavy burden, establishing either that the law had changed entirely, or that Judge Bruce made grave errors in his decision. The IDOC Defendants never make any such showing, however—indeed, they never even suggest that Judge Bruce erred, or take issue with his rulings. Instead, they simply pretend that Judge Bruce's decision was never made, while at the same time asking the Court to overturn it. The Court should reject this highly improper maneuver, and deny the IDOC Defendants' motion in its entirety.

**I.     The law of the case doctrine bars the IDOC Defendants' motion.**

The IDOC Defendants have already moved to dismiss Plaintiff's original complaint, making essentially the same arguments they do here. (*See* ECF 37.) After Plaintiff responded (ECF 40),[1] Judge Bruce denied the IDOC Defendants' motion in its entirety, rejecting every argument that the defendants

---
[1] Plaintiff incorporates his response (ECF 40) by reference.

made for dismissal.  (ECF 44.)  In bringing this new motion to dismiss, the IDOC Defendants concede that "Plaintiff's First Amended Complaint only adds additional defendants and is substantively identical [to his original complaint]."  (ECF 105 at 4.)  As such, the IDOC Defendants' new motion is a naked attempt to take advantage of a change in judges.

That maneuver is forbidden by the law of the case doctrine.  That doctrine "reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one." *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997).  Rather, "the presumption is that earlier rulings will stand," *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1014 (N.D. Ill. 2003) (Posner, J. sitting by designation), and as such, the second judge "is not free to [alter the first judge's rulings] . . . merely because he has a different view of the law or facts from the first judge." *Williams v. Comm'r*, 1 F.3d 502, 503 (7th Cir. 1993).  Rather, the earlier judge's rulings should only be revisited "for compelling reasons (such as new controlling law or clear error)."  *Best*, 107 F.3d at 546.  Indeed, pleadings filed in defiance of the law of the case doctrine are considered frivolous.  *See Reynolds v. U.S. Capitol Police Bd.*, 357 F. Supp. 2d 19, 24 (D.D.C. 2004) ("[W]here a party reiterates arguments that have already been unequivocally rejected by the Court, and its pleadings reflect a deliberate decision to ignore an opinion of the Court which is the controlling law of the case, sanctions are warranted under Rule 11.").

Nowhere in their new motion do the IDOC Defendants identify new controlling law, nor do they suggest anywhere that Judge Bruce committed clear error.  Rather, their hope seems to be that the Court will simply "have a different view of the law or facts" from Judge Bruce, and deliver an outcome they prefer.  The law of the case doctrine forbids that.  The IDOC Defendants are wrong on the merits of their motion, as Plaintiff explains herein.  But at the outset, the IDOC Defendants' attempt to vacate Judge Bruce's ruling for the simple reason that the case has been transferred to a second judge is flatly improper, and the Court should reject it for that reason alone.

**II. Plaintiff has alleged that he was harmed by systemic deficiencies of which IDOC managers are presumed to have been aware.**

The individual IDOC Defendants are IDOC corrections managers of one type or another. They move to dismiss Plaintiff's Section 1983 claims against them by arguing that Plaintiff has only alleged "localized" rather than systemic harm, and as such prison managers are not presumed to have personal involvement—and thus personal culpability—for localized constitutional violations. (ECF 105 at 4-5.) Those manager IDOC Defendants who are not doctors further argue that prison administrators are entitled to "relegate to the prison's medical staff the provision of good medical care." (*Id*. at 5 (quotation omitted).)

The IDOC Defendants made these precise arguments in their first motion to dismiss, and Judge Bruce rejected all of them. Indeed, the IDOC Defendants appear to have lifted the arguments in their original motion and moved them into this one with virtually no modification. (*Compare, e.g.*, ECF 37 at 3-4 *with* ECF 105 at 5-6.) Plaintiff responded noting that he had amply alleged that "the conditions giving rise to Plaintiff's claims did not affect just him alone, but rather affected a number of other inmates as well." (ECF 40 at 3-4.) Regarding the IDOC administrator Defendants' argument that they could "relegate" medical care, Plaintiff explained that the complaint had explained at length that "no person charged with administering a prison system could be unaware that solitary confinement is harmful, particularly to those suffering from mental illness," (ECF 40 at 4), and that "it is well established that prison officials are deliberately indifferent to a prisoner's serious medical needs if they have reason to know that those needs are not being met." (*Id.* at 5.)

