E-FILED
Friday, 11 October, 2024  03:48:57 PM
Clerk, U.S. District Court, ILCD

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MAURISA GAY, as Special Representative of the Estate of ANTHONY GAY, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 19-CV-1133 |
| v. | ) ) | |
| JOHN BALDWIN, et al., | ) ) | Judge: Sue E. Myerscough |
| Defendants. | ) | |

## IDOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants John Baldwin, Sylvia Butler, Dr. Jamie Chess, Dr. Melvin Hinton, Rob Jeffreys, Terri Kennedy, Michael Melvin, Sonja Nicklaus, Shane Reister, Emily Ruskin, Jeff Sims, John Varga, and Justin Wilks (collectively, the IDOC Defendants), hereby move this Honorable Court for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) and Central District of Illinois Local Rule 7.1(D)(1).

## INTRODUCTION

Decedent Anthony Gay battled chronic mental illness and violent behavioral issues throughout his life. Those are sad, undisputed facts. But, despite Gay's significant and many challenges and needs, IDOC met the constitutional and statutory obligations it owed him, reasonably balancing the significant safety and security concerns created by an extremely disruptive and severely disturbed inmate with his ongoing mental and physical healthcare needs.

Between January 1, 1998 and August 27, 2018, while incarcerated at several different facilities operated by the Illinois Department of Corrections (IDOC), Gay was determined guilty of hundreds of incidents of misconduct, including scores of incidents of sexual misconduct and 10 violent assaults directed mostly at corrections officers. That necessitated Gay's removal from

1

the general prison population and placement in segregated housing.  Gay also engaged in horrific

acts of self-mutilation, something he had done even years prior to his incarceration, and for

which Gay received comprehensive mental health treatment in prison from co-defendant

Wexford Health Sources, Inc.  At times he accepted it; at times he refused.

Plaintiff[1] now alleges four claims against the IDOC Defendants related to Gay's

placement in restricted housing:  1) an Eighth Amendment deliberate indifference claim alleging

inadequate mental health care and improper segregation; 2 and 3) claims that Jeffreys (in his

official capacity) violated the Americans With Disabilities Act, 42 U.S.C. § 12132 (the ADA)

and section 504 of the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 794; and 4) a Fourteenth

Amendment claim that certain IDOC Defendants denied Gay procedural due process by failing

to provide him with a meaningful opportunity to challenge his placement in segregation.  The

IDOC Defendants are entitled to summary judgment on all of them.  Many are time-barred,

barred by *res judicata*, or fail because of a lack of personal involvement by the IDOC

Defendants.  To the extent any survive those preliminary problems, the IDOC Defendants were

never deliberately indifferent to Gay's medical needs; the conditions of his confinement were

constitutionally sufficient; he was not refused care or treatment based on his disability; and his

housing status was entirely appropriate given his dangerous and disruptive behavior.

## STATEMENT OF MATERIAL FACTS

**I.    Parties**

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

---

[1] Gay died on August 17, 2024.  Maurisa Gay has been appointed to act the special representative of Gay's estate.

40432\322687185.v1

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

40432\322687185.v1

[redacted]

40432\322687185.v1

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[2] Because of the number of documents involved and for ease of use, the IDOC Defendants have compiled summaries of different categories of records from Anthony Gay's lengthy incarceration in the Illinois Department of Corrections. The summaries include citations to bates numbers of the relevant supporting documents. Because of the volume, the supporting documents are not being submitted to this Court, but they are available at the Court's request.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

40432\322687185.v1

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

40432\322687185.v1

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

40432\322687185.v1

40432\322687185.v1

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

40432\322687185.v1

[redacted]

[redacted]

██████████████████████████████████████████

███████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████

## ARGUMENT

### I.  Standard of Review.

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper where there are no genuine issues of material fact and a movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019).

### II.  Plaintiff's Claims Pre-Dating October 28, 2016 Are Procedurally Barred.

**A.**    **The Majority Of Plaintiff's Claims Are Barred By the Statute of Limitations.**

First and foremost, the majority of Plaintiff's claims are time-barred.  She cannot pursue any claims that accrued before October 28, 2016 – two years before Gay filed his original state court complaint in this case.

### 1.  A two-year limitations period applies to all of plaintiff's claims.

Under Illinois law, personal injury claims must be filed within two years of their accrual. 735 ILCS 5/13-202; *see Wilson v. Garcia*, 471 U.S. 261, 279-80 (1985) (noting that personal injury claims in federal court are governed by the applicable statute of limitations of the state in which the alleged injury occurred).  That rule also applies to constitutional claims under section 1983, *Woods v. Ill. Dep't of Children & Family Servs.*, 710 F.3d 762, 768 (7th Cir. 2013), and claims under the ADA and the RA, *Rutledge v. Ill. Dep't of Human Servs.*, 878 F.3d 258, 260 (7th Cir. 2015).  Claims accrue when a plaintiff knows or has reason to know of the injury giving

23

40432\322687185.v1

rise to the action.  *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1992).  "Civil rights claims, therefore, accrue when the plaintiff knows or should know that his or her constitutional rights have been violated."  *Id*.

Here, Plaintiff's claims are all rooted in Gay's placement in restricted housing, which allegedly exacerbated his mental illness, causing him to act out in ways that prolonged his confinement in segregation.  (*See* Dkt. 82).  In calculating the day on which those claims accrued, this Court looks to the accrual date of the last applicable violation, rather than to the time when Gay's placement in segregation began.  *Isby v. Brown*, 856 F.3d 508, 513 n. 2 (7th Cir. 2017); *see also Wallace v. Jeffreys*, 2023 U.S. Dist. LEXIS 28725, *26-27 (S.D. Ill. February 20, 2023).  That limits Plaintiff's claims to those occurring before October 28, 2016 – the date Gay filed his initial (state court) complaint in this case.  *Wallace*, 2023 U.S. Dist. LEXIS 28725, *27.

### 2. The continuing violation doctrine does not apply.

Plaintiff's decedent previously argued that he could raise claims pre-dating that October 28, 2016 time bar under the continuing violation doctrine.[3]  (*See* Dkt. 40 at 10-14).  Now that the parties have completed extensive discovery, it is evident that the doctrine does not apply.

The Seventh Circuit has identified three categories of claims to which the doctrine applies:  genuine continuing violations, where a defendant commits discrete but repeated violations; violations where otherwise inactionable deeds become actionable if they add up; and continuing *injury*, where a discrete wrongful act causes *continuing* harm.  *Turley v. Rednour*, 729 F.3d 645, 654 (7th Cir. 2013); *Bernard v. Scott*, 501 F.Supp.3d 611, 621 (N.D. Ill. 2020).  As

---

[3] The trial court denied the IDOC Defendants' motion to dismiss time-barred claims based on the continuing violation doctrine, but emphasized that its ruling was based on the pleadings, only, and that "further discovery may prove otherwise."  (Dkt. 44 at 12).  Therefore, this issue is ripe for further consideration by this Court.

40432\322687185.v1

Plaintiff's decedent previously conceded, this case involves neither the second type (a cumulative violation) nor the third (one in which discrete wrongful acts caused continuing harm). (*See* Dkt. 40 at 10-14).

This is also not a case involving the first category – a genuine continuing violation. As the *Bernard* court explained, continuing violation cases involve "instances of continuing violations that last as long as the defendant has the power to remedy the plaintiff's condition but fails to do so." *Bernard*, 501 F.Supp.3d at 621 (cleaned up); *see also Turley*, 729 F.3d at 654; *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001). Defendants here did not have the power to remedy Gay's condition, much less did Defendants engage in an ongoing and protracted refusal to do so.

The decedent's previous argument to the contrary was a circular one: he maintained that his ongoing confinement in segregation caused his significant mental health issues, that he was denied appropriate mental health care, and the denial of care led to ongoing disciplinary issues that continued his confinement in segregation. (Dkt. 40 at 10-14). But this is not a case in which Gay was improperly subjected to segregation without reason or recourse, or to the ongoing denial of care and treatment for his mental health issues, creating a continuing violation. That may have been the situation in *Turley*, where frequent, improper lockdowns deprived plaintiff of exercise and, in turn, caused him a variety of related health issues. 729 F.3d at 652. That may also have been true in *Heard*, where plaintiff alleged that for months and for no reason, prison officials denied him all medical attention and care to address a painful, treatable ruptured hernia about which they knew. 253 F.3d at 317, 319-20.

Not so here. Gay's history of mental health issues predated his incarceration (SOF ¶78) and, while in IDOC's custody, Gay received consistent, appropriate, and aggressive mental health care from physicians, psychologists, and counselors at every facility in which he was

housed, for decades.  (SOF ¶¶68, 72, 75-77).  He was administered medications, monitored

carefully, and received frequent medical care, both inpatient and outpatient.  (SOF ¶¶68, 72, 75-

77, 85, 87-93, 94-95).  Sometimes he refused treatment; sometimes he seemed to improve;

sometimes he presented as a danger to both himself and others.  (SOF ¶¶68, 72, 77, 79, 84-85,

94, 97-98).  His condition was not static.  It evolved, improved sometimes, regressed others.

Gay's treatment also evolved.  (SOF ¶¶68, 72, 75-77).  Tellingly, even Plaintiff focuses her

allegations on Gay's confinement and care from 2015-2018, and on mental health incidents

beginning in August, 2016.  (*See* Dkt. 82 at 6-11, 13).  This Court should, too.  *See Wallace*,

2023 U.S. Dist. LEXIS 28725, *27.

Notably, even *Plaintiff* does not claim not that Gay received *no* care.  Plaintiff alleged that

Gay wanted a *different* type of care, or *more aggressive* care.  (Dkt. 82 at 17).  That, though, is

not a continuing violation of the type described in *Heard*, where defendant *had* the ability to

remedy plaintiff's condition (a painful ruptured hernia) but *refused* to do so.  253 F.3d at 317-19.

This is a case involving an inmate with a complex presentation, who received mental health care

for years, who regularly refused treatment, and who was diagnosed as using those mental health

issues as a means of control.  (SOF ¶¶68, 72, 75-98). His mental health issues were not being

ignored.  Plaintiff's claims are more akin to a medical malpractice argument – a claim that

plaintiff should have been treated in a specific way, as opposed to plaintiff being denied any care

at all.  *See Heard*, 253 F.3d at 318.

Essentially, Plaintiff is attempting to weave together two separate sets of circumstances –

Gay's mental health issues and Gay's placement in segregation – to create a new, continuing tort

that purportedly existed for the duration of Gay's confinement also exists outside the

requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Allowing Plaintiff to

pursue such a claim here would effectively revive nearly two decades' claims that had gone

26

stale because Gay did not timely or properly grieve them.  Not only is that contrary to the statute

of limitations, it would also defeat both a purpose and goal of the PLRA, eliminating the need for

timely exhausting one's administrative remedies so long as a plaintiff claimed the existence of a

continuing violation after a subsequent release.

Furthermore, even when a violation is considered continuing, it ends when the inmate is

released or transferred to a different facility.  *Bernard*, 501 F.Supp.3d at 622.  That is particularly

notable here for two reasons.  Gay was transferred regularly and repeatedly to and from eight

different IDOC facilities from 1994 and 2018, including – of note here – to Menard on August

18, 2015; to Pontiac on November 15, 2016; and then to Dixon on March 9, 2018.  (SOF ¶23).

At a minimum, any claims predating his transfer back to Menard on August 18, 2015 accrued

outside the limitations period and are now barred.

**B.      Even If Plaintiff Alleged a Continuing Violation, Claims Predating October 3, 2012, Are Barred By *Res Judicata*.**

In addition to the narrowing of Plaintiff's claims under the applicable statute of

limitations, claims older than October 3, 2012 are barred by *res judicata*.  The doctrine works to

"relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by

preventing inconsistent decisions, encourage reliance on adjudication."  *Warren v. McCall*, 709

F.2d 1183, 1184 (7th Cir. 1983) (internal quotations and citations omitted).  Under *res judicata*,

claims that were litigated "or could have been litigated in a previous action" are barred when

there is an identity of the causes of action, an identity of the parties or their privies, and a final

judgment on the merits.  *Kilburn-Winnie v. Town of Fortville*, 891 F.3d 330, 332-33 (7th Cir.

2018); *see Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc.*, 590 U.S. 405, 412

(2020).  Three elements are required:  there must be a previous final judgment on the merits, in a

case involving the same causes of action, between the same parties or their privies. *Licari v. City of Chicago*, 298 F.3d 664, 666 (7th Cir. 2002).

All three of those elements are met. Over the course of his IDOC incarceration, Gay brought dozens of constitutional and statutory claims against IDOC and IDOC-affiliated medical professionals related to the conditions of his confinement and his mental health care. *See Gay v. Chandra*, 682 F.3d 590, 591-92 (7th Cir. 2012) (*see* SOF ¶¶114-15).[4] As the Seventh Circuit observed in 2012, Gay, a "deeply disturbed Illinois inmate with a long history of self-mutilation," had at that point filed more than 30 civil rights cases alleging, among other things, constitutionally inadequate mental health treatment; and had lost two at trial, settled two, and lost or withdrew the remainder. *Chandra*, 682 F.3d at 592, (*see* SOF ¶113).

In *Chandra*, for example, Gay (represented by counsel) alleged constitutional violations related to his mental health care and conditions of his confinement while housed at Tamms. (SOF ¶114). On September 17, 2009, after multi-day trial, a jury returned its verdict against Gay. (SOF ¶115).

In another example, the district court conducted an evidentiary hearing, including hearing evidence from plaintiff's retained mental health expert, to determine whether Gay would be allowed to proceed *in forma pauperis*. (SOF ¶¶117-18). On October 3, 2012, the district court issued its findings of fact, observing that Gay had been self-harming intentionally since 1998, "in an attempt to obtain care and treatment from prison staff." (SOF ¶¶118; Ex. 77). The district court explained that Gay demanded therapy and treatment, but sometimes refused both; and that Gay deliberately injured himself "as a strategic tactic designed to obtain care, compassion, and

---

[4] This Court can take judicial notice of matters of public record, *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir 1994), including Gay's "lengthy history of unsuccessful civil rights litigation" as summarized by the Seventh Circuit, *see Chandra*, 682 F.3d at 592, and proceedings filed in United States District Court.

40432\322687185.v1

attention from his jailers," a way to get attention and elicit specific responses.  (SOF ¶¶118; Ex. 77).  The district court then dismissed Gay's case under 28 U.S.C. § 1915(g) ((SOF ¶¶118) – a final judgment on the merits, *see Drew v. Murphy*, 2024 U.S. Dist. LEXIS 14991, *7 (S.D. Ill. January 8, 2024).

It is impossible to know whether Plaintiff seeks to re-litigate those claims.  The instant allegations are broad, general criticisms of Gay's confinement and mental health care, but not specific about dates, care, or individuals involved.  Regardless, Gay's prior civil rights claims bar him from both relitigating those actually made and alleging any claims that *could* have been raised.  *See*, *e.g.*, *Taylor v. Meyers*, 2003 U.S. Dist. LEXIS 20493, *3 (N.D. Ill. November 6, 2003).  Thus, at a minimum, claims predating October 3, 2012 are barred.

### III.  The Individual IDOC Defendants Were Not Personally Involved In Any Alleged Constitutional Deprivation.

The individual IDOC Defendants sued in their individual capacities, all supervisors, were not responsible for Gay's medical care and had no direct control over the conditions of his confinement.  They are all entitled to summary judgment on that basis, alone.  Liability for claims under 42 U.S.C. § 1983 requires a defendant's direct, personal involvement in the alleged constitutional violation.  *Gentry v. Duckworth*, 65 F.3d 555 561 (7th Cir. 1995); *see also Bedford v. Dewitt*, 695 F. Supp. 3d 998, 1002 (N.D. Ill. 2023); *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021); *see also Jones v. Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). "To be personally liable, a supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Kemp v. Fulton Cnty.*, 27 F.4th 491, 498 (7th Cir. 2022).  Plaintiff cannot meet that evidentiary burden in this case.

### A.    There Is No Evidence That Sims, Reister, Kennedy, Varga, Wilks, Or Nicklaus Were Personally Involved In Gay's Medical Treatment.

40432\322687185.v1

Plaintiff alleged her Eighth Amendment Claims against 12 individual IDOC Defendants. There is very little evidence about six of them – Sims, Reister, Kennedy, Varga, Wilks, and Nicklaus. They had no involvement whatsoever in Gay's medical treatment, and rarely, if ever, interacted with Gay. Specifically, Gay never met, nor was he treated by, Sims. (SOF ¶5; Ex. 2 at 317:1-5, 318:20-319:3). Gay met Reister on one occasion, when Gay was incarcerated at Menard in 2016. (SOF ¶6; Ex. 2 at 321:21-322:6). When asked why he believed he had a claim against Reister, Gay responded simply, "the overall scheme of things," and "they all played a part." (Ex. 2 at 326:6-19). Similarly, Gay assumed Kennedy, Pontiac's assistant warden, had the authority to order inpatient care because of her position. (SOF ¶10; Ex. 2 at 379:15-3980:7). Gay testified in his deposition, without elaboration, that Varga "left me in solitary" (SOF ¶14; Ex. 2 at 387:21-388:8), and did not testify at all regarding Wilks' or Nicklaus's purported involvement in his medical care. (SOF ¶¶ 16-19; Ex. 2 at 388:9-389:14).

That is the only evidence Plaintiff offered regarding any of those defendants. There is no evidence that any were involved in Gay's confinement, knew he needed additional or different psychiatric care, or knew of any impact of Gay's housing status on his mental health. *See Gevas v. Mitchell*, 492 Fed. Appx. 654, 660 (7th Cir. 2012).

**B.    There Also No Evidence That Baldwin, Melvin, Ruskin, Butler, Chess, or Hinton Were Personally Involved In the Alleged Violation of Gay's Constitutional Rights.**

Plaintiff alleges that the remaining IDOC Defendants – Baldwin, Melvin, Ruskin, Butler, Chess, and Hinton – were all personally aware of Gay's "confinement and its impact on his mental health condition, as well as his need for psychiatric care and appropriate treatment," and "did not seek this appropriate treatment despite having the power to do so[.]" (Dkt. 82 at 6, 8, 10). The evidence does not support her claims. They all relied on Wexford to determine an appropriate course of care for Gay. (SOF ¶¶69-71). They were allowed to do so. *See*, *e.g.*,

30

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (observing that prison directors and wardens are entitled to "relegate to the prison's medical staff the provision of good medical care").

Baldwin never had a conversation with Gay during his incarceration and did not have any knowledge of Gay's mental health issues or related treatment. (SOF ¶¶2-3; Ex. 1 at 34:2-12; *see* Ex. 2 at 305:20-306:2-312:14). Neither did Hinton. (SOF ¶7; Ex. 33 at 244:13-19). Melvin was aware that Gay had mental health issues but was unaware of Gay's treatment protocols or impacts that segregated housing allegedly had on Gay's mental health. (SOF ¶¶8-9; Ex. 3 at 32:12-24). Ruskin, an assistant warden at Pontiac, was familiar with Gay's treatment protocols, but there is no evidence that Ruskin found them inadequate (SOF ¶¶12-13; Ex. 4 at 13:18-14:2, 59:9-13). On the contrary, Ruskin, who regularly interacted with Gay and knew of Gay's penchant for outbursts and self-harm, specifically and frequently asked doctors onsite to follow-up with Gay. (Ex. 4 at 21:24-22:6, 32:18-20). Gay assumed Ruskin knew of the impact solitary confinement had on him because of the length of her tenure at Pontiac (Ex. 2 at 381:8- 24), but there is no evidence of that, nor is there evidence that Ruskin knew Gay's mental health care and housing assignments were deficient. Even if there were, that is not enough, without more, to demonstrate a constitutional violation. *Taylor v. Ways*, 999 F.3d 478, 495 (7th Cir. 2021) (holding that that "[a]n allegation that the supervisor had knowledge of a deficiency is not, without more, enough to maintain an individual liability claim under §1983").

Drs. Butler and Chess also lacked significant involvement with or control over Gay's mental health care. Dr. Butler treated Gay twice; Gay took no issue with that care. (Ex. 2 at 336:20-337:16). Gay complained that Dr. Butler trimmed his therapy treatment and failed to hospitalize him, but did not know whether Butler had authority to hospitalize him. (Ex. 2 at 337:20-339:21). Gay testified that he treated with Dr. Chess once or twice over a two-day span,

and took no issue with that care – on the contrary, Gay appreciated that Dr. Chess helped Gay find a therapist.  (Ex. 2 at 275:7-276:10, 340:2-13, 344:7-18).  Gay merely complained that Dr. Chess failed to hospitalize him.  (Ex. 2 at 344:19-345:8).

### IV.  IDOC Defendants Were Not Deliberately Indifferent.

To the extent any of Plaintiff's claims survive the time-bar, *res judicata*, and lack of personal involvement of the IDOC Defendants, the undisputed evidence establishes the IDOC Defendants are entitled to summary judgment on Count I:  they were not deliberately indifferent to any serious medical need or to the conditions of Gay's confinement.

Plaintiff's burden here is "a heavy one."  *Pyles v. Fahim*, 771 F.3d 403, 408-09 (7th Cir. 2014).  To succeed on her Eighth Amendment claim about indifference to medical needs or the allegedly inadequate conditions of Gay's confinement, Plaintiff must prove both an objective and subjective element:  that defendants had knowledge of plaintiff's objectively serious need, and that defendants deliberately disregarded it.  *Isby*, 856 F.3d at 521; *see also Wallace*, 2023 U.S. Dist. LEXIS 28725, *29.  She cannot prove either.

### A.    Plaintiff Cannot Show the IDOC Defendants Acted With Deliberate Indifference to Gay's Serious Medical Needs.

An Eighth Amendment claim for constitutionally-deficient medical care is not one describing mere medical malpractice.  "[M]alpractice does not violate the Eighth Amendment[.]"  *Heard*, 253 F.3d at 318.  Rather, to prevail on claims like these against prison administrators, a plaintiff must have evidence that the defendant administrator "knows about unconstitutional conduct and facilitates, approves, condones, or turns a blind eye to it."  *Wallace*, 2023 U.S. Dist. LEXIS 28725, *40.  As explained in *Rasho v. Jeffreys*, a class action brought by IDOC inmates alleging inadequate mental health care and services, that "is a high bar because it requires a showing of something approaching a total unconcern for the prisoner's welfare in the face of

32

serious risks." *Rasho*, 22 F.4th 703, 710 (7th Cir. 2022). Importantly, a prison official may rely on the judgment of medical officials. *Johnson v. Prentice*, 29 F.4th 895, 905 (7th Cir. 2020) (noting "[w]e have long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment"). If "records show that medical professionals are providing ongoing treatment, and there is nothing to give officials notice of inadequate care, then administrators are not deliberately indifferent to a need for care." *Wallace*, 2023 U.S. Dist. LEXIS 28725, *40.

That is what happened here. While in IDOC's custody, Gay received consistent, appropriate, comprehensive, and aggressive mental health care, over the course of decades, from physicians, psychologists, and counselors, at every facility in which he was housed, for decades. (SOF ¶¶68, 72, 75-77).). The IDOC Defendants did not deny Gay that care. On the contrary, Gay's treaters issued him treatment plans; gave him regular and frequent mental health counseling and care, often multiple times a week in group and individual settings; and attempted to treat him with appropriate medication. (SOF ¶¶68, 72-77, 87-88, 93, 95). Sometimes he refused treatment or medication; sometimes he acted out or presented as a danger to himself and others. (SOF ¶¶68, 90-94, 96-98). At all times, the IDOC Defendants relied on Gay's treatment providers to provide the appropriate level of necessary care. (SOF ¶¶69-71).

Gay testified that many of the individual IDOC defendants *should have known* about his mental health issues based on *Rasho*. That separate class action litigation is not enough to establish a specific constitutional violation in *this* case. Nothing in *Rasho* spoke to Gay's *specific* care, or that he needed *different* care from that already being given by his treaters; or that the IDOC Defendants deliberately disregarded Gay's mental health care needs. That is a fundamental requirement for these claims: a plaintiff must "present evidence that one or more of the defendants *deliberately disregarded* his mental health needs . . . that the defendants actually

knew of his serious health need and acted with deliberate indifference to his suffering." *Johnson*, 29 F.4th at 905 (internal brackets and quotations omitted, emphasis added).

In essence, Plaintiff's claims are that Sims, Reister, Hinton, Chess, Melvin, Kennedy, Ruskin, Varga, Wilks, and Nicklaus all *should have known* about Gay's mental health condition, *should have known* that Gay was not being provided with sufficient or appropriate mental health care, and improperly relied on Wexford to provide that care. (Dkt. 82 at 6-11). But, as in *Wallace*, there is no clear evidence that any of those prison administrators knew of a serious risk and allowed it to continue or turned a blind eye to it. 2023 U.S. Dist. LEXIS 28725, *42-43. The records establish that Gay *was* receiving extensive medical and mental health care. (SOF ¶¶68, 72-77, 87-88, 93, 95). Plaintiff complains about the quality and effectiveness of that care, but that, alone, does not establish a constitutional violation. Indeed, even in *Rasho*, the Seventh Circuit found that although imperfect, IDOC officials undertook reasonable measures to provide more (and better) access to mental health care to inmates, defeating a deliberate indifference claim by the class. 22 F.4th at 711. As the Seventh Circuit observed, "actions by IDOC administrators demonstrate a commitment to addressing the problem – the antithesis of the callous disregard required to make out an Eighth Amendment claim." *Id.* at 710.

The same is true here. Plaintiff cannot satisfy the subjective element of the Eighth Amendment inquiry. The IDOC Defendants were entitled to rely on the care and treatment provided by the medical professionals providing Gay care. There is no evidence they had notice of inadequate care or were deliberately indifferent to Gay's needs. The "administrators [were] not deliberately indifferent to a need for care." *See Wallace*, 2023 U.S. Dist. LEXIS 28725, *40.

**B.    The Conditions Of Gay's Confinement Were Constitutionally Sufficient.**

IDOC Defendants are also entitled to summary judgment on that portion of Count I alleging an Eighth Amendment violation based on the conditions of Gay's confinement. For the

objective element, Plaintiff must establish that the conditions of Gay's confinement denied him

"the minimal civilized measure of life's necessities," creating an excessive risk to his health or

safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see Wallace*, 2023 U.S. Dist. LEXIS

28725 at \*29. That necessitates a showing that "the conditions resulted in an unquestioned and

serious deprivation of basic human needs such as food, medical care, sanitation, or physical

safety." *Wallace*, 2023 U.S. Dist. LEXIS 28725 at \*29.

For the subjective element, Plaintiff must establish that the IDOC Defendants had a

culpable state of mind and, therefore, acted with deliberate indifference to a substantial risk of

serious harm to Gay. *Id.* (citing *Farmer*, 511 U.S. at 837, 842). Mere negligence is not enough.

*Farmer*, 511 U.S. at 835 (observing that "deliberate indifference describes a state of mind more

blameworthy than negligence"). Rather, prison officials must have known of and consciously

disregarded a substantial risk of harm, like "something approaching a total unconcern for a

prisoner's welfare." *Rasho*, 22 F.4th 703, 710 (7th Cir. 2022).

### 1.    Plaintiff Cannot Show Gay's Confinement Was Objectively Inadequate.

First, Plaintiff once again cannot satisfy the objective Eighth Amendment element.

Plaintiff misleadingly alleges throughout her instant complaint that Gay remained in "solitary

confinement for years on end," and that "solitary confinement" is what exacerbated his mental

illness. (Dkt. 82 at 20). Gay's own testimony belies that characterization. He was not housed in

"solitary confinement," he was kept in restrictive housing – and he still had the ability to

communicate with others and was afforded life's minimal necessities. As Gay acknowledged, he

received yard and library access while in segregation at Menard in the 1990s. (Ex. 2 at 164:6-

165:2.) He had shower access, pens and paper, and – most importantly – medical care, including

contact with the mental-health staff, while at Menard. (Ex. 2 at 165:14-166:12.) Later in his

IDOC incarceration, after returning to Menard, Plaintiff even had access to a television while in segregation.  (Ex. 2 at 165:7-13.)

Upon his transfer to Pontiac in 1997, Gay received out-of-cell time for visits and medical care.  (Ex. 2 at 167:15-168:3.)  In the late 1990s, on transfer to the then-newly opened Tamms, Gay had outdoor yard access and access to reading and writing materials.  (Ex. 2 at 168:10-14; 169:9-14, 19-20.)  Even after assaulting IDOC staff at other facilities in a calculated effort to return to Tamms where a doctor for whom he had romantic feelings worked, Gay had access to on-site mental-health personnel, including staff that conducted routine crisis assessments.  (Ex. 2 at 178:11-20; 180:5-10; 191:13-192:2.)

At other IDOC facilities, including Pontiac and Dixon, Gay had access to, and was eligible for, group therapy sessions, which allowed him out-of-cell time.  He routinely refused to submit to bodily searches required for admittance to those therapy sessions.  (SOF ¶92; Ex. 2 at 194:8-199:14; Group Ex. 52.)  The Pontiac prison also offered a "soothing room," with pictures and paintings on the walls, where Gay understood he could ask to visit; he did not go often.  (Ex. 2 at 209:7-21; Group Ex. 52.)  Gay could talk to prisoners in adjoining cells while in segregation at IDOC facilities, including Pontiac, Menard, and sometimes Tamms, and Gay was allowed to speak with IDOC chaplains.  (Ex. 2 at 221:7-223:14, 374:7-23.)

Plaintiff makes no claim that IDOC Defendants denied Gay any of life's basic necessities, like shelter, bedding, food, hygiene, and exercise.  To the contrary, Gay admitted he received more than life's basic necessities, and therefore more than the Constitution required, when he acknowledged having access in segregation to showers, recreation time, mental-health staff, reading and writing materials, chaplain services, a "soothing room," and even, at times, television.  And while Plaintiff claims Gay received inadequate medical care for his mental-health concerns, Gay's testimony and IDOC's records establish that he did, in fact, receive

36

medical and mental-health care during his incarceration, including access to medication and out-of-cell group therapy sessions that he admittedly regularly refused.

A prisoner's "conditions are not unconstitutional simply because they are harsh and restrictive," because "the Constitution does not mandate that prisons be comfortable." *Meriweather v. Faulkner*, 821 F.2d 408, 415 (7th Cir. 1987). Gay's conditions exceeded those the Seventh Circuit has found sufficient under the Eighth Amendment's objective inquiry. For example, in *Isby*, plaintiff spent more than ten years in segregation, and complained about excessive lighting in his cell, food, temperatures, sleeping arrangement, and restricted shower and exercise time, among other issues. 856 F.3d at 515, 522. Like Gay, the *Isby* plaintiff accumulated serious disciplinary violations throughout his confinement, including assaulting correctional officers. *Id.* at 512-13. As a result, he was confined to his cell for 23 hours per day, received one hour of exercise per day in a small enclosure frequently covered with dead birds and/or bird feces, and was forced to wear a "nylon dog leash" when outside. *Id.* at 513. The plaintiff also received out-of-cell time for medical care, showers, and meetings, and could speak orally with other prisoners on the yard or his cell block. *Id.*

In affirming summary judgment for the correctional defendants, the Seventh Circuit pointed to "extensive [Seventh Circuit] case law rejecting Eighth Amendment claims based on similar conditions of confinement[.]" *Id.* at 522. Even considering the total effect of the plaintiff's grievances, the court still found no "extreme deprivation of basic human needs" sufficient to satisfy the Eighth Amendment objective inquiry. *Id.* The court also emphasized that although plaintiff testified he felt angry and dehumanized in isolation, he *declined* opportunities to speak with mental-health staff, engage in counseling, or otherwise attempt to address the situation. *Id.* at 522-23.

37

The *Wallace* court recently reached a similar conclusion as that in *Isby*, granting summary judgment IDOC officials on Eighth Amendment mental health-related claims alleged by a long-segregated Illinois inmate.  2023 U.S. Dist. LEXIS 28725. Wallace spent approximately 18 years in segregation after receiving 32 disciplinary violations, including eight for fighting or assault.  *Id*. at *2, 7.  He, too, alleged that IDOC officials violated his constitutional rights with his continuous placement in restrictive housing, which allegedly caused his mental health to deteriorate.  *Id.* at *2.  Wallace complained about a small cell and recreation yard, lack of contact visits and religious services, limits on materials in his possession, and an overall lack of meaningful interaction.  *Id.* at *32.  He also complained about his cell's year-round temperature and lack of television.  *Id.* at *33.

The *Wallace* court found his claims "strikingly similar" to *Isby* and, therefore, insufficient under the objective inquiry.  *Id.* at *31, 34.  Although plaintiff "identified many unpleasantries," his complaints about segregation did not "go to an identifiable essential of civilized life."  *Id.* at *35.  Nor did his complaints about total social isolation, where plaintiff admitted he could have talked to others if he wanted, but chose not to speak.  *Id.*  Indeed, "whatever the serious consequences may be of social isolation, the social isolation described by the [p]laintiff alone does not equate with the deprivation of life's necessities."  *Id.*

The same holds true here.  Like in *Isby*, Gay spent an extended period in segregation, but nonetheless received constitutionally sufficient treatment, including yard and shower access, mental health and medical care, reading and writing materials, and eventually television.  Like in *Wallace*, Gay complained about the size of his cell, lack of out-of-cell recreation time, and an overall lack of meaningful interaction, but never alleged any deficiency in food, shelter, hygiene, and other life essentials.  While Gay complained about certain alleged unpleasantries during his incarceration, none of his allegations demonstrate a deprivation of life's basic necessities.

38

As for Gay's alleged social isolation, like in both *Isby* and *Wallace*, Gay had opportunities to address his complaints about his mental health issues during group and one-on-one therapy sessions at multiple IDOC institutions, yet often refused necessary searches required to participate in those sessions. The district court correctly emphasized in *Wallace* that alleged social isolation alone "does not equate with the deprivation of life's necessities" where the plaintiff admittedly rejected opportunities to address their isolation. 2023 U.S. Dist. LEXIS 28725, *35. Like the district court in *Wallace* and the Seventh Circuit in *Isby*, this Court should find no constitutional violation related to Plaintiff's conditions of confinement claim.

### 2. Plaintiff Cannot Satisfy the Deliberate Indifference Standard.

Plaintiff also cannot satisfy the subjective element of a conditions of confinement claim. The Supreme Court has emphasized that "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Long-term segregation does not automatically violate the Eighth Amendment. *Wallace*, 2023 U.S. Dist. LEXIS 28725, *30. Nor does placing a mentally ill inmate in segregation. *Id.* An official must both be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he or she] must also draw the inference." *Id.* Importantly, a plaintiff is required to go beyond their allegations and produce evidence that officials were aware of and refused to correct inhumane conditions. *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021).

There is no such evidence here. There is no evidence of the personal involvement of any of the IDOC Defendants in Gay's specific placement in segregation, or any IDOC Defendant's deliberate indifference to the conditions of Gay's confinement.

Further, Plaintiff's years-long misbehavior also eliminated virtually any feasible alternative to segregation, which "obviously influenc[es]" whether an Eighth Amendment

40432\322687185.v1

violation occurred.  *Isby*, 856 F.3d at 523.  "Prison administrators … should be accorded wide-ranging deference in the adoption and execution of policies and practice that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *see Walker v. Shansky*, 28 F.3d 666, 673 (7th Cir. 1994) ("Whether [prolonged] confinement" violates the Eighth Amendment depends on the duration "and the existence of feasible alternatives").

Here, Gay's own dangerous and aggressive misconduct throughout his incarceration virtually eliminated any feasible alternatives to restrictive housing.  Plaintiff admitted numerous convictions for throwing bodily fluids at or otherwise assaulting correctional staff.  (SOF ¶¶45-47; Ex. 2 at 158:1-160:20.)  Nor was Plaintiff sent to segregation for an indefinite period:  to the contrary, he admittedly received hearings with the IDOC's Adjustment Committee following his disciplinary violations.  (Ex. 2 at 351:4-352:8.)  At each hearing, the Committee made a guilty/not guilty determination and imposed discipline (if any), after sometimes hearing from Plaintiff.  (SOF ¶45; Ex. 2 at 352:9-18, 355:14-20; Ex. 20.)  If the Committee imposed discipline, like extended segregation time, Plaintiff received a definite end date and specific duration of extra segregation—not an indefinite period of restrictive housing.  (Ex. 2 at 353:5-354:5.)

And, again, Gay regularly elected not to avail himself of the mental health services to which had access, regardless of his status in segregation.  He often refused counseling services or to take medication intended to address his condition.  (SOF ¶¶68, 89, 91-94, 97).  That matters. As *Wallace* explained, plaintiff's "own varying degrees of participation with services or programming that may have allowed him a change in housing, and his continued disciplinary infractions over time detracts a finding that there were feasible alternatives."  2023 U.S. Dist. LEXIS 28725, *38-39.

40

Plaintiff cannot satisfy either element of the Eighth Amendment analysis as to either a deliberate indifference to medical need or conditions of confinement claim.  The IDOC Defendants are entitled to summary judgment on Count I.

### V.    Jeffreys Is Entitled to Summary Judgment on Plaintiff's ADA and RA Claims.

The relief sought under Plaintiff's Counts II and III, alleged respectively under the ADA, 42 U.S.C. § 12101(b)(1) *et seq.* and the Rehabilitation Act, 29 U.S.C. § 794, is coextensive and, therefore, they are addressed together.  *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012); *Wallace*, 2023 U.S. Dist. LEXIS 28725, *73.  To state either, a plaintiff must show:

> (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of his disability.

*O'Guinn v. Nev. Dep.'t of Corr.*, 468 Fed. Appx. 651, 652 (9th Cir. 2012) (internal citations and quotations omitted); *see Wallace*, 2023 U.S. Dist. LEXIS 28725, *73 (internal citations omitted). "Refusing to make reasonable accommodations is tantamount to denying access[.]"  *Jarros*, 684 F.3d at 672.

Plaintiff claims Gay suffered from mental illness that affected his ability to interact with others and control his behavior.  (Dkt. 82 at 21).  According to Plaintiff, Jeffreys denied Gay proper care by discriminating against mentally ill inmates (including Gay) and not providing Gay with access to human contact or adequate mental health care, particularly "*inpatient* intensive psychiatric treatment."  (Dkt. 82 at 22-23).  Essentially, Plaintiff argues that because of Gay's mental illness, he committed misconduct that led to his placement in segregation, which exacerbated his mental illness, which caused him to act out, which kept him in segregation.

41

First, assuming for purposes of this motion that Gay satisfies the first requirement – he is an individual with a disability – he cannot satisfy the second.  He was not an *otherwise qualified person* under either statute.  Plaintiff alleges that Gay was discriminatorily denied necessary care and treatment of his mental illness *because of Gay's mental illness*:  that he was placed in segregation, which caused his mental illness, which caused him to remain in segregation, which caused his mental illness to worsen.  Those issues are intertwined, making the ADA and RA inapplicable.  As the Ninth Circuit has explained, a plaintiff cannot claim he was discriminatorily *denied* mental health treatment *because of* his mental health disability.  *O'Guinn*, 468 Fed. Appx. at 653; *see Wallace*, 2023 U.S. Dist. LEXIS 28725, *74-75.

Beyond that problem, there is no evidence in support of the third required element:  that Gay was denied access to things like human contact, mental health treatments, or rehabilitation opportunities available to other IDOC inmates, or that Jeffreys failed to accommodate Gay's mental health condition, *because of Gay's mental health issues*.  On the contrary, the evidence shows Gay had access to more hours of weekly structured out-of-cell time than similarly situated inmates, including group and individual mental health care, often multiple times per week.  (*See* SOF ¶¶68, 72, 75).  The *Wallace* court's finding applies equally here:

> [Plaintiff] argues that the Defendants created his mental disability by placing him in prolonged segregation, and then they failed to accommodate his dwindling mental health by keeping him in segregation *because of* his mental health. Plaintiff was originally placed in segregation for discipline and to maintain safety and security.  Plaintiff has not identified any specific evidence that shows he was kept in segregation because of his mental health, either when he was first placed or later when he was kept segregated.  Thus, Plaintiff was not housed in segregation *because* of his disability, and he was not deprived of services or programs *based on* his disability.

*Wallace*, 2023 U.S. Dist. LEXIS 28725, *74-75 (emphasis in original).  There is no evidence that any of Gay's placements in restrictive custody resulted from discrimination *based on his mental health issues*, or on any discriminatory failure to accommodate those issues.  Gay was placed and

remained in segregation because of his *misconduct* – hundreds of offenses including assaults, violent assaults, and acts of sexual misconduct, which created significant institutional safety and security concerns. *See e.g. Wallace*, 2023 U.S. Dist. LEXIS 28725, *75 n.31; (SOF ¶¶45-48). And, despite Gay's placement in segregation, he received mental health and other services available to other IDOC inmates, as allowable based on institutional safety and security concerns. (*See* SOF ¶¶75-76, 87-88, 95).

There is also no evidence of the fourth requirement – discrimination based on disability. There is no evidence that Jeffreys denied Gay any *reasonable* accommodation for Gay's mental illness. Again, Gay *did* receive mental health care and treatment. (SOF ¶¶68, 75-76, 87-88, 95). He was administered medications, monitored carefully, and received frequent medical care, both inpatient and outpatient. (SOF ¶¶68, 70-78, 85-95). Plaintiff's issue is largely with the *type* of care: she argues that a "reasonable accommodation" in this situation would have equated to intensive, *inpatient* psychiatric treatment. (Dkt. 82 at 23). But, research shows no case that sets that standard. There is certainly no evidence in this case that, in order to comply with the ADA and RA, the IDOC was *required* to provide Gay with intensive *inpatient* mental health care. *See*, *e.g.*, *Rasho*, 22 F.4th at 711. And Gay's treating physicians, the ones who made the decisions about his level of care, never ordered inpatient mental health care. (SOF ¶¶ 73-74).

There have been no ADA or RA violations. Jeffreys is entitled to summary judgment.

## VI. Melvin, Kennedy, Ruskin, Varga, Wilks, and Nicklaus Are Entitled to Summary Judgment on Plaintiff's Fourteenth Amendment Due Process Claim.

Defendants Melvin, Kennedy, Ruskin, Varga, Wilks, and Nicklaus are also entitled to summary judgment on Plaintiff's final claim, her Count IV alleging a due process violation. Plaintiff claimed that Melvin, Kennedy, Ruskin, Varga, Wilks, and Nicklaus violated Gay's due process rights by failing to provide Gay with a meaningful opportunity to challenge his status in

40432\322687185.v1

segregation.  (Dkt. 82 at 24).  Plaintiff is incorrect.  The IDOC officials properly exercised their discretion and flexibility in a way that met the requirements of the Fourteenth Amendment.

As a preliminary matter, in addition to the individual IDOC Defendants named above, Plaintiff also alleges Count IV against "Defendant Does 2-5."  (Dkt. 82 at 24).  Does 2-5 have never been identified by Plaintiff.  Therefore, they have not been served with process, have not entered an appearance, are not represented by an attorney, and have not had the opportunity to prepare and participate in any defense of these claims.  The claims against those still-unnamed defendants should be dismissed for want of prosecution.  At a minimum, they are entitled to summary judgment like the named IDOC defendants, whose arguments apply "with equal force" to Does 2-5.  *Santiago v. Severs*, 2014 U.S. Dist. LEXIS 154754, at *14 (S.D. Ill. Aug. 7, 2014)

As to those defendants against whom this count is specifically alleged, this Court's due process analysis proceeds in two parts: it must first determine whether a plaintiff was deprived of a protected interest; and, if so, then determine the process due under the circumstances.  *Isby*, 856 F.3d at 524.  Although prison inmates have no constitutional right to remain in the general population, these IDOC defendants accept, for summary judgment purposes only, that plaintiff's claims implicate Gay's due process rights.  *See id*; *see also Lekas v. Briley*, 405 F.3d 602, 608-09 (7th Cir. 2005).  Because a liberty interest is at stake, an inmate is entitled to informal, non-adversarial due process procedures, such as a periodic review of the placement determination "to ensure that administrative segregation does not become a pretext for indefinite confinement."  *Wallace*, 2023 U.S. Dist. LEXIS 28725, *58.

When a due process interest is at stake, the Seventh Circuit entitles prisoners to some "informal and nonadversary" periodic review, "the frequency of which is committed to the discretion of prison officials," to ensure segregation assignments do not become indefinite.  *Isby*, 856 F.3d at 525.  To evaluate the adequacy of whatever procedures existed, the Seventh Circuit

44

40432\322687185.v1

uses the Supreme Court's three-part *Mathews v. Eldridge* test: (1) the private interest affected by a governmental decision; (2) the governmental interests at stake; and (3) the risk of an erroneous deprivation of the private interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards. 424 U.S. 319, 335; *see Isby*, 856 F.3d at 525 (adopting the Mathews test for a Fourteenth Amendment claim).

Here, Gay received adequate process. Although Gay had a protected interest based on *Isby*, thereby satisfying the first *Mathews* factor, Plaintiff cannot satisfy the others. The government has a strong interest in the safety and security of IDOC facilities, residents, visitors, and staff. *Isby*, 856 F.3d at 526 (citing *Bell*, 441 U.S. at 547, and emphasizing that the government had "substantial" interests because "maintaining institutional security and safety are crucial considerations in the management of a prison"). Given the governmental interest in facility security, ongoing segregation may well be justified to the extent a prisoner poses as threat to themselves or others. *Id.* Gay's lengthy disciplinary record (*see* SOF ¶¶45-50) and his own testimony about his aggressive and violent behavior confirm the government's strong interest in segregating him – that segregation was necessary to ensure the safety and security of prison officials and other inmates, as well as IDOC property. As noted above, Gay was not placed in segregation indefinitely. (*See* Ex. 2 at 353:5-354:5.) Gay admittedly received hearings with the IDOC's Adjustment Committee following his disciplinary violations, received a definite end date, and knew the specific duration of extra segregation. (SOF ¶45; Ex. 2 at 351:4-352:9-18, 355:14-20; Ex. 20.) Melvin, Kennedy, Ruskin, Varga, Wilks, and Nicklaus are entitled to summary judgment on Count IV.

## VII.  Any Remaining Claims Are Barred By Qualified Immunity.

To the extent any of Plaintiff's claims brought against IDOC Defendants in their individual capacities may proceed beyond summary judgment, those remaining IDOC

40432\322687185.v1

Defendants are entitled to qualified immunity. Under the doctrine of qualified immunity, state workers sued in their individual capacities are shielded from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). In ruling on whether qualified immunity applies, this court considers "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Isby*, 856 F.3d at 529. If the answer to either question is no, the defendant is entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 662 (2009).

Here, for all of the reasons discussed above, Plaintiff cannot establish any existing constitutional right or, at a minimum, any clearly established constitutional right at the time of the alleged violation. Plaintiff challenges Gay's confinement by arguing that he required *inpatient* mental health treatment, but there is no clearly established constitutional right to the higher level of care Plaintiff describes. There is certainly no evidence showing that the IDOC Defendants disregarded any medical provider attempts at providing Gay that level of care – because there is no evidence that Gay's healthcare providers ever ordered that level of care. Because there is no evidence that any clearly established constitutional right was violated, the IDOC defendants are entitled to qualified immunity.

## VIII.  Plaintiff's Punitive Damages Claims Are No Longer Viable.

To the extent this Court were to allow any of Plaintiff's claims to survive summary judgment, she is barred from seeking punitive damages in this case. Plaintiff's constitutional claims survive Gay's death, but as this Court has observed, punitive damages "are not recoverable under … the Illinois Survival Act." *Harrison v. Burlington Northern R. Co.*, 750 F.Supp. 316, 317 (N.D. Ill. 1990). Punitive damages may not be awarded in suits brought under

the ADA or the RA either. *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).  In any event, punitive damages would be inappropriate under these facts.

## CONCLUSION

WHEREFORE, the IDOC Defendants ask that this Court enter summary judgment in their favor on all counts of the instant First Amended Complaint, and for any additional relief that this Court deems just and proper.

RESPECTFULLY SUBMITTED,


/s/ *Robert T. Shannon*
Robert T. Shannon
*Counsel for IDOC Defendants*

Robert T. Shannon
Thomas L. O'Carroll
Ambrose V. McCall
Stephen D. Mehr
Christian J. Michalik
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinois 60606
(312) 704-3000
rshannon@hinshawlaw.com
tocarroll@hinshawlaw.com
amccall@hinshawlaw.com
smehr@hinshawlaw.com
cmichalik@hinshawlaw.com

40432\322687185.v1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 11, 2024, he electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Central District of Illinois using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Robert T. Shannon*