44653/19344/JNR/JCS

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

MAURISA GAY, as representative of the estate
of ANTHONY GAY, deceased

        Plaintiff,

v.

THE STATE OF ILLINOIS, JOHN BALDWIN,
JEFF SIMS, SHANE REISTER, DR. DOE 1,
MELVIN HINTON, SYLVIA BUTLER,
KELLY ANN RENZI, WILLIAM PUGA, DR.
CHESS, DR. NUNEZ, WEXFORD HEALTH
SOURCES, INC., and DOES 2-5,

        Defendants.

No. 19-cv-01133

Judge Sue E. Myerscough

Magistrate Judge Eric I. Long

## MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendants, WEXFORD HEALTH SOURCES, INC., KELLY RENZI, PSY.D., and WILLIAM PUGA, M.D., by and through their attorney, Joseph Rupcich of CASSIDAY SCHADE LLP, and, pursuant to Federal Rule of Civil Procedure 56 and CDIL-LR 7.1(D), hereby submit their Motion for Summary Judgment, stating as follows:

## INTRODUCTION

Anthony Gay was in the custody of IDOC for 24 years---from 1994 to mid-2018. Over that time, he saw hundreds of mental health providers at thousands of mental health encounters. Gay had an antisocial personality disorder that led to all manner of aberrant behavior, including thousands of disciplinary infractions, additional years of incarceration for staff assaults, and premeditated, calculated, and goal-oriented self-injury. In this lawsuit, Gay has picked out, seemingly at random, a Wexford psychiatrist (Puga) and a Wexford psychologist (Renzi) that treated him in 2017 and 2018 and claimed they violated his Eighth Amendment rights. Yet, Gay

refused to explain in response to discovery what they did or did not do. He failed to disclose expert testimony critical of the voluminous and comprehensive care Dr. Puga and Dr. Renzi provided him. It seems Gay may have had a personal animus for Puga and Renzi that drove the litigation against them. But considering the undisputed care Dr. Puga and Dr. Renzi provide Gay and the complete lack of competent evidence against them, they are entitled to summary judgment.

Plaintiff's claim against Wexford is even harder to decipher. It appears based on the Amended Complaint and Plaintiff's interrogatory answers, Plaintiff claims Wexford failed to deliver the care it contractually obligated itself to deliver to patients in IDOC requiring inpatient/hospital level of mental health care and that was required by a settlement agreement in *Rasho v. Baldwin,* CDIL No. 07-129. No dispute exists IDOC, not Wexford, sets the policies and procedures for mental health in IDOC facility, which were substantially overhauled through negotiations and a settlement in *Rasho.* The suggestion Wexford was obligated by its contract or the Eighth Amendment to independently develop an inpatient facility or send inmates to community mental health centers has no support in the record. Wexford delivered voluminous care to Gay consistent with IDOC's enhanced inpatient treatment protocol, which is exactly what IDOC expected.

## UNDISPUTED MATERIAL FACTS

**Anthony Gay**

1. Gay is formerly an inmate in the IDOC. Exhibit A, deposition of Anthony Gay, pg. 8.

2. Gay was incarcerated in IDOC between 1994 and August 27, 2018. Exhibit A, deposition of Anthony Gay, pg. 8.

3.      Gay's case concerns events that occurred while he was incarcerated in IDOC. Exhibit A, deposition of Anthony Gay, pg. 9.

**Dr. Kelly Renzi**

4.      Dr. Renzi is a clinical psychologist licensed in Illinois.  Exhibit B, deposition of Kelly Renzi, pg. 11.

5.      Dr. Renzi began working as a staff psychologist for Wexford at Pontiac between June 2016 and January 2018, when she became a psychology administrator for the State of Illinois at Pontiac.  Exhibit B, deposition of Kelly Renzi, pg. 9-12, 14, 62.

6.      After becoming a State of Illinois employee at Pontiac in January 2018, Dr. Renzi had general oversight involvement in Mr. Gay's care but was not a direct provider.  Exhibit B, deposition of Kelly Renzi, pg. 62.

7.      As a staff psychologist at Pontiac, Dr. Renzi, provided mental health services directly to inmates, screened patients for psychiatric referral, and participated in multidisciplinary meetings with psychiatry, nursing and security to consult on delivery of care.  Exhibit B, deposition of Kelly Renzi, pg. 13.

8.      Pontiac was an Illinois prison designated for people with long-term segregation sentences.  Exhibit B, deposition of Kelly Renzi, pg. 79.

9.      In January 2017, Dr. Renzi became the mental health site services director at Pontiac, with supervisory responsibility over hiring, assigning, and supervising mental health staff. Exhibit B, deposition of Kelly Renzi, pg. 19.

10.     Dr. Renzi became Mr. Gay's primary therapist in March 2017.  Exhibit B, deposition of Kelly Renzi, pg. 61, Exhibit E, IDOC Medical Records, Bates 1921, Exhibit C, expert report of Dr. Joseph Penn, pg. 47-48.

11.     Dr. Renzi's first appointment with Mr. Gay for one-on-one therapy was March 9, 2017, when she noted his diagnosis of persistent depressive disorder, and unspecified personality disorder with borderline and antisocial traits.  *Id.*

12.     During the time Dr. Renzi treated Mr. Gay, he was designated inpatient level of care.  Exhibit B, deposition of Kelly Renzi, pg. 70-71, 148-49; Exhibit E, IDOC Medical Records, Bates 1921.

13.     Inpatient level of care is the equivalent of a person in a hospital with requirement to be seen minimally every seven days by both the psychiatrist and the psychologist and attend group therapy.  Exhibit B, deposition of Kelly Renzi, pg. 39-40.

14.     Upon taking over as Mr. Gay's primary therapist, Dr. Renzi reviewed Mr. Gay's mental health file to familiarize herself with his history.  Exhibit B, deposition of Kelly Renzi, pg. 75.

15.     Upon taking over as Mr. Gay's primary therapist, Dr. Renzi had continuity of care discussions with Mr. Gay's prior therapist to go over diagnosis, medication compliance, behavioral patterns, response to treatment, and frequency of treatment modality.  Exhibit B, deposition of Kelly Renzi, pg. 63-64.

16.     Upon taking over as Mr. Gay's primary therapist, Dr. Renzi learned Mr. Gay had significant personality disorders and a mood disorder and was manipulative with mental health staff, attempting to dictate with whom he would receive treatment, and also engaged in frequent self-harm for goal-oriented reasons.  Exhibit B, deposition of Kelly Renzi, pg. 64-69.

17.     During the time Dr. Renzi treated Mr. Gay, he was housed in Pontiac's residential treatment unit.  Exhibit B, deposition of Kelly Renzi, pg. 86.

18.    During the time Dr. Renzi treated Mr. Gay, there were times Mr. Gay was housed in the prison infirmary due to crisis watch or four-point therapeutic restraint placement due to prevent self harm.  Exhibit B, deposition of Kelly Renzi, pg. 94.

19.    As of March 9, 2017, Dr. Renzi's plan for Mr. Gay's care was to see him weekly for individual counseling sessions per inpatient patient protocol and to have him continue with group therapy when he came off crisis watch.  Exhibit E, IDOC Medical Records, Bates 1921.

20.    Dr. Renzi's one-on-one sessions with Mr. Gay were typically in a confidential room in the cell house.  Exhibit B, deposition of Kelly Renzi, pg. 85-86.

21.    Mr. Gay's treatment team met weekly to discuss his care.  Exhibit D, deposition of William Puga, M.D., pg. 80.

22.    On March 14, 2017, Dr. Renzi saw Mr. Gay for individual therapy with a plan of care to continue weekly sessions, access crisis team if needed, and continue with group therapy sessions.  Exhibit D, deposition of William Puga, M.D., pg. 68; Exhibit E, IDOC Medical Records, Bates 1939.

23.    Dr. Renzi had weekly therapy sessions with Mr. Gay on March 17, 2017 (Bates 1951) (40 minutes); March 21, 2017 (Bates 1967) (10 minute); March 29, 2017 (Bates 1991) (60 minute); March 31, 2017 (Bates 1995) (60 minutes);  April 4, 2017 (Bates 2009-2010) (25 minutes); March 6, 2017 (Bates 2029-2030) (5 minutes due to tactical unit on living unit); April 11, 2017 (Bates 2051-2052) (3 minutes because Gay refused to talk); April 13, 2017 (Bates 2053-2054) (60 minutes); April 25, 2017 (Bates 2073-2074) (50 minutes); May 2, 2017 (Bates 2988) (5 minutes but unable to be seen out of cell due to level 1 lockdown); May 4, 2017 (Bates 2992) (5 minutes at cell due to level 1 lockdown); May 10, 2017 (Bates 3026) (5 minutes at cell due to level 1 lockdown); May 17, 2017 (Bates 3066) (10 minute encounter in healthcare unit while Gay waited

to have staple removed from ear); May 19, 2017 (Bates 3074) (60 minutes); May 22, 2017 (Bates 3082) (60 minutes); May 25, 2017 (Bates 2602) (30 minutes); May 30, 2017 (Bates 2616-2617) (45 minutes); June 1, 2017 (Bates 2620) (10 minute session terminated due to Gay threatening Dr. Renzi); June 6, 2017 (Bates 2632-2633) (60 minutes); June 8, 2017 (Bates 2650-2651) (10 minute session due to Gay agitation and lack of cooperation); June 13, 2017 (Bates 2664-2665) (50 minutes); June 15, 2017 (Bates 2674) (40 minutes); June 20, 2017 (Bates 2686) (assessment for restraints); June 22, 2017 (Bates 2700-2701) (50 minutes); June 27, 2017 (Bates 2722-2723) (60 minutes); June 30, 2017 (Bates 2732-2733) (60 minutes); July 3, 2017 (Bates 2746-2747) (50 minutes); July 6, 2017 (Bates 2758-2759) (10 minute session due to Gay kicking cell door and yelling profanity); July 11, 2017 (Bates 2780-81) (45 minutes); July 13, 2017 (Bates 2886-2887) (75 minutes); July 18, 2017 (Bates 2900-2901) (60 minutes); July 25, 2017 (Bates 2930-2931) (45 minutes); July 28, 2017 (Bates 2942-2943) (45 minutes); August 1, 2017 (Bates 2960-2961) (45 minutes); August 3, 2017 (Bates 2972) (35 minutes); August 8, 2017 (Bates 3094) (15 minutes); August 10, 2017 (Bates 3108) (60 minutes); August 22, 2017 (Bates 3130) (65 minutes); August 24, 2017 (Bates 3138-3139); August 25, 2017 (Bates 3140) (0 minutes due to Dr. Renzi being called away for another inmate's crisis); August 29, 2017 (Bates 3148) (70 minutes); August 31, 2017 (Bates 3162) (60 minutes); September 5, 2017 (Bates 4093-4094) (60 minutes); September 7, 2017 (Bates 4099-4100) (75 minutes); September 14, 2017 (Bates 4119) (60 minutes); September 19, 2017 (Bates 4137-4138) (60 minutes); September 21, 2017 (Bates 4147) (60 minutes); September 27, 2017 (Bates 4167) (60 minutes); September 29, 2017 (Bates 4183) (60 minutes); October 5, 2017 (Bates 3689) (75 minutes); October 6, 2017 (Bates 3687-3688) (60 minutes); October 17, 2017 (Bates 3721) (60 minutes).  Exhibit E, IDOC Medical Records.

**Dr. William Puga**

24.    Dr. Puga worked for Wexford as a psychiatrist from March 1, 2017, to March 1, 2018, at which time he became a State employee.  Exhibit D, deposition of William Puga, M.D., pg. 12.

25.    Dr. Puga is a physician practicing medicine as a psychiatrist.  Exhibit D, deposition of William Puga, M.D., pg. 11.

26.    Dr. Puga's first visit with Mr. Gay was on March 21, 2017.  Exhibit E, IDOC Medical Records, Bates 1959.

27.    When he began providing psychiatric care to Mr. Gay, Dr. Puga spoke with individuals who had treated Mr. Gay and reviewed Mr. Gay's chart to develop insight into Mr. Gay. Exhibit D, deposition of William Puga, M.D., pg. 60-61.

28.    When he started treating Mr. Gay in March 2017, Dr. Puga knew about Mr. Gay's history of self-injury.  Exhibit D, deposition of William Puga, M.D., pg. 61.

29.    On his first visit with Mr. Gay on March 21, 2017, Dr. Puga noted Mr. Gay's diagnoses of personality disorder NOS, impulse control disorder, and rule out bipolar disorder and continued Mr. Gay's prescription for Geodon, changing it to an PM dose due to complaints of drowsiness when taking it in the morning.  Exhibit D, deposition of William Puga, M.D., pg. 77; Exhibit E, IDOC Medical Records, Bates 1959-1964.

30.    Dr. Puga believed that Mr. Gay's personality disorder was best treated by encouraging Mr. Gay to accept boundaries and develop skills to make better choices to be able to function in prison and in the world on release.  Exhibit D, deposition of William Puga, M.D., pg. 152-155.

31.     Dr. Puga's psychiatric sessions involved helping Mr. Gay recognize faulty thinking that would harm him and his situation and lead to harming and instead help him self-soothe so he would not act out.  Exhibit D, deposition of William Puga, M.D., pg. 152-53.

32.     Several hours after their first encounter, Mr. Gay reported to nursing staff he was "not getting what I'm supposed to" and presented a three-inch superficial laceration to his right arm.   Exhibit E, IDOC Medical Records, Bates 3342.

33.     Dr. Puga saw Mr. Gay for individual psychiatric therapy sessions on March 28, 2017 (Bates 1979-1984); April 6, 2017 (Bates 2011-2016); April 11, 2017 (Bates 2045-2050); April 18, 2017 (Bates 2055-2060); April 25, 2017 (Bates 2075-2080); May 5, 2017 (Bates 3006-3011); May 12, 2017 (Bates 3036-3041); May 22, 2017 (Bates 3091-3096); May 30, 2017 (Bates 2610-2615); June 6, 2017 (Bates 2634-2639); June 13, 2017 (Bates 2668-2673); June 27, 2017 (Bates 2714-2719); July 3, 2017 (Bates 2738-2743); July 11, 2017 (Bates 2772-2777); July 18, 2017 (Bates 2902-2907); July 25, 2017 (Bates 2922-2927); August 1, 2017 (Bates 2962-2967); August 8, 2017 (Bates 3100-3105); August 15, 2017 (Bates 3114-3119); August 22, 2017 (Bates 3132-3137); August 29, 2017 (Bates 3141-3146); September 5, 2017 (Bates 4087-4091); September 12, 2017 (Bates 4107-4111); September 19, 2017 (Bates 4131-4136); September 26, 2017 (Bates 4157-4162); October 3, 2017 (Bates 3681-3686); October 10, 2017 (Bates 3691-3696); October 17, 2017 (Bates 3715 to 3720); October 24, 2017 (Bates 3737-3741); October 31, 2017 (Bates 3781-3786); November 7, 2017 (Bates 3803-3908); November 14, 2017 (Bates 3819-3824); November 21, 2017 (Bates 3841-3846); November 28, 2017 (Bates 3851-3856); December 5, 2017 (Bates 3923-3928); December 18, 2017 (Bates 3945-3949); December 29, 2017 (Bates 3979-3984); January 5, 2018 (Bates 4017-4022); January 15, 2018 (Bates 4033-4038); February 5, 2018 (Bates 4707-4712). Exhibit E, IDOC Medical Records

34.     Dr. Puga adjusted Mr. Gay's medications as needed. Exhibit E, IDOC Medical Records, Bates 1959 (Geodon 60 mg changed to pm dose); (Bates 2634 (Geodon increased to 80 mg at night); (Bates 4087) (Geodon increased to 100 mg at night); Bates 3691 (Geodon reduced to 80 mg at night); Bates 3841 (Geodon reduced to 60 mg at night); Bates 3979 (Geodon reduced to 40 mg at night); Bates 4707 (Geodon increased to 80 mg).

35.     Dr. Puga's meetings with Mr. Gay were in a treatment room and not typically at the cell front unless the facility was on lockdown.  Exhibit D, deposition of William Puga, M.D., pg. 84, 105.

36.     When Dr. Puga was treating Mr. Gay, Mr. Gay was designated as inpatient level of care.  Exhibit D, deposition of William Puga, M.D., pg. 63-64.

37.     Dr. Puga's opinion as to Mr. Gay's mental health diagnosis was cluster B personality disorder  consisting of histrionic, narcissistic, antisocial, and borderline personality disorders.  Exhibit D, deposition of William Puga, M.D., pg. 66.

**Gay's Treatment Plans at Pontiac**

38.     At Pontiac, Mr. Gay's mental health treatment plans were formulated collaboratively by a psychologist like Dr. Renzi, a psychiatrist like Dr. Puga, and a patient, like Mr. Gay.  Exhibit B, deposition of Kelly Renzi, pg. 84; Exhibit F, deposition of Scott McCormick M.D., pg. 30-31.

39.     Mr. Gay's treatment plans included general contact with mental health staff five to six days per week, twice weekly sessions with Dr. Renzi, regular sessions with a behavioral health technician, and weekly psychiatry appointments with Dr. Puga.  Exhibit B, deposition of Kelly Renzi, pg. 84-85.

40.    Mr. Gay's treatment plans were periodically updated.  Exhibit B, deposition of Kelly Renzi, pg. 96.

41.    As of April 4, 2017, Mr. Gay's mental health treatment plan was to address his low self-esteem and fear of abandonment through weekly therapy sessions with Dr. Renzi and to address therapy-interfering behaviors like self harm through dialectical behavioral therapy group twice monthly; coping skills group twice monthly; anger management group twice weekly; criminal thinking group twice weekly; interpersonal coping group twice monthly, among other groups. Exhibit E, IDOC Medical Records, Bates 2018-2022.

42.    As of May 4, 2017, Mr. Gay's treatment plan created by Dr. Renzi and reviewed by Dr. Puga was to address his low self-esteem and fear of abandonment through weekly therapy sessions with Dr. Renzi and to address therapy-interfering behaviors like self harm through dialectical behavioral therapy group twice monthly; coping skills group twice monthly; anger management group twice weekly; criminal thinking group twice weekly; interpersonal coping group twice monthly, among other groups.  Exhibit D, deposition of William Puga, M.D., pg. 109.

43.    During the time Dr. Renzi and Dr. Puga treated Mr. Gay, his treatment plan included interventions to address Mr. Gay's self-injurious behavior.  Exhibit B, deposition of Kelly Renzi, pg. 102-03; Exhibit E, IDOC Medical Records Bates 2996-3001 (May 2017); 2628-2631 (June 2017); 2950-2955 (July 2017); 3154-3159 (August 2017); 4177-4182 (September 2017); 3759-3769 (October 2017); Bates 3859-3869 (December 2017); Bates 3985-3995 (January 2018); Bates 4073-4083 (February 2018).

44.    Gay's mental health therapy sessions were considered structured out of cell time per the *Rasho* requirements.  Exhibit B, deposition of Kelly Renzi, pg. 87.

45.     Mental health staff regularly consulted about Mr. Gay out of concern for his mental health.  Exhibit B, deposition of Kelly Renzi, pg. 146.

46.     As of September 19, 2017, Mr. Gay was receiving more mental health services than any other inmate in his cellhouse, which consisted of three groups weekly, two one-on-one sessions with a psychologist, and a session with a behavioral health technician.  Exhibit B, deposition of Kelly Renzi, pg. 152-53; Exhibit E, IDOC Medical Records Bates 4137-4139.

**A.  Mr. Gay's Self-Harm at Pontiac While Being Treated by Renzi/Puga**

47.     On May 5, 2017, Mr. Gay saw Dr. Tilden for a laceration to his left forearm with twisted wire in the wound and a 4 cm laceration to his scrotum with insertion of a metallic foreign body.  Exhibit E, IDOC Medical Records 3354.

48.     May 9, 2017, Mr. Gay saw a practitioner after he attached a plastic spoon to his public hair.  Exhibit E, IDOC Medical Records 3376.

49.     On May 15, 2017,  Mr. Gay saw a medical practitioner for self-inflicted wounds from insertion of ballpoint pens in his ear and insertion of cloth strips into a wound in his right arm. Exhibit E, IDOC Medical Records  3368.

50.     Dr. Puga recalls that during the time he treated Mr. Gay, Mr. Gay self-harmed three times.  Exhibit D, deposition of William Puga, M.D., pg. 73-74.

51.     Dr. Puga recalls two instances of Mr. Gay harming himself in June 2017.  Exhibit D, deposition of William Puga, M.D., pg. 78.

52.     On June 8, 2017,  Mr. Gay was admitted to the infirmary after he inserted parts of a broken fan into his genitals.  Exhibit E, IDOC Medical Records, Bates 3244.

53.    On June 8, 2017, Dr. Renzi saw Mr. Gay for one-on-one therapy session several hours after his infirmary admission for inserting a fan in his genitals.  Exhibit E, IDOC Medical Records, Bates 2650-2651.

54.    On June 8, 2017, Dr. Renzi's note states that prior to their session, Mr. Gay sent a letter requesting to see a crisis team member, which he gave to another inmate to deliver.  Exhibit E, IDOC Medical Records, Bates 2650-2651.

55.    On June 8, 2017, upon being removed from his cell for therapy session and crisis intervention, Mr. Gay refused mental health intervention, cursing at Dr. Renzi and threatening to sue her.  Exhibit E, IDOC Medical Records, Bates 2650-2651.

56.    On June 8, 2017, Mr. Gay's treatment session was terminated due to his agitation and lack of cooperation.  Exhibit E, IDOC Medical Records, Bates 2650-2651.

57.    On June 20, 2017, Mr. Gay was admitted to the infirmary for insertion of a spork into his arm.  Exhibit E, IDOC Medical Records, Bates 3272.

58.    On February 3, 2018, Mr. Gay presented to nursing staff with foreign bodies affixed to an eyelid and a right thigh laceration with a plastic eating utensil in the wound.  Exhibit D, deposition of William Puga, M.D., pg. 80; Exhibit E, IDOC Medical Records, Bates 4239.

59.    During the time Dr. Puga provided psychiatric care to Mr. Gay, Dr. Puga believed Mr. Gay was making progress due to the therapy he was receiving from Dr. Puga and Dr. Renzi. Exhibit D, deposition of William Puga, M.D., pg. 88.

**IDOC Policies for Mental Health**

60.    Wexford is required by its contract to follow IDOC's policies and procedures. Exhibit G, deposition of Cheri Laurent, pg. 69.

61.     Placement of inmates in segregation is operational and within the purview of IDOC, not mental health staff.  Exhibit D, deposition of William Puga, M.D., pg. 162-163.

62.     The policies and procedures for mental health treatment in IDOC are the IDOC administrative directives and the IDOC Standard Operating Procedure for Mental Health (SOP).  Exhibit H, deposition of Christian Gillespie, pg. 53.

63.     Wexford staff were required to follow IDOC's SOP.  Exhibit G, deposition of Cheri Laurent, pg. 78.

64.     The IDOC SOP effective April 1, 2016, contains four levels of care:  general population/outpatient; special/residential treatment unit; crisis treatment; and inpatient level of care.  Exhibit I, deposition of Andrea Moss, pg. 47-52; Exhibit 4 to deposition of Moss, Standard Operating Procedure, pg. 26.

65.     The mental health team has no control over patient housing assignments.  Exhibit F, deposition of Scott McCormick, M.D., pg. 110-111, 113-114.

66.     The mental health team can recommend a patient be transferred to a residential treatment unit within IDOC if the team believed the person would benefit from the services offered in a residential treatment unit.  Exhibit F, deposition of Scott McCormick, M.D., pg. 112-113.

67.     Residential treatment is a therapeutic milieu or community setting with group therapy.  Exhibit I, deposition of Andrea Moss, pg. 37-38.

68.     Inmates designated inpatient level of care by the mental health team could receive inpatient level of services within IDOC before IDOC opened a dedicated inpatient unit in 2018.  Exhibit F, deposition of Scott McCormick, M.D., pg. 161.

69.     Inmates designated inpatient level of care within IDOC must see their psychiatric provider at least once per week per IDOC's requirements.  Exhibit F, deposition of Scott McCormick, M.D., pg. 161.

70.     Wexford employees follow IDOC's policies and procedures for mental health. Exhibit H, deposition of Christian Gillespie, pg. 14.

71.     Wexford employees could communicate clinical recommendations about patient needs, including possible referral outside of IDOC to the IDOC and IDOC would make the decision.  Exhibit H, deposition of Christian Gillespie, pg. 29-37; Exhibit G, deposition of Cheri Laurent, pg. 70-71.

72.     Wexford employees have in the past made clinical recommendations that certain patients within IDOC should be referred outside IDOC to inpatient mental health hospitals. Exhibit H, deposition of Christian Gillespie, pg. 37-38.

73.     Wexford staff could not make referrals directly to the Illinois Department of Human Services.  Exhibit G, deposition of Cheri Laurent, pg. 82-83.

74.     One IDOC patient has been referred from IDOC to IDHS, which occurred in summer 2018.  Exhibit J, deposition of Meridith Kiss, pg. 30-31.

75.     Wexford and IDOC mental health providers perform segregation reviews to ensure that patients in segregation are assessed for stability and to determine whether any higher level of intervention is needed.  Exhibit H, deposition of Christian Gillespie, pg. 49-50.

76.     No Wexford employee made a documented recommendation Mr. Gay be transferred to a mental health facility outside of IDOC for mental health treatment.  Exhibit H, deposition of Christian Gillespie, pg. 98-100.

77.     In 2015, IDOC sought to provide a more comprehensive inpatient mental health service program than had been provided in the past.  Exhibit G, deposition of Cheri Laurent, pg. 18-19.

78.     In 2015, at IDOC's request Wexford contacted 87 different hospitals to inquire about whether they had capability and willingness to accept IDOC inmates for inpatient mental health services.  Exhibit G, deposition of Cheri Laurent, pg. 15-17, 106-07.

79.     At the relevant time, the Wexford-IDOC contract did not contain any obligation for Wexford to send IDOC inmates to offsite facilities for mental health treatment.  Exhibit K, deposition of Melvin Hinton, pg. 235.

80.     IDOC's expectation at the relevant time was for Wexford to provide mental health treatment to IDOC inmates within IDOC facilities, not send them to outside facilities.  Exhibit K, deposition of Melvin Hinton, pg. 235.

81.     Before IDOC opened the Elgin Treatment Center to which it could transfer patients for inpatient care, IDOC developed an enhanced treatment protocol for individuals designated inpatient level of care.  Exhibit K, deposition of Melvin Hinton, pg. 111-114, 148, 237; Exhibit 9 to deposition of Hinton, Standard Operating Procedure, pg. 27.

82.     IDOC's enhanced treatment protocol included:

- Weekly psychiatry visits
- Individual therapeutic sessions with a licensed mental health professional
- Enhanced out of cell structured activity
- Weekly visits by a mental health professional.

Exhibit K, deposition of Melvin Hinton, pg. 237-238; Exhibit 9 to deposition of Hinton, Standard Operating Procedure, pg. 27.

83.     Notwithstanding the SOP becoming effective in April 2016, nothing prevented mental health staff from delivering enhanced mental health services in accordance with individual clinical needs.  Exhibit K, deposition of Melvin Hinton, pg. 237-240.

84.     Per agreements reached in the *Rasho* litigation inmates in segregation were to receive specified hours of structured and unstructured out of cell time to prevent decompensation.  Exhibit B, deposition of Kelly Renzi, pg. 31-32.

85.     Structured out of cell time was time an individual spends out of their cell engaged in an activity with a goal associated with it, such as therapy sessions.  Exhibit B, deposition of Kelly Renzi, pg. 35-36.

86.     Unstructured out of cell time is time an inmate spends out of their cell not engaged in a goal-oriented activity but at their leisure.  Exhibit B, deposition of Kelly Renzi, pg. 36.

## ARGUMENT

### A.    Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment, the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for a trial.  If Defendants meet their burden in showing there is no evidence to support Plaintiff's claim, Plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  In determining and evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the opposing party and draws all justifiable inferences in

his favor.  A mere scintilla of evidence supporting Plaintiff's position cannot create a genuine issue of material facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Summary judgment is proper if the pleadings, answers to interrogatories, depositions, and admissions, along with affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  In determining whether there are any genuine issues of material fact, the court must draw all inferences in the light most favorable to the non-movant.  *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002).  Yet not every conceivable inference must be drawn, only reasonable inferences.  *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312-13 (7th Cir.1986).  Moreover, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (holding that the "[r]espondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction…").

## B.  Plaintiff Has No Evidence to Support Deliberate Indifference by Dr. Puga or Dr. Renzi

To establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976).  To prevail on an Eighth Amendment claim, a plaintiff must show that the responsible prison officials were deliberately indifferent to his serious medical needs.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th

Cir.1999). Deliberate indifference involves a two-part test. The plaintiff must show that (1) the medical condition was objectively serious, and (2) the state officials acted with deliberate indifference to his medical needs, which is a subjective standard. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir.2000). The required showing for deliberate indifference is "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006), quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992).

Deliberate indifference requires that a defendant actually know about yet disregard a substantial risk of harm to an inmate's health or safety. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). Emphasizing the deference owed to the professional judgment of medical providers, we have observed that "[b]y definition a treatment decision [that is] based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Id.* at 805; *see also McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013); *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008). "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain,* 512 F.3d at 895 (internal quotation marks omitted); *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017).

The substance and volume of the care Dr. Puga and Dr. Renzi provided Gay belies deliberate indifference. As to Dr. Puga, he took over Gay's psychiatric management in March 2017 and remained his primary psychiatrist until February 2018. UMF 24-27. Dr. Puga saw Gay

for weekly consultation and medication management at least 40 times during that period.  UMF 33-34.  Review of his records reveals constant assessment and adjustment to Gay's medication regimen, which demonstrates the exercise of professional judgment.  *See Boykin v. Fischer*, 2019 U.S. Dist. LEXIS 199197 at *55-56 (N.D. Ill.) (the defendants were entitled to summary judgment where they demonstrated they exercised their professional judgment in prescribing certain psychotropic medications and adjusting those drugs and dosages upon the plaintiff's experiences and feedback).  Dr. Puga testified that during the time he was treating Gay's incidences of self-injurious behavior decreased, he had extended periods with no self-harm, and clinically improved. Exhibit D, deposition of William Puga, M.D., pg. 54.

Dr. Renzi began seeing Gay for weekly psychological therapy sessions in early March 2017 to October 17, 2017, and provided therapy during at least 50 clinical consultations.  UMF 4-23. Her encounters are documented in the mental health progress notes and reflect her interactions with Mr. Gay and her clinical impressions of his situation.  While Gay claimed his encounters were cut short by Renzi's administrative responsibilities, that is (1) not a basis for deliberate indifference and (2) belied by the contemporaneous documentation.  Specifically, Dr. Renzi's notes the duration of each encounter.  The overwhelming majority of Dr. Renzi's one-on-one therapy sessions with Gay were around an hour.  UMF 23.  Several were shorter, like when the facility was on lockdown or when Gay cursed at Dr. Renzi and was uncooperative. UMF 23.  Like Dr. Puga, Dr. Renzi testified Gay went an extended period without self-harming (between June 2017 and February 2018), which she attributed to him having a sense of hope and positivity due to receiving a large amount of good-conduct credit.  Exhibit B, deposition of Kelly Renzi, pg. 74.

Moreover, Dr. Puga and Dr. Renzi also participated in formulating and updating Gay's treatment plans, which were reviewed monthly.  These plans generally called for Gay to have

general contact with mental health staff five to six days per week, regular weekly sessions with Dr. Renzi, regular sessions with a behavioral health technician, and weekly psychiatry appointments with Dr. Puga. UMF 38-45.   Gay's plan included interventions to address Gay's self-injurious behavior. UMF 43.   As of September 19, 2017, Mr. Gay was receiving more mental health services than any other inmate in his cellhouse, which consisted of three groups weekly, two one-on-one sessions with a psychologist, and a session with a behavioral health technician. UMF 39-46.   It is notable that during the time Dr. Puga and Dr. Renzi were treating Gay, he was not repeatedly engaging in self-harm, only doing it on several occasions.  UMF 47-58.

When asked in his deposition what he found objectionable about Dr. Puga's treatment, Gay said Dr. Puga "refused to acknowledge that solitary was eating [Gay] up" and refused to give Gay a hearing to come off enforced medication status.  Exhibit A, deposition of Anthony Gay, pg. 220. Gay says Dr. Puga and Dr. Renzi told him they could not do anything about cell placement because it was an "administration" decision.  *Id.* at 223-224   Gay acknowledged that he filed a grievance on his enforced medication status while at Pontiac.  He further acknowledged he took Geodon voluntarily in the sense he was handed it and swallowed it but disputes it was voluntary in the sense he did not want to take it.  *Id.* at 225.   IDOC's regulations say an inmate on involuntary administration of psychotropic medication can request make a written request for review by the Treatment Review Committee (TRC).  20 Ill. Admin Code §415.70(d).  The ordering psychiatrist cannot be a member of the Treatment Review Committee, so Gay's request for review to Dr. Puga was misplaced.  20 Ill. Admin Code §415.70(b).  Gay needed to submit a written request for review to the TRC.

When asked what he found objectionable about the treatment Dr. Renzi provided him, Plaintiff testified Renzi "left [him] out to dry" in that whenever they had treatment sessions, he

would "wait for the other foot to drop." Exhibit A, Plaintiff's deposition, pg. 203. Plaintiff explained that Renzi was the only psychologist and therefore she frequently got called away from their sessions. *Id.* at 204. But the records reflect Dr. Renzi's one-on-one meetings with Gay were frequently around an hour, unless the facility was on lockdown or Gay was uncooperative or abusive. UMF 33. August 25, 2017, reflects Dr. Renzi was called away for another inmate's crisis. UMF 33. Gay's preference for Dr. Renzi's undivided attention for as long as he wanted is not guaranteed by the Eighth Amendment. *See Gabb v. Wexford Health Sources, Inc.,* 945 F.3d 1027, 1032 (7th Cir. 2019) (Eighth Amendment does not guarantee unqualified access to healthcare).

During discovery, Defendants Renzi and Puga served contention interrogatories on Plaintiff tailored to the Complaint allegations. Docs. 166-3 and 166-4. Specifically, Defendants asked Plaintiff to identify (1) the facts, information, or data that provided Dr. Renzi and Dr. Puga actual knowledge Plaintiff was receiving constitutionally inadequate care; (2) all actions or inactions of Dr. Renzi and Dr. Puga that demonstrate their disregard of a substantial risk of serious harm; (3) all facts, information, or data that support the allegation Dr. Renzi and Dr. Puga disregarded a substantial risk of serious harm; (4) the harm Dr. Renzi and Dr. Puga proximately caused Plaintiff. *Id.* at 166-3 and 166-5 (interrogatories 1-4). Defendants also asked Plaintiff to identify the factual basis for the allegation in paragraph 44(b) of the Amended Complaint Dr. Renzi and Dr. Puga "could have sought Anthony's referral to an inpatient psychiatric facility through the 'collegial review' process operated by Wexford, their employer." *Id.* (interrogatory 6). Plaintiff objected to each of these interrogatories as premature contention interrogatories. Doc. 166-6 and 166-7. Plaintiff proposed a deadline for answering these contention interrogatories "at the of submission of expert reports." Doc. 166-10 at 1. Plaintiff has never supplemented her answers to

the contention interrogatories and her experts did not mention Dr. Puga or Dr. Renzi. Exhibits L, M, N.

While Plaintiff's experts did not address Dr. Puga's or Dr. Renzi's care in their Rule 26(a)(2) reports, Defendants disclosed an expert in psychiatry who performed an exhaustive review of Gay's care, including that provided by Dr. Puga and Dr. Renzi. *See* Exhibit C, report of Dr. Joseph Penn, pg. 47-55. In Dr. Penn's opinion, Gay received appropriate psychiatric and mental health care at Pontiac while under Dr. Puga's and Dr. Renzi's care. Exhibit C, report of Dr. Joseph Penn, pg. 64. Specifically, Dr. Penn observed that while Gay was in restrictive housing at Pontiac under Dr. Puga's and Dr. Renzi's care was evidence based and met and exceeded the community and correctional standards of care. *Id.* at 65-68. In the face of Dr. Puga's, Dr. Renzi's, and Dr. Penn's testimony on the appropriateness of their care, Plaintiff cannot raise a genuine issue of material fact without contrary expert testimony that no minimally competent provider would have acted as Dr. Puga and Dr. Renzi did. *See Davis v. Kayira,* 938 F.3d 910, 916 (7th Cir. 2019) (without expert testimony that every minimally competent doctor would have done what the defendant failed to do, deliberate indifference claim failed).

**C. Plaintiff Cannot Raise a Genuine Issue of Material Fact on Wexford's *Monell* liability**

       *1. Legal Standard for Monell Claims*

The Seventh Circuit has held that private companies that act under color of law can be liable under *Monell*, 436 U.S. at 691-92. First, a §1983 plaintiff must show "he was deprived of a federal right." *Dean v. Wexford,* 18 F.4th 214, 235 (7th Cir. 2021), quoting *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). Beyond that, a plaintiff must trace the deprivation to some municipal action (i.e., a "policy or custom"), such that the challenged conduct is "properly attributable to the municipality itself." *Id.* To establish municipal liability under *Monell*, a plaintiff

must prove three things. First is the existence of an unconstitutional policy. This can be done by showing either: (a) an express policy that, when enforced, causes a constitutional deprivation; (b) a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (c) that the constitutional injury was caused by a person with final decision policymaking authority. *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). Second is that the municipality is culpable, which means the municipality's policymakers were deliberately indifferent to a known or obvious risk that a policy or custom would lead to constitutional violations. *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997); *see also*, *Dean*, 18 F.4th at 235 (noting "the plaintiff must show that 'the policy or custom demonstrates municipal fault,' *i.e.*, deliberate indifference"). Third, the municipality's policy must "directly cause[] a deprivation of federal rights." *Brown*, 520 U.S. at 415. The municipality's own actions must be the "moving force" behind plaintiff's injuries. *Id.* at 404.

### 2. *Plaintiff Lacks Evidence of an Unconstitutional Wexford Policy*

In the Amended Complaint, Plaintiff alleged that during a number of years of Gay's incarceration Wexford was under contract to provide medical care and mental healthcare to IDOC prisoners, including comprehensive and specialized mental health treatment, including specialty and emergency care. Doc. 82 at par. 12. Plaintiff claims "despite its contractual obligations *** by policy and practice Wexford did not provide onsite mental health services necessary to meet the needs of persons with severe mental health illnesses like [Plaintiff], nor did it transfer prisoners who needed such care to appropriate outside mental health facilities." Doc. 82 at 8. Plaintiff further alleges Wexford "never developed such a hospitalization capacity within the IDOC's facilities, so this meant [Plaintiff] required off-site hospitalization." Nonetheless, Plaintiff claims

that "[o]n information and belief Wexford also had a policy and practice of ignoring its obligation to provide such off-site hospitalization for seriously mentally ill prisoners, and did not seek to transfer any prisoner [including Plaintiff] for the off-site mental healthcare that they needed." Doc. 82 at par. 42(c); *see also* Exhibit O, Plaintiff's Amended Responses to Wexford Interrogatories 8 (Wexford failed to deliver care at the crisis and inpatient levels identified in *Rasho v. Baldwin,* CDIL No. 07-1298 and failed to send patients offsite to receive that care).

First, to the extent Plaintiff is alleging Wexford maintained official policies concerning mental health that violated Gay's rights, Wexford does not set mental health policy or procedures in IDOC. UMF 60-62.   IDOC determines its own mental health policy and procedures. *Id*.  These policies and procedures have undergone a substantial overhaul, not by any action of Wexford, but through over a decade of litigation involving IDOC, resulting in a settlement agreement in *Rasho v. Baldwin,* CDIL No. 07-1298.  *Rasho* is a statewide Rule 23(b)(2) class action concerning mental health treatment in IDOC that has been pending for over 15 years.  *Rasho* addressed the alleged deficiencies Plaintiff attributes to Wexford, including the levels of care in IDOC, management of segregated offenders with mental health needs, and  the lack of an inpatient mental health facility in IDOC, and resulted in a sweeping settlement agreement that changed the IDOC's mental health system.  *See* Exhibit 6 to Exhibit K, deposition of Melvin Hinton, Settlement Agreement, section

Review of *Rasho's* history shows IDOC's policies and procedures mentioned by Plaintiff in response to interrogatory No. 8 resulted from a negotiation between *Rasho* plaintiffs and IDOC, not Wexford policymakers.  In certifying *Rahso's* Rule 26(b)(2) class of IDOC inmates in need of mental health treatment in August 2015, the district court cited to IDOC's October 6, 2014, "Inpatient Status Report," which was part of ongoing negotiations between the plaintiffs and IDOC.  *Rasho v. Baldwin,* CDIL No. 07-1298, doc. 252 at 3.  *Id.* at 6.  That 2014 report proposed

a graduated treatment system involving distinct levels of mental health care, as well as creation of

residential treatment units at several IDOC prisons.  *Id.*  Indeed, consistent with negotiations and

agreements in *Rasho* as reflected in the 2014 "inpatient report,"*,* IDOC's administrative directive

on mental health programs and services first reflects the four levels of care in an amendment

effective October 1, 2014.  *See* Exhibit K, deposition of Melvin Hinton, pg. 27, 204 (referring to

deposition exhibit 2, AD 04.04.100, pg. 2).  IDOC's October 1, 2014, administrative directive

04.04.100 defined "crisis treatment level of care as:

> a level of care for offenders who present a danger to self or others, or require
> diagnostic assessment and require temporary, clinical intervention for stabilization
> or diagnostic purposes. Crisis treatment provides short-term, 24 hour supervised,
> structured living arrangements in a crisis designated area. This level of care shall
> be used for short-term crisis stabilization, usually less than 10 days or as considered
> clinically necessary by the offender's treatment team.  Exhibit 2 to Exhibit K,
> deposition of Melvin Hinton, AD 04.04.100, Bates 010021).

IDOC's October 1, 2014, administrative directive 04.04.100 defined "inpatient level of care" as of

October 1, 2014, as:

> the most intensive level of care, involving an individual plan of active psychiatric
> treatment, that includes 24 hour access to a full range of psychiatric and mental
> health staff. Offenders appropriate for this level of care require a level of treatment
> that exceeds the level of care that the Department is able to provide and results in
> commitment to outside facilities for a duration as considered clinically necessary
> by the offender's treatment team.  Exhibit 2 to Exhibit K, deposition of Melvin
> Hinton, AD 04.04.100 (Bates 0100021).

The October 2014 inpatient report further  said that IDOC had committed to reopening and

repurposing the Joliet youth home as a mental health campus to provide 304 male inpatient beds

and that Illinois Department of Human Services would provide 10 inpatient beds at Chester Mental

Health Center.  Exhibit 5 to deposition of Melvin Hinton, pg. 1-2.  IDOC had obtained $29,000,000

for the capital upgrades needed to open the four residential treatment units.  *Id.* at 2.  Construction

of the Joliet Inpatient Treatment Center required a $150,000,000 appropriation from the State.

https://idoc.illinois.gov/news/press-release.19813.html (last visited October 7, 2024).

In April 2016, IDOC put out its SOP.  Exhibit 9 to Exhibit K, deposition of Melvin Hinton,

Standard Operating Procedure Manual for Mental Health.  While Plaintiff says in answer to

Amended Interrogatory No. 8, instead of providing the *Rasho*-identified inpatient and crisis levels

of care, Wexford provided "enhanced" care, which did not resemble what had been defined in

*Rasho*, and did not send patients to outside facilities.  Exhibit O, Plaintiff's Amended Answer to

Interrogatory No. 8.  The enhanced treatment protocol was not Wexford's invention.  It grew out

of *Rasho* and is specified in IDOC's SOP as a temporary solution until IDOC was able to provide

a psychiatric hospital.  The SOP says:

> Until such time as the Department identifies a Psychiatric Hospital, an Enhanced
> Treatment Protocol shall be implemented for all Inpatient Level of Care offenders
> which shall include:
> - Weekly visits with a Psychiatrist.
> - Individual Therapeutic Sessions with a Licensed Mental Health Professional
>   (Licensed Clinical Psychologist), if the offender is able to tolerate such a
>   schedule
> - Enhanced out of cell structured activity.
> - Weekly visits by a Mental Health Professional.

Exhibit K, deposition of Melvin Hinton pg.  111-112; Exhibit 9, to Exhibit K, deposition

of Melvin Hinton, Standard Operating Procedure Manual for Mental Health, pg. 27 (April 1, 2016).

In May 2016, the plaintiffs and IDOC settled *Rasho*.  Exhibit 6 to Exhibit K, deposition of

Melvin Hinton.  The settlement agreement stated the parties had used substantial information

exchanged in the case to determine appropriate staffing ratios, bed and treatment space needs,

therapeutic programming, policies governing segregation and discipline of mentally ill offenders,

and other relevant factors for establishing a constitutionally adequate system for mentally ill

inmates.  Exhibit 6 to Exhibit K, deposition of Melvin Hinton, Settlement Agreement, section I(e).

The settlement agreement contained no admission of liability.  *Id.* at section I(h). The agreement

memorialized the levels of care referenced in Plaintiff's Amended Response to interrogatory No.

8: inpatient, outpatient, residential treatment unit, and crisis. *Id.* at pg. 4-5. It defined "inpatient mental health services" as intensive, inpatient care and treatment at an appropriate facility, one equivalent to an inpatient accredited mental health treatment facility, during the time of an offender's acute crisis, in order to return the offender to a less intensive treatment environment at the earliest clinically appropriate time as required by IDOC Administrative Directive 04.04.100…" *Id* at 3-4. Regarding inpatient services, the settlement agreement provided for the opening of the RTU units in IDOC, the Joliet Inpatient Treatment Center, and required IDOC to enter into an intergovernmental agreement with Illinois Department of Human Services to secure inpatient beds in IDHS facilities for IDOC inmates.[1] *Id.* at 13.

Second, to the extent Plaintiff claims Wexford had a widespread practice of not complying with the *Rasho* settlement by not providing the care it required, that is also unsupported. *See* Exhibit O, Amended Response to Wexford Interrogatory No. 8 (Wexford failed to deliver care at the crisis and inpatient levels identified in *Rasho v. Baldwin,* CDIL No. 07-1298 and failed to send patients offsite to receive that care). The settlement agreement contained a "dispute resolution" section by which the plaintiffs could notify IDOC if they believed IDOC was not in substantial compliance with the settlement agreement. *Id.* at 29. The settlement agreement allowed the parties to *Rasho* to seek relief from the court if they cannot resolve a dispute over IDOC's compliance with the agreement. *Id.* In 2017, the *Rasho* plaintiffs, making use of the settlement agreement's dispute resolution mechanism, alleged IDOC had breached the settlement agreement, resulting in six days of evidentiary hearings in late 2017 and early 2018 on IDOC's compliance. *Rasho v. Jeffreys*, 22 F.4th 703, 707 (7th Cir. 2022). The district court entered a permanent injunction against

---

[1] IDHS never had beds available to take IDOC patients. Exhibit K, deposition of Melvin Hinton, pg. 208-209.

IDOC ordering it to take specific steps related to five specific areas:  staffing, crisis care, segregation, medication, and evaluations and treatment plans.  *Id.* at 708-09.

On appeal, the Seventh Circuit reversed the district court's order and vacated the injunction.  *Id.*  The Seventh Circuit found that contrary to the district court's finding of deliberate indifference by IDOC in implementing the agreed changes to its mental health system, the evidence established that IDOC made reasonable efforts to cure the deficiencies in the five areas the plaintiffs had identified, demonstrating "a commitment to addressing the problem---the antithesis of the callous disregard required to make out an Eighth Amendment claim."  *Id.* at 12, citing *Rosario v. Brawn,* 670 F.3d 816, 821 (7th Cir. 2012).  The Seventh Circuit noted the evidence showed that since the settlement, IDOC had spent 45 million to build new residential treatment units at several facilities and $150 million to construct a new inpatient facility.[2]  *Id.* at 715-716.  If Wexford had simply failed to implement *Rasho* as IDOC and the *Rasho* plaintiffs intended, this would have been identified, litigated, and IDOC would have been compelled to compel Wexford to comply.  Instead, no deliberate indifference was found.

Third, notwithstanding that IDOC clearly developed its own policies, to the extent Plaintiff alleges Wexford had contractual obligation to develop an inpatient solution in IDOC or send IDOC patients to offsite mental health hospitals, that is incorrect.  *See* Doc. 82, par. 12 (despite its contractual obligations *** by policy and practice Wexford did not provide onsite mental health services necessary to meet the needs of persons with severe mental health illnesses like [Plaintiff], nor did it transfer prisoners who needed such care to appropriate outside mental health facilities).

---

[2] IDOC opened Elgin Inpatient Treatment Center, an inpatient/hospital level mental health facility in 2018, which provided IDOC a physical plant location in which to deliver inpatient level of care.  Exhibit K, deposition of Melvin Hinton, pg. 111, 147-148.  IDOC also constructed/repurposed the Joliet Inpatient Treatment Center as its dedicated inpatient mental health facility, which opened in 2022.  Exhibit K, deposition of Melvin Hinton, pg. 110-111.

Plaintiff's theory is not supported by (1) the contract's plain language, (2) the parties' understanding and performance of the contract, or (3) Illinois law.

Section 2.2.2 of the Contract is a general description of Wexford's duties. Exhibit P, 2011 IDOC-Wexford contract. The contract then enumerates the details of the "Comprehensive Medical Program" and the "Comprehensive Mental Health Program." It describes the details of the "Comprehensive Medical Program" in §2.2.3, which describes provision of offsite and hospital-based medical services. *Id.* at 5-7. The "comprehensive medical program" describes the process and timing by which requests for offsite consultation are handled. *Id.* at §2.2.3.2. By contrast, the "Comprehensive Mental Health Program" includes no description of provision of offsite services. *Id.* at 11-15. It specifically says, "Vendor shall deliver effective and efficient mental health services *on-site* to offenders determined to be mentally or emotionally disturbed, due to a chronic mental illness of situational stress." (Emphasis added). *Id.* at 11. Wexford's duty is limited by the extent of its voluntary contractual undertaking. *See Kotarba v. Jamrozik*, 283 Ill. App. 3d 595, 597, 669 N.E.2d 1185 (1996) (the scope of the duty owed by a party to a contract is limited to what was voluntarily undertaken in the contract).

Second, both IDOC and Wexford agree that transferring IDOC inmates for offsite mental health services was not one of Wexford's responsibilities in its relationship with IDOC. Dr. Hinton, IDOC's 30(b)(6) representative, confirmed the contract did not require Wexford to send IDOC patients to offsite mental health facilities during the relevant time:

> Q. For the entirety of Dr. Hinton's time with the department Wexford Health Sources has been a contractual partner with the IDOC, is that right?
> A. That's correct.
>   [Objection].
> Q. And Wexford Health Sources has provided mental health services?
> A. That's correct.
> Q. And you're familiar with the contractual obligations of Wexford Health Sources as it relates to mental health services in that contract, is that right?

A. That's correct.

Q. And the department has never expected Wexford Health Sources to send patients to off-site facilities for mental health treatment, that's not been a contractual obligation as the department understands the contract, is that right? [Objection].

A. Correct.

Q. The department expects Wexford Health Sources to provide at least in the relevant time mental health treatment to IDOC patients in IDOC facilities [Objection].

A. That is correct. Exhibit K, deposition of Melvin Hinton, pg. 235-36.

Wexford's 30(b)(6) representative, Dr. Christian Gillespie testified similarly to Dr. Hinton that Wexford staff could not force the transfer of a patient and were limited to making recommendations:

Q. Were Wexford employees trained that there was any way to transfer individuals outside of IDOC for mental health services?

A. I'm not sure that that was the specific language or focus of the training, given that that was not the practice at that time. They were trained on how to make a recommendation and they were trained that they do not have the authority to independently make the transfer. All our staff had the ability to do is to make a clinical recommendation about what level of care is appropriate for a patient.

\*\*\*

Q. Can you describe how Wexford employees were trained to handle a situation where they believed an inmate required mental health services that could not be provided within IDOC?

A. Wexford Health staff were always trained that if they did not believe that they could provide the level of treatment that was necessary for a particular patient, then they should be consulting with their clinical supervisor for direction on how to proceed. Exhibit H, deposition of Christian Gillespie, pg. 28-29.

Recommendations for transfer as Dr. Gillespie described have happened, as Wexford mental health providers generated referrals of patients at Logan to IDHS in approximately 2016. This is discussed at length in *Andrews v. Rusher,* CDIL 18-1101, a case in which Plaintiff's counsel herein claims the IDHS referrals are evidence Wexford was providing insufficient onsite care. *See Andrews v. Rusher,* CDIL 18-1101 (Doc. 181 at 21). But this is the extent of Wexford's ability concerning outside referral for mental health---to make the need known. UMF 70-73.

Third, the ability to move an inmate out of IDOC custody and into a DHS facility rests

solely with IDOC and DHS per Illinois law.  Section 3-8-5 of the Unified Code of Corrections

(730 ILCS 5/3-8-5) provides:

> The Department shall cause inquiry and examination at periodic intervals to
> ascertain whether any person committed to it may be subject to involuntary
> admission, as defined in Section 1-119 of the Mental Health and Developmental
> Disabilities Code [405 ILCS 5/1-119], or meets the standard for judicial admission
> as defined in Section 4-500 of the Mental Health and Developmental Disabilities
> Code [405 ILCS 5/4-500], or is an intoxicated person or a person with a substance
> use disorder as defined in the Substance Use Disorder Act [20 ILCS 301/1-1 et
> seq.]. The Department may provide special psychiatric or psychological or other
> counseling or treatment to such persons in a separate institution within the
> Department, or the Director of the Department of Corrections may transfer such
> persons other than intoxicated persons or persons with substance use disorders to
> the Department of Human Services for observation, diagnosis and treatment,
> subject to the approval of the Secretary of the Department of Human Services, for
> a period of not more than 6 months, if the person consents in writing to the transfer.
> The person shall be advised of his right not to consent, and if he does not consent,
> such transfer may be effected only by commitment under paragraphs (c) and (d) of
> this Section 730 ILCS 5/3-8-5.

Meredith Kiss, who testified on behalf of IDHS, said IDHS was only aware of one patient

who had been referred for transfer from IDOC to IDHS.  In all of the mental health providers who

saw Gay over the years, none sought to generate his referral out of IDOC for mental health

treatment.  UMF 76.

Any suggestion Wexford had an independent duty to develop more intensive inpatient

treatment protocols or transfer inmates out of IDOC is inconsistent with the contract, Illinois law,

and over a decade of *Rasho* litigation.   No basis exists for a *Monell* theory of liability in which a

contractual vendor implicitly accepts a constitutional duty to provide a type of service it did not

contract to provide and that its client never expected it to provide.  A finding otherwise would

make the voluntary undertaking of services as a vendor to the State an unknowable business

venture where failing to provide un-contracted-for services could result in civil liability and punitive damages.

### 3. Plaintiff has no Evidence of Corporate Fault

Even if Plaintiff had sufficient evidence of a policy, she still needs evidence of corporate fault, *i.e.,* deliberate indifference. *Dean,* 18 F.4th at 235. A Plaintiff relying on a widespread custom or practice "must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id.* When a municipality takes action or directs an employee to take action that facially violates a federal right, municipal fault is easily established. *Brown,* 520 U.S. at 404-05. In contrast, where the plaintiff alleges the municipality has not directly violated his rights but rather has caused an employee to do so, a "rigorous standard[] of culpability ... applie[s] to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405. In this situation, the plaintiff must demonstrate that the municipality's action "was taken with 'deliberate indifference'" to the plaintiff's constitutional rights. *Id.* at 407. This is a high bar. *Dean*, 18 F.4th at 235. Negligence or even gross negligence on the part of the municipality is not enough. *LaPorta v. City of Chicago*, 988 F.3d 978, 986-987 (7th Cir. 2021). A plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences. *Id., citing Brown,* 520 U.S. at 407. Plaintiff has no evidence of deliberate indifference at Wexford's corporate policymaker level.

During discovery, Defendants served a contention interrogatory on Plaintiff, asking her to "[i]dentify and cite in the record to all facts that support any contention Wexford Health Sources was deliberately indifferent to a known or obvious risk of harm." Doc. 166-5 at 7 (Wexford interrogatory No. 11). Plaintiff objected to the question as a premature contention interrogatory

and directed Defendants to the operative complaint and document production. *Id.* Plaintiff proposed answering interrogator No. 11 contemporaneous with disclosure of expert opinions. Doc. 166-10 at 1. Plaintiff has not supplemented this answer.

While Plaintiff failed to answer this question, Wexford's efforts at assisting IDOC with a plant location for inpatient care is well-documented. In 2015, as IDOC sought to provide a more comprehensive inpatient mental health service program than had been provided in the past as part of the *Rasho* negotiations, Wexford attempted to find an entity willing to take IDOC patients. UMF 77-78. Specifically, Wexford staff in Pittsburgh contacted 87 different Illinois hospitals to inquire whether they had capability and willingness to accept IDOC inmates for inpatient mental health services. UMF 77-78. Ultimately, all 87 of the facilities declined to take IDOC inmates. Exhibit G, deposition of Cheri Laurent, pg. 15-17. Dr. Hinton testified he did not know Wexford had undertaken this task, so it is not as if Wexford was directed to do it. Between the Seventh Circuit's opinion in *Rasho,* finding no deliberate indifference in implementation and Wexford's assistance to IDOC in finding an inpatient solution, a jury could not find Wexford was deliberately indifferent.

### 4. *Plaintiff Has No Evidence of Moving-Force Causation*

To survive summary judgment Plaintiff must have evidence sufficient to support a jury finding that a municipal action was "the 'moving force' behind the federal-rights violation." *LaPorta*, 988 F.3d at 987, quoting *Brown*, 520 U.S. at 404; *Dean*, 18 F.4th at 235. This "rigorous causation standard" requires "a 'direct causal link' between the challenged municipal action and the violation of [the plaintiff's] constitutional rights." *LaPorta*, 988 F.3d at 987, quoting *Brown*, 520 U.S. at 404; *see also, Dean*, 18 F.4th at 235.

During discovery, Defendants served a contention interrogatory on Plaintiff, asking Plaintiff "[f]or each unconstitutional policy or practice of Wexford Health Sources identified in response to these interrogatories identify all evidence that supports any contention Plaintiff was harmed by the alleged policy or practice." Doc. 166-5 at 7 (Wexford interrogatory No. 12). Plaintiff objected to the question as a premature contention interrogatory and directed Defendants to the operative complaint and document production. *Id.* Plaintiff proposed answering interrogatory No. 12 contemporaneous with disclosure of expert opinions. Doc. 166-10 at 1. Plaintiff has not supplemented this answer.

While it is difficult to address moving-force causation where Plaintiff has not answered discovery that would make clear Plaintiff's *Monell* theory, the Court can fairly conclude on this record Gay was not shortchanged in access to mental health care on account of the lack of inpatient beds, "enhanced treatment" protocol, or staffing shortages in IDOC. Gay's treatment plans at Pontiac as showed Gay receiving general contact with mental health staff five to six days per week, weekly sessions with Dr. Renzi, regular sessions with a behavioral health technician, and weekly psychiatry appointments with Dr. Puga. UMF 38-45. This is the implementation in practice of the enhanced treatment protocol in the Standard Operating Procedure which served as a *Rasho*-approved bridge to a physical inpatient plant location. In fact, Dr. Renzi testified that Gay was receiving more mental health services than any other inmate in his cellhouse. UMF 46. This was delivered by Wexford providers per the IDOC administrative directives and Standard Operating Procedure Manual for Mental Health enhanced treatment protocol that was in place until IDOC developed an inpatient facility.

**D.  Recovery Against Wexford for Events Before October 28, 2016, Is Outside the Statute of Limitations**

In March 2020, Wexford moved to dismiss Plaintiff's *Monell* claim against it to the extent it sought relief for actions/inactions before October 28, 2016. Docs. 88-89. Wexford tracked Gay's litigation against it and its employees concerning his mental health treatment in nine different cases going back to 2005 and argued Gay could not avail himself of the "continuing violation" doctrine because he regularly sued over his mental health treatment. Doc. 89 at 8. The district court relying on the law of the case doctrine from its decision on co-defendants' previous Motion to Dismiss, which did not detail Gay's litigation history, denied Wexford's Motion. Doc. 116. The law of the case is a discretionary doctrine, not a rigid bar. *Pepper v. United States*, 562 U.S. 476, 506, (2011). The doctrine "does not apply if the court is 'convinced that [its prior decision] is clearly erroneous and would work a manifest injustice. *Id.* Here, the Court's decision was made at the pleadings stage and should be reconsidered in light of the full record. *See Chi. Joe's Tea Room, LLC v. Vill. of Broadview,* 894 F.3d 807, 818 (7th Cir. 2018) (recognizing law of case would not preclude revising an issue after record developed in discovery).

## **CONCLUSION**

Plaintiff has years to develop evidence against Dr. Puga, Dr. Renzi, and Wexford. Plaintiff has not challenged Dr. Puga and Dr. Renzi's care in any substantial way, leaving the only competent discussion of it to be provided by Dr. Renzi, Dr. Puga, and their expert, Dr. Penn. Concerning Wexford, Plaintiff tries to bootstrap herself to *Rasho* and extract a *Monell* claim against Wexford from a laborious and good-faith negotiation between *Rasho* plaintiffs and IDOC. Gay received copious mental health treatment at IDOC's highest level of care in IDOC. No basis exists to find Wexford was deliberately indifferent to the risk posed by some unidentified yet unconstitutional policy that inflicted harm on Gay. Defendants are entitled to summary judgment.

WHEREFORE, for the above reasons, Defendants respectfully requests this Honorable Court grant their Motion for Summary Judgment and grant such further relief as deemed appropriate.

Respectfully Submitted,

CASSIDAY SCHADE LLP

By: __/s/ Joseph N. Rupcich_____
    One of the Attorneys for Defendants,
    WEXFORD HEALTH SOURCES, INC.,
    KELLY RENZI, PSY.D., and WILLIAM PUGA,
    M.D.

Joseph N. Rupcich
6283899
CASSIDAY SCHADE LLP
2040 West Iles Avenue, Suite B
Springfield, IL  62704
(217) 572-1714
(217) 572-1613 (fax)
jrupcich@cassiday.com

## <u>CERTIFICATION OF COMPLIANCE WITH TYPE/VOLUME LIMITATION</u>

Pursuant to CDIL-LR 7.1(B)(4), the undersigned counsel certifies that Defendants' Motion for Summary Judgment complies with the Type Volume Limitation set forth in the Central District Local Rules. Defendants' Response consists of 6,391 words and 483 lines of text. In determining the word, character, and line counts of the document, the undersigned counsel relied on the word, character, and line count functions of the word processing system used to prepare the document.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 11, 2024, I electronically filed the foregoing Motion to for

Summary Judgment, with following receiving electronic notice through the Court's ECF.

Antonio M. Romanucci, Stephan D. Blandin
Bhavani Raveendran, Javier Rodriguez, Jr.
Samantha A. Harton, Stephen Weil
Romanucci & Blandin, LLC
321 N. Clark Street, Suite 900
Chicago, IL 60654
aromanucci@rblaw.net
sblandin@rblaw.net
b.raveendran@rblaw.net
jRodriguez@rblaw.net
sharton@rlaw.net

Jon Loevy
Arthur Loevy, Locke E. Bowman
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago IL 60607
arthur@loevy.com
jon@loevy.com

Christopher J. Bergin
Still Law Group
1101 North Broadway, Suite 102
Oklahoma City OK 73103
cbergin@fulmersill.com

Alan Remy Taborga
Assistant Attorney General
1776 E. Washington Street
Urbana IL 61802

Phillip W. Rehani
Assistant Attorney General
100 W. Randolph, 13th floor
Chicago, IL  60601
Phillip.Rehani@ilag.gov

Stetson F. Atwood, Laura Ieremia
Scott Kater, Monica L. Smit
Brian P. O'Kane
Donohue Brown Mathewson & Smyth, LLC
131 South Dearborn Street, Suite 1600
Chicago, IL 60603
stetson.atwood@dbmslaw.com
shelly.harders@dbmslaw.com
ieremia@dbmslaw.com
becker@dmbslaw.com
okane@dbmslaw.com

Robert T. Shannon, Thomas L. O'Carroll,
Stephen Mehr, John W. Anders
Hinshaw & Culbertson LLP
151 North Franklin Street
Suite 2500
Chicago, IL 60606
Telephone: 312-704-3000
Facsimile: 312-704-3001
Counsel for IDOC Defendants

/s/ Joseph N. Rupcich

12082387