Judge Bruce agreed with Plaintiff, and rejected the administrator-defendants' "systemic" arguments entirely. Judge Bruce held that

> Despite Defendants' focus on Plaintiff's specific circumstances, the Court construes Plaintiff's allegations as asserting a constitutional claim regarding a fundamental deficiency within IDOC—namely, the lack of

4

appropriate mental health care, which Plaintiff alleges Defendants knew was deficient.

(ECF 44 at 5.) Judge Bruce went on to hold that "[b]ased on Plaintiff's alleged facts, a jury could reasonably find that [the administrator defendants] knew of this alleged systemic deficiency given their respective senior positions within IDOC." (*Id.* at 6.)

In their current motion, the IDOC Defendants do not explain why Judge Bruce's holding was clearly erroneous, nor do they identify new law. Rather, they rely on language in Magistrate Judge Long's opinion regarding the appropriate scope of an ESI protocol, that Plaintiff's complaint was "'silent as to any system-wide failure regarding solitary confinement policies, that caused harm to a group of mentally ill prisoners,'" and instead "'focuses on an alleged deficiency within the IDOC that caused harm to Plaintiff.'" (ECF 105 at 4 (quoting ECF 66 at 3).)

Immediately after the passage quoted by the IDOC Defendants, however, Magistrate Judge Long acknowledged that Plaintiff's complaint *did* allege that the defendants had a "policy of failing to provide these accommodations to *mentally ill prisoners like Anthony* resulted in" Plaintiff's solitary confinement, and that Plaintiff's complaint made allegations about "similarly situated individuals" (emphasis Magistrate Judge Long's). Magistrate Judge Long ruled against broader ESI discovery on grounds that Plaintiff's complaint ultimately concerned and made allegations about "harm to [Plaintiff] himself," (ECF 66 at 4),[2] but he did not dispute that Plaintiff had made allegations about similar treatment of other inmates.

In other words, Magistrate Judge Long's ruling *specifically acknowledged* that Plaintiff had alleged that the IDOC's policies applied to numerous detainees besides Plaintiff. That is the predicate for a "systemic" deficiency of which prison managers are presumed to be aware. *See Richard v.*

---

[2] Plaintiff respectfully contends that Magistrate Judge Long's ruling was incorrect. (*See* ECF 74, ECF 84.) But that ruling does not ultimately disagree with the proposition that Plaintiff has alleged that his injuries flow from systemic deficiencies.

5

*Baldwin*, No. 17-cv-4677, 2018 WL 6606037, at *4 (N.D. Ill. Dec. 17, 2018) ("'Systematic'" conditions are those that affect a number of individuals rather than one inmate in isolation."). *Accord Smith v. Dart*, 803 F.3d 304, 309 n.2 (7th Cir. 2015) ("[T]he personal involvement of senior jail officials … can be inferred at the motion to dismiss stage, where, as here, the plaintiff alleges 'potentially systemic,' as opposed to 'clearly localized,' constitutional violations.").

Plaintiff's complaint, moreover, cites the facts in *Rasho v. Baldwin*, No. 1:07-cv-1298, (C.D. Ill.), an injunctive class action brought on behalf of mentally ill IDOC prisoners, including mentally ill prisoners that were subject to solitary confinement. (*See* ECF 82 at 3 & ¶ 42(a).) The record developed in *Rasho*, which was originally filed in 2007 and is overseen by Judge Mihm, amply supports Plaintiff's allegations that his injuries arise from systemic, rather than localized, constitutional violations.

Plaintiff refers the Court to *Rasho*'s Permanent Injunctive Order, issued April 23, 2019 and attached hereto as Exhibit 1.³ While he was incarcerated Plaintiff was a member of the *Rasho* class, which included more than 900 other mentally ill prisoners who were housed in solitary confinement. (*See Rasho*, Ex 1 at 2.) Indeed, Plaintiff testified about his solitary confinement as part of *Rasho*'s injunctive hearings. (*See id.* at 13.)⁴ At the conclusion of those hearings, Judge Mihm found that there "were systemic and gross deficiencies" within the IDOC that "effectively denied the Plaintiffs access to

---

³ Plaintiff cites the *Rasho* order pursuant to the Rule 12(b)(6) approach approved of in *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012). In *Geinosky* the court explained that while the party moving to dismiss under Rule 12(b)(6) may not rely on materials outside the complaint, "[a] plaintiff . . . has much more flexibility in opposing a Rule 12(b)(6) motion," and "may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove." 675 F.3d at 745 n.1. "Such documents are not evidence, but they provide a way for a plaintiff to show a court that there is likely to be some evidentiary weight behind the pleadings the court must evaluate," and thus may be considered by the court at the dismissal phase. *Id*. Unlike citation to such materials by a Rule 12(b)(6) movant, a plaintiff's citation to such materials does not convert the Rule 12(b)(6) briefing into a summary judgment motion. *Id*.

⁴ Ironically, among the witnesses who testified opposite Plaintiff were several of the IDOC Defendants who argue here that Plaintiff has not shown they were aware of the conditions giving rise to his claims. *See* Baldwin (*see* Ex. 1 at 20), Sim (*id*. at 13), Hinton (*id*.), and Renzi (*id*.).

adequate medical care." (*Id.* at 6.)  Judge Mihm focused in particular on the testimony of Dr. Hinton—one of the moving IDOC Defendants here—finding that his "testimony at the preliminary injunction hearing regarding inmates who are in segregation was extremely troublesome." (*Id.* at 16.)  Judge Mihm then quoted from that testimony at length:

> Q. [ ]. Why do you have so many mentally ill people in segregation and so few regular population people in segregation?
>
> A. I think, in general, the percentage of folks who are mentally ill tend to have more behavioral issues, in part because of their mental illness.
>
> Q. So, you've got so many of them in segregation because they do—they don't follow the rules well, right?
>
> A. In part.
>
> Q. And has anyone, to your knowledge, wondered whether or not putting mentally ill people in segregation is good for them?
>
> A. Yes.
>
> Q. Who's done that?
>
> A. I have.
>
> Q. And what's your view?
>
> A. My view is there's nothing—there's nothing that is a good thing about being in segregation. We need to make sure that they have proper access to treatment.
>
> Q. Now, I believe your testimony the last time I took it on that subject was it won't hurt them if we treat them with the treatment they need, right?
>
> A. Access to treatment, correct.
>
> Q. But how do you know they're getting the treatment they need if they're in segregation?
>
> A. That's why we have to make sure that there are no barriers to the access to treatment.
>
> Q. But you don't have enough people?
>
> A. Correct.
>
> Q. So, you know they're not getting the right treatment?
>
> A. We know that there's significant staffing shortages.
>
> Q. They're not getting the right kind of psychiatric care, right?
>
> A. We don't have—correct, we don't have the right staffing requirements.

7

> Q. They're not getting enough groups because you don't have enough people to run the groups?
>
> A. Correct.
>
> <u>Q. And you know from your own personal judgment that if you're not doing that for people in segregation, they're going to get worse; isn't that right?</u>
>
> <u>A. Across the board.</u>

(Ex. 1 at 16-17 (emphasis Judge Mihm's).) Judge Mihm concluded that the administrators of the IDOC were deliberately indifferent to the mental healthcare of these inmates, noting, "The Seventh Circuit has concluded 'that a clear consensus had been reached indicating that a prison official's failure to remedy systemic deficiencies in medical services akin to those alleged in the present case constituted deliberate indifference to an inmate's medical needs.'" (*Id.* at 42-43 (*quoting Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430-31 (7th Cir. 1989).) Judge Mihm also held that the IDOC's administrators, including Director Baldwin, "cannot shirk their constitutional obligations by delegating them to" medical vendors that had also failed to provide mentally ill inmates with the care they needed. (Ex. 1 at 62.)

Plaintiff alleges that his horrific mistreatment resulted from the systemic deficiencies laid bare in *Rasho*. Judge Mihm's permanent injunction ruing in *Rasho*, indeed, suggests that there is likely to be ample evidentiary weight behind those claims. It is certainly enough to create the inference that the administrator-defendants in this case should have been aware of the systemic problems that Plaintiff claims caused his injuries, which is all that is required at the pleading stage. *See Smith*, 803 F.3d at 309 n.2. The Court should reject the IDOC Defendants' arguments to the contrary.

### III.    Plaintiff states claims under the Americans with Disabilities Act and Rehabilitation Act.

The IDOC Defendants—in this case, the State of Illinois, represented by Defendant Jeffreys in his official capacity[5]—sought to dismiss Plaintiff's Americans with Disabilities Act ("ADA") and

---

[5] Plaintiff's ADA and RA claims are brought against the State (represented by Defendant Jeffreys in his official capacity), as provided by those statutes. (*See* ECF 82 ¶¶ 10, 57-78.)

Rehabilitation Act ("RA") claims before Judge Bruce. (*See* ECF 37 at 6-10.)[6] Judge Bruce denied the State's motion in its entirety, holding that Plaintiff's complaint sufficiently alleged claims of disability discrimination. (*See* ECF 44 at 7-10.) The State now seeks to undo that ruling. Once more, the State does not identify any new law nor does it contend, anywhere, that Judge Bruce's holding was clearly erroneous or incorrect at all. Rather, the State's pleading is in defiance of this Court's law of the case doctrine, and the Court should deny the State's motion for that reason alone.

The State is wrong on the merits as well. **First** the State argues that Plaintiff's ADA and RA claims are actually claims of medical malpractice or deliberate indifference to a serious medical need, and as such are "not viable under the ADA." (ECF 105 at 9-10 (citing *Estate of Crandall v. Godinez*, 2015 WL 1539017, *7 (C.D. Ill. Mar. 31, 2015)).) This argument simply confuses medical malpractice claims with denial of access to care. Indeed *Crandall* helpfully draws this distinction.

In *Crandall*, a mentally ill prisoner's ADA claims challenged the defendants' medical decision: to give him psychotropic medications, when they should have provided him with therapy. *Crandall* held that this allegation amounted to a claim that the decedent "was not properly treated for his mental illness—[which] is distinctly different from a claim that Crandall was denied access to medical services." As such, the claim was "not cognizable under the ADA." *Crandall*, 2015 WL 1539017, at *7. But *Crandall* itself emphasized that the situation would be different if the question of *access* to care was separate from questions about medical judgment or *quality* of care. *See id.* at *6 (citing *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006). Indeed in citing to *Kiman*, *Crandall* highlighted an important distinction between malpractice-like claims on the one hand, and ADA claims on the other.

*Kiman* involved a prisoner who challenged (1) his doctors' diagnosis and treatment of his ALS, and (2) the prison's failure to provide drugs that the doctors had prescribed for his ALS. In assessing

---

[6] Plaintiff explained why the State was wrong (*see* ECF 40 at 5-10), and he incorporates those arguments by reference.

these two claims *Kiman* (like *Crandall*) explained that if a claim "simply [concerns] a reasoned medical judgment with which the patient disagreed," medical malpractice or the Eighth Amendment—not the ADA—is the appropriate vehicle for a claim. *Kiman*, 451 F.3d at 285. However, if the challenged practice constitutes "outright denial of medical services," an ADA claim may lie. *Id*. at 287. Given this distinction, *Kiman* held that the plaintiff could not challenge his doctors' diagnosis and treatment of ALS as inadequate under the ADA, since that involved medical judgments; but he *could* assert and ADA claim for the prison's failure to provide him with prescribed ALS medications, since that act did not involve medical judgments, but rather constituted a denial of access to medical care. *Id.* at 285-87.

That distinction is critical for this case. The plaintiff in *Crandall* challenged a medical judgment—to provide a person suffering psychosis with psychotropic medications, instead of therapy. Here, by contrast, Plaintiff alleges that the State refused to provide Plaintiff with the mental healthcare that he was *assessed* to need—the State neither developed an onsite mental hospitalization capacity to treat severely mentally ill patients like Plaintiff, nor did it refer them off-site. (*See* ECF 82 ¶¶ 42(b) & (c) (alleging that the IDOC's medical vendor never developed an on-site mental hospitalization capacity, nor did it refer mentally ill inmates off-site for care); *id.* ¶ 42(a) (defendants failed to transfer[7] Plaintiff to state facilities that could provide adequate mental healthcare).) All the while, Plaintiff alleges, inmates with physical illnesses, like cancer, are referred to off-site hospitalization. (ECF 82 ¶ 42(c).) Those allegations state a straightforward claim under the ADA and RA. *See Andrews v. Rauner*, No. 3:18-cv-1101, 2018 WL 3748401, at *5 (C.D. Ill. Aug. 6, 2018) ("In this case, Plaintiff alleges that the State Defendants discriminated against [the disabled prisoner] by denying her access to hospitalization

---

[7] The IDOC Defendants argue the failure to transfer Plaintiff to hospitalization in the Illinois Department of Human Services had to sign off (*see* ECF 105 at 11), but Plaintiff's ADA and RA claims are claims against the State of Illinois, and is thus comprised of both agencies. (*See* ECF 44 at 10 (*sua sponte* dismissing the State of Illinois as a defendant because Plaintiff had also sued the IDOC's director in his official capacity, which was "no different from a suit against the State itself." (quotation omitted).)

outside of the prison but allowed prisoners with physical injuries or illnesses to receive outside hospitalization. . . . This is sufficient to state a claim under the ADA and the Rehabilitation Act."). Indeed, Judge Bruce so held. (*See* ECF 44 at 9-10 (quoting *Andrews*).)

What is more, Plaintiff alleges that mental health treatment is itself an accommodation, since it would have allowed him to benefit from *other* programs and services:

> Due to the failure of Defendants to provide Anthony with the reasonable accommodation of inpatient intensive psychiatric treatment, Anthony was deprived of access to services, programs, and activities, including education, programming, recreation, exercise, human interaction, and mental health treatment and services.

(ECF 82 ¶ 70.) The State does not disagree that providing Plaintiff with adequate mental health treatment would have been reasonable, and Plaintiff sufficiently alleges that such treatment would have allowed him to take advantage of other programming. Dismissal fails, as Judge Bruce held.

*Second* the State argues, as it did in its original motion, that "Plaintiff was not denied access to any programs or services on the basis of his disability" because "the restrictions on his access to any programs and benefits . . . resulted from disciplinary infractions he received, not his disability." (ECF 105 at 10; ECF 37 at 8.) The State relatedly argues that Plaintiff's ADA and RA claims are foreclosed because he merely alleges that "placement in solitary confinement was not directly because of his serious mental illness, but because of misconduct that was a result of a serious mental illness," which, they say, is barred by the ADA and RA. (ECF 105 at 11; ECF 37 at 9.)

As Plaintiff explained in his original response, however, this "misconduct" argument fails to grapple with the elements of a failure-to-accommodate claim—specifically, that the State failed to provide Plaintiff with a reasonable accommodation for his disability. (*See* ECF 40 at 5 (reviewing elements).) The conceit of the "misconduct" argument is that the State treated Plaintiff like any other inmate: he broke prison rules that are neutrally applied, and in response the prison guards sanctioned

11

him in proportion to that misconduct, just like they would any other prisoner. In Plaintiff's case—because of the nature of his misconduct—this resulted in decades of solitary confinement.

That position "misses the point of a reasonable accommodation claim." *Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006). "[T]he crux of a reasonable accommodation claim is a facially neutral requirement that is consistently enforced," which thereby deprives a disabled person from the provision of programs and services. *Id*. (quotation omitted). Indeed, contrary to the State's claim that "[t]here is very little case law applying this theory generally in a prison context," (ECF 105 at 11), courts across the country have applied the principle articulated in *Wisconsin Community Services* to reject the "misconduct" defense that the State advances here. Instead, they have recognized that allegations like Plaintiff's state a claim under the ADA and RA. *See C.P.X. through S.P.X. v. Garcia*, No. 4:17-cv-17, 2020 WL 1531126, at *45 (S.D. Iowa Mar. 30, 2020) ("Courts have concluded that prisoner-plaintiffs raise colorable ADA and RA claims where they allege: (1) they have been subject to punishments as a consequence of behavior attributable to their mental health disabilities; and (2) either mental health professionals were not consulted as to the appropriateness of the punishment, or the plaintiff was denied mental health treatment for the behavior in question." (collecting cases)); *Brown v. Wash. Dep't of Corr.*, No. 13-cv-5367, 2015 WL 4039322, at *11 (D. Wash. May 13, 2015) (finding a reasonable jury could conclude the defendant discriminated against the plaintiff on the basis of his mental illness where "ample evidence supports plaintiff's allegation that his acts of self-harm were treated not as evidence of mental illness, but as acts requiring a disciplinary response"); *Biselli v. Cty. of Ventura*, No. 2:09-cv-08694, 2012 WL 2061688, at *24 (C.D. Cal. June 4, 2012) (denying summary judgment to the defendants on plaintiff's ADA claim after concluding that evidence showing (1) the plaintiff was housed "in the most restrictive area of the jail[ ] based on conduct that was specifically linked to his mental illness," (2) the housing decision was "made without input from the mental health staff at the jail," and (3) the plaintiff's isolation "persisted despite indications that segregation housing

was adverse to [the plaintiff's] mental health condition," could lead a rational jury to find the plaintiff "had proven he could be housed in more integrated environments without posing a security risk, and that [his] placement in [restricted housing] and disciplinary isolation was punishment for behavior known to be related to his mental illness"); *Scherer v. Pa. Dep't of Corr.*, No. 04-cv-191, 2007 WL 4111412, at *44 (W.D. Pa. Nov. 16, 2007) (because the misconduct that resulted in his placement in segregation may have been "a result of his mental illness. . . . the lack of modification of [prison's] disciplinary procedures to account for . . . his mental illness . . . possibly resulted in a violation of Title II of the ADA . . . ."). The State's "misconduct" argument, in short, fails on its own terms.

Plaintiff's Complaint, moreover, is not just about the State's immediate disciplinary choices. Plaintiff asserts a broader challenge to his extended placement in solitary confinement with no accommodation of his disabilities. As the Complaint explains, extended solitary confinement is especially devastating to people with mental illness, and Plaintiff's solitary confinement both compounded and worsened his mental illness. (*See* ECF 82 ¶¶ 32-39.) Adequate time out of a segregation cell, along with other ameliorations of the conditions of solitary confinement, is an accommodation that was necessary in light of Plaintiff's mental illness. It would have allowed Plaintiff to avoid symptoms so extreme that he was rendered unable to participate in any aspect of prison life, including to be able to get out of solitary confinement and to avoid further misconduct that resulted in yet more segregation. Such accommodations are like any other accommodation to people with disabilities. Under the ADA, such accommodations for a prisoner with mental illness are analogous to providing interpretive services for a deaf person, a magnifier or reader for a person with low vision, or a wheelchair so that a paraplegic person can leave his cell to attend chapel.

In Plaintiff's case, the accommodations were necessary to allow him to remain free enough from delusion, mania, and self-harm in order to participate in the limited programs or services that are available in solitary confinement, such as yard, showers and treatment participation. They also would

13

have helped him to avoid decompensation while in solitary confinement, so that in time he could be released and return to the programming available in general population—rather than compound his mental illness, leading to further violations of prison rules, leading to yet more time in solitary confinement.

The question that remains is whether Plaintiff has sufficiently alleged that such accommodations were "reasonable." He has. As the Complaint explains, the State finally provided Plaintiff with such accommodations in the last few weeks of his imprisonment, at Dixon CC, and he improved dramatically during this time. (ECF 82 ¶ 43.) Thus the allegations of the complaint plainly show that accommodating Plaintiff's disability was feasible. Certainly this is enough to permit the inference that it would have been reasonable for the State to offer Plaintiff this accommodation years before, avoiding the damages described in the Complaint. In short, as Judge Bruce concluded, Plaintiff's claims surrounding his solitary confinement state a claim for disability discrimination:

> In Plaintiff's complaint, he alleges that despite his known and visible mental health illness, Defendants discriminated against him by denying access to mental health services outside of the prison yet Defendants provided outside medical services to other inmates with physical injuries and illnesses. . . . The Court concludes that Plaintiff's allegations are sufficient to state a claim under the [RA].

(ECF 44 at 9.)  The Complaint alleges facts stating claims under the ADA and RA.

**IV.     Plaintiff's claims accrued when the defendants stopped mistreating him, not before.**

The IDOC Defendants renew their argument that Plaintiff's claims going beyond two years, before October 28, 2016, should be barred by the statute of limitations. (ECF 105 at 12.)  They make no arguments in their motion, but rather incorporate by reference the arguments in their original motion to dismiss (ECF 37) and Wexford's more recent motion (ECF 89). (*See* ECF 105 at 12.)  Plaintiff incorporates his responses to those two motions (*see* ECF 40 at 10-15 and ECF 107 *passim*).  And, once again, Judge Bruce has already rejected the IDOC Defendants' motion; to the contrary he held that

Plaintiff had alleged a continuing violation, and as such his claims did not accrue until the defendants in this case stopped mistreating him, which happened on the eve of his release from prison. (*See* ECF 44 at 12 (holding that Plaintiff had stated a continuing violation and denying the defense motion to dismiss Plaintiff's claims for injuries occurring before October 2016).) Nowhere do the IDOC Defendants suggest, much less demonstrate, that Judge Bruce committed clear error. Their renewed motion is barred by the law of the case doctrine alone.

Judge Bruce was right to hold that Plaintiff has alleged a continuing violation. The main thrust of Plaintiff's claims is that the defendants in this case kept him inside a small metal box for decades. That caused a cumulative injury, because the *length* of time that he spent in solitary confinement made his injuries worse. Indeed, the continuing violation doctrine focuses on continuing misconduct that causes an *accumulating* and compounding harm, as the defendants caused Plaintiffs here. As the Court explained the principle in *Heard*, while "a single event gives rise to continuing injuries, the plaintiff can bring a single suit" and "estimat[e]" his injuries going forward. *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001). But where the defendants continually ignore a prisoner's serious medical need, "every day that the defendants ignored the plaintiff's [needs] increased his pain." *Id.*

Indeed the Seventh Circuit has recognized the interlocking nature of continuing violation leading to accumulating harm specifically in the solitary confinement context. In *Turley v. Rednour*, 729 F.3d 645 (7th Cir. 2013) the Seventh Circuit held that a prisoner who had been subject to continuous lockdowns in "a small cell" had alleged a continuing violation, since

> [t]he nature of Turley's allegations [is] that prison officials repeatedly and regularly imposed lockdown for improper purposes, and *with each continuing day and period of lockdown, Turley's injuries increased*. The statute of limitations began running from the last date of lockdown, or last day confined to the tiny cell, and consequently, Turley is well within the two-year statute of limitations.

*Id.* at 651 (emphasis added).

The continuing violation doctrine set out in *Heard* and *Turley* thus turns on (1) the continuing nature of the defendant's misconduct and (2) whether that misconduct results in a harm that is cumulative, and thus effectively impossible to calculate in advance. The IDOC Defendants incorporate by reference Wexford's arguments that Plaintiff's lawsuits filed during his years in solitary confinement somehow undo the continuing violation doctrine (*see* ECF 105 at 12), but that does not follow. It may be the case that as a policy matter "we don't *want* the plaintiff to sue before the violation is complete," *Heard*, 253 F.3d at 319 (emphasis original), but that is because it is infeasible to "apportion damages" in a case involving such cumulative harm. *Id.*[8] It is for this reason that the application of the continuing violation doctrine itself turns on the relationship between the continual nature of the violation and the accumulating harm it imposes. And that is why neither Wexford nor the IDOC Defendants have identified a single case, arising in any area of substantive law, in any jurisdiction, that transforms the application of the continuing violation doctrine into the rule they propose. Instead, as Plaintiff explained in his response in opposition to Wexford's motion to dismiss, the well-developed doctrines of claim and issue preclusion set out the manner in which prior lawsuits affect a party's rights in subsequent ones. (*See* ECF 107 at 2-3, 7-8.) The IDOC Defendants' motion, like Wexford's should be denied.

V.   **A stay of discovery is not appropriate.**

Based on their statute of limitations arguments, the IDOC Defendants finally request a stay of all discovery prior to October 28, 2016. (ECF 105 at 12.) Plaintiff construes this request as a motion for protective order pursuant to Federal Rule of Civil Procedure 26(c).

---

[8] As *Heard* noted, such cumulative violations are distinct from "the case in which a continuous series of events gives rise to a cumulative injury is the case in which repeated events give rise to discrete injuries, as in suits for lost wages." *Heard*, 253 F.3d at 320. There the continuation doctrine would not apply, because "the damages from each discrete act of discrimination would be readily calculable without waiting for the entire series of acts to end." *Id.*

16

Such motions to stay are disfavored. "Although stays on discovery are sometimes appropriate, this court disfavors them because they bring resolution of the dispute to a standstill." *Coss v. Playtex Prods., LLC,* No. 08-cv-50222, 2009 WL 1455358, at *1 (N.D. Ill. May 21, 2009). Indeed, "[t]he party seeking a stay has no absolute right to a stay; rather, that party 'bears the burden of proof to show that the Court should exercise its discretion in staying the case,'" *AOT Holding AG v. Archer Daniels Midland Co.*, No. 19-cv-2240, 2020 WL 1472266, at *1 (C.D. Ill. Jan. 22, 2020) (Long, M.J.), which can only be satisfied by a "show[ing of] good cause to stay discovery." *Id.* Moreover, "[i]n order to establish good cause, 'courts have insisted on a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.'" *New England Carpenters Health & Welfare Fund v. Abbott Labs.*, No. 12-cv-1662, 2013 WL 690613, at *3 (N.D. Ill. Feb. 20, 2013) (quoting 8A Charles Alan Wright, *et al.*, *Federal Practice & Procedure* § 2035, at 157-58 (3d ed. 2010).).

The IDOC Defendants signally fail to do that here. They assert as a general matter that discovery going before 2016 would implicate tens of thousands of documents (ECF 105 at 13), but they provide no supporting affidavits for that conclusory statement, nor do they explain why that is particularly likely to be so. They also say that the COVID-19 crisis will make document-gathering more difficult, but the way to deal with that sort of problem is through case-by-case discussions—not outright bans instituted for an entirely different reason.

Indeed, the IDOC Defendants are only seeking a stay after having engaged in discovery regarding the entire case for months; their Rule 12(b)(6) motion was rather plainly *not* brought to avoid the expenses of such discovery, but rather to take advantage of a change in judges. *Cf. Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 13-1054, 2014 WL 1797674, at **1-2 (C.D. Ill. May 6, 2014) (denying defendant's motion for stay where "the Defendant did not file its Motion for Judgment on the Pleadings until more than one year after the case was filed and until after it had vigorously engaged

in discovery for over nine months . . . . [T]he fact that the Defendant delayed so long in filing its Motion for Judgment on the Pleadings and in the meantime engaged in extensive discovery does not indicate good cause on its part in now seeking a stay of discovery.").

A stay, meanwhile, will unduly prejudice and tactically disadvantage Plaintiff. Even if the defendants' motion were granted, Plaintiff would still need to conduct discovery regarding events occurring prior to October 2016 that caused his injuries from October 2016 onward. Plaintiff has alleged that he was subject to continuous policies of indifference and discrimination that originated well before 2016. Even if this case is limited to injuries he suffered in 2016 on, he will still need to understand the creation of the policies that eventually led to the injuries he eventually suffered. Staying that discovery would not only slow down the resolution of this case; it will prevent Plaintiff from discovering important information to support his claims, as memories from those earlier years fade, documents are lost, and people die. The Court should deny the motion for stay.

## CONCLUSION

For the foregoing reasons the Court should adopt Judge Bruce's decision and deny the IDOC Defendants' motion in its entirety.[9]

May 15, 2020                                    Respectfully submitted,

Antonio Romanucci -                             /s/ Stephen H. Weil
aromanucci@rblaw.net                            Stephen H. Weil – weil@loevy.com
Nicolette Ward - nward@rblaw.net                Jon Loevy – jon@loevy.com
Romanucci & Blandin LLC                         Sarah Grady – sarah@loevy.com
321 N Clark                                     Loevy & Loevy
Street Suite 900,                               311 N. Aberdeen
Chicago, IL 60654                               Street 3rd Floor
312-458-1000                                    Chicago, IL 60607
                                                312-243-5900

---

[9] Pursuant to Local Rule 7.1, the undersigned counsel certifies that this memorandum contains 6,428 words, including all footnotes.

Maggie E Filler -
maggie.filler@macarthurjustice.org
Roderick and Solange MacArthur Justice Center
375 E. Chicago Avenue,
Chicago, IL 60611
(312) 503-1271

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

  I hereby certify that on May 15, 2020, a true and correct copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

                  /s/ Stephen H. Weil