**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| Maurisa Gay, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19-CV-01133 |
| | ) | |
| v. | ) | Judge Sue E. Myerscough |
| | ) | |
| John Baldwin et al., | ) | Magistrate Judge Eric I. Long |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

---

# Table of Contents

RESPONSE TO STATE DEFENDANTS' STATEMENT OF FACTS ........................................... 3

I.   State Undisputed Material Facts ................................................................................. 3

II.   State Disputed Material Facts ................................................................................. 13

III.   State Undisputed Immaterial Facts ...................................................................... 18

IV.   State Disputed Immaterial Facts ........................................................................... 39

RESPONSE TO WEXFORD DEFENDANTS' STATEMENT OF FACTS .............................. 54

I.   Wexford Undisputed Material Facts ....................................................................... 54

II.   Wexford Disputed Material Facts ........................................................................... 66

III.   Wexford Undisputed Immaterial Facts ................................................................ 75

IV.   Wexford Disputed Immaterial Facts ...................................................................... 76

PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS ...................................................... 80

INTRODUCTION ................................................................................................................ 108

ARGUMENT ....................................................................................................................... 110

FACTUAL BACKGROUND ............................................................................................... 110

II.   Wexford. ................................................................................................................. 123

III.   Anthony Gay. .......................................................................................................... 125

LEGAL STANDARD .......................................................................................................... 131

DISCUSSION ...................................................................................................................... 132

I.   Plaintiff met her burden against the State under the Americans with Disabilities Act & Rehabilitation Act. ...................................................................................................... 132

   A.   Plaintiff states a discrimination claim for the failure to refer Mr. Gay for outside treatment. ................................................................................................................. 133

   B.   Plaintiff states a failure-to-accommodate claim for failing to provide Mr. Gay with a means for removal from long-term disciplinary segregation. ................................... 135

II.   Wexford is not entitled to summary judgement. ................................................... 142

III.   Plaintiff's claims are not procedurally barred. .................................................... 145

IV.   Uncontested claims and defendants. ..................................................................... 150

CONCLUSION ..................................................................................................................... 151

Plaintiff Maurisa Gay, through her undersigned counsel, submits this response in opposition to the motions for summary judgment filed by the defendants in this matter filed by the State defendants (ECF 285) and the Wexford defendants (ECF 286). Plaintiff respectfully submits that, for the reasons set forth herein, both motions should be denied.

## RESPONSE TO STATE DEFENDANTS' STATEMENT OF FACTS

### I.    State Undisputed Material Facts

1. Between 1994 and 2018, decedent Anthony Gay was imprisoned by the IDOC at multiple prisons, including the Tamms, Dixon, Pontiac, Statesville, and Menard correctional facilities. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 9.)

**Response:** Undisputed.

2. Defendant John Baldwin is sued in his individual capacity and was the Acting Director of IDOC between August 2015 and May 31, 2020. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 11.)

**Response:** Undisputed.

4. Defendant Rob Jeffreys, who has not been deposed in this lawsuit and is not mentioned in Gay's deposition, is the Director of IDOC and is sued in his official capacity. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 10; see Ex. 2, Anthony Gay Dep.)

**Response:** Undisputed.

5. Defendant Jeff Sims, who has not been deposed in this lawsuit and is not mentioned in Gay's deposition, is the IDOC's Central regional Psychology Supervisor and is sued in his individual capacity. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 13; see Ex. 2, Anthony Gay Dep.)

**Response:** Undisputed.

6. Defendant Shane Reister, who has not been deposed in this lawsuit and is not mentioned in Gay's deposition, is the IDOC's Southern Regional Psychology Supervisor and is sued in his individual capacity. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 14; see Ex. 2, Anthony Gay Dep.)

**Response:** Undisputed.

7. Defendant Dr. Melvin Hinton is the Acting Statewide Mental Health Supervisor for the IDOC and is sued in his individual capacity. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 16.)

**Response:** Undisputed.

8. Defendant Michael Melvin was the Warden at Pontiac Correctional Center during Gay's imprisonment there in 2017-2018 and is sued in his individual capacity. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 22.)

**Response:** Undisputed.

10. Defendant Terri Kennedy was previously an Assistant Warden at Pontiac Correctional Center during Gay's imprisonment there in 2017-2018 and is sued in her individual capacity. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 23.)

**Response:** Undisputed.

11. Kennedy, who has not been deposed in this lawsuit, had conversations with Gay during his time at Pontiac limited to his desire to be moved from solitary confinement. (Ex. 2, Anthony Gay Dep., 378:4-15.)

4

**Response:** Undisputed.

12. Defendant Emily Ruskin was previously an Assistant Warden at Pontiac during Gay's 2017-2018 imprisonment there and is sued in her individual capacity. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 24.)

**Response:** Undisputed.

13. At Pontiac, Ruskin was the Assistant Warden of Programs who oversaw the heads of each department, but she did not have any involvement with Gay's treatment decisions. (Ex. 4, Emily Ruskin Dep., 13:18-14:2, 59:9-13.)

**Response:** Undisputed.

14. Defendant John Varga, who has not been deposed in this case, was previously Warden at Dixon Correctional Center during Gay's 2018 imprisonment and is sued in his individual capacity. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 25).

**Response:** Undisputed.

16. Defendant Justin Wilks, who has not been deposed in this case, was previously an Assistant Warden at Dixon Correctional Center during Gay's 2018 imprisonment there and is sued in his individual capacity. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 26).

**Response:** Undisputed.

17. Gay testified that Wilks was involved in Gay's **"seriously mentally ill"** (SMI) reviews but does not indicate whether he interacted directly with Wilks. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 26; see, e.g., Ex. 2, Anthony Gay Dep., 367:6-8.

**Response:** Undisputed.

18. Defendant Sonja Nicklaus, who has not been deposed in this case, previously was an Assistant Warden at Dixon Correctional Center during Gay's 2018 imprisonment there and is sued in her individual capacity. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 27.)

**Response:** Undisputed.

19. Gay testified to his belief that Nicklaus was involved in his SMI reviews, but offers no specifics and does not indicate whether he ever interacted directly with Nicklaus. (See, e.g., Ex. 2, Anthony Gay Dep., 367:9-10.)

**Response:** Undisputed.

20. Defendant Dr. Kelly Ann Renzi was employed by Defendant Wexford at Pontiac Correctional Center from June, 2016 to January, 2018, and is sued in her individual capacity. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 18., Ex. 5, Dr. Kelly Ann Renzi Dep., 9:13-17).

**Response:** Undisputed.

21. Defendants Drs. Sylvia Butler, Jamie Lynn Chess, William Puga, and Pierre Nunez are sued in their individual capacities as employees of defendant Wexford Health Sources. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶¶ 17, 19-21.)

**Response:** Undisputed.

22. Except for Defendant Jeffreys, all of the individual defendants are sued in their individual capacities. (Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl.)

**Response:** Undisputed.

23. Gay's IDOC records reflect numerous residential facility movements records from 1994 through 2018, including to and from eight IDOC facilities. (Ex. 6, Anthony Gay IDOC Movement History.)

**Response:** Plaintiff objects that **"residential facility movements"** is vague in the context of this factual statement and does not permit Plaintiff to prepare a response. Undisputed that between 1994 and 2018 Mr. Gay was imprisoned in eight different IDOC prisons.

24. Gay was released from segregation during his incarceration at Dixon Correctional Center in 2018. (Dkt. 82, Am. Compl., ¶ 43.)

**Response:** Undisputed.

25. Gay was paroled from IDOC on August 27, 2018 (Ex. 6, Anthony Gay IDOC Movement History, at 1.)

**Response:** Undisputed.

26. Throughout his incarceration in the Illinois Department of Corrections, Gay was also transferred to and from his parent facilities for short-term stays at different facilities for medical reasons, court appearances, and other temporary purposes. (Ex. 6, Anthony Gay IDOC Movement History; Ex. 7, Anthony Gay IDOC Placement History.)

**Response:** Undisputed.

27. At numerous points in his IDOC incarceration, including while at Dixon and Pontiac Correctional Facilities, Gay was transferred intra-facility to and from psychological, mental health,

and medical units. (Ex. 6, Anthony Gay IDOC Movement History; Ex. 7, Anthony Gay IDOC Placement History.)

**Response:** Plaintiff objects that **"psychological"** and **"mental health"** are vague in the context of this factual statement in that it is unclear what types of units are referred to, and for that reason, disputed, though undisputed that Mr. Gay was frequently put on crisis watch during his incarceration.  See generally IDOC Ex. 8. Undisputed that Mr. Gay was frequently transferred to medical units.

31. Since at least 1987, the Administrative Code provided for transfers of inmates upon request or recommendation, including in consultation with clinical staff, psychiatry staff, and other medical personnel. (Ex. 12, 20 Ill. Admin. Code, Ch. I § 503.130.)

**Response:** Object that "transfer" is vague in the context of this statement is it is unclear whether the term refers to transfers within or outside the IDOC.  Subject to that objection undisputed that the Illinois Administrative Code so provided.

32. Since at least 1987, the Administrative Code provided for the transfer of adult inmates to specialized mental health settings upon examination and certification by a physician or psychiatrist. (Ex. 13, 20 Ill. Admin. Code, Ch. I § 503.150.)

**Response:** Undisputed that the Illinois Administrative Code so provided.  To the extent that the fact asserted is that the relevant code was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance; and for that reason and in the alternative, disputed.

33. The Administrative Code enumerates maximum penalties for adult offenders found responsible for more than forty different offenses, including loss or restriction of privileges, good-time revocations, and segregation periods. (Ex. 14, 20 Ill. Admin. Code, Ch. I § 504, Table A.)

**Response:** Undisputed.

56. On April 1, 2016, the IDOC Standard Operating Procedural Manual for Mental Health reflected procedures for monitoring mental health stability of offenders in segregation, including an enhanced treatment protocol for all inpatient level of care offenders with visits to psychiatrists, individual therapeutic sessions with a licensed mental health professional (licensed clinical psychologist), enhanced out of cell structured activity, and weekly visits by a mental health professionals within IDOC. (Ex. 26, IDOC SOP Manual for Mental Health, eff. Apr. 1, 2016, at 28.)

**Response:** Undisputed that the cited SOP so provided. Said SOP encodes that prisoners requiring an inpatient level of care require psychiatric hospitalization will not receive it, but instead remain in the IDOC. Virtually all such prisoners would be subjected to long-term disciplinary segregation. *See* PSOAF 35.

57. IDOC defines **"Mental Health Professional"** (MHP) as a board-certified and licensed psychiatrist, a psychologist with a Ph.D. or Psy. D. and licensed as a clinical psychologist, a licensed psychiatric nurse, a licensed clinical social worker, or an individual with clinical training and a master's degree in psychology. (Ex. 27, IDOC Admin. Directive 04.04.101, eff. June 1, 2017, at 2; Ex. 22, IDOC Admin. Directive 04.04.101A-J, eff. Dec. 1, 1993, at 2.)

**Response:** Undisputed.

62. IDOC considered offenders SMI if they, as a result of a mental condition defined by the Diagnostic and Statistical Manual of Mental Disorders (**"DSM"**) of the American Psychiatric Association, exhibits impaired emotional, cognitive, or behavioral functioning that interferes seriously with their ability to function adequately except with supportive treatment or services. (Ex. 26, IDOC SOP Manual for Mental Health, eff. Apr. 1, 2016, at 64.)

**Response:** Undisputed.

69. IDOC contracts with Defendant Wexford Health Sources, Inc. to provide medical care and mental health care and treatment to the prisoners of the IDOC, including Gay. (Ex. 33, Melvin Hinton Dep., 235:2-5; Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 12; Dkt. 87, Wexford Defs.' Answer to First Am. Compl., ¶ 12.)

**Response:** Undisputed.

99. In Illinois, an inmate wishing to be heard about a complaint or grievances related to conditions may file a written grievance on a grievance form addressed to institutional counselors, and complaints concerning discipline are sent directly to the Grievance Officer. (Ex. 59, 20 Ill. Admin. Code, Ch. I § 504.810.)

**Response:** Undisputed that the cited provision in the Administrative Code so provided.

100. All inmates are entitled to file grievances regardless of their disciplinary status or classification. (Ex. 59, 20 Ill. Admin. Code, Ch. I § 504.810.)

**Response:** Undisputed that the cited provision in the Administrative Code so provided.

101. IDOC Administrative Directive 04.01.114, effective October 1, 2001 (later amended March 1, 2005, August 1, 2012, and January 1, 2016), sets forth general provisions for grievance

procedures. Individuals seeking resolution of non-resolved issues submit a grievance form to the Chief Administrative Officer, Administrative Review Board, Counselor, or Grievance Officer, depending on the nature of the issue. Grievance officers review grievances weekly, complete a corresponding report, and submit the grievance response to the Chief Administrative Officer for final decision. (Ex. 60, IDOC Admin. Directive 04.01.111, eff. Oct. 1, 2001, am. Mar. 1, 2005, Aug. 1, 2012, and Jan. 1, 2016.)

**Response:** Undisputed that the cited Administrative Directive (**"AD"**) so provided. To the extent that the fact asserted is that the relevant AD was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, which is a written AD only.

102. If an inmate rejects the Grievance Officer's response and Chief Administrative Officer's decision, the inmate must file an appeal within 30 days of the date of the Chief Administrative Officer's decision. (Ex. 60, IDOC Admin. Directive 04.01.111, eff. Oct. 1, 2001, am. Mar. 1, 2005, Aug. 1, 2012, and Jan. 1, 2016, at 5, 10, 16, 22.)

**Response:** Undisputed that the cited Administrative Directive (**"AD"**) so provided.

105. On July 10, 2008, the Administrative Review Board and Director issued a letter to Gay in response to multiple grievances reflecting that based on a total review of the available information, Gay's grievances were denied because it was determined his medical needs were being addressed by Tamms Correctional Center Administration in accordance with established policies and procedures. (Ex. 64, IDOC Letter to Anthony Gay, July 10, 2008.)

**Response:** Undisputed.

**107.** On July 8, 2010, in response to a grievance filed by Gay, the IDOC Administrative Review Board denied Gay's claims and the ADA Coordinator indicated Gay's disabilities were being addressed at the time. (Ex. 66, IDOC Letter to Gay, July 8, 2010.)

**Response:** Undisputed.

**108.** On October 3, 2012, Gay filed a grievance regarding his feelings of anxiety, agitation, and self-harm, requested to be seen by a psychiatrist for prescription medication, and this grievance was denied because Gay had been seen by Mental Health Providers eleven times in ten days from September 17, 2012, through October 12, 2012. (Ex. 67, Anthony Gay Grievance, Oct. 3, 2012.)

**Response:** Undisputed.

**109.** On August 26, 2016, Gay filed a grievance against Drs. Sunjay and Butler alleging a denial of proper mental health treatment. Dr. Butler indicated, among other things, that Gay did not want to be referred to a treatment review committee. Gay's grievance was deemed moot, as he was receiving mental health treatment as determined by mental health professionals. (Ex. 68, Anthony Gay Grievance, Aug. 26, 2016.)

**Response:** Undisputed.

**110.** On June 1, 2017, Gay filed a grievance in which he requested to be transferred to an institution where he could receive inpatient level of care, specifically the Elgin facility. The grievance was denied on August 13, 2017. MFP R. Benner responded, "Acting in my role as a Qualified Mental Health Professional, I reviewed grievance and pertinent records. At this time, the Mental Health Treatment Team has determined that the offender remaining at Pontiac Mental Health Unit being the most appropriate placement at this time." (Ex. 69, Anthony Gay Grievance, June 1, 2017.)

**Response:** Undisputed.

**111.** All told, Gay filed at least 38 grievances focused on just his segregated status and mental health treatment. (Ex. 70, IDOC Defendants' Summary of Anthony Gay's Grievances.)

**Response:** Undisputed.

112. On September 9, 2016, IDOC determined an out date for Gay on August 27, 2018. (Ex. 71, IDOC Memo to Anthony Gay, Sept. 9, 2016.)

**Response:** Undisputed.

## II.    State Disputed Material Facts

28. Throughout his incarceration, Gay's segregation status was reviewed regularly pursuant to protocol. (Ex. 8, IDOC Cumulative Counseling Summary; Ex. 9, IDOC Defendants' Summary of Anthony Gay Due Process Review2.)

**Response:** Disputed. First, the fact asserted is not supported by the evidence cited. Specifically, Defendants' citation to Exhibit 8 fails to comply with Local Rule 7.1(D)(1)(b), which provides that "[f]or each fact asserted, [the moving party must] provide citations to the documentary evidence that supports it, appropriately referencing the exhibit and page." (emphasis added). Exhibit 8 consists of 43 pages of hundreds of "counseling" entries without identification of which entries support the asserted fact, or which pages they appear on. Second, the document does not indicate any reviews occurred before December 19, 2016. Furthermore, Exhibit 9 appears to contain excerpts of Exhibit 8, but only likewise identifies reviews beginning on December 19, 2016; no reviews prior to that date are identified. Finally, the "protocol" pursuant to which the reviews were conducted is not identified, making it impossible to determine whether the reviews were conducted pursuant to a protocol or not.

36. IDOC has policies and procedures in place for when individuals were decompensating or needed to be removed from restrictive housing assignments and placed in a higher level of care. (Ex. 16, Justin Hammers Dep., 103:5-12.)

**Response:** Disputed. First, the fact asserted is not supported by the evidence cited.  In the cited passage of the deposition, a Rule 30(b)(6) witness for the state is asked what policies were in place to protect against decompensation of prisoners housed in segregation *before* the implementation of certain written policies. See IDOC Ex. 16 at 103:1-4.  The witness responds that he would **"have to look at the policy to see what it states for sure,"** and then goes on to claim that **"there was a policy and there was a procedure"** in place to protect prisoners who decompensated in segregation. Id. at 103:5-12.  When pressed about what the policy was, however, the witness stated, **"I can't speak to"** what the policies were, id. at 105:13, and that he ultimately did not know what changes were made before the implementation of certain written policies in discussion.  Id. at 106:8-9.  The state has not met its burden regarding the asserted fact in that it has failed to support the asserted fact with the written policy referred to by the witness in IDOC Ex. 16 at 103:5-6 (**"I'd have to look at that policy to be sure …"**). Second, the existence of any formal policies and procedures allowing for decompensating individuals to be removed from segregation is contrary to the ample evidence that the State failed to facilitate such removals for individuals with psychiatric disabilities such as Mr. Gay.

37. Inmates in segregation have their segregation assignment reviewed every ninety days, with mental health considerations included in part of the periodic reviews. (Ex. 16, Justin Hammers Dep., 120:7-15; Ex. 9, IDOC Defendants' Summary of Anthony Gay Due Process Review.)

**Response:** Disputed. Plaintiff does not dispute that the ninety-day review process exists at the time of this filing, but if this factual assertion is to be construed to apply to the entirety of Mr. Gay's

incarceration, it is inaccurate. The evidence cited in this factual assertion is deposition testimony of the Rasho settlement agreement and does not contain evidence supporting that the relevant portion of the settlement agreement was implemented at any particular time within the IDOC. IDOC Exhibit 9 does not refer to why a review was conducted, but in all events does not support that any reviews were conducted before December 19, 2016.  See IDOC Ex. 9 at 5. Indeed, the State's "Summary of Due Process Review" afforded to Mr. Gay does not contain a record that dates before January 2016. Id. at 1. Mr. Gay had been incarcerated in the DOC for twenty years before receiving any 'due process.' IDOC Statement of Facts ¶ 1.

67. IDOC administrative directives provide Americans with Disabilities Act accommodations for offenders with disabilities. (Ex. 31, IDOC Admin. Directive 04.01.111, eff. Dec. 1, 2012, am. July 1, 2013.)

**Response:** Disputed. First, the fact asserted is not supported by the evidence cited.  An assertion that an Administrative Directive itself "provide[s]" ADA accommodations is nonsensical, as written rules are incapable of "providing" an accommodation, an act that only people and organizations can provide. Indeed, there is ample evidence that the IDOC did fully comply with their duty to accommodate offenders with disabilities, particularly those with psychiatric disabilities such as Mr. Gay

It is undisputed that the cited AD provided that the IDOC "shall not discriminate against offenders with known disabilities and shall provide reasonable accommodations to ensure access to programs, activities, and services in accordance with the Americans with Disabilities Act," but to the  extent that the fact asserted is that the relevant AD was observed with respect to Mr. Gay or was observed in practice generally, plaintiff objects that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance.

70. IDOC officials deferred and relied upon Wexford providers' professional judgment and clinical recommendations. (Ex. 33, Melvin Hinton Dep., 235:24-236:5; Dkt. 161, IDOC Defendants' Am. and Supp. Answer to First Am. Compl., ¶ 12.)

**Response:** Plaintiff objects that the fact asserted is not supported by the evidence cited. The cited deposition passage does not refer to reliance on deference, reliance, professional judgment, or clinical recommendations; at no point in the deposition cited are the words (or derivations thereof) deference or reliance recorded (with the exception of the unrelated use of **"relying"** on page 127). The cited deposition passage additionally is in response to a leading question and is therefore inadmissible under FRE 611(c). The cited complaint answer states in full: **"Defendants admit Wexford is a private company that was under contract to provide medical care and mental healthcare to the prisoners of the IDOC, including Plaintiff, during some years of the Plaintiff's imprisonment. Defendants deny the remaining allegations contained in paragraph 12."** Responding further, Plaintiff objects that **"deferred"** and **"relied upon"** are vague in the context of this asserted fact, including because they have no apparent relation to the evidence cited. For these reasons, disputed.

71. The Wexford treatment providers were the individuals responsible for determining each inmate's appropriate level of care and care designation, including Gay. (Ex. 2, Anthony Gay Dep., 329:4-13; Ex. 33, Melvin Hinton Dep., 244:13-19, Ex. 34, Patrick Horn Dep., 215:3-10.)

**Response:** Disputed. In the cited deposition passage, Patrick Horn testified as follows regarding the assessment of the level of care for a patient: **"I would say providers in consultation with their clinical supervisors, and for cases where it's -- was sort of uncertain to -- for the regionals."** IDOC Ex. 34, Patrick Horn Dep., 215:3-10. Regional psychological administrators are IDOC employees. See, e.g., id. at 14:7-15:24; and Dr. Horn testified that in that role he was involved in overseeing

tough mental healthcare cases. Id. at 16:9-17:16; 19:1-20:15. Additionally, IDOC staff played substantial roles in making decisions that substantially affected the mental health care provided to individuals with psychiatric disabilities, such as Mr. Gay, including their placement in solitary confinement. See PLSOF ¶ 13.

73. At no time did any medical or mental health treater recommend that Gay receive treatment that Wexford or IDOC could not provide. (Ex. 34, Patrick Horn Dep., 216:14-217:2.)

**Response:** Disputed. Mr. Gay was designated inpatient level of care. See Pl. Ex. 38; Pl. Ex. 31; Pl. Ex. 17 at 64:21-65:1 Inpatient level of care did not exist within any DOC facility. See PLSOF ¶ 20. As of April 2016, IDOC's Standard Operating Procedures recognized that prisoners who required an inpatient level of care could not receive that level of care at an IDOC facility, so prisoners needing an "inpatient" level of care would receive "enhanced" care instead. See PLSOF ¶ 66. Worse, that enhanced level of care, misnamed "inpatient level of care," took place in segregation if the individual had been placed on disciplinary segregation, where most seriously mentally ill inmates were housed. PLSOF ¶¶ 11-15, 35. Indeed, Mr. Gay required hospitalization at a psychiatric hospital. IDOC and Wexford were unwilling to refer Mr. Gay to an inpatient facility, such as a psychiatric hospital. See PLSOF ¶ 96.

78. Prior to being housed in the IDOC, Gay had a history of self-harm, and as far back as 1991, while housed at the Illinois Youth Center of Joliet, Gay self-harmed himself on multiple occasions, including by putting staples in his ear, and with one such example being an incident that involved him inserting a paperclip into his penis. (Ex. 2, Anthony Gay Dep., 93:9-94:2, 95:22-96:22; Ex. 39, Family Counseling & Psych. Ctr. Report, Mar. 8, 2022; see also Dkt. #82, Am. Compl., ¶ 35.)

**Response:** Disputed. First, during his deposition, Mr. Gay only recalled attempting to harm himself once before he was incarcerated in IDOC in 1996 when he swallowed an excessive amount of pills around 12 or 13 years old. Pl. Ex. 53 at 74. Additionally, Mr. Gay does not recall the incident involving him inserting a paperclip in his penis. Id. at 93:4-96:22. Mr. Gay testified that he put staples in his ear at the Youth Center *while in segregation*. Id. at 99:18-100:9.

104. On January 3, 2008, Gay filed a grievance asserting he was denied an appointment with the psychiatrist because the mental health staff did not know how to treat his disability, but Gay had been evaluated by a psychiatrist and clinically determined not to have a disability at that time, and Gay also was seen by a psychiatrist on January 14, 2008 and other mental health providers for routine rounds, segregation reviews, and PRN. (Ex. 63, Anthony Gay Grievance, Jan. 3, 2008.)

**Response:** Disputed that the referenced grievance was filed on January 3, 2008; the cited document indicates only that a grievance was received on that date. Undisputed that the grievance officer's report states, **"**Mr. Gay has been evaluated by the psychiatrist who has clinically determined that he is not disabled.**"** Undisputed that the grievance report reflects an appointment with a psychiatrist on January 14, 2008. Disputed that Mr. Gay did not have a psychiatric disability. See PX 50 at 46-51, 59-60; IDOC Statement of Facts ¶ 107. Otherwise, object that the asserted facts are not supported by the evidence cited, and for that reason disputed.

## III.    State Undisputed Immaterial Facts

3. Baldwin does not recall meeting Gay, does not have any recollection of Gay during his time as an employee of the IDOC and first became aware of Gay with this lawsuit. (Ex. 1, John Baldwin Dep., 34:2-12.)

**Response:** Undisputed. This fact is immaterial because Baldwin was in a leadership role attendant to the implementation and administration of policies at IDOC. Plaintiff does not contest dismissal of individual defendants.

9. Melvin never physically interacted or conversed with Gay and was never advised that Gay's placement in segregation exacerbated his mental health or mental illness. (Ex. 3, Michael Melvin Dep., 29:9-31:1, 32:12-24.)

**Response:** Undisputed. This fact is immaterial because Melvin was in a supervisory role attendant to the implementation and administration of policies at IDOC. Plaintiff does not contest dismissal of individual defendants.

15. Gay did not testify to any specific interactions with Varga. (Ex. 2, Anthony Gay Dep., 387:21-24.)

**Response:** Undisputed. Plaintiff does not contest dismissal of individual defendants.

29. The standards and guidelines issued by the American Correctional Association do not prohibit placement of mentally ill prisoners in restrictive housing. (Ex. 10, Exhibit 11 to Dep. of Pl.'s Rule 26(a)(2) Witness, Dr. Dora Schriro.)

**Response:** Object that the fact asserted is vague as to time, in that the evidence cited is a single ACA policy from 2004; for this same reason object that the asserted fact is unsupported as to any time after 2004.  Object that the fact asserted is vague as to "placement," as the term does not address the length of confinement.  Subject to these objections, it is undisputed that correctional standards do not connote a blanket prohibition on placement of mentally ill prisoners in solitary confinement. Plaintiff notes and discusses *infra* in her Additional Statement of Facts, however, that there are clear prohibitions on the placement of mentally ill prisoners in restrictive housing

attendant to factors such as length of time in that housing setting, psychiatric disability, and ability to engage in pro-social behavior while in solitary confinement.

30. Pursuant to the Illinois Administrative Code, newly admitted inmates were evaluated at a reception and classification center for assignment to a correctional facility or program. Classification designations and program assignments were thereafter conducted at regular intervals. (Ex. 11, 20 Ill. Admin. Code, Ch. I § 503.20.)

**Response:** Undisputed that the Illinois Administrative Code so provided.  To the extent that the fact asserted is that the relevant code was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance; and for that reason and in the alternative, disputed. This fact is immaterial to any question of fact in this case. The existence of law does not mean that the law was being followed, and there is no evidence in this factual statement that said law was being followed at IDOC. Additionally, Plaintiff does not and has not alleged that Defendant failed to implement systems regarding the classification of inmates. Plaintiff's complaint is that the systems in place failed to provide account for and accommodate psychiatric disability.

39. Provisions of the Illinois Administrative Code enumerate exercise requirements for inmates in segregation, as well as a correctional official's ability to limit exercise opportunities, unless medically contraindicated, if he or she determines the activity to be a threat to the safety and security of the facility or any person. (Ex. 15, 20 Ill. Admin. Code, Ch. I § 504, at 5.)

**Response:** Undisputed. This fact is immaterial to any question of fact in this case. The existence of law does not mean that the law was being followed, and this factual assertion does not provide any evidence that said law was used by IDOC to provide exercise opportunities to Mr. Gay such

that the conditions he experienced in solitary confinement materially improved. Regardless of these services, Mr. Gay was still subject to at least twenty-two hours per day in a cell, alone. See PLSOF ¶ 24

40. IDOC Administrative Directive 05.12.110, effective February 1, 2000, outlined the placement of maximum-security inmates in disciplinary segregation or administrative detention at Tamms Correctional Center, including the review required prior to an inmate's placement at Tamms, required mental health evaluations, subsequent mental health reviews upon placement, and the transfer of inmates from Tamms. (Ex. 17, IDOC Admin. Directive 05.12.110, eff. Feb. 1, 2000.)

**Response:** Undisputed. This fact is immaterial to any question of fact in this case. The existence of law does not mean that the law was being followed, and this factual assertion does not provide any evidence that said law was used by IDOC to meaningfully assess his decompensation and placement in segregation. Additionally, this factual assertion does not provide evidence that the referenced reviews accounted for and/or accommodated psychiatric disability.

41. Pursuant to Administrative Directive 05.12.110, a mental health professional reviewed an inmate's medical and master files before placement at Tamms. (Ex. 17, IDOC Admin. Directive 05.12.110, eff. Feb. 1, 2000, at 3.)

**Response:** Undisputed that the cited Administrative Directive (**"AD"**) so provided.  To the extent that the fact asserted is that the relevant AD was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance; and for that reason and in the alternative, disputed. This fact is immaterial to any question of fact in this case. The existence of law does not mean that the law was being followed, and this factual assertion does not provide any evidence that said law was

used by IDOC to meaningfully assess Mr. Gay's decompensation and placement in segregation in light of his psychiatric disability. Additionally, this factual assertion does not provide evidence that the referenced reviews accounted for and/or accommodated psychiatric disability.

42. If an inmate's pre-placement review resulted in a finding that the inmate was seriously mentally ill, Administrative Directive 05.12.110 directed mental health staff to recommend the inmate be placed in the Specialized Treatment Unit at Tamms. (Ex. 17, IDOC Admin. Directive 05.12.110, eff. Feb. 1, 2000, at 4.)

**Response:** Undisputed that the Administrative Directive so provided. This fact is immaterial to any issue in this case. The existence of the directive does not mean that the directive was being followed, and this factual assertion does not provide any evidence that said law was used by IDOC to meaningfully assess Mr. Gay's decompensation and placement in segregation in light of his psychiatric disability. Additionally, this factual assertion provides no evidence that the conditions of the Specialized Treatment Unit at Tamms were materially different from solitary confinement. Rather, the entirety of the Tamms facility was comprised of segregation units while Mr. Gay was housed there.

43. Pursuant to Administrative Directive 05.12.110, all inmates placed at Tamms were seen by a psychiatrist as needed and were considered for placement in the Specialized Treatment Unit when clinically indicated. (Ex. 17, ID OC Admin. Directive 05.12.110, eff. Feb. 1, 2000, at 5-6.)

**Response:** Undisputed that the cited Administrative Directive ("AD") so provided. Plaintiff objects to the extent that the fact asserted is that the relevant AD was observed with respect to Mr. Gay or was observed in practice generally. The fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance; and for that reason and in the alternative,

disputed. This fact is immaterial to any issue in this case.  The existence of the directive does not mean that the directive was being followed, and this factual assertion does not provide any evidence that said law was used by IDOC to meaningfully assess Mr. Gay's decompensation and placement in segregation in light of his psychiatric disability. Additionally, this factual assertion provides no evidence that the conditions of the Specialized Treatment Unit at Tamms were materially different from solitary confinement. Rather, the entirety of the Tamms facility was comprised of segregation units while Mr. Gay was housed there.

45. Gay was determined guilty of 171 incidents of assault, including 10 violent assaults during his incarceration with IDOC between January 1, 1998 and August 20, 2018. (Ex. 18, Anthony Gay IDOC Inmate Disciplinary Card; Ex. 19, Anthony Gay Handwritten IDOC Disciplinary Record; Ex. 20, IDOC Defendants' Summary of Anthony Gay's Disciplinary History.)

**Response:** Undisputed that Mr. Gay was found guilty of multiple incidents of "assault" and multiple incidents of "violent assault" as those terms are reflected in Mr. Gay's disciplinary card. Plaintiff objects that the terms "assault" and "violent assault" are vague and do not accurately reflect the circumstances of each ticket. This fact is immaterial because it does not have any bearing on whether the State accounted for and/or accommodated Mr. Gay's psychiatric disability

46. Gay was determined guilty of 320 incidents of intimidation/threatening behavior during his incarceration with IDOC between January 1, 1998 and August 20, 2018. (Ex. 18, Anthony Gay IDOC Inmate Disciplinary Card.)

**Response:** Undisputed that Mr. Gay was found guilty of multiple incidents of intimidation or threats as reflected on Mr. Gay's disciplinary card. Plaintiff objects that the terms "intimidation" and "threats" are vague and do not accurately reflect the circumstances of each ticket. This fact is

immaterial because it does not have any bearing on whether the State accounted for and/or accommodated Mr. Gay's psychiatric disability

47. Gay was determined guilty of 46 incidents of sexual misconduct during his incarceration with IDOC between January 1, 1998 and August 20, 2018. Incidents including masturbation, indecent exposure, physical assaults, sexual comments and threats including threats of rape. (Ex. 18, Anthony Gay IDOC Inmate Disciplinary Card.)

**Response:** Undisputed that Mr. Gay was found guilty of multiple incidents as reflected on Mr. Gay's disciplinary card. Plaintiff objects that the term **"sexual misconduct"** is vague and do not accurately reflect the circumstances of each ticket. This fact is immaterial because it does not have any bearing on whether the State accounted for and/or accommodated Mr. Gay's psychiatric disability

48. Gay received numerous disciplinary infractions, and was involved in multiple fights prior to being segregated while incarcerated at Menard Correctional Center. (Ex. 2, Anthony Gay Dep., 78:10-16; 88:7-22.)

**Response:** Plaintiff objects that **"numerous"** is undefined and not supported by the evidence cited, in which Mr. Gay testifies that he had multiple (unspecified) disciplinary infractions before being placed in segregation. Additionally, the term **"fights"** is vague and inaccurate as Mr. Gay testified that it was a single fight that caused his segregation; Mr. Gay testified that there were other fights but the cited evidence does not support the proposition that prison authorities were aware of other the other fights described. Subject to these objections, undisputed. This fact is immaterial because it does not have any bearing on whether the State accounted for and/or accommodated Mr. Gay's psychiatric disability.

49. Gay's disciplinary history is not limited to his time in segregation. (Ex. 2, Anthony Gay Dep., 157:18-23.)

**Response:** Undisputed. This fact is immaterial because it does not have any bearing on whether the State accounted for and/or accommodated Mr. Gay's psychiatric disability while in segregation.

50. In 2018, during his last eight months incarcerated in IDOC, Gay was charged with 15 instances of intimidating or threatening corrections staff (including threatening to kill staff upon his release and learning the guard's home address), and one instance of hitting a staff member in the mouth. (Ex. 18, Anthony Gay IDOC Inmate Disciplinary Card; Ex. 20, IDOC Defendants' Summary of Anthony Gay's Disciplinary History.)

**Response:** Undisputed that Mr. Gay was charged with multiple instances misconduct as reflected on Mr. Gay's disciplinary card. This fact is immaterial because it does not have any bearing on whether the State accounted for and/or accommodated Mr. Gay's psychiatric disability while in segregation.

51. The Illinois Administrative Code sets forth general health care provisions for IDOC. (Ex. 21, 20 Ill. Admin. Code, Ch. I § 415.)

**Response:** Plaintiff objects that the term "general health provisions" is undefined. Subject to this objection, it is undisputed that the cited provisions of the Illinois Administrative Code concern healthcare and that they apply to the IDOC among other state divisions. . To the extent that the fact asserted is that the relevant law was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no

evidence cited to suggest compliance with this law in practice. For that reason the asserted fact is immaterial.

52. Pursuant to IDOC Administrative Directive 04.04.101A-J, effective December 1, 1993, inmates determined to be mentally disturbed, either due to chronic mental illness or situational stress, had access to the following services as recommended by a mental health professional: Diagnostic evaluation by mental health staff; mental health treatment in accordance with the mental health assessment; regular and more frequent monitoring by counseling staff where mental health treatment is not indicated; monitoring of the inmate's mental health status on a regular basis by mental health professionals until it is determined that continued services are no longer needed; participation in available programs in accordance with identified needs, and transfer to a mental health treatment setting when such intensive services are needed. (Ex. 22, IDOC Admin. Directive 04.04.101A-J, eff. Dec. 1, 1993, at 4.)

**Response:** Undisputed that the cited Administrative Directive (**"AD"**) so provided. To the extent that the fact asserted is that the relevant AD was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance with this AD in practice. For that reason the asserted fact is immaterial.

53. As early as 1994, IDOC administrative directives codified policies and procedures for emergency mental health services, including crisis and suicide watch. (Ex. 23, IDOC Admin. Directive 04.04.102A-J, eff. Oct. 1, 1994.)

**Response:** Undisputed.

54. Pursuant to IDOC Administrative Directive 04.04.101, effective August 1, 2005, a mental health professional personally interviewed and prepared a written report on any offender remaining in the Segregation Unit for more than 30 days, and if confinement continued for an extended period, a mental health professional would, at a minimum, personally interview and prepare a written report at least every three months following the initial evaluation. (Ex. 24, IDOC Admin. Directive 04.04.101, eff. Aug. 1, 2005, at 4.)

**Response:** Undisputed that the cited Administrative Directive (**"AD"**) so provided. To the extent that the fact asserted is that the relevant AD was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance with this AD in practice. For that reason, the asserted fact is immaterial.

55. Any offender placed in segregation for 30 days or more would be interviewed by a mental health professional within the first 30 days, and no less than once every 90 days thereafter for the duration of his placement. (Ex. 25, IDOC Admin. Directive 04.04.101, eff. June 1, 2012, Sept. 1, 2013, Oct. 1, 2014, and May 1, 2016.)

**Response:** Undisputed that the cited Administrative Directive (**"AD"**) so provided. To the extent that the fact asserted is that the relevant AD was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance with this AD in practice. For that reason, the asserted fact is immaterial.

58. Offenders living in a segregation housing unit were seen by a mental health provider within seven days, and every seven (or fewer) days while in segregation. (Ex. 26, IDOC SOP Manual for Mental Health, eff. Apr. 1, 2016, at 20.)

**Response:** Undisputed that the cited Standard Operating Procedural Manual (**"SOP"**) so provided. To the extent that the fact asserted is that the relevant SOP was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance with this SOP in practice. For that reason, the asserted fact is immaterial. This fact is also immaterial because the treatment referenced did not meaningfully account for his psychiatric disability because they all required him to receive treatment in solitary confinement, where he could not complete his treatment plans. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

59. MHPs reviewed the overall appropriateness of placement in segregation based on offender's symptoms and needs, considering potential for deterioration and reasons why placement in segregation may be inadvisable. (Ex. 26, IDOC SOP Manual for Mental Health, eff. Apr. 1, 2016, at 21.)

**Response:** Undisputed that the cited Standard Operating Procedural Manual (**"SOP"**) so provided. To the extent that the fact asserted is that the relevant SOP was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance with this SOP in practice. For that reason, the asserted fact is immaterial.

60. The Mental Health Disciplinary Review documented whether the offender's mental illness contributed to the underlying behavior of the offense. The MHP would then recommend a specific term for segregation. Reviewing MHPs drafted and filed Mental Health Progress Notes indicating action taken on behalf of the offender. (Ex. 26, IDOC SOP Manual for Mental Health, eff. Apr. 1, 2016, at 22.)

**Response:** Undisputed that the cited Standard Operating Procedural Manual (**"SOP"**) so provided. To the extent that the fact asserted is that the relevant SOP was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance with this SOP in practice. For that reason, the asserted fact is immaterial.

61. The Seriously Mentally Ill Committee, chaired by the Lead MHP, reviewed a SMI offender that was sentenced to 60 days or more in segregation. (Ex. 26, IDOC SOP Manual for Mental Health, eff. Apr. 1, 2016, at 62-64.)

**Response:** Undisputed that the cited Standard Operating Procedural Manual (**"SOP"**). To the extent that the fact asserted is that the relevant SOP was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance with this SOP in practice. For that reason the asserted fact is immaterial.

65. Crisis Care Areas were used to house offenders determined by an MHP to require removal from their current housing assignment for the purpose of mental health treatment or observation. (Ex. 30, IDOC Admin. Directive 04.04.102, eff. Nov. 1, 2017, at 3.)

**Response:** Undisputed that the cited Administrative Directive (**"AD"**) so provided. To the extent that the fact asserted is that the relevant AD was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance with this AD in practice. For that reason, the asserted fact is immaterial.

66. Crisis Watch is initiated when an offender exhibits behavior that is likely to cause harm to himself, mental health issues render an offender unable to care for himself, gestures, threats, or attempts of suicide are made, or less restrictive measures have failed or are determined to have been clinically ineffective. Offenders in crisis watch cannot be transferred to another facility unless clinically indicated. (Ex. 30, IDOC Admin. Directive 04.04.102, eff. Nov. 1, 2017, at 7-8.).

**Response:** Undisputed that the cited Administrative Directive (**"AD"**) so provided. To the extent that the fact asserted is that the relevant AD was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance with this AD in practice. For that reason, the asserted fact is immaterial. This fact is immaterial, moreover, because there is no evidence that the Crisis Care Areas were materially different from solitary confinement. Indeed, suicide observation cells are typically *de facto* solitary confinement and Anthony's placement on crisis watch often featured the most severe isolation. Pl. Ex. 23 at 75:22-76:24; 80:11-13; Pl. Ex. 50 at 46. Further, this factual assertion is immaterial because the existence of the directive does not mean that the directive was being followed, and this factual assertion does not provide any evidence that said directive was used by IDOC to meaningfully assess, account for, and/or accommodate Mr. Gay's decompensation and placement in segregation in light of his psychiatric disability. Additionally,

the cited evidence was in effect on June 1, 2017, so there is no evidence in this paragraph to support any argument regarding the first twenty-three years of Mr. Gay's incarceration.

72. Mental health treatment plans, behavioral treatment plans, and crisis treatment plans were developed and administered for Gay throughout his incarceration. (Ex. 32, IDOC Defendants' Medical and Mental Health Treatment Summary, Oct. 2018 – Aug. 2018; see also, e.g., Group Ex. 35, IDOC Treatment Plans.)

**Response:** Undisputed. This fact is immaterial because the treatment plans which were developed for Mr. Gay did not meaningfully account for his psychiatric disability because they all required him to receive treatment in solitary confinement, where he could not complete his treatment plans. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

74. At no time did any medical or mental health treater recommend that Gay be transferred to a facility outside of IDOC, including, for example, the Illinois Department of Human Services, to receive either medical or mental health treatment. (Ex. 34, Patrick Horn Dep., 153:20-155:1, 155:14-156:5, 184:24-185:13, 216:9-13.)

**Response:** Undisputed. This fact is immaterial because mental health staff did not have the ability to insist that a prisoner be transferred out of segregation. PX 15 at 67:1-7. Segregation was a security determination, not a mental health determination, and is not one mental health could make. PX 15 at 68:15-69:4; PX 24 at 162:15-163:2; PX 29 at 49:9-50:2. Mental health staff did not have control over whether or not a prisoner was kept in segregation. PX 15 at 66:20-23. Mr. Gay's healthcare providers explained that even though they believed segregation harmed the mentally ill,

masses of mentally ill prisoners were kept in segregation in prisons like Pontiac, because the IDOC had not yet begun to do mental health segregation reviews.  PX 15 at 67:8-20.

76. Health care providers conducted mental health segregation rounds during Gay's time in segregation. (See, e.g., Group Ex. 38, IDOC Mental Health Segregation Round Forms.)

**Response:** Undisputed. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered in solitary confinement, where he could not complete his treatment plans. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

77. Gay's medical records from 2014 through 2018 reflect that he was receiving at least weekly psychiatry and psychology treatment at IDOC. (Ex. 34, Patrick Horn Dep., 212:18-24.)

**Response:** Undisputed. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered in solitary confinement, where he could not complete his treatment plans. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

79. In May 2014, Gay told his treating doctor at the University of Illinois that he did not feel that the involvement of the psychology team was needed at the time because his last episode of self-injurious behavior had occurred more than five months earlier and that he was able to keep this under control. (Ex. 40, Clinical Progress Note, May 9, 2014.)

**Response:** Undisputed that the cited progress note states as follows: **"**I also would like to involve the psychology team to have risk stratification for additional self-inflicted wound or placement of these objects. The patient told me that he does not feel this is needed at this time point and that the last episode of self-inflicting injury is from over 5 months ago, and that is able to keep this under control…**"**  To the extent that the fact asserted varies from the statement in the cited evidence, disputed.

80. On March 28, 2015, Gay indicated that he cut his leg with a rock **"**since they put me on watches for nothing, I'll get more for the money.**"** (Ex. 41, IDOC Offender Injury Report, Mar. 28, 2015.)

**Response:** Undisputed. This fact is immaterial because Plaintiff does not dispute that Mr. Gay engaged in self-harming behavior, acts for which DOC staff disciplined him, and acts derived from his psychiatric disability. This factual assertion, however, is not relevant to whether Mr. Gay had the ability to be released from segregation in light of his psychiatric disability or whether the state accommodated and/or accounted for his psychiatric disability.

81. On July 30, 2015, Gay indicated that he thought about cutting as an attempt to control and was always fighting to not take advantage of new female mental health providers. (Ex. 42, IDOC Mental Health Progress Note, July 30, 2015.)

**Response:** Undisputed. This fact is immaterial because Plaintiff does not dispute that Mr. Gay engaged in self-harming behavior, acts for which DOC staff disciplined him, and acts derived from his psychiatric disability. This factual assertion, however, is not relevant to whether Mr. Gay had the ability to be released from segregation in light of his psychiatric disability or whether the state accommodated and/or accounted for his psychiatric disability.

82. On August 19, 2015, Gay told a health provider that he cut himself because he wanted a cell change. (Ex. 43, IDOC Evaluation of Suicide Potential, Aug. 19, 2015.)

**Response:** Undisputed. This fact is immaterial because Plaintiff does not dispute that Mr. Gay engaged in self-harming behavior, acts for which DOC staff disciplined him, and acts derived from his psychiatric disability. This factual assertion, however, is not relevant to whether Mr. Gay had the ability to be released from segregation in light of his psychiatric disability or whether the state accommodated and/or accounted for his psychiatric disability.

83. On November 16, 2016, during a Psychiatric Diagnostic Evaluation, Gay indicated he cut to get out of his cell, because he was bored, not suicidal. He added that he started cutting to escape "isolation" and that he did not want medication. (Ex. 44, IDOC Psychiatric Diagnostic Evaluation, Nov. 16, 2016.)

**Response:** Undisputed. This fact is immaterial because Plaintiff does not dispute that Mr. Gay engaged in self-harming behavior, acts for which DOC staff disciplined him, and acts derived from his psychiatric disability. This factual assertion, however, is not relevant to whether Mr. Gay had the ability to be released from segregation in light of his psychiatric disability or whether the state accommodated and/or accounted for his psychiatric disability.

84. On April 4, 2017, Gay indicated to a mental health provider that he can control cutting himself, but did so to try to "force their hand" at the Menard Correctional Center. (Ex. 45, IDOC Mental Health Progress Note, Apr. 4, 2017.)

**Response:** Undisputed.  This fact is immaterial because Plaintiff does not dispute that Mr. Gay engaged in self-harming behavior, acts for which DOC staff disciplined him, and acts derived from his psychiatric disability. This factual assertion, however, is not relevant to whether Mr. Gay had

the ability to be released from segregation in light of his psychiatric disability or whether the state accommodated and/or accounted for his psychiatric disability.

87. Gay participated in group therapy in 2016 while in IDOC, and believes he may have participated in group therapy in 2017 while incarcerated at Pontiac. (Ex. 2, Anthony Gay Dep., 194:8-12.)

**Response:** Undisputed. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in solitary confinement, where he could not complete his treatment plans. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id. Additionally, the cited evidence references 2017, so there is no evidence in this paragraph to support any argument regarding the first twenty-three years of Mr. Gay's incarceration.

88. Gay was eligible for, and did in fact participate in, group therapy while incarcerated at Dixon. (Ex. 2, Anthony Gay Dep., 197:10-19; 200:4-5.)

**Response:** Undisputed. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in solitary confinement, where he could not complete his treatment plans. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id. Additionally, the cited evidence references 2017, so there is no evidence in this

paragraph to support any argument regarding the first twenty-three years of Mr. Gay's incarceration.

91. Gay refused to sign a mental health treatment plan which included weekly sessions with the primary mental health provider at Pontiac and group therapy three times per week, among other provisions. (Ex. 51, IDOC Mental Health Treatment Plan, Aug. 31, 2017.)

**Response:** Undisputed. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in solitary confinement, where he could not complete his treatment plans. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id. Additionally, the cited evidence references 2017, so there is no evidence in this paragraph to support any argument regarding the first twenty-three years of Mr. Gay's incarceration.

95. As of May 25, 2017, Gay was receiving two one-on-one sessions per week with a mental health provider and group sessions three days per week. (Ex. 55, IDOC Mental Health Progress Note, May 25, 2017.)

**Response:** Undisputed that Mr. Gay received the sessions described in the progress note. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in solitary confinement, where he could not complete his treatment plans. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id. Additionally,

the cited evidence references May 2017, so there is no evidence in this paragraph to support any argument regarding the first twenty-three years of Mr. Gay's incarceration.

106. IDOC informed Gay of the procedure for requesting a reduction in segregation placement in accordance with 20 Ill. Admin. Code § 504.120 in its response to his grievance filed on May 21, 2009. (Ex. 65, Anthony Gay Grievance, May 21, 2009.)

**Response:** Undisputed. This fact is immaterial because there was no mechanism for Mr. Gay to earn his way out of segregation in light of his psychiatric disability.

113. Since 2005, Gay filed 35 lawsuits against the IDOC and/or its employees, and Wexford and/or its employees, 8 of which resulted in dispositive rulings in the defendants' favor. (Ex. 72, IDOC Defendants' Summary of Dispositive Rulings.)

**Response:** Undisputed that Mr. Gay filed 35 lawsuits. Object that whether a ruling was dispositive or was in defendants' favor are legal assertions, and to that extent, disputed. This fact is immaterial because the disposition of Mr. Gay's prior lawsuits, which centered different acts, omissions, and evidence, make no material fact in this case more or less likely.

114. In Gay v. Chandra, S.D. Ill. No. 05 cv 150, Gay (represented by counsel) alleged constitutional violations related to his mental health care and conditions of his confinement while housed at Tamms (the Chandra Litigation). (Ex. 73, Chandra Litigation Dkt. 1; Ex. 74, Chandra Litigation Dkt. 64).

**Response:** Undisputed that Mr. Gay filed the lawsuit cited. Object that the nature of Mr. Gay's allegations are legal assertions, and for that reason, disputed to the extent the facts asserted differ from the evidence cited.

115. On September 17, 2009, after multi-day trial, a jury returned its verdict against Gay. (Ex. 75, Chandra Litigation Dkt. 153).

**Response:** Undisputed. Object that the nature of Mr. Gay's allegations are legal assertions, and for that reason, disputed to the extent the facts asserted differ from the evidence cited. Additionally, the verdict does not constitute a factual adjudication that certain facts are true.

116. On January 7, 2011, Gay filed suit in the U.S. District Court, Southern District of Illinois against Carol Blackman and Claudia Kachigian alleging that, on several occasions between May 11, 2010 and August 27, 2010, he was in need for a psychiatric evaluation due to building anxiety and was refused by Carol Blackmon (the Blackman Litigation). (Ex. 76, Blackman Litigation Dkt 1).

**Response:** Undisputed that Mr. Gay filed the lawsuit cited.  Object that the nature of Mr. Gay's allegations are legal assertions, and for that reason, disputed to the extent the facts asserted differ from the evidence cited.

117. The court dismissed Gay's complaint for failing to pay required filing fees; Gay appealed under 28 U.S.C. § 1915, arguing that he be granted leave to proceed in forma pauperis (IFP) without payment of fees and the Seventh Circuit remanded the petition for review. (Ex. 77, Blackman Litigation Dkt 80).

**Response:** Object that the progress of Mr. Gay's litigation are legal conclusions and for that reason, disputed to the extent the facts asserted differ from the evidence cited.

118. The Blackman court held an evidentiary hearing to evaluate a petition for leave to proceed in forma pauperis and, on October 3, 2012, denied Gay's IFP petition noting, among other things, Gay's testimony about strategically self-mutilating and refusing treatment if the treating staff

member was not sympathetic towards Gay; finding Gay had not demonstrated that he was under imminent danger so as to avoid the **"three strikes"** rule; and dismissing the case with prejudice. (Ex. 77 at 2-5).

**Response:** Object that the progress of Mr. Gay's litigation are legal conclusions and for that reason, disputed to the extent the facts asserted differ from the evidence cited.

119. On September 13, 2018, Gay filed suit in the U.S. District Court, Northern District of Illinois against Jonathan Ortman alleging misuse of force, battery, intentional infliction of emotional distress, and violations of the Eighth Amendment related to medical and mental health treatment he received as an inmate at Dixon Correctional Center (the Ortman Litigation). (Ex. 78, Ortman Litigation Dkt. 220).

**Response:** Undisputed that Mr. Gay filed the lawsuit cited. Object that the nature of Mr. Gay's allegations are legal assertions, and for that reason, disputed to the extent the facts asserted differ from the evidence cited.

## IV.    State Disputed Immaterial Facts

35. Segregated housing consists of at least twenty standards for living conditions enumerated in the Illinois Administrative Code, including possible double celling subject to a pre-assignment review that incorporated medical and mental health concerns; required furnishings in cells, including a bed, bedding, running water, flushable toilets, and adequate lighting; cleaning and hygiene materials; restrictions on the use of physical restraints within the cells; laundry services; commissary privileges; personal property availability; visits in accordance with other provisions of the Administrative Code; daily medical personnel visits and weekly physician visits; chaplain visits no less than once per week; contact with a correctional counselor at least once every thirty

days; exercise; mail privileges; and reading materials. (Ex. 15, 20 Ill. Admin. Code, Ch. I § 504, at 2-4.)

**Response:** Undisputed that the Illinois Administrative Code so provided. To the extent this factual statement asserts that the relevant code was observed with respect to Mr. Gay or was observed in practice generally, Plaintiff objects that the fact asserted is unsupported by the evidence cited. There is no evidence cited to suggest compliance; and for that reason and in the alternative, disputed. The fact is immaterial because there is no evidence that Mr. Gay had a cellmate for a material amount of time during the relevant period, and none of the other conditions associated with segregated housing as described by the Code would place such housing outside the definition of solitary confinement. See PLSOF ¶ 24.

38. IDOC inmates in restrictive housing assignments have access to similar facility programming as the general population, just in a different forum. (Ex. 16, Justin Hammers Dep., 36:18-20.)

**Response:** Plaintiff objects that the fact asserted is not supported by the evidence cited. In the cited deposition testimony, the State's Rule 30(b)(6) witness states that prisoners in segregation "have access to a lot of the same programming" as prisoners in general population but did not describe or quantify or describe what "a lot" meant. See IDOC Ex. 16 at 36:9-20. The testimony preceding the answer cited involved numerous programs (such as automotive and woodworking courses, jobs, and visitation) that were undertaken in a milieu with other prisoners and required a pass to move between units. Id. at 33:15-36:4. The witness does not describe which if any of these programs would be made available in segregation but does confirm that segregation involves confinement to a cell for more than 22 hours per day. Id. at 36:9-17, and in so doing confirms that a person in segregation is removed from all the programming and services that were described. Id. For these reasons, disputed. Additionally, access to the referenced programming would not

materially alter the conditions in segregation such that it would no longer be considered solitary confinement. See PLSOF ¶ 24.

44. IDOC could not remove an inmate from a facility for mental health reasons without a psychiatrist or physician determining that such a removal was necessary. (Ex. 17, IDOC Admin. Directive 05.12.110, eff. Feb. 1, 2000, at 6.)

**Response:** Disputed. The fact asserted is not supported by the evidence cited. The evidence cited is an administrative directive dated Feb. 1, 2000, and applicable only to Tamms Correctional Center only. The cited passage states, **"**An inmate shall not be removed from the Tamms Correctional Center for mental health reasons without a determination being made by a psychiatrist or a physician prior to the removal that such removal is necessary.**"** IDOC Ex. 17 at 6 (emphasis added). The cited evidence offers no support for the assertion that IDOC required a determination by a psychiatrist or physician from a **"**from a facility**"** other than Tamms, and other than the time period covered by the cited AD. Additionally, this fact is immaterial because it does not provide evidence that any State agent or employee, such as a physician or psychologist, conducted any meaningful assessment of Mr. Gay's placement in segregation in light of his psychiatric disability or otherwise accounted for and/or accommodated psychiatric disabilities of individuals in segregation.

63. Pursuant to IDOC administrative directives, health care personnel conducted daily rounds in segregation or confinement units to ensure adequate offender access, and a physician, physician's assistant, or nurse practitioner made rounds in the segregation or confinement units at least once per week. (Ex. 28, IDOC Admin. Directive 04.03.103, eff. June 1, 2017, at 3.)

**Response:** Undisputed that the cited Administrative Directive ("AD") so provided. Undisputed that the Illinois Administrative Code so provided. To the extent that the fact asserted is that the relevant code was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance; and for that reason and in the alternative, disputed. It is further disputed that Mr. Gay had "adequate" access to mental health care. See PX 50, at 46-51. Further, this factual assertion is immaterial because the existence of the directive does not mean that the directive was being followed, and this factual assertion does not provide any evidence that said directive was used by IDOC to meaningfully assess, account for, and/or accommodate Mr. Gay's decompensation and placement in segregation in light of his psychiatric disability. Additionally, the cited evidence was in effect on June 1, 2017, so there is no evidence in this paragraph to support any argument regarding the first twenty-three years of Mr. Gay's incarceration.

64. Pursuant to IDOC administrative directives, a mental health professional visited segregation housing units and conducted mental health rounds on all disciplinary segregation offenders at least once every seven calendar days. (Ex. 29, IDOC Admin. Directive 04.04.100, eff. June 1, 2017, at 7.)

**Response:** Undisputed that the Illinois Administrative Code so provided. To the extent that the fact asserted is that the relevant code was observed with respect to Mr. Gay or was observed in practice generally, object that the fact asserted is unsupported by the evidence cited, as there is no evidence cited to suggest compliance; and for that reason and in the alternative, disputed. Additionally, to the extent this factual assertion could be construed to allege that Mr. Gay had access to adequate mental health care, such is disputed, as adequate health care for Mr. Gay was not possible in the setting of solitary confinement. See Pl. Ex. 50, at 46-51. Further, this factual

assertion is immaterial because the existence of the directive does not mean that the directive was being followed, and this factual assertion does not provide any evidence that said law was used by IDOC to meaningfully assess, account for, and/or accommodate Mr. Gay's decompensation and placement in segregation in light of his psychiatric disability. Additionally, the cited evidence was in effect on June 1, 2017, so there is no evidence in this paragraph to support any argument regarding the first twenty-three years of Mr. Gay's incarceration.

68. During his incarceration, Gay received substantial medical and mental health treatment, including treatment from psychiatrists, psychologists, licensed mental health providers, participation in group therapy and administration of prescribed medication. (Ex. 32, IDOC Defendants' Medical and Mental Health Treatment Summary; Ex. 33, Melvin Hinton Dep.; Ex. 34, Patrick Horn Dep.)

**Response:** Plaintiff objects that the citation to the Melvin Hinton (Ex. 33) and Patrick Horn (Ex. 34) deposition transcripts fails comply with Local Rule 7.1(D)(1)(b), which requires an assertion of fact to "referenc[e] the exhibit and page," whereas the citations to the Hinton and Horn depositions fail to cite any pages. Object further that the adjective "substantial" is vague in the context of this statement of facts in that the term is undefined and has no clear meaning or obvious support in the evidence cited, including the Ex. 32, which appears to contain excerpts of selected medical or mental health records beginning in approximately 2010, without support to establish that the healthcare was substantial. As such, the fact asserted is not supported by the evidence cited. For these reasons, while Plaintiff does not dispute that Mr. Gay received medical and mental health care during his incarceration in the IDOC, Plaintiff does dispute that the medical and mental healthcare were "substantial." Additionally, this fact is immaterial because it cites no evidence indicating that the referenced services included any meaningful assessment of Mr. Gay's placement

in segregation in light of his psychiatric disability or otherwise accounted for and/or accommodated the psychiatric disabilities of individuals in segregation Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete in light of his psychiatric disability because it did not account for or accommodate his psychiatric disability and decompensation in solitary confinement. Pl. Ex. 50 at 45-50.

75. At times during his incarceration, Gay was receiving more hours of weekly structured out-of-cell time than other similarly situated inmates. (Ex. 36, IDOC Mental Health Progress Note, Sept. 7, 2017; Ex. 37, IDOC Mental Health Progress Note, Sept. 19, 2017.)

**Response:** Disputed. The cited records do not support the factual assertion cited. The documents cited here are notes drafted by mental health practitioners. IDOC Ex. 36 states, that Anthony "demonstrates entitled behavior as evidenced by demanding out of cell hours, but is getting 9 hours weekly structured out of cell time compared to 6.5 offenders." This document does not state that such out-of-cell time is relative to "similarly situated" individuals nor does it explain what "6.5 offenders" are. Ex. 37 states that Anthony received "more services than any other individual in the cell house," but does not state that the referred-to services involved out-of-cell time and does not identify whether the other individuals in the cell house were psychiatrically disabled. This fact is immaterial. First, it only references out-of-cell time that Anthony was receiving in September of 2017, one month in the last year of Anthony's twenty-four years of incarceration. It is not indicative of the damage caused by the prior two decades of segregation, for which there is no evidence of relative increased out-of-cell time. Second, the term "similarly situated" individuals is vague; it is unclear whether that term is referring to people who are severely mentally ill, psychiatrically disabled, in segregation, or something else. Finally, the heightened services do not materially alter the environment of segregation as solitary confinement.

85. On or around 2017, Gay received an inpatient Psychiatry Consult from the University of Illinois Hospital and Health Sciences System, wherein it was concluded that his actions appeared to be well-planned and he expressed clear motivation by various gains from being admitted to an inpatient hospital. Gay did not meet criteria for inpatient psychiatric admission. (Ex. 46, Univ. of Ill. Adult Psychiatry Consult. Final Report, Jan. 3, 2017; Ex. 47, Univ. of Ill. Psychiatry Consult., Jan. 3, 2017.)

**Response:** Disputed that the fact asserted accurately represents the evidence cited. In the cited evidence, Mr. Gay did not indicate that he cut himself to achieve inpatient psychiatric admission, but rather, **"**[T]he patient reports that he engages in frequent 'cutting' in order to leave prison.  The patient says that he is forced to stay in his cell nearly 24hrs/day, and that he is refused various requests such as having access to a TV.  He states that when he is in the hospital that he is able to talk to other people, watch TV, and eat better food. He states that if he was given more structure/time outside of his cell at his prison that he would discontinue his cutting behaviors. However, he states that if things remain the same he will[] continue to cut in order to have time away from prison.**"** IDOC Ex. 46 at 2. The cited document reflects an assessment that Mr. Gay had a lack of suicidal ideation/plan and given his long-standing history self-mutilation, an acute inpatient psychiatry admission was unlikely to modify his behavior, and that for this reason the hospital psychiatry team deferred his treatment to prison mental health staff.  Id. at 5. Disputed that Mr. Gay did not mee the criteria for inpatient psychiatric admission. Mr. Gay was designated inpatient level of care. This fact is immaterial because it does not address whether Mr. Gay was able to be released from segregation.

86. Gay's psychiatrist was responsible for treating Gay's self-mutilation. (Ex. 48, Univ. of Ill. Discharge Summary, Jan. 3, 2017.)

**Response:** Plaintiff objects that "responsible" is vague in this context. Additionally, the evidence cited does not establish an assignment of responsibility to any particular person. In the evidence cited for the fact asserted is a Jan. 3, 2017, University of Illinois hospital discharge summary, which stated: "[Mr. Gay] was evaluated by the psychiatric service and found to be safe for discharge; management of self mutilation left to his prison psychiatrist." Disputed that a statement by an outside medical provider establishes responsibility within the State of Illinois or the IDOC for addressing or treating Mr. Gay's self-mutilation. Additionally, there is evidence that other DOC and Wexford staff members, including correctional staff, were responsible for making decisions related to Mr. Gay's self-mutilating behavior and psychiatric disability, including his placement in segregation. Indeed, mental health staff did not have the ability to insist that a prisoner be transferred out of segregation.  PX 15 at 67:1-7.  Segregation was a security determination, not a mental health determination, and is not one mental health could make.  PX 15 at 68:15-69:4; PX 24 at 162:15-163:2; PX 29 at 49:9-50:2. Mental health staff did not have control over whether or not a prisoner was kept in segregation.  PX 15 at 66:20-23. Mr. Gay's healthcare providers explained that even though they believed segregation harmed the mentally ill, masses of mentally ill prisoners were kept in segregation in prisons like Pontiac, because the IDOC had not yet begun to do mental health segregation reviews.  PX 15 at 67:8-20.

This factual assertion is immaterial because regardless of the individual "responsible" for Mr. Gay's mental health care, the acts and omissions of such individuals were within the scope of their employment with the State and Wexford. Any Wexford employee's acts and omissions pertain to the liability of the State under the ADA because the State is responsible for the conduct of its contractors. Additionally, the cited evidence was in effect on January 3, 2017, so there is no

evidence in this paragraph to support any argument regarding the first twenty-three years of Mr. Gay's incarceration.

89. Gay intermittently rejected group and individual treatment sessions offered by Wexford providers. (See, e.g., Group Ex. 49, IDOC Mental Health Progress Notes and Refusals of Mental Health Services.)

**Response:** Plaintiff objects that the fact asserted is not supported by the evidence cited, which refers to a single encounter in October 2017, describing sessions offered close in time to the encounter. Subject to this objection, undisputed that Mr. Gay did decline to go to some group and individual therapy sessions offered in 2017. Otherwise, for the reasons set forth above, disputed. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in solitary confinement, where he could not complete his treatment plans. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id. Additionally, the cited evidence only references October 2017, so there is no evidence in this paragraph to support any argument regarding the first twenty-three years of Mr. Gay's incarceration.

90. Gay intermittently refused appointments with his mental health providers or other medical services, including medications. (See, e.g., Group Ex. 50, IDOC Refusals of Medical and Health Services, Observation Logs, Progress Notes, and Medical Referrals.)

**Response:** Plaintiff objects that the fact asserted is unsupported by the evidence cited, to the extent the fact asserted purports to concern periods outside of 2016, except a single refusal in 2014. The

documents gathered in the exhibit refer to refusals in 2016. Plaintiff objects further that nearly all the refusals cited occur in a short period between July 8, 2016, and September 4, 2016. Undisputed that on several occasions in 2016 Mr. Gay declined to certain medical and mental health services. Otherwise disputed, for the reasons stated. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in solitary confinement, where he could not complete his treatment plans. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id. Additionally, the cited evidence only references October 2017, so there is no evidence in this paragraph to support any argument regarding the first twenty-three years of Mr. Gay's incarceration.

92. Gay intermittently refused out-of-cell time for reasons including but not limited to him not wanting to go or not wanting to wear restraints. (See, e.g., Group Ex. 52, IDOC Refusals of Out of Cell Time.)

**Response:** Undisputed that Mr. Gay refused out-of-cell time on the three occasions in 2016 that are cited in IDOC Ex. 52. Plaintiff objects that the fact asserted is unsupported by the evidence cited, to the extent the fact asserted purports to concern periods outside of 2016. Otherwise disputed, for the reasons stated. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in solitary confinement. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

93. Mental Health Treatment Plans were provided for Gay, including for example, at the Pontiac Correctional Center, where pursuant to a plan dated January 30, 2017, Gay received therapy at least once per week and group therapy at least once per week. (Ex. 53, IDOC Mental Health Treatment Plan, Jan. 30, 2017.)

**Response:** Undisputed that a mental health treatment plan dated January 30, 2017, was prepared in which it was contemplated that Mr. Gay would receive therapy and group therapy once per week. Otherwise, object that the fact asserted (regarding the provision of other mental health plans, and that Mr. Gay actually received the therapy described) is not supported by the evidence cited, and for that reason, disputed. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in solitary confinement, where he could not complete his treatment plans. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id. Additionally, the cited evidence references 2017, so there is no evidence in this paragraph to support any argument regarding the first twenty-three years of Mr. Gay's incarceration.

94. Gay continued to refuse treatment (trauma management sessions, group sessions, and individual counseling sessions) and other structured out-of-cell time after his psychiatrist encouraged him to participate in the mental health services offered. (Group Ex. 54, IDOC Suicide Evaluations, Mental Health Progress Notes, Refusals of Services, Psychiatric Progress Notes, and Mental Health Segregation Rounds.)

**Response:** Undisputed that Mr. Gay declined certain treatment on the occasions gathered in the cited records, which span a two-month period between November 2017 and January 2018.

Otherwise, object that the fact asserted is unsupported by the evidence cited, and for the reasons cited, disputed. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in solitary confinement. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

96. On February 6, 2018, Gay stated that manipulation at Pontiac worked for him and that he considered himself to be **"very powerful and well known"** at the facility, and when encouraged to use the rest of his time at IDOC to gain positive coping mechanisms instead of continuing to manipulate the system, Gay stated, **"**[T]his has worked for me for 20 years a couple more months won't hurt.**"** (Ex. 56, IDOC Mental Health Progress Note, Feb. 6, 2018.)

**Response:** Object that the fact asserted is not supported by the evidence cited, which does not contain the cited statements. For that reason, disputed. This fact is immaterial because Mr. Gay's own subjective beliefs about his psychiatric disability is not relevant to whether the State was justified in keeping him in solitary confinement for over twenty years. Mr. Gay is not a mental health professional. This factual assertion does not make it more or less likely that the State failed to account for and/or accommodate his psychiatric disability.

97. A Mental Health Progress Note from April 6, 2018, indicated that Gay stated he had **"no interest in earning placement outside of a crisis cell."** (Ex. 57, IDOC Mental Health Progress Note, Apr. 6, 2018.)

**Response:** Plaintiff disputes that the fact asserted is a statement by Mr. Gay. This fact is immaterial because Mr. Gay's own subjective beliefs about his psychiatric disability is not relevant to whether

the State was justified in keeping him in solitary confinement for over twenty years. Mr. Gay is not a mental health professional. This factual assertion does not make it more or less likely that the State failed to account for and/or accommodate his psychiatric disability.

98. During meetings with mental health providers Gay indicated that he knew that by committing acts of self-harm, he could manipulate IDOC to give him something he wanted, including so he could be transferred from Pontiac to Dixon, and to create contact with the medical staff. (Group Ex. 58, IDOC Mental Health Progress Notes, Evaluations of Suicide Risk, Infirmary Progress Notes, and Outpatient Progress Notes; Ex. 2, Anthony Gay Dep., 175:15-176:10.)

**Response:** Plaintiff objects that the fact asserted is not supported by the evidence cited. Specifically, Defendants' citation to Exhibit 8 fails to comply with Local Rule 7.1(D)(1)(b), which provides that **"[f]or each fact asserted, [the moving party must] provide citations to the documentary evidence that supports it, appropriately referencing the exhibit *and page*."** (emphasis added). Exhibit 58 consists of 78 pages of mental health progress notes that describe a wide variety of statements by Mr. Gay, and the Defendants do not cite which pages support which entries support the asserted fact, or which pages they appear on; pages contain a variety of statements by Mr. Gay, all made in different contexts. For these reasons, disputed. This fact is immaterial because Mr. Gay's own subjective beliefs about his psychiatric disability is not relevant to whether the State was justified in keeping him in solitary confinement for over twenty years. Mr. Gay is not a mental health professional. This factual assertion does not make it more or less likely that the State failed to account for and/or accommodate his psychiatric disability.

103. On April 11, 1999, Gay filed a grievance regarding medical and mental health treatment he was receiving at Tamms Correctional Facility in which he requested to be seen by Dr. Kelly Rhodes. The Chief Administrative Officer's Response indicated Gay was seen by a primary

therapist and other mental health professionals pursuant to an agreed-upon mental health treatment plan as needed. (Ex. 61, Anthony Gay Grievance, Apr. 11, 1999; Group Ex. 62, Dr. Rhodes Treatment Documentation.)

**Response:** Undisputed. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in solitary confinement. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in solitary confinement, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

120. Gay was transported to the emergency department at Katherine Shaw Bethea Hospital in Dixon, Illinois, for treatment after intentionally cutting his leg and slicing his eye, among other harms; and alleged battery and force were used to restrain him while in the emergency department. (Ex. 78 at 2).

**Response:** Object that the fact asserted is not supported by admissible evidence. The evidence cited is a summary judgment opinion issued by a court which describes evidence submitted by the parties and does not constitute a factual adjudication that certain facts are true. For these reasons, disputed and immaterial.

121. The court granted summary judgment for defendants, holding that Gay acted intentionally with the end goal of being transferred to the University of Illinois Chicago to be out of his cell longer; and concluding that the use of force by the IDOC defendants in the emergency department was de minimis because of Plaintiff's deliberate conduct in the emergency room. (Ex. 78 at 5).

**Response:** Object that the fact asserted is not supported by admissible evidence. The evidence cited is a summary judgment opinion issued by a court which describes evidence submitted by the

parties and does not constitute a factual adjudication that certain facts are true. For these reasons, this factual assertion is disputed and immaterial.

**RESPONSE TO WEXFORD DEFENDANTS' STATEMENT OF FACTS**

**I.    Wexford Undisputed Material Facts**

1. Gay is formerly an inmate in the IDOC. Exhibit A, deposition of Anthony Gay, pg. 8.
**Response:** Undisputed.

2. Gay was incarcerated in IDOC between 1994 and August 27, 2018. Exhibit A.

**Response:** Undisputed.

3. Gay's case concerns events that occurred while he was incarcerated in IDOC. Exhibit A, deposition of Anthony Gay, pg. 9.

**Response:** Undisputed.

4. Dr. Renzi is a clinical psychologist licensed in Illinois. Exhibit B, deposition of Kelly Renzi, pg. 11.

**Response:** Undisputed.

5. Dr. Renzi began working as a staff psychologist for Wexford at Pontiac between June 2016 and January 2018, when she became a psychology administrator for the State of Illinois at Pontiac. Exhibit B, deposition of Kelly Renzi, pg. 9-12, 14, 62.

**Response:** Undisputed.

6. After becoming a State of Illinois employee at Pontiac in January 2018, Dr. Renzi had general oversight involvement in Mr. Gay's care but was not a direct provider. Exhibit B, deposition of Kelly Renzi, pg. 62.

**Response:** Undisputed.

7. As a staff psychologist at Pontiac, Dr. Renzi, provided mental health services directly to inmates, screened patients for psychiatric referral, and participated in multidisciplinary meetings with psychiatry, nursing and security to consult on delivery of care. Exhibit B, deposition of Kelly Renzi, pg. 13.

**Response:** Undisputed.

8. Pontiac was an Illinois prison designated for people with long-term segregation sentences. Exhibit B, deposition of Kelly Renzi, pg. 79.

**Response:** Undisputed.

9. In January 2017, Dr. Renzi became the mental health site services director at Pontiac, with supervisory responsibility over hiring, assigning, and supervising mental health staff. Exhibit B, deposition of Kelly Renzi, pg. 19.

**Response:** Undisputed.

10. Dr. Renzi became Mr. Gay's primary therapist in March 2017. Exhibit B, deposition of Kelly Renzi, pg. 61, Exhibit E, IDOC Medical Records, Bates 1921, Exhibit C, expert deposition of Kelly Renzi, pg. 61, Exhibit E, IDOC Medical Records, Bates 1921, Exhibit C, expert report of Dr. Joseph Penn, pg. 47-48.

**Response:** Undisputed.

11. Dr. Renzi's first appointment with Mr. Gay for one-on-one therapy was March 9, 2017, when she noted his diagnosis of persistent depressive disorder, and unspecified personality disorder with borderline and antisocial traits. Id.

**Response:** Undisputed.

12. During the time Dr. Renzi treated Mr. Gay, he was designated inpatient level of care. Exhibit B, deposition of Kelly Renzi, pg. 70-71, 148-49; Exhibit E, IDOC Medical Records, Bates 1921.

**Response:** Undisputed.

13. Inpatient level of care is the equivalent of a person in a hospital with requirement to be seen minimally every seven days by both the psychiatrist and the psychologist and attend group therapy. Exhibit B, deposition of Kelly Renzi, pg. 39-40.

**Response:** Undisputed.

14. Upon taking over as Mr. Gay's primary therapist, Dr. Renzi reviewed Mr. Gay's mental health file to familiarize herself with his history. Exhibit B, deposition of Kelly Renzi, pg. 75.

**Response:** Undisputed.

15. Upon taking over as Mr. Gay's primary therapist, Dr. Renzi had continuity of care discussions with Mr. Gay's prior therapist to go over diagnosis, medication compliance, behavioral patterns, response to treatment, and frequency of treatment modality. Exhibit B, deposition of Kelly Renzi, pg. 63-64.

**Response:** Undisputed.

16. Upon taking over as Mr. Gay's primary therapist, Dr. Renzi learned Mr. Gay had significant personality disorders and a mood disorder and was manipulative with mental health staff, attempting to dictate with whom he would receive treatment, and also engaged in frequent self-harm for goal-oriented reasons. Exhibit B, deposition of Kelly Renzi, pg. 64-69.

**Response:** Objection that the cited fact is supported by hearsay evidence only, such that the stated fact is not admissible for the truth of the matter asserted. Subject to this objection, undisputed that

Dr. Renzi that the claims about Mr. Gay reported in the paragraph were related to Dr. Renzi by another person.

17. During the time Dr. Renzi treated Mr. Gay, he was housed in Pontiac's residential treatment unit. Exhibit B, deposition of Kelly Renzi, pg. 86.

**Response:** Undisputed.

18. During the time Dr. Renzi treated Mr. Gay, there were times Mr. Gay was housed in the prison infirmary due to crisis watch or four-point therapeutic restraint placement due to prevent self-harm. Exhibit B, deposition of Kelly Renzi, pg. 94.

**Response:** Undisputed.

19. As of March 9, 2017, Dr. Renzi's plan for Mr. Gay's care was to see him weekly for individual counseling sessions per inpatient patient protocol and to have him continue with group therapy when he came off crisis watch. Exhibit E, IDOC Medical Records, Bates 1921.

**Response:** Undisputed.

23. Dr. Renzi had weekly therapy sessions with Mr. Gay on March 17, 2017 (Bates 1951) (40 minutes); March 21, 2017 (Bates 1967) (10 minute); March 29, 2017 (Bates 1991) (60 minute); March 31, 2017 (Bates 1995) (60 minutes); April 4, 2017 (Bates 2009-2010) (25 minutes); March 6, 2017 (Bates 2029-2030) (5 minutes due to tactical unit on living unit); April 11, 2017 (Bates 2051-2052) (3 minutes because Gay refused to talk); April 13, 2017 (Bates 2053-2054) (60 minutes); April 25, 2017 (Bates 2073-2074) (50 minutes); May 2, 2017 (Bates 2988) (5 minutes but unable to be seen out of cell due to level 1 lockdown); May 4, 2017 (Bates 2992) (5 minutes at cell due to level 1 lockdown); May 10, 2017 (Bates 3026) (5 minutes at cell due to level 1

lockdown); May 17, 2017 (Bates 3066) (10 minute encounter in healthcare unit while Gay waited to have staple removed from ear); May 19, 2017 (Bates 3074) (60 minutes); May 22, 2017 (Bates 3082) (60 minutes); May 25, 2017 (Bates 2602) (30 minutes); May 30, 2017 (Bates 2616-2617) (45 minutes); June 1, 2017 (Bates 2620) (10 minute session terminated due to Gay threatening Dr. Renzi); June 6, 2017 (Bates 2632-2633) (60 minutes); June 8, 2017 (Bates 2650-2651) (10 minute session due to Gay agitation and lack of cooperation); June 13, 2017 (Bates 2664-2665) (50 minutes); June 15, 2017 (Bates 2674) (40 minutes); June 20, 2017 (Bates 2686) (assessment for restraints); June 22, 2017 (Bates 2700-2701) (50 minutes); June 27, 2017 (Bates 2722-2723) (60 minutes); June 30, 2017 (Bates 2732-2733) (60 minutes); July 3, 2017 (Bates 2746-2747) (50 minutes); July 6, 2017 (Bates 2758-2759) (10 minute session due to Gay kicking cell door and yelling profanity); July 11, 2017 (Bates 2780-81) (45 minutes); July 13, 2017 (Bates 2886-2887) (75 minutes); July 18, 2017 (Bates 2900-2901) (60 minutes); July 25, 2017 (Bates 2930-2931) (45 minutes); July 28, 2017 (Bates 2942-2943) (45 minutes); August 1, 2017 (Bates 2960-2961) (45 minutes); August 3, 2017 (Bates 2972) (35 minutes); August 8, 2017 (Bates 3094) (15 minutes); August 10, 2017 (Bates 3108) (60 minutes); August 22, 2017 (Bates 3130) (65 minutes); August 24, 2017 (Bates 3138-3139); August 25, 2017 (Bates 3140) (0 minutes due to Dr. Renzi being called away for another inmate's crisis); August 29, 2017 (Bates 3148) (70 minutes); August 31, 2017 (Bates 3162) (60 minutes); September 5, 2017 (Bates 4093-4094) (60 minutes); September 7, 2017 (Bates 4099-4100) (75 minutes); September 14, 2017 (Bates 4119) (60 minutes); September 19, 2017 (Bates 4137-4138) (60 minutes); September 21, 2017 (Bates 4147) (60 minutes); September 27, 2017 (Bates 4167) (60 minutes); September 29, 2017 (Bates 4183) (60 minutes); October 5, 2017 (Bates 3689) (75 minutes); October 6, 2017 (Bates 3687-3688) (60 minutes); October 17, 2017 (Bates 3721) (60 minutes). Exhibit E, IDOC Medical Records.

**Response:** Undisputed.

24. Dr. Puga worked for Wexford as a psychiatrist from March 1, 2017, to March 1, 2018, at which time he became a State employee. Exhibit D, deposition of William Puga, M.D., pg. 12.

**Response:** Undisputed.

25. Dr. Puga is a physician practicing medicine as a psychiatrist. Exhibit D, deposition of William Puga, M.D., pg. 11.

**Response:** Undisputed.

26. Dr. Puga's first visit with Mr. Gay was on March 21, 2017. Exhibit E, IDOC Medical Records, Bates 1959.

**Response:** Undisputed.

27. When he began providing psychiatric care to Mr. Gay, Dr. Puga spoke with individuals who had treated Mr. Gay and reviewed Mr. Gay's chart to develop insight into Mr. Gay. individuals who had treated Mr. Gay and reviewed Mr. Gay's chart to develop insight into Mr. Gay. Exhibit D, deposition of William Puga, M.D., pg. 60-61.

**Response:** Undisputed.

28. When he started treating Mr. Gay in March 2017, Dr. Puga knew about Mr. Gay's history of self-injury. Exhibit D, deposition of William Puga, M.D., pg. 61.

**Response:** Undisputed.

29. On his first visit with Mr. Gay on March 21, 2017, Dr. Puga noted Mr. Gay's diagnoses of personality disorder NOS, impulse control disorder, and rule out bipolar disorder and continued

Mr. Gay's prescription for Geodon, changing it to an PM dose due to complaints of drowsiness when taking it in the morning. Exhibit D, deposition of William Puga, M.D., pg. 77; Exhibit E, IDOC Medical Records, Bates 1959-1964.

**Response:** Undisputed.

32. Several hours after their first encounter, Mr. Gay reported to nursing staff he was "not getting what I'm supposed to" and presented a three-inch superficial laceration to his right arm. Exhibit E, IDOC Medical Records, Bates 3342.

**Response:** Undisputed.

33. Dr. Puga saw Mr. Gay for individual psychiatric therapy sessions on March 28,2017 (Bates 1979-1984); April 6, 2017 (Bates 2011-2016); April 11, 2017 (Bates 2045-2050); April 18, 2017 (Bates 2055-2060); April 25, 2017 (Bates 2075-2080); May 5, 2017 (Bates 3006-3011); May 12, 2017 (Bates 3036-3041); May 22, 2017 (Bates 3091-3096); May 30, 2017 (Bates 2610- 2615); June 6, 2017 (Bates 2634-2639); June 13, 2017 (Bates 2668-2673); June 27, 2017 (Bates 2714-2719); July 3, 2017 (Bates 2738-2743); July 11, 2017 (Bates 2772-2777); July 18, 2017 (Bates 2902-2907); July 25, 2017 (Bates 2922-2927); August 1, 2017 (Bates 2962-2967); August 8, 2017 (Bates 3100-3105); August 15, 2017 (Bates 3114-3119); August 22, 2017 (Bates 3132-3137); August 29, 2017 (Bates 3141-3146); September 5, 2017 (Bates 4087-4091); September 12, 2017 (Bates 4107-4111); September 19, 2017 (Bates 4131-4136); September 26, 2017 (Bates 4157-4162); October 3, 2017 (Bates 3681-3686); October 10, 2017 (Bates 3691-3696); October 17, 2017 (Bates 3715 to 3720); October 24, 2017 (Bates 3737-3741); October 31, 2017 (Bates 3781-3786); November 7, 2017 (Bates 3803-3908); November 14, 2017 (Bates 3819-3824); November 21, 2017 (Bates 3841-3846); November 28, 2017 (Bates 3851-3856); December 5, 2017 (Bates 3923-

3928); December 18, 2017 (Bates 3945-3949); December 29, 2017 (Bates 3979-3984); January 5, 2018 (Bates 4017-4022); January 15, 2018 (Bates 4033-4038); February 5, 2018 (Bates 4707-4712). Exhibit E, IDOC Medical Records.

**Response:** Undisputed.

47. On May 5, 2017, Mr. Gay saw Dr. Tilden for a laceration to his left forearm with twisted wire in the wound and a 4 cm laceration to his scrotum with insertion of a metallic foreign body. Exhibit E, IDOC Medical Records 3354.

**Response:** Undisputed.

48. May 9, 2017, Mr. Gay saw a practitioner after he attached a plastic spoon to his public hair. Exhibit E, IDOC Medical Records 3376.

**Response:** Undisputed.

49. On May 15, 2017, Mr. Gay saw a medical practitioner for self-inflicted wounds from insertion of ballpoint pens in his ear and insertion of cloth strips into a wound in his right arm. Exhibit E, IDOC Medical Records 3368.

**Response:** Undisputed.

50. Dr. Puga recalls that during the time he treated Mr. Gay, Mr. Gay self-harmed three times. Exhibit D, deposition of William Puga, M.D., pg. 73-74.

**Response:** Undisputed.

51. Dr. Puga recalls two instances of Mr. Gay harming himself in June 2017. Exhibit D, deposition of William Puga, M.D., pg. 78.

**Response:** Undisputed.

52. On June 8, 2017, Mr. Gay was admitted to the infirmary after he inserted parts of a broken fan into his genitals. Exhibit E, IDOC Medical Records, Bates 3244.

**Response:** Undisputed.

53. On June 8, 2017, Dr. Renzi saw Mr. Gay for one-on-one therapy session several hours after his infirmary admission for inserting a fan in his genitals. Exhibit E, IDOC Medical Records, Bates 2650-2651.

**Response:** Undisputed.

54. On June 8, 2017, Dr. Renzi's note states that prior to their session, Mr. Gay sent a letter requesting to see a crisis team member, which he gave to another inmate to deliver. Exhibit E, IDOC Medical Records, Bates 2650-2651.

**Response:** Undisputed.

55. On June 8, 2017, upon being removed from his cell for therapy session and crisis intervention, Mr. Gay refused mental health intervention, cursing at Dr. Renzi and threatening to sue her. Exhibit E, IDOC Medical Records, Bates 2650-2651.

**Response:** Undisputed.

56. On June 8, 2017, Mr. Gay's treatment session was terminated due to his agitation and lack of cooperation. Exhibit E, IDOC Medical Records, Bates 2650-2651.

**Response:** Undisputed that Dr. Renzi terminated the session on grounds that Mr. Gay was not behaving.

57. On June 20, 2017, Mr. Gay was admitted to the infirmary for insertion of a spork into his arm. Exhibit E, IDOC Medical Records, Bates 3272.

**Response:** Undisputed.

58. On February 3, 2018, Mr. Gay presented to nursing staff with foreign bodies affixed to an eyelid and a right thigh laceration with a plastic eating utensil in the wound. Exhibit D, deposition of William Puga, M.D., pg. 80; Exhibit E, IDOC Medical Records, Bates 4239.

**Response:** Undisputed.

61. Placement of inmates in segregation is operational and within the purview of IDOC, not mental health staff. Exhibit D, deposition of William Puga, M.D., pg. 162-163.

**Response:** Undisputed.

63. Wexford staff were required to follow IDOC's SOP. Exhibit G, deposition of Cheri Laurent, pg. 78.

**Response:** Undisputed.

64. The IDOC SOP effective April 1, 2016, contains four levels of care: general population/outpatient; special/residential treatment unit; crisis treatment; and inpatient level of care. Exhibit I, deposition of Andrea Moss, pg. 47-52; Exhibit 4 to deposition of Moss, Standard Operating Procedure, pg. 26.

**Response:** Undisputed.

66. The mental health team can recommend a patient be transferred to a residential treatment unit within IDOC if the team believed the person would benefit from the services offered in a residential treatment unit. Exhibit F, deposition of Scott McCormick, M.D., pg. 112-113.

**Response:** Undisputed.

70. Wexford employees follow IDOC's policies and procedures for mental health. Exhibit H, deposition of Christian Gillespie, pg. 14.

**Response:** Undisputed.

75. Wexford and IDOC mental health providers perform segregation reviews to ensure that patients in segregation are assessed for stability and to determine whether any higher level of intervention is needed. Exhibit H, deposition of Christian Gillespie, pg. 49-50.

**Response:** Undisputed.

76. No Wexford employee made a documented recommendation Mr. Gay be transferred to a mental health facility outside of IDOC for mental health treatment. Exhibit H, deposition of Christian Gillespie, pg. 98-100.

**Response:** Undisputed.

78. In 2015, at IDOC's request Wexford contacted 87 different hospitals to inquire about whether they had capability and willingness to accept IDOC inmates for inpatient mental health services. Exhibit G, deposition of Cheri Laurent, pg. 15-17, 106-07.

**Response:** Undisputed.

81. Before IDOC opened the Elgin Treatment Center to which it could transfer patients for inpatient care, IDOC developed an enhanced treatment protocol for individuals designate inpatient level of care. Exhibit K, deposition of Melvin Hinton, pg. 111-114, 148, 237; Exhibit 9 to deposition of Hinton, Standard Operating Procedure, pg. 27.

**Response:** Undisputed.

82. IDOC's enhanced treatment protocol included:

- Weekly psychiatry visits

- Individual therapeutic sessions with a licensed mental health professional

- Enhanced out of cell structured activity

- Weekly visits by a mental health professional.

Exhibit K, deposition of Melvin Hinton, pg. 237-238; Exhibit 9 to deposition of Hinton, Standard Operating Procedure, pg. 27.

**Response:** Undisputed.

83. Notwithstanding the SOP becoming effective in April 2016, nothing prevented mental health staff from delivering enhanced mental health services in accordance with individual clinical needs. Exhibit K, deposition of Melvin Hinton, pg. 237-240.

**Response:** Undisputed. Plaintiff clarifies, however, that mental health services in accordance with individual clinical needs would have required providers to deliver such services in such a way that accounted for psychiatric disability, and nothing was stopping any IDOC or Wexford employee from making efforts to remove Mr. Gay from segregation.

84. Per agreements reached in the Rasho litigation inmates in segregation were to receive specified hours of structured and unstructured out of cell time to prevent decompensation. Exhibit B, deposition of Kelly Renzi, pg. 31-32.

**Response:** Undisputed.

85. Structured out of cell time was time an individual spends out of their cell engaged in an activity with a goal associated with it, such as therapy sessions. Exhibit B, deposition of Kelly Renzi, pg. 35-36.

**Response:** Undisputed.

86. Unstructured out of cell time is time an inmate spends out of their cell not engaged in a goal-oriented activity but at their leisure. Exhibit B, deposition of Kelly Renzi, pg. 36.

**Response:** Undisputed.

## II.    Wexford Disputed Material Facts

30. Dr. Puga believed that Mr. Gay's personality disorder was best treated by encouraging Mr. Gay to accept boundaries and develop skills to make better choices to be able to function in prison and in the world on release. Exhibit D, deposition of William Puga, M.D., pg. 152-155.

**Response:** Disputed. Dr. Puga does refer to treating Mr. Gay's personality disorder by encouraging him to "accept[] limits" and similar terms, see ECF 286-8 at 153:16-19, but Dr. Puga does not state that such measures are the "best" treatment and does not endorse that a person with personality disorder like Mr. Gay can be "best treated" while being confined in long-term segregation.

41. As of April 4, 2017, Mr. Gay's mental health treatment plan was to address his low self-esteem and fear of abandonment through weekly therapy sessions with Dr. Renzi and to address therapy-interfering behaviors like self harm through dialectical behavioral therapy group twice monthly; coping skills group twice monthly; anger management group twice weekly; criminal thinking group twice weekly; interpersonal coping group twice monthly, among other groups. Exhibit E, IDOC Medical Records, Bates 2018-2022.

**Response:** Undisputed that these were the purported goals of Mr. Gay's treatment plan, but disputed that the plan was designed to address the listed conditions given Mr. Gays continued "treatment" in the segregation setting.

42. As of May 4, 2017, Mr. Gay's treatment plan created by Dr. Renzi and reviewed by Dr. Puga was to address his low self-esteem and fear of abandonment through weekly therapy sessions with Dr. Renzi and to address therapy-interfering behaviors like self harm through dialectical behavioral therapy group twice monthly; coping skills group twice monthly; anger management group twice weekly; criminal thinking group twice weekly; interpersonal coping group twice monthly, among other groups. Exhibit D, deposition of William Puga, M.D., pg. 109

**Response:** Object that asserted fact is not supported by the evidence cited. Undisputed that the there is a treatment plan in Mr. Gay's medical records with a "therapeutic focus" listing similar problems, see ECF 286-16 at Page 23 of 186, but disputed that the plan was designed to address the listed conditions in the absence of releasing Mr. Gay from long term segregation.

43. During the time Dr. Renzi and Dr. Puga treated Mr. Gay, his treatment plan included interventions to address Mr. Gay's self-injurious behavior. Exhibit B, deposition of Kelly Renzi, pg. 102-03; Exhibit E, IDOC Medical Records Bates 2996-3001 (May 2017); 2628-2631 (June 2017); 2950-2955 (July 2017); 3154-3159 (August 2017); 4177-4182 (September 2017); 3759-3769 (October 2017); Bates 3859-3869 (December 2017); Bates 3985-3995 (January 2018); Bates 4073-4083 (February 2018).

**Response:** Plaintiff objects that "to address" is vague in this context in that it is unclear whether "address" refers to a treatment that is "addressed to" a condition, or one that is designed actually to mitigate, ameliorate, cure, or fix the condition. Undisputed that the treatment plan referred to

included interventions addressed to Mr. Gay's self-harm while in segregation; disputed that these plans were intended to be, or believed to be by the prescribers, a means to ameliorate or cure the condition, as none of them involved release from segregation.

59. During the time Dr. Puga provided psychiatric care to Mr. Gay, Dr. Puga believed Mr. Gay was making progress due to the therapy he was receiving from Dr. Puga and Dr. Renzi. Exhibit D, deposition of William Puga, M.D., pg. 88.

**Response:** Undisputed that Dr. Puga so testified. Disputed that Dr. Puga believed that Mr. Gay was making genuine progress, given his continued confinement in segregation and his continued self-harm, see PLSOF ¶ 24.

60. Wexford is required by its contract to follow IDOC's policies and procedures. Exhibit G, deposition of Cheri Laurent, pg. 69.

**Response:** Object that "procedures" is vague in the context of this statement, in that it is unclear whether the term refers to written policies or unwritten customs. Object further that "policies" is vague in the context of this request, in that it is unclear what written policies the term refers to, e.g., terms and written undertakings in the contract between the State of Illinois and Wexford. Subject to and without waiving these objections, Plaintiff does not dispute that the contract stated Wexford was required to follow IDOC written policy. Plaintiff disputes that Wexford staff followed IDOC's written policies.

62. The policies and procedures for mental health treatment in IDOC are the IDOC administrative directives and the IDOC Standard Operating Procedure for Mental Health (SOP). Exhibit H, deposition of Christian Gillespie, pg. 53.

**Response:** Object that "procedures" is vague in the context of this statement, in that it is unclear whether the term refers to written policies or unwritten customs.  Subject to this objection, and to the extent "policies and procedures" refers to written policies, undisputed.  To the extent "procedures" refers to unwritten customs or practices, object that the asserted fact does not support the evidence cited, as there is no indication that the testimony includes unwritten customs or practices.  Additionally, the cited page does not refer to IDOC directives or procedures. There is evidence indicating that the referenced written policies were not actually followed as a matter of custom. Compare IDOC Administrative Directive 04.04.100 (mentally ill offenders "shall have access" to "[t]ransfer to a specialized mental health setting **when intensive services are clinically indicated** or transfer to a licensed mental health care facility when the offender's needs exceed the treatment capabilities of the Department" PX 12 at 3 (emphasis added)), with the testimony of William Puga, PX  24 at 162-163 (testifying that Wexford did not have any "input" regarding the use of segregation) and the testimony of Dr. Marano, PX 15 67:1-7, (Mental health staff did not have the ability to insist that a prisoner be transferred out of segregation.).

65. The mental health team has no control over patient housing assignments. Exhibit F, deposition of Scott McCormick, M.D., pg. 110-111, 113-114.

**Response:** Object that "team" is undefined.  To the extent this refers to Wexford as an entity, disputed. There is evidence indicating that inmates could be transferred out of DOC to an inpatient hospital setting (not segregation) at the behest of Wexford medical and mental health providers according to written policies. IDOC Administrative Directive 04.04.100 provides that mentally ill offenders "shall have access" to "[t]ransfer to a specialized mental health setting **when intensive services are clinically indicated** or transfer to a licensed mental health care facility when the offender's needs exceed the treatment capabilities of the Department." PX 12 at 3 (emphasis

added). That directive also provided that "Any offender placed in segregation for 30 days or more shall be interviewed by a [mental health professional] within the first 30 days and no less than once every 90 days thereafter through the duration of his or her placement," which was to be documented. Id. Additionally, Wexford employees affirmed that they could refer patients to outside hospitals (which did not have segregation units) when medical care available within the IDOC's walls was limited because of staffing, equipment, and facilities, and that when a patient needed somatic medical care that exceeded what could be provided within the IDOC's walls, and that it was important to send prisoners outside for the medical care they required. PX 29 at 42:17-433:15.

67. Residential treatment is a therapeutic milieu or community setting with group therapy. Exhibit I, deposition of Andrea Moss, pg. 37-38.

**Response:** Disputed. It is unclear how the term "residential treatment" is being used here, as there were Special Residential Treatment Units at Dixon, for example, that Andrea Moss unsuccessfully tried to have Mr. Gay transferred to, a Special Residential Treatment Unit in Pontiac, and a residential treatment level of care. Regardless, "Residential treatment" could still occur in single cells, PX 4 at 26-28, and was not therapeutic for Mr. Gay when it still occurred in segregation. PX 50 at 36-51.

68. Inmates designated inpatient level of care by the mental health team could receive inpatient level of services within IDOC before IDOC opened a dedicated inpatient unit in 2018. Exhibit F, deposition of Scott McCormick, M.D., pg. 161.

**Response:** Disputed. As of April 1, 2016, IDOC acknowledged offenders designated "inpatient level of care" "require a level of treatment that exceeds the level of care that the Department is able to provide and results in commitment to a Psychiatric Hospital for a duration as considered

clinically necessary by the offender's Treatment Team. Until such time as the Department identifies a Psychiatric Hospital, an Enhanced Treatment Protocol shall be implemented for all Inpatient Level of Care. PX 36 at 27.

70. Wexford employees follow IDOC's policies and procedures for mental health. Exhibit H, deposition of Christian Gillespie, pg. 14.

**Response:** Disputed. There is evidence indicating that inmates could be transferred out of DOC to an inpatient hospital setting (not segregation) at the behest of Wexford medical and mental health providers according to written policies. IDOC Administrative Directive 04.04.100 provides that mentally ill offenders "shall have access" to "[t]ransfer to a specialized mental health setting **when intensive services are clinically indicated** or transfer to a licensed mental health care facility when the offender's needs exceed the treatment capabilities of the Department." PX 12 at 3 (emphasis added). That directive also provided that "Any offender placed in segregation for 30 days or more shall be interviewed by a [mental health professional] within the first 30 days and no less than once every 90 days thereafter through the duration of his or her placement," which was to be documented. Id. Additionally, Wexford employees affirmed that they could refer patients to outside hospitals (which did not have segregation units) when medical care available within the IDOC's walls was limited because of staffing, equipment, and facilities, and that when a patient needed somatic medical care that exceeded what could be provided within the IDOC's walls, it was important to send prisoners outside for the medical care they required. PX 29 at 42:17-433:15.

71. Wexford employees could communicate clinical recommendations about patient needs, including possible referral outside of IDOC to the IDOC and IDOC would make the decision. Exhibit H, deposition of Christian Gillespie, pg. 29-37; Exhibit G, deposition of Cheri Laurent, pg. 70-71.

**Response:** Object that Wexford has forfeited this contention by preventing Plaintiff from gathering evidence regarding other patients. *See* ECF 61 at 6-7 (objecting to Plaintiff's *Monell* discovery plan encompassing other patients on grounds that "Evidence of a notional organizational inadequacy is not relevant to this case unless it relates, in some way, to how Plaintiff was allegedly mistreated. Any relevant "systemic failure," should it exist, would necessarily be evident in e-mails related to Plaintiff individually, or the policies which guided his treatment."), *and see* ECF 66 (granting *Monell* discovery restrictions sought by Wexford), *and see* March 6, 2020 Text Order (denying Plaintiff's motion to reconsider ECF 66).  Subject to this objection, disputed. There is evidence indicating that inmates could be transferred out of DOC to an inpatient hospital setting (not segregation) at the behest of Wexford medical and mental health providers according to written policies. IDOC Administrative Directive 04.04.100 provides that mentally ill offenders "shall have access" to "[t]ransfer to a specialized mental health setting **when intensive services are clinically indicated** or transfer to a licensed mental health care facility when the offender's needs exceed the treatment capabilities of the Department." PX 12 at 3 (emphasis added). Wexford employees affirmed that they could refer patients to outside hospitals (which did not have segregation units) when medical care available within the IDOC's walls was limited because of staffing, equipment, and facilities, and that when a patient needed somatic medical care that exceeded what could be provided within the IDOC's walls, and it was important to send prisoners outside for the medical care they required.  PX 29 at 42:17-433:15.  *See also* response to Wexford SOF ⁋ 72.

72. Wexford employees have in the past made clinical recommendations that certain patients within IDOC should be referred outside IDOC to inpatient mental health hospitals. Exhibit H, deposition of Christian Gillespie, pg. 37-38.

**Response:** Object that Wexford has forfeited this contention for the reasons set forth in response to Wexford SOF ⁋ 71. Subject to this objection, disputed. Mr. Gillespie identified a single recommendation made by Wexford employees, which was not carried out, and he does not know why that referral was not accomplished. Multiple Wexford employees testified that such attempted transfers did not and could not occur. PX 9 at 28:12-18: PX 26 at 51:7-18: PX 15 at 68:15-69:4; PX 24 at 162:15-163:2; PX 29 at 49:9-50:2. 43. Between 1996 and 2018, there were no transfers of mentally ill prisoners from IDOC to IDHS for treatment, with the exception of a single patient in 2018. PX 10 at 30:7-14.

73. Wexford staff could not make referrals directly to the Illinois Department of Human Services. Exhibit G, deposition of Cheri Laurent, pg. 82-83.

**Response:** Object that Wexford has forfeited this contention for the reasons set forth in response to Wexford SOF ⁋ 71. Subject to this objection, object that "referrals" is vague in the context of this statement, in that it is unclear whether "referral" refers to a recommendation of care or an order for transfer. To the extent that "referral" refers to recommendation, object that the asserted fact is not supported by the evicence cited. For these reasons, disputed.

77. In 2015, IDOC sought to provide a more comprehensive inpatient mental health service program than had been provided in the past. Exhibit G, deposition of Cheri Laurent, pg. 18-19.

**Response:** Disputed. The terms "sought" and "more comprehensive" are vague and ambiguous. Efforts made by the State to address deficiencies in its inpatient mental health services were largely triggered by the reforms compelled by the *Rasho* lawsuit and the implementation of a federal monitor, who was charged with monitoring the mental health services provided by the State. PX

48 at 4. As of April 2016, a year after the date referenced in this factual assertion, the State still was not capable of providing access to inpatient mental health services. PX 36 at 27.

79. At the relevant time, the Wexford-IDOC contract did not contain any obligation for Wexford to send IDOC inmates to offsite facilities for mental health treatment. Exhibit K, deposition of Melvin Hinton, pg. 235.

**Response:** Disputed. Paragraph 2.2.2.1 recites that Wexford is to provide "comprehensive medical and mental health services" including "comprehensive and specialized mental health services," PX 53 ⁋ 2.2.2.1.   In turn, Paragraph 2.2.2.14 states that Wexford must "maintain good working relationship with community medical and mental health providers in order to provide off-site services."   PX 53 ⁋ 2.2.2.14.   Paragraph 2.2.3 of the contract states, "Vendor shall make arrangements with medical and mental health providers to provide services including … Non-hospital and hospital services off-site .... When such services cannot be ... Adequately and cost-effectively delivered on-site. PX 53 ⁋ 2.2.3.   Furthermore, IDOC Administrative Directive 04.04.100 provides that mentally ill offenders "shall have access" to "[t]ransfer to a specialized mental health setting **when intensive services are clinically indicated** or transfer to a licensed mental health care facility when the offender's needs exceed the treatment capabilities of the Department." PX 12 at 3 (emphasis added).

80. IDOC's expectation at the relevant time was for Wexford to provide mental health treatment to IDOC inmates within IDOC facilities, not send them to outside facilities. Exhibit K, deposition of Melvin Hinton, pg. 235.

**Response:** Disputed. Plaintiff objects that "provide treatment" is vague in the context of this factual statement. IDOC Administrative Directive 04.04.100 provides that mentally ill offenders

"shall have access" to "[t]ransfer to a specialized mental health setting **when intensive services are clinically indicated** or transfer to a licensed mental health care facility when the offender's needs exceed the treatment capabilities of the Department." PX 12 at 3 (emphasis added).

## III.    Wexford Undisputed Immaterial Facts

20. Dr. Renzi's one-on-one sessions with Mr. Gay were typically in a confidential room in the cell house. Exhibit B, deposition of Kelly Renzi, pg. 85-86.

**Response:** Plaintiff objects that "typically" is vague.  In the cited deposition passage, Dr. Renzi states that "most" of the time the encounters would occur in group rooms or classrooms, but when there was a prison lockdown or when Mr. Gay was on crisis watch, the encounters would occur at cell front. Subject to and without waiving this objection, Plaintiff admits Dr. Renzi would sometimes encounter Mr. Gay out of his cell and sometimes would encounter him inside his cell. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in segregation. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in segregation, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

22. On March 14, 2017, Dr. Renzi saw Mr. Gay for individual therapy with a plan of care to continue weekly sessions, access crisis team if needed, and continue with group therapy sessions. Exhibit D, deposition of William Puga, M.D., pg. 68; Exhibit E, IDOC Medical Records, Bates 1939.

**Response:** Undisputed. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while

Mr. Gay was in segregation. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in segregation, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

40. Mr. Gay's treatment plans were periodically updated. Exhibit B, deposition of Kelly Renzi, pg. 96

**Response:** This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in segregation. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in segregation, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

69. Inmates designated inpatient level of care within IDOC must see their psychiatric provider at least once per week per IDOC's requirements. Exhibit F, deposition of Scott McCormick, M.D., pg. 161.

**Response:** Undisputed. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in segregation. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in segregation, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

## IV.    Wexford Disputed Immaterial Facts

21. Mr. Gay's treatment team met weekly to discuss his care. Exhibit D, deposition of William Puga, M.D., pg. 80.

**Response:** Plaintiff objects that the cited facts do not support that Mr. Gay's treatment team met (i.e., convened) once a week for the purpose of discussing Mr. Gay's care specifically. Dr. Puga testified that the treatment team "talked about him as a team weekly," ECF 286-7 at 80:6-7, without specifying whether said "talk[]" occurred as simply reviewing a broader list of patients in which Mr. Gay's care might receive cursory or pro forma mention, or whether the team met for the purpose of discussing Mr. Gay's care specifically or substantively. For these reasons, admit that Mr. Gay was on the mental health caseload for review by prison mental health staff at weekly meetings; but denied that mental health staff met for the purpose of reviewing Mr. Gay's care or that Mr. Gay's case was reviewed in substance at said meetings. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in segregation. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in segregation, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

31. Dr. Puga's psychiatric sessions involved helping Mr. Gay recognize faulty thinking that would harm him and his situation and lead to harming and instead help him self-soothe so he would not act out. Exhibit D, deposition of William Puga, M.D., pg. 152-53.

Object that the term "helped" is vague in this context, in that it is unclear whether it refers to an attempted action (attempting to help someone) or a completed act (the person was helped). The cited testimony refers to Dr. Puga "trying" to help Mr. Gay. It does not indicate that such help was successful, or that it was likely to be successful given that Dr. Puga's interventions occurred while Mr. Gay was held in long-term segregation. This fact is immaterial because all treatment provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in segregation. Pl. Ex. 50 at 45-50. Regardless of the treatment

Mr. Gay received in segregation, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

44. Gay's mental health therapy sessions were considered structured out of cell time per the Rasho requirements. Exhibit B, deposition of Kelly Renzi, pg. 87.

**Response:** Plaintiff objects that the fact asserted is not supported by the evidence cited. Dr. Renzi is a treater, not an authority regarding Rasho; furthermore, the cited testimony does not mention Rasho or its requirements. Subject to this objection, undisputed. This fact is immaterial because the "structured out of cell time" was not substantial enough to render segregation an appropriate setting for Mr. Gay's treatment in light of his psychiatric disability.

45. Mental health staff regularly consulted about Mr. Gay out of concern for his mental health. Exhibit B, deposition of Kelly Renzi, pg. 146.

**Response:** Object that the phrase "out of concern" is vague in this context, to the extent that it is read to imply that mental health staff had consulted with each other out of a special or particular concern for Mr. Gay's health.  In the cited testimony, Dr. Renzi testified that "the overall reason for [inter-staff mental health] consultations for . . . any of the offenders is out of concern for their mental health, so we would never have a meeting and say that this one is specifically out of concern because he's been on crisis watch or in segregation and we're concerned about the impact on his mental health." Additionally, the term "regularly" is vague, as it does not connote a particular number or range of consultations, and it is not supported by the evidence cited. Subject to this objection, undisputed. This factual assertion is immaterial because it does not provide any information relevant to the content, goals, or subsequent actions taken in light of such consultations.

46. As of September 19, 2017, Mr. Gay was receiving more mental health services than any other inmate in his cellhouse, which consisted of three groups weekly, two one-on-one sessions with a psychologist, and a session with a behavioral health technician. Exhibit B, deposition of Kelly Renzi, pg. 152-53; Exhibit E, IDOC Medical Records Bates 4137-4139. A. Mr. Gay's Self-Harm at Pontiac While Being Treated by Renzi/Puga

**Response:** Object that the fact asserted is not supported by admissible evidence.  In the document cited, Dr. Renzi does not recount admissible facts facts but rather her own, out-of-court statements to Mr. Gay.  Those statements are hearsay and are not covered by an exception. Subject to these objections, disputed. This fact is immaterial because all services provided to Mr. Gay did not meaningfully account for his psychiatric disability because such services were administered while Mr. Gay was in segregation. Pl. Ex. 50 at 45-50. Regardless of the treatment Mr. Gay received in segregation, it was *never* adequate, substantial, or complete because it did not account for or accommodate his psychiatric disability. Id.

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

**I.     The State failed to create an inpatient psychiatric capacity within the IDOC.**

1.     It is inevitable that a correctional facility will have custody of mentally ill prisoners. PX 51 at 15.

2.     Inpatient mental healthcare involves mental health treatment in a hospital setting, which makes a big difference from care provided in prison.  PX 3 at 31:16-34:4. Simply providing some inpatient services is not the same thing.  PX 3 at 36:24-37:6.

3.     Inpatient psychiatric hospital settings have physical space dedicated to treatment, including a place for patient-prisoners to congregate in an open and communal milieu environment as they would in a mental hospital setting, which is lacking withing the IDOC's prison facilities.  PX 46 at 148:13-152:3. PX 19 at 62:12-24; PX 19 at 63:12-18.

4.     In April 2014, for example, the State reported that of 48,655 IDOC prisoners, 10,891 were on the mental health caseload, including 9,418 male prisoners on the case load.  Of these, 3,894 were classified as seriously mentally ill.  Of these, 39 were classified as requiring an inpatient level of care.  PX 48 at 4.

5.     Director John Baldwin became director of the Iowa Department of Corrections in 2007 and retired in January 2015.  PX 3 at 11:15-24.  He became director of the Illinois Department of Corrections in June 2015 and left in May 2019. PX 3 at 11:22-12:8.

6.     During Director Baldwin's tenure at the Iowa DOC, Iowa DOC had an inpatient mental health capacity as of at least 1977.  PX 3 at 10:14-11:3. When Baldwin arrived at the Illinois DOC in 2015, it did not have an inpatient mental health capacity.  PX 3 at 12:2-16; 13:18-22.

7.     The departments of corrections in numerous other states long ago developed psychiatric inpatient care capacity as well. In the immediate area these included, at a minimum, Missouri, Kentucky, Indiana, Iowa, Wisconsin, and Mississippi. PX 48 at 8.  The Cook County Department

of Corrections, which operates the Cook County Jail, also had a psychiatric hospital capacity. See PX 48 at 9-10.

8.      Prior to bringing the Elgin facility online in late 2018, the IDOC did not have an inpatient psychiatric hospital setting. PX 46 at 148:13-152:3. Elgin was designed with the primary goal being providing a physical space where the overall mission of the facility would be focused on mental health treatment. Id. at 151:1-18.

## II.     The State referred out prisoners with somatic medical needs for the care they required.

9.      Medical staff within the IDOC affirmed that the medical care available within the IDOC's walls was limited because of staffing, equipment, and facilities, and that when a patient needed somatic medical care that exceeded what could be provided within the IDOC's four walls, it was important to send prisoners outside for the medical care they required. PX 29 at 42:17-433:15; ECF 161 at 32. IDOC has and does make arrangements for prisoners who require hospitalization outside of the IDOC because of physical injuries or illnesses, to receive such outside hospitalization, or to receive effective care within the IDOC. ECF 161 at 32.

10.     In addition to the IDHS, there are multiple private and public hospitals in Illinois with inpatient psychiatric settings. PX 48 at 7-8.

11.     Segregation is the isolation of a prisoner alone in their cell where they are segregated from the rest of the population in prison. PX 4 at 15:1-23. Cells are typically 7x9 or 7x10 feet and features a bed and a toilet. PX 4 at 15:1-23.

12.     The prisoners are otherwise isolated nearly the entire day in their cell, with even means consumed in isolation. PX 30 at 27:3-28:4.

13.        IDOC long observed a "division of labor" in which security and mental health were separate, such that security would handle discipline of mentally ill prisoners without involving mental health considerations. PX 16 at 35:13-36:7.

14.        In the IDOC, disciplinary segregation is designed to deter a prisoner when they break the rules. PX. 1 at 20:12-18. It is punishment for breaking prison rules, and the imposition of time in disciplinary segregation is cumulative. PX. 1 at 50:7-14, 52:6- 10.

15.        During the time Mr. Gay was incarcerated in the IDOC, the limit to the time a prisoner could spend in disciplinary segregation was the length of time on the disciplinary ticket. PX. 1 21:10-19.

16.        For most of the period of Mr. Gay's imprisonment within the IDOC until at least 2017, when a prisoner was placed in disciplinary segregation, mental health providers would be notified after the fact, PX 47 at 120:24-121:23, but the IDOC did not impose a requirement that mental health be consulted about the appropriateness of the discipline imposed. PX 47 at 122:17-123:1. The State's Rule 30(b)(6) witness stated it was possible there might be additional policies at individual institutions but was not aware of any. PX 47 121:24-122:16. By 2000, Mr. Gay had already accumulated more than 177 years in disciplinary segregation. PX 56. 17.  In 2012, Mr. Gay's "out" date was 12/27/01, as in 3001, and Mr. Gay's mental health provider testified that this was not the only offender on her caseload who she understood to have almost 100 years of segregation time. PX 18 at 132:12-133:10.

18.        Mental health staff did not have the ability to insist that a prisoner be transferred out of segregation. PX 15 at 67:1-7. Segregation was a security determination, not a mental health determination, and is not one mental health could make. PX 15 at 68:15-69:4; PX 24 at 162:15-

163:2; PX 29 at 49:9-50:2. Mental health staff did not have control over whether or not a prisoner was kept in segregation. PX 15 at 66:20- 23.

19.     Mr. Gay's healthcare providers explained that even though they believed segregation harmed the mentally ill, masses of mentally ill prisoners were kept in segregation in prisons like Pontiac, because the IDOC had not yet begun to do mental health segregation reviews. PX 15 at 67:8-20.

20.     In 2014 the IDOC adopted formal level-of-care definitions that it used for categorizing the mental health needs of its patient population. PX 48 at 3. This included outpatient, residential, crisis, and inpatient. PX 12 at bates 010021; PX 48 at 3-4. The "inpatient" level of care "presents the most intensive level of treatment, involving an individual plan of active psychiatric treatment that includes 24-hour access to a full range of psychiatric services in a mental health setting." PX 48 at 4. Between 2014 and 2018, IDOC Administrative Directives provided that IDOC patients "appropriate for this [inpatient] level of care require a level of treatment that exceeds the level of care that the Department is able to provide and results in commitment to outside facilities for a duration as considered clinically necessary by the offender's treatment team." PX 12 at bates 010021, -27.

21.    Mr. Gay's mental health providers believed that out-of-cell time had a therapeutic benefit. PX 24 at 145:10-13.

22.    IDOC mental health staff who treated Mr. Gay were of the opinion that segregation can have detrimental effects on those prisoners who are seriously mentally ill, including by causing decompensation. PX 1 at 21:23-3.

23. Dr. Nunez offered the opinion that while it is always difficult to stabilize severely mentally ill patients, it is much more difficult to do so when they are confined to a cell for much of the day. PX 19 at 76:5-20.

24. Dr. Nunez, one of Mr. Gay's mental health treaters, offered the opinion in the correctional setting regular social stimulation is needed for good psychiatric health, PX 19 at 105:10-106:7, and that a patient, including Mr. Gay, who is locked in a cell for 23 hours a day in isolation will always do worse from a mental health perspective. PX 19 at 103:14-104:12.

25. Dr. Jamie Chess, one of Mr. Gay's mental health treatment providers, was of the opinion that placing any person with serious mental illness in prolonged segregation was not in their best interest, and that it would have a negative impact on that person's serious mental illness. PX 2 at 159:8-18; 163:16-164:5.

26. Before 2018, Dr. Chess and her superiors in the IDOC were aware that placing mentally ill prisoners in prolonged segregation was detrimental to their mental health. PX 2 at 169:1-21; 170:11-171:2.

27. Dr. Marano, another of Mr. Gay's mental health providers, was of the opinion that isolating mentally ill people in segregation has negative effects on them. PX 15 at 56:8-18; 58:12-16. PX 15 at 66:2-10.

28. Dr. Marano explained that mentally ill people in segregation tend to get more symptomatic, leading to more illness and dysfunction and an inability to act in a socially appropriate manner. PX 15 at 56:19-58:2.

29. Dr. Renzi, the director of mental health services at Pontiac during part of Mr. Gay's incarceration there, PX 26 at 19:1-8, understood that disciplinary segregation was associated with a potential for decompensation in mentally ill prisoners, PX 26 at 32:4-10, whereas out of cell time

could help stave off worsening symptom of decompensation in mentally ill people who were held in isolation. PX 26 at 33:2-9.

30.   Restriction of a person's social contact with others can exacerbate mental illness, and the effects are more pronounced in persons who are already mentally ill. PX 26 at 143:8-16.

31.    During Mr. Gay's incarceration, mental health staff did not have authority to have a prisoner released form disciplinary segregation. PX 1 at 88:18-21.

32.   Courtney Meyer, who had been a mental health provider at Menard correctional center, could not remember any instance in which prison security staff consulted with her to review the confinement of a seriously mentally ill prisoner, including Mr. Gay, in segregation. PX 17 at 136:5-21.

33.      Dr. Marano testified that among IDOC correctional staff there existed a culture in which they did not believe in mental health treatment and would deny mental health treatment to difficult patients like Mr. Gay, often for purportedly "discipline" reasons, claiming that he was not really mentally ill. PX 15 at 92:14-96:5.

34.       Prisoners who were serving time for disciplinary segregation who were designated as requiring an inpatient level of care would not be removed from segregation. They would simply receive their "inpatient" care there. PX 28 at 36:1-17, 39:12-24.

35.      As of April 2014, the State reported that of 48,655 IDOC prisoners, 10,891 were on the mental health caseload, including 9,418 male prisoners on the case load. Of these, 3,894 were classified as seriously mentally ill (SMI). And of these, 39 were classified as requiring an inpatient level of care. PX 48 at 4. Of the 39 male prisoners and 7 female prisoners designated as requiring an inpatient level of care, 100% were confined in disciplinary segregation. PX 48 at 5. There were 898 males, and 70 females designated at the next-highest level of treatment, Residential, of which

all the females and 97% of the males were in disciplinary segregation. PX 48 at 5-6. Of those SMI inmates on the lowest level of care, Outpatient, 69% of the males were in disciplinary segregation and the remainder were in protective custody. PX 48 at 5-6. 97% of the outpatient females within segregation. PX 48 at 5- 6.

36.     The State, through the Illinois Department of Human Services ("IDHS"), operates multiple psychiatric hospitals that provide inpatient mental health treatment and an inpatient level of care. PX 49; PX 48 at 8-9; PX 46 at 121:3-18.

37.     Pursuant to 730 ILCS § 5/3-8-5, IDOC prisoners may be transferred to IDHS for mental health treatment.

38.     The State created the "inpatient" definition of care in 2014, PX 46 at 156:5-11, but at least through the entire relevant period of 1996 through 2018, the State had always incarcerated prisoners whose mental illness was sufficiently severe to have met the inpatient classification. PX 46 at 157:21-159:13.

39.     At the latest in 1994 and throughout the relevant period of 1996 to 2018, the IDOC had written policies that contemplated transfer of mentally ill prisoners to IDHS for mental health treatment if they had "severe" mental health problems. PX 12 at Bates 010011-12, 010016-17, 010022-23, 010028-29; PX 13 at 2, 4; PX 42 at 2-3, 7, 12, 13, 18; PX 43 at 3-5. For example, one policy provided that mentally ill prisoners would receive "Transfer to a specialized mental health setting when intensive services are clinically indicated or transfer to a licensed mental health care facility when the offender's needs exceed the treatment capabilities of the Department." PX 12 at 010011.

40.  Mental health staff treating Mr. Gay believed that many IDOC prisoners would benefit from being transferred to outside psychiatric hospitals, including Mr. Gay. PX 15 at 70:14-71:11.

41.     Between 1996 and 2018, there were no transfers of mentally ill prisoners from IDOC to IDHS for treatment, with the exception of a single patient in 2018. PX 10 at 30:7- 14.

42.     With the exception of a single prisoner transferred in 2018, the State is not aware of any communications in which the IDHS was ever approached about accepting IDOC prisoners between 1996 and 2018. PX 10 at 35:21-36:10.

43.     Between 1996 and 2018, with a single exception, the State gave no consideration to the transfer of IDOC prisoners for outside psychiatric care. PX 10 at 37:1-9, 41:4-12. (That one exception was not Mr. Gay, but rather another prisoner. PX 10 at 30:7- 31:15; 36:16-21.) The State could give no policy reason for its failure even to consider such transfers during this time. PX 10 at 41:13-16.

44.     Mental health provider Andrea Moss testified that mental health staff in IDOC could not refer their patients to an inpatient psychiatric hospital. PX 18 at 18:17-24.

45.     Pontiac had units housing severely mentally ill prisoners, PX 18 at 24:18-25:8, but during the entire time mental health provider Andrea Moss worked at Pontiac, not a single mentally ill prisoner was transferred to an outside psychiatric hospital. PX 18 at 19:5-12.

46.     Mental health staff could not refer mentally ill prisoners to outside treatment even if they had very serious mental health issues. PX 4 at 51:2-7. PX 15 at 68:15-22; 69:18-21. PX 16 at 22:3-20.

47.     IDHS houses two categories of mental health patients. In one category are civilians who are afflicted with mental illness, which is sufficiently severe that they must be hospitalized, but whose mental illness has not connected with criminal prosecution in the criminal justice system. These patients are referred to as "civil" patients. PX 10 at 48:16-24.

48.    The remainder of IDHS patients are referred to as "forensic" patients, PX 10 at 48:16-49:6. The forensic patients all come to IDHS through contact with the criminal justice system, and they fall into several categories, which are described in the following paragraphs.

49.    IDHS houses forensic patients who have committed a crime but must be restored to competency in order to stand trial. PX 10 at 46:19-47:6. This includes current IDOC prisoners: IDHS accepts from IDOC referrals of IDOC prisoners where the prisoner is awaiting charges in another criminal case but must first be restored to competency so that they can face the charges. PX 2 at 250:19-251:14.

50.    A second portion of IDHS's forensic population are persons who have committed a crime but have been deemed not guilty by reason of insanity, or "NGRI". PX 10 at 47:6-13. NGRI patients include persons who have committed murder, rape, and other extremely violent crimes, PX 10 at 19-22, and they are committed to the custody of IDHS because they are considered too dangerous to be in the public. PX 10 at 14:18.

50.    A second portion of IDHS's forensic population are persons who have committed a crime but have been deemed not guilty by reason of insanity, or "NGRI". PX 10 at 47:6-13. NGRI patients include persons who have committed murder, rape, and other extremely violent crimes, PX 10 at 19-22, and they are committed to the custody of IDHS because they are considered too dangerous to be in the public. PX 10 at 14:18.

51.    IDHS also accepts as "forensic" patients who had been serving prison sentences in the IDOC and who are referred from IDOC directly to IDHS at the end of their sentence. PX 10 at 48:2-15. Such transfers would be made for multiple reasons, including a conclusion by IDOC mental health staff that the outgoing IDOC prisoner's mental illness made them dangerous. PX 16 at 34:12-15.

52.     During the relevant period IDHS housed forensic patients in four different facilities—Chester, Alton, McFarland, and Elgin. PX 10 at 15-20. Alton and McFarland are medium security facilities, while Chester is a medium- and maximum-security facility. PX 10 at 49:15-20

53.     IDHS could and did hire locum tenens mental health providers to deal with fluctuations in its caseload. PX 10 at 60:7-10.

54.     IDHS did have contraindications for admission to IDHS facilities, but these were largely medical in nature, such as a medical condition that would make it difficult for a person to live in a mental health facility. PX 10 at 62:12-63:22; PX 10 at 113:20- 115:20; PX 11.

### III.     The State never implemented the 2014 IGA between IDOC and IDHS.

55.     As of April 2014, the IDOC represented to the Rasho monitor that it "recognized the immediate need for inpatient services for its SMI population." PX 48 at 6. The State represented that it would make 10 inpatient beds available at Chester, and with rotations would be able to treat approximately 40 prisoner-patients at Chester per year as mental health treatment in IDHS stabilized the prisoners. PX 48 at 9. That corresponded roughly with the 39 IDOC male prisoners identified as requiring an inpatient level of care. PX 48 at 4

56. The State testified that at a minimum, it would have considered the lack of inpatient beds to be an emergency when the State began engaging with the Rasho monitor. PX 46 at 166:12-167:17; 182:18-24; 183:2-10. The monitor was retained in September 2013. PX 48 at 2. The state also testified that the emergency consideration extended back minimally to 2012. 169:16-24.

57.  The 2014 IGA is an "agreement" between two agencies of the State of Illinois, the IDOC and the IDHS, signed in August 2014. The agreement contemplates the periodic transfer of up to 10 IDOC prisoners to Chester for mental health treatment. PX 14.

58.  Before the signing of the Inter-Governmental Agreement ("IGA") in 2014 the State is not aware of any consideration to the transfer of mentally ill IDOC prisoners to the IDHS for treatment. PX 10 at 74:15-20.

59.  The State also could not explain and did not know why the IGA only contemplated sending IDOC patients to Chester instead of the IDHS's other facilities around the state, which had 531 additional forensic beds among them. PX 14; PX 10 at 75:12- 24, 91:5-94:3.

60.  At Chester, the IDHS had four psychiatrists and three to four psychologists for 284 forensic patients, resulting in an approximate range of patient-to-psychiatrist / psychologist ratio of 71:1 or 94:1. PX 10 at 78:10-79:24.

61.  Despite these ratios, the IGA, which was signed in August 2014 required the IDOC to recruit two full-time psychiatrists and one full-time psychologist to Chester before accepting any of the IDOC patients—a ratio ranging from 5:1 or 10:1. PX 14; PX 10 at 80:1-5. The State insisted on this high ratio even though it was extremely difficult to recruit mental health staff to work at Chester, which is in a rural area. PX 10 at 79:7- 14, 88:9-16.

62.  The State could offer no reason why the IGA mandated such vastly different ratios for patients transferred from the IDOC for treatment. PX 10 at 84:7-86:8.

63.  In an October 2014 filing in the Rasho case, the State conceded that the IDOC "currently lacks any hospital-level beds to provide adequate inpatient [mental health] treatment," and that the "IDOC has long recognized that the Department's lack of inpatient beds constitutes an emergency situation requiring immediate redress." PX 44 at 2. See also PX 48 at 6 ("The IDOC recognizes the immediate need for inpatient services for its SMI population.").

64. In November 2014, after the IGA was signed, the State insisted on even more stringent ratio and decreed that in order for the IDHS to take three inpatient IDOC prisoners, IDOC would need to provide one full-time psychologist and one part-time psychiatrist. PX 45.

65. The State does not know why no prisoners were transferred from IDOC to IDHS between 1996 and 2018 for treatment. PX 10 at 28:23-29:8; 32:4-8.

66. As of April 2016, the IDOC's Standard Operating Procedure recognized that prisoners who required an inpatient level of care that the IDOC could not provide, and instead required hospitalization at a psychiatric hospital. PX 36 at 27. But the SOP provided that until the IDOC identified a psychiatric hospital, referrals out would not occur—instead, prisoners needing an "inpatient" level of care would receive "enhanced" care instead. PX 36 at 27.

### IV.    In segregation, Mr. Gay could not control of his maladaptive behavior.

67.    Dr. Renzi, one of Mr. Gay's mental health providers at Pontiac, agreed that Mr. Gay was severely mentally ill. PX 26 at 76:13-16.

68.    One of Mr. Gay's mental health providers at Pontiac, Dr. Renzi, could recall horrific acts of self-harm, like sewing parts of a fan motor into his scrotum and stabbing a pen near his eye. PX 26 at 104:13-105:1. These were among the higher end of the scale of self-injurious behavior that Dr. Renzi had witnessed at Pontiac.

69.    Mental health providers at Pontiac CC described Mr. Gay's level of self-harm as "extreme" and something that could not go easily overlooked, including incidents such as removing a testicle and placing it on the bars of his cell to show passersby. PX 24 at 61:17-21; 69:17-70:1.

70.    Mental health staff triaged their caseload based on severity. PX 18 at 55:4-20, 62:8- 63:8. Mr. Gay was seen more frequently than other prisoners, but this was due to the complexity of his case. PX 17 at 102:1-3.

71.     Refusal to participate in medical or mental health services can be a sign of decompensation. PX 24 at 102:19-23; PX 26 at 147:15-19.

72.     Mr. Gay received a number of mental health diagnoses over the course of his incarceration, including borderline personality disorder, adjustment disorder with cluster B features, antisocial personality disorder, borderline personality disorder with narcissistic features, impulse control disorder, mood disorder not otherwise specified, narcissistic personality disorder, depressive disorder, personality disorder not otherwise specified, post-traumatic stress disorder, bipolar disorder, unspecified anxiety disorder, and unspecified depressive disorder. PX 38; PX. 1 at 31:8-15.

73.     Mr. Gay had been diagnosed with an Axis II borderline personality disorder and a psychosis accompanied by depression, PX 4 at 23:21-24:5, as well as PTSD. PX 15 at 17:15-19. PX 17 at 41:12-14. His Axis II constructs were considered by his mental health providers to be significant. PX 15 at 17:15-19.  Mr. Gay's mental health treaters considered him to be seriously mentally ill. PX 4 at 24:7-9.

74.     During his segregation Mr. Gay's MGAF scores were recorded as low as 21, see PX 25 at 1, reflecting severe impairment in functioning. PX 25 at 5; PX 24 at 113:2-13. Dr. Renzi, who made the MGAF designation, testified that her designation of Mr. Gay in this range was consistent with his designation as being seriously mentally ill. PX 26 at 109:5-21.  Andrea Moss, one of Mr. Gay's mental health treaters at Pontiac, viewed him as severely mentally ill characterologically, such that he struggled significantly under her care. PX 18 at 41:2-9.

75. Mr. Gay would tell mental health providers that he used self - harm to get things he wanted and presented his self-harm as rational; while his mental health providers attempted unsuccessfully

to show him that his self-harm had the opposite effect, and only made his situation worse. PX 24 at 150:24-152:11.

76.     Mr. Gay's mental health treaters at Pontiac offered the opinion that Mr. Gay's events of self-harm indicated times at which he was decompensating. PX 24 at 101:8- 102:1.

77.     Many of the behaviors that resulted in discipline for Mr. Gay, including "splitting," manipulation of others, and attempts to dictate his treatment were all symptoms of his Axis II borderline personality disorder, and are considered a dysfunctional way of getting needs met that is consistent with borderline personality disorder. PX 16 at 7:19-24, 51:14-52:9, PX 34.

78.     Mr. Gay's treatment team saw his efforts at manipulation as an unhealthy means of trying to advocate for himself and as part of his treatment they encouraged him to advocate appropriately. PX 16 at 14:3-20; PX 35.

79.     Clinical descriptions of Mr. Gay as "manipulative" did not have the same negative connotation as its use by laypersons. Instead, the term is part of a group of diagnostic criteria for multiple personality disorders, including borderline personality disorder. In this context, it referred the use of various means to get their needs met that may not occur to persons without personality disorders. PX 26 at 117:1-118:18.

80.     Mental health staff reported that Mr. Gay engaged in "a lot" of "extreme" self-injury and inappropriate attachment to certain staff. PX 26 at 67:3-69:17. Mr. Gay's mental health treaters were of the opinion that his frequent improper personal attachments to female staff were a common symptom of patients with borderline personality disorders. PX 26 at 134:7-16.

81.     In one incident while he was incarcerated at Menard, Mr. Gay cut his scrotum open, pulled his testicles out, and held them in his hands. PX 8 at 27:2-8.

82.    Dr. Marano noted that she had observed many correctional officers responding to prisoners with Axis II disorders as engaging in "countertransference," meaning negative emotional reactions to the symptomatic behaviors of prisoners with Axis II personality disorders. PX 15 at 62:18-64:8.

83.    By April 2015 Mr. Gay's mental health team prepared a mental health treatment plan for him that identified one set of his mental health problems as follows: "[p]oor affect regulation, poor distress tolerance, poor impulse control when anxious / panicked / irritable, primarily due to emotional reasoning when his routine is altered or perceived rejection. These symptoms have directly resulted in a life sentence." PX 41. The treatment goal for this problem included Mr. Gay reducing self-injurious behavior and thereby reducing crisis-watch placement, along with therapy sessions. PX 41.

84.    Mr. Gay's April 2015 mental health treatment plan grouped "Long [history] of severe [self-injurious behavior] and assaultive behavior. These symptoms have directly resulted in a natural life sentence." PX 41

85.    Dr. Marano, a psychologist at Pontiac, agreed that Mr. Gay's self-harm to get things he wanted was not healthy, that Mr. Gay had problems with impulse control, and that while he was in segregation Mr. Gay was easily over-stimulated by noises and people. PX 16 at 53:3-54:8.

86.    Mr. Gay's own mental health providers were of the opinion that his self-mutilation was a result of his serious mental illness and was a form of decompensation resulting from his long-term segregation. PX. 1 at 37:4-18.

87.    Mr. Gay's borderline personality disorder resulted in exaggerated feelings of abandonment. PX 4 at 54:2-18.

88.    On multiple occasions, including in November of 2016, Mr. Gay was given involuntary psychiatric medication because the mental health staff providing care for him were concerned that

his condition in segregation would deteriorate and he would engage in further self-harm unless he was medicated. PX. 1 at 44:5:16. The review committee determined that as a result of Mr. Gay's mental disorder, he posed a likelihood of serious harm to himself or others. PX 1 at 45:1-15. PX 37.

89.     One of Mr. Gay's mental health providers, Dr. Sylvia Butler, explained that while Mr. Gay did engage in self-harm to elicit a desired response in others, this did not indicate that his self-harming behavior was volitional. PX 1 at 83:20-84:10. As Dr. Butler explained it, Mr. Gay's self-harm behavior could not be characterized as volitional. Instead, Mr. Gay's self-harm was brought on by impulses resulting from mood swings brought on by his mental illness. PX 1 at 84:8-23.

90.     Despite Mr. Gay's statements that he engaged in self-harm for secondary gain, Dr. Al Doyle, a psychologist at Dixon, assessed his behavior as resembling addition in which Mr. Gay had "developed an automatic response to certain feelings and cannot control how far he will go once he starts." PX 6 at 6.

91.     Dr. Doyle's assessment was that due to his mental illness and post-traumatic stress disorder, Mr. Gay's maladaptive responses in segregation were so built up in his mind that they flowed out without Mr. Gay's control and would only get worse and worse if Mr. Gay were not stopped or helped in some way. PX 4 at 37:21-38:11.

92.     Dr. Doyle's assessment of Mr. Gay's self-injury was the result of Mr. Gay being stuck in a mental pattern that he was unable to control. PX 4 at 38:16-21.

93.     Mr. Gay's self-injurious behavior was assessed by his mental health providers as addictive and as the result of increasingly anxiety and release that would reach a breaking point with self-injury, and resembled persons with substance addictions. PX 4 at 39:14-40:16; 42:6-43:18. PX 5 at 2.

94.    Mr. Gay's mental health providers diagnosed that Mr. Gay would self-mutilate as a way to regulate his emotions, meaning that he mutilated as a coping skill to help him regulate his emotions. PX 17 at 64:4-10. PX 38.

95.    The 2016 residential treatment referral concluded, "Inmate Gay does not have the skills to disengage in self-harming behaviors and needs intensive treatment." PX 38.        Ms. Meyer reached the conclusion that Mr. Gay's mental illness was sufficiently severe that he could not reside in an outpatient setting. PX 17 at 84:16

96. Mr. Gay was referred to an inpatient level of care. PX 17 at 64:21-65:1; 101:9-20; PX 38; PX 31. However, despite this assessment, even where IDOC mental health staff believed a prisoner like Mr. Gay needed psychiatric hospitalization, there was no mechanism through which they could refer such a patient to an outside psychiatric hospital. PX 17 at 159:14-22.

97.    Ms. Meyer was able to refer seriously mentally ill patients, including Mr. Gay, from Menard to Dixon or Pontiac because those prisons offered some additional therapies, but hospitalization was not possible through such referrals. PX 17 at 159:6-13.

98.    Even when Mr. Gay engaged in self-injurious behavior like cutting open his scrotum with a nail clipper, Ms. Meyer would not refer him to an outside psychiatric hospital because her understanding was that nobody was ever sent to an outside psychiatric hospital. PX 17 at 157:14-158:4.

99.    In 2016, one of Mr. Gay's mental health providers, Courtney Meyer, reached the conclusion that Mr. Gay required a level of care that was beyond what Menard could provide and recommended that Mr. Gay be placed in a therapeutic environment to include hospitalization. PX 17 at 76:14-23; PX 38.

**V.     Segregation harmed Mr. Gay, but until 2018 Mr. Gay's treaters were powerless to remove him from it.**

100.     The quality of mental health care at Pontiac and Dixon was the same, however, Dixon was a very different environment from Pontiac in the sense that it was less restrictive, and Mr. Gay was transferred from Pontiac to Dixon with the idea that a "less restrictive environment . . . is probably the best plan of care for him." PX 2 at 181:21-185:12.

101.     Mental health staff assessed that placing Mr. Gay in prolonged segregation was contrary to his mental health. PX 2 at 171:13-172:10.

102.     One of Mr. Gay's mental health providers at Menard pointed to his November 2016 mutilation of his scrotum as a "clear example that Mr. Gay was in crisis and was decompensating. PX 1 at 73:4-10; 74:13-22. Decompensation means that a person starts not to function, and it has a variety of manifestations. Sometimes the person might not eat; sometimes they might withdraw and become depressed; sometimes they might try to harm themselves. PX. 1 at 22:4-10.

103.     Decompensation can be a consequence of subjecting people who are seriously mentally ill to long-term segregation. PX. 1 at 22:11-16.

104.   Self-harm by a person in segregation for the purpose of gaining social stimulation can be a sign of decompensation. PX 24 at 103:13-18.

**VI.     In 2018 Mr. Gay's mental health team is able to remove him from segregation and he improves greatly.**

105.     Gay transferred from Dixon to Pontiac on March 8, 2018. PX 28 at 23:19-22.  Pontiac's warden asked for Mr. Gay's transfer to Dixon because he was engaged in so much misbehavior and self-harm that he was "digging himself a hold he could not get out of," and might benefit from new surroundings. PX 27 at 33:6-34:8.

106.     When Mr. Gay arrived at Dixon in 2018, mental health staff there were prepared to have him civilly committed to IDHS at the end of his sentence. PX 2 at 227:24- 228:13.

107.     In 2018, the IDOC mental health staff at Dixon changed what we were doing with Mr. Gay to see how he would react. PX 2 at 227:24-228:13. This was part of an effort to determine whether continuing to house Mr. Gay in segregation was contrary to his self-interest. PX 2 at 178:6-179:10.

108.     Dr. Nunez recommended that Mr. Gay be transferred out of segregation as a way of helping him psychologically, particularly for more treatment. PX 19 at 123:8-18; PX 20 at 2.

109.     Mr. Gay's mental health providers at Dixon believed that placing Mr. Gay in segregation would increase the chance of self-harm and would be bad for him. PX 2 at 215:13-216:3.

110.     Mental health treatment providers at Dixon believed that Mr. Gay's mental illness was causing to self-harm on an extensive basis in light of his extensive segregation. PX 2 at 181:3-15.

111.     In April 2018, Dr. Doyle recommended that he be placed in a residential treatment unit. PX 4 at 31:21-32:2.

112.     In April 2018, Dr. Nunez sent around an email to Mr. Gay's mental health team explaining that he did not believe it would be helpful to move Mr. Gay from crisis back to segregation and recommended therapeutic placement in population. PX 19 at 123:19-127:11; PX 21. It was not common for Dr. Nunez to make placement recommendations, but he did so for Mr. Gay because he had opened up his scrotum while in segregation. PX 19 at 127:12-21.

113.     In June 2018, Dr. Nunez concluded from Mr. Gay's continued self-mutilation that he remained in a continued state of decompensation while on crisis watch and reached out to mental health supervisors to out of concern for his course of care. PX 19 at 127:4-130;18; PX 22. At this point Mr. Gay had been on crisis watch for more than 700 days, indicating that Mr. Gay was doing poorly in a setting designed for temporary placement. PX 19 at 130:19-132:24; PX 23.

114.    Dr. Nunez told his superiors that he believed Mr. Gay's isolation in segregation was adversely affecting him. PX 19 at 1111:2-16.

115.    In 2018, the IDOC mental health staff stepped Mr. Gay down from inpatient status to residential treatment status and had him released from restrictive housing status and constant monitoring by security staff. PX 2 at 228:21-229:13; PX 2 at 229:14-19. This meant Mr. Gay was no longer in segregation. PX 2 at 229:20-21.

116.    During this time Mr. Gay received considerable time in the prison day room, and out- of-cell time alongside everyone else in his housing area, along with structured programs provided by mental health. PX 2 at 255:18-258:2. When Mr. Gay was removed from segregation by Dixon mental health staff, he did well, and his mental condition improved. PX 2 at 229:22-230:2.

117.    Removing Mr. Gay from restrictive housing in 2018 was part of an effort by Dixon mental health staff to gauge whether or not he could be successful in the community after his release. PX 2 at 228:21-229:13. The improvement was significant enough that Dixon mental health staff concluded that Mr. Gay did not need to be civilly committed at the end of his sentence and could instead be released into the community. PX 2 at 230:7-9. That included an assessment by Dixon mental health staff that Mr. Gay was at less risk for self-harm, and that he would not be a danger to others. PX 2 at 230:10-18.

**VII.    Earlier release from segregation was reasonable.**

118.    As of 2017 or 2018, there were no temporal limits on the use of disciplinary segregation for prisoners, PX 24 at 92:10-19; PX 26 at 6-16, whereas by 2022 segregation is limited to 29 days or less of continuous segregation. PX 24 at 93:8-16.

119.    During this time period, the only way for a prisoner's time in disciplinary segregation to be reduced would be for the prisoner to file a petition asking for a reduction, or for a prison warden,

in the exercise of discretion, to release the prisoner from their term of confinement. PX 47 at 129:9-130:18.

121.    In the case of petitions for release by a prisoner in disciplinary segregation, consideration of such petitions would focus on the prisoner's behavior in segregation leading up to their petition. PX 47 at 130:19-140:19.

121.    Mental health staff at Tamms did not have the ability to transfer a prisoner to an inpatient psychiatric hospital. PX 9 at 28:12-18.

122.    Mental health staff at Pontiac did not have the option to transfer mentally ill prisoners outside of the IDOC for care. PX 26 at 51:7-18.

**VIII.    Reform sparked by *Rasho* comes too late for Mr. Gay.**

123.    In 2018 IDOC policy changed, such that all mental health staff were involved in assessing all disciplinary tickets for the seriously mentally ill to determine culpability and could recommend alternatives to segregation for mentally ill prisoners. PX 2 at 166:23-168:24.

124.    Mental health had technically previously been a consideration in disciplinary segregation, but it was taken into account "95 percent" more heavily, "[a] lot more heavily," after the Rasho settlement went into effect around 2018. PX 2 at 236:4- 238:16. Dr. Chess, an administrator at Dixon, suggested this might have been a factor explaining why Mr. Gay's serious mental illness did not result in a release from disciplinary segregation earlier in his incarceration. PX 2 at 234:11-238:16.

125.    Before the changes implemented because of Rasho, there was no formal process to review segregation placements due to mental illness. PX 15 at 72:7-10. It was also only after Rasho that mental health staff retroactively reviewed past segregation tickets for adjustment. PX 15 at 71:13-24.

126.    The Elgin facility was designed for patients who could not receive sufficient care within the IDOC's existing mental health facilities. PX 2 at 33:2-14.

127.    Eventually the IDOC opened a portion of the IDH Elgin treatment facility, but that was done only to comply with the Rasho settlement. PX 10 at 102:21-103:21; PX 2 at 29:3-6. The Elgin facility came online towards the end of 2018, around the time Mr. Gay was released from prison. PX 46 at 111:4-18.

## IX.    Mr. Gay's mental health team believed segregation was harming him but they were powerless to recommend removal.

129.    Ms. Meyer understood that Mr. Gay was in disciplinary segregation for violation of prison rules. PX 17 at 93:3-12. Ms. Meyer did not recommend that Mr. Gay be removed from segregation, however, because it was not a recommendation she could make, and was never told by anyone that she had the ability to make such a recommendation. PX 17 at 87:2-17; 128:17-23.

129.    Releasing Mr. Gay from segregation was not part of his treatment plan because he had disciplinary segregation time. PX 28 at 37:20-38:1. PX 26 at 145:20- 146:10.

130.    Dr. Chess explained that she and other mental health staff did not attempt to remove Mr. Gay from segregation earlier because disciplinary segregation was a security issue, and mental health was not meaningfully taken into account until the IDOC's policy changed as a result of Rasho. PX 2 at 238:18-240:16. PX 27 at 75:14- 17.

131.    Individuals placed in IDOC general population have access to job opportunities, vocational courses, college programming, culinary arts courses, automotive courses, woodworking courses, educational programs, and access to the law library. PX 47 at 33:17-35:23. Individuals in general population participate in those programs within the milieu of the prison such that they are participating alongside other people in prison. Id.

133.    The State contracted with Wexford to provide medical and mental health care to prisoners in IDOC custody. PX. 53 at 1-3.

133.    The contract imposed a duty on Wexford to "arrange for services to offenders who require off-site hospitalization for routine admissions and for emergency situations" if a prisoner "requires care beyond the capability of the infirmary." PX 53 at 5.

134.    All recommendations for hospitalization, with the exception of emergencies, were to be reviewed and approved by the IDOC on-site Medical Director. PX 53 at 9.

135.    The contract imposed a duty on Wexford to meet with hospital representative and other provider to coordinate the referral of offenders. PX 53 at 9.

136.    The contract imposed a duty on Wexford to promulgate "policies and procedures concerning the emergency transfer and transportation of offenders." PX 53 at 9.

137.    The contract stated that Wexford "shall be responsible for emergency transportation of inmates for medical and mental health care." PX 53 at 6 (emphasis added). Such transportation included arrangements for the use of helicopter and ambulance. Id.

138.    The contract imposed a duty on Wexford to "deliver effective and efficient mental health services on-site to offenders determined to be mentally or emotionally disturbed due to a chronic mental illness or situational stress." PX 53 a 10.

139.    The contract imposed a duty on Wexford to ensure that its mental health services were delivered in compliance with mental health and healthcare related federal state statutes. PX 53 a 10.

140.    The contract imposed a duty on Wexford to "provide crisis management of behavioral and/or psychiatric emergencies, such as management of the suicidal, self-mutilating, or decompensating offender." PX 53 a 10.

141.    The contract provided that crisis management services were "to be provided in a manner consistent with that identified in the IDOC [Administrative Directives] an in the Office of Mental Health Management Procedure Manual." PX 53 a 10.

142.    The psychiatric services provided at DHS facilities did not occur in isolation, as patients were typically housed among 18-24 other patients at any given time. PX 54 at 1.

143.    IDHS facilities could not replicate the isolated environment of segregation. PX 54 at 1.

144.    Wexford's 30(b)(6) witness testified that, at some point in approximately 2016, Wexford staff did recommend that some patients at Logan Correctional Center be transferred to the Department of Human Services, but that transfer did not occur, and the witness did not know why not. PX 7 at 2-22.

145.    Wexford did not direct its staff that DHS could accept or house DOC patients. PX 7 at 75:21-76:7.

**X.    Opinions of Dr. Kupers.**

146.    Segregation causes severe psychiatric damage and exacerbates serious mental illness in individuals like Mr. Gay who have a history of prior trauma. PX 50 at 3, 45.

147.    Segregation units are a problematic environment for the delivery of mental health and psychiatric treatment because it causes many symptoms and disabilities— including suicide and self-harm—and precludes mental health staff from forming a trusting, therapeutic relationship with their patients. PX 50 at 50.

148.    It is extraordinarily difficult to treat mental disorders caused or exacerbated by segregation while the patient remains in segregation. PX 50 at 49. Instead of treating a patient's underlying mental illness, therapist is forced to play "catch-up," trying to lessen ongoing mental health symptoms caused by solitary confinement.

149.    Severe anxiety and panic attacks are the most common symptoms in individuals subject to segregation. PX 50 at 45.

150.    Severe anxiety in prisoners in segregation can build to an extreme level, cause the prisoner to feel like he cannot breathe or like the walls are closing in on himself, and ultimately lead to the prisoner engaging in self-harm to relieve the unbearable anxiety. PX 50 at 45.

151.    Mr. Gay's disability associated with his psychiatric illnesses, such as Borderline Personality Disorder and PTSD, was significant and manifested by severe symptoms. PX 57-58.

152.    Borderline Personality Disorder is often a cause of very serious long-term psychiatric disability. PX 50 at 59.

153.    Borderline Personality Disorder is a cause of severe psychiatric disability in Mr. Gay. PX 50 at 58.

154.    A phase program, which is often incorporated into treatment plans of mentally ill prisoners in segregation, is a system by which prisoners earn amenities, freedoms, programs, and, ultimately, release from segregation, by exhibiting pro-social behaviors. PX 50 49-50.

155.    While many prisoners in segregation can earn release from segregation by exhibiting pro-social behaviors, successful movement through a phase program is not possible for a small group of prisoners due to psychiatric disability. PX 50 49-50.

156.    There is a subgroup of prisoners in segregation who have such severe psychiatric disability that they are unable to function well enough in segregation to accomplish the steps designated in their treatment plan to earn release from segregation. PX 50 at 48.

157.    Treatment plans that offer incremental increases in privileges and freedom for inmates who engage in pro-social behavior are typically ineffective for inmates whose psychiatric disability

prevents them from functioning in segregation well enough to earn those privileges and freedoms. PX 50 at 47.

158.     For inmates with psychiatric disability that prevents them from progressing through the phase program in segregation, another treatment plan and a different series of phases must be created to enable them release from segregation. PX 50 at 47-48.

159.     If an inmate continues to fail to gain rewards and eventual release from segregation, the treatment plan must be reconsidered and include a first step of releasing the inmate from segregation. PX 50 at 48.

160.     Mr. Gay was among the subgroup of prisoners whose psychiatric disability is so severe that he is unable to function in segregation well enough to accomplish the steps designated in his treatment plan that would allow him a way out of segregation. PX 50 at 47-48.

161.     Mr. Gay was unable to earn his way out of segregation by exhibiting certain pro- social behavior while in solitary because of psychiatric disability. PX 50 at 49-50.

162.     Mr. Gay's psychiatric disability prevented him from advancing through the phase system that would have allowed him to earn his way out of segregation by exhibiting pro-social behavior while in solitary. PX 50 at 48.

163.     Any plan that required Mr. Gay to exhibit pro-social behavior to earn his release from segregation was doomed to fail because his psychiatric disability prevented him from engaging in those pro-social behaviors while in segregation. PX 50 at 48.  Mr. Gay's segregation was the most important contributing factor in his self- harming. PX 50 at 50

164.     Mental health standards require that people who commit serious acts of self-harm while anxious and plagued by other disturbing symptoms in segregation be removed from segregation and provided mental health treatment in a less restrictive setting. PX 50 at 45-46.

165.    The first time Anthony ever self-harmed was in segregation. PX 50 at 43.

166.    Segregation is the confinement of prisoners for twenty-two hours or more per day without meaningful human contact. PX 50 at 46.

167.    Mr. Gay's brief contact with his mental health professionals was not "meaningful human contact." PX 50 at 47.

168.    A wish to manipulate is not a credible motive to cause an individual to engage in acts of severe self-harm when it has been proven repeatedly to him that acts of severe self-harm will not result in his release from solitary or another therapeutic outcome. PX 50 at 54-55. Mr. Gay's self-harming behavior was not entirely willful, but rather compelled by intolerable feelings like anxiety an abandonment that are exaggerated and compounded by segregation. PX 50 at 55.

169.    The notion that Mr. Gay's self-harm is entirely voluntary, and manipulative is overly simplistic, very callous, and tends to obfuscate investigation into the complex and multi-faceted reasons for Mr. Gay's self-harm. PX 50 at 61.

170.    By at least 2012, Mr. Gay's self-harming behavior was so engrained that he could not stop cutting if he wanted to. PX 50 at 55.

171.    It is not acceptable to return a chronically self-harming and self-mutilating individual to segregation, where the self-harm and self-mutilation will almost certainly result in more self-harm and self-mutilation. PX 50 at 60.

172.    Mr. Gay did not receive the mental health treatment that his mental illness required largely because his segregation exacerbated his mental illness and worsened his prognosis. PX 50 at 61.

173.    Service providers at the IDOC, including officers and mental health staff, rendered Mr. Gay's treatment iatrogenic by responding to his repeated acts of self-harm by repeatedly placing

him in the same conditions—segregation—where they know it is likely that he will engage in the acts of self-harm. PX 50 at 61.

## XI.     Opinions of Dr. Schriro.

174.     Housing seriously mentally ill inmates in a segregated setting knowing they will continue to engage in self-harm falls outside the standard of care. PX 51 at 15.

175.     Mr. Gay's continued placement in segregation served no penological gain. PX 51 at 16.

# INTRODUCTION

Anthony Gay was a severely mentally ill man.  In 1994 he was imprisoned on in the Illinois Department of Corrections ("IDOC") on a relatively short sentence.  An infraction in 1996 got him a ticket that landed him in disciplinary segregation.  A prisoner of sound mind might have been able to serve their time in segregation and learn to be more careful in the future. Because of his mental illness, however, Mr. Gay, however, could not handle segregation.  He began engaging in flagrantly maladaptive behavior, which took two basic forms: misconduct directed against staff from within his cell (like hurled insults or toilet water) and horrific and sustained self-mutilation.

He was seen by mental health staff, who recognized that these maladaptive behaviors were symptoms of Mr. Gay's mental illness and his mental decompensation in segregation.  Appropriate treatment called for removing a severely mentally ill person like Mr. Gay so that he could be treated effectively; indeed, so severe was Mr. Gay's mental illness that the mental health practitioners who cared for him concluded that he required psychiatric hospitalization.

That, however, was not possible.  Unlike other state correctional systems, Illinois had never built a hospital for prisoners who required psychiatric hospitalization.  Instead, Illinois law and written IDOC policies permitted the State to transfer mentally ill prisoners to the Illinois Department of Human Services ("IDHS"), which operated psychiatric hospitals in the state.  Those policies recognized the need for such transfers, but they were not worth the paper they were printed on:  for decades, not one single prisoner was ever transferred from IDOC to IDHS—indeed, the State never even *considered* making such transfers. And that was not because there was no need: when the State was sued for its treatment of mentally ill prisoners in *Rasho*, it was forced to concede that at any given time there were dozens of prisoners who required "inpatient" psychiatric hospitalization, but who remained in the IDOC instead.

To make matters worse, almost all those severely mentally ill prisoners were held in segregation.  The State observed a "division of labor" in which correctional administrators made all disciplinary decisions—including segregation—even when imposing segregation would have devastating effects on a prisoner's mental state and make them worse off.  For almost the entire time Mr. Gay was incarcerated, from 1994 to 2018, mental health staff in the IDOC had little to no say in the imposition and maintenance of this damaging practice.  The result was catastrophic: in April 2014 the State submitted a report to the monitor in the *Rasho* case in which it was forced to admit that 100% of its most severely mentally ill prisoners—those who the State itself identified as requiring psychiatric hospitalization—were held in disciplinary segregation. Mr. Gay was one of those prisoners. Even though it was obvious that he was severely mentally ill and had long ago decompensated in segregation, the State continued to hold him there for years, even as his maladaptive behavior and his sustained and awful self-mutilation continued.

Tragically, those decades in segregation were all for nothing: in 2018, with the reforms forced by the *Rasho* litigation finally taking hold, IDOC mental health staff simply had Mr. Gay let out of disciplinary segregation and allowed him to join the prison's general population.  By all accounts he improved considerably, and his maladaptive behavior abated.  The Defendants could have taken their simple step years before, or minimally referred him to the outside hospital where their own written policies said he should go.  Instead, they chose to leave him in segregation for decades, despite the obvious and catastrophic impact that confinement had on him.

The defendants now seek summary judgment, but the foregoing facts have all been gathered in discovery.  Those facts are sufficient to prove that the defendants violated Mr. Gay's rights as a disabled person and his right to be free from cruel and unusual punishment.  Plaintiff should be permitted to take Mr. Gay's case to trial and prove those claims to a jury.

## ARGUMENT

## FACTUAL BACKGROUND

I.     **The State's mental health and disciplinary policies during Mr. Gay's incarceration.**

   A.     **For decades, Illinois failed to develop a psychiatric hospital capacity within its prison system.**

State correctional systems, including the IDOC, inevitably take custody of people who are severely mentally ill or who become severely mentally ill while incarcerated, and who require psychiatric hospitalization as a result. PSOF 1, 38. Psychiatric hospital settings provide an inpatient level of care, including dedicated treatment space and a place for patient-prisoners to congregate in an open and communal milieu environment. PSOF 2, 3. Hospital settings also are operated for the purpose of treatment rather than discipline, and do not employ segregation, but rather situate their patients in a communal milieu. PSOF 205, 206. Such a hospital setting—particularly the physical layout of the hospital with its communal areas—enables a level of care that is not possible in a conventional prison environment, including in the prison environment within the IDOC. PSOF 2-3, 11. In such prison environments, prisoners, particularly those who are mentally ill and often get in trouble for not following rules, are frequently held most of the day in segregation cells. PSOF 4, 35, 176. Segregation does not provide meaningful human contact and cause severe anxiety in those subject to it, causing them to feel like they cannot breathe or like the walls are closing in on them, such that they engage in self-harm to relieve the unbearable anxiety. PSOF 149-150, 167. Confining a mentally ill person in their cell for much of the day tends to prevent mental healthcare from being effective and can exacerbate and worsen a person's mental illness despite efforts at providing care. PSOF 147, 150, 167, 172.

For decades now, correctional systems in other states have operated psychiatric hospitals in order to care for such severely mentally ill prisoners. PSOF 5-7. Some other correctional

institutions have done the same, such as the Cook County Department of Corrections, which operates the Cook County jail. *See* PSOF 7. During virtually the entire period of Mr. Gay's incarceration in the IDOC from 1994 to 2018, however, State of Illinois did not develop the capacity to provide in-house hospital-level mental health treatment severely mentally ill prisoners within the IDOC, even though the State explicitly recognized the need to provide that level of care for some of their mentally ill prisoners. PSOF 6-8, 21.

**B.    Illinois elected not to treat severely mentally ill prisoners to outside mental healthcare.**

While the State did not develop a psychiatric hospital capability within the walls of the IDOC, there was an alternative for hospitalizing severely mentally ill prisoners—at least on paper. The Illinois Department of Human Services ("IDHS") operates multiple inpatient psychiatric hospitals around the state, PSOF 36, and an Illinois state statute, 730 ILCS § 5/3-8-5, provided for the transfer of mentally ill prisoners from the IDOC to the IDHS in order to receive needed treatment. PSOF 37. Additionally, there are multiple private and public hospitals in the state with inpatient psychiatric hospital settings. PSOF 7, 10. The relevant Administrative Directives promulgated by the IDOC during the entirety of Mr. Gay's incarceration formally encoded referrals to such outside facilities, providing that when a prisoner's mental health needs "exceeded the treatment capabilities of the [IDOC]," they would be "[t]ransfer[red] to a specialized mental health setting" or a "licensed mental health care facility."  PSOF 39. *See also* State Def. SOF 32 (indicating such transfers were provided for "[s]ince at least 1987"). The State does exactly that for prisoners whose somatic medical needs. As a matter of policy and everyday routine, the State refers prisoners whose somatic medical needs exceed the medical treatment available within the walls of the IDOC to external providers who can provide that medical treatment. PSOF 9.

That is not how the State treated prisoners who were severely mentally ill and psychiatrically disabled, however. While Illinois law and the IDOC's *written* policies provided for referrals to outside providers, the State never effectuated those policies in practice. During the period of Mr. Gay's confinement in segregation from 1996 to 2018, no IDOC prisoners—with one single exception, in 2018—was referred from the IDOC to an outside psychiatric hospital for mental health treatment. PSOF 41, 42, 45.

This was not because there was no need for such transfers. Such a need has always existed within the IDOC. PSOF 1, 38. Indeed, multiple mental health providers who practiced within the IDOC during the time of Mr. Gay's incarceration testified that numerous prisoners under their care should have been hospitalized—but, these treaters testified, they were never given authority to obtain outside referrals for mentally ill prisoners whom they believed required hospitalization. PSOF 40, 44, 46, 121, 122. So settled was this policy that treaters who believed a prisoner needed psychiatric hospitalization would not bother recommending it, since they understood that no prisoner would ever be sent to an outside hospital for mental health treatment. PSOF 98, 99. The result was that numerous severely mentally ill and psychiatrically disabled prisoners were not hospitalized, even when their mental health treaters recognized that they required hospitalization. PSOF 43, 96. The IDOC gave a snapshot of this population in April 2014, reporting to the *Rasho*[1] monitor that there were 39 IDOC prisoners who required outside psychiatric hospitalization, but who all remained within the IDOC instead. PSOF 35.

---

[1]    *Rasho* refers to an injunctive class action alleging unconstitutional treatment of prisoners with serious mental illnesses in the IDOC that ultimately led the State to be subject to an independent monitor of their mental health provisions and services and an agreement requiring changes to policies and customs attendant to the treatment of severely mentally ill prisoners. *Rasho v. Jeffreys*, No. 07-cv-1298-MMM (C.D. Ill.).

The failure to refer severely mentally ill prisoners to mental hospitals for treatment was not an innocent oversight. In that same April 2014 report, the State told the *Rasho* monitor that it "recognized the immediate need for inpatient services for its SMI [seriously mentally ill] population." PSOF 55. Yet going back as least to 1996, there were never even *communications* between IDOC and IDHS about transferring severely mentally ill IDOC prisoners to IDHS—indeed, during that time, the State never even considered transfers of severely mentally ill or psychiatrically disabled IDOC prisoners for hospitalization in *any* outside facility. PSOF 40, 41, 53, 54. The State could offer no justification or explanation for this failure. PSOF 41.

### C.    Illinois could have transferred severely mentally ill IDOC prisoners to IDHS.

By April 2014, as part of its response to *Rasho*, the State told the court-appointed *Rasho* monitor that as a long-term solution it planned to build a psychiatric hospital to care for severely mentally ill prisoners, to be operated by the IDOC. PX 48 at 4. Recognizing that such a psychiatric hospital would take years to bring online, the State told the *Rasho* monitor that in the interim it was exploring inpatient psychiatric treatment of such severely mentally ill IDOC prisoners in other locations. PSOF 5-7.

Several of the options explored by the State involved other entities, such as prison hospitals in other states, private or public hospitals, and the psychiatric hospital operated by the Cook County Department of Corrections. *See* PSOF 5-7, 10. One entity, however, was part of the State itself: the IDHS, an agency of the State of Illinois, which was capable of treating severely mentally ill and psychiatrically disabled IDOC prisoners. PSOF 37.

The IDHS operates multiple psychiatric hospitals that provide inpatient mental health care. PSOF 36. More to the point, the IDHS already cared for a large number of patients who, from a mental health, security, and danger perspective, are indistinguishable from IDOC prisoner-patients.

113

IDHS classifies its patients in two broad categories. In one category are "civil" patients. These are mentally ill people who are referred to the IDHS without any connection to the criminal justice system. PSOF 47. The remainder of IDHS patients are grouped into different types of "forensic" patients—all of whom come to the IDHS through contact with the criminal justice system. PSOF 48. **One** group of "forensic" patients are people who have been accused of crimes but who are too mentally ill to stand trial. PSOF 49. IDHS treats these people for the purpose of restoring them to mental competency, so that they can be prosecuted. PSOF 49. Notably, this includes *current IDOC prisoners* who have been accused of additional crimes while they are incarcerated but who are too mentally ill to be prosecuted. PSOF 49. These patients are sent from the IDOC to IDHS—not to be cared for, but rather to be restored to competency so they can be prosecuted on the new charges. PSOF 49. A **second** group of "forensic" patients housed by the IDHS are people who have committed crimes but have been adjudicated as not guilty by reason of insanity ("NGRI"). PSOF 50. The IDHS hospitalizes numerous NGRI patients, including persons who committed serious offenses like rape, murder, and other extremely violent crimes. PSOF 53. A **third** group of forensic patients are IDOC prisoners who are transferred directly from the IDOC to the IDHS upon completion of their criminal sentences, particularly IDOC prisoners whom IDOC mental health staff assessed as posing a continuing danger to others because of their mental illness. PSOF 51.

During the period of Mr. Gay's incarceration, the IDHS housed this "forensic" population in multiple psychiatric hospitals totaling approximately 815 medium- and maximum-security forensic beds. PSOF 52, 56. The population and staffing at these facilities fluctuated, and the IDHS hired *locum tenens* mental health practitioners to deal with such changes. PSOF 53.

114

**D.**     **Even under pressure from the *Rasho* litigation, Illinois did not transfer IDOC mental health patients to IDHS.**

In the ongoing *Rasho* litigation, the *Rasho c*ourt appointed Dr. Raymond F. Patterson as an independent monitor in 2013. *Rasho v. Jeffreys*, No. 07-cv-1298-MMM, ECF 143 (C.D. Ill. Aug. 21, 2013). In April 2014, the State assured the *Rasho*'s court-appointed monitor that by June 2014, it would be making 10 IDHS inpatient beds available for treatment of severely ill IDOC prisoners, where they could be cared for until their mental health improved enough that they could return to the IDOC. PSOF 55. The State estimated that because prisoners would rotate out IDHS care as their mental health improved under treatment there, the 10 beds could be used to treat approximately 40 patients per year. PSOF 55. This corresponded with the 39 prisoners that the State identified as being so severely mentally ill that they required inpatient psychiatric hospitalization. PSOF 55.

The State never made the 10 IDHS beds available. The State purported to implement the provision of the 10 beds through an Intergovernmental "Agreement" ("IGA") between the IDOC and the IDHS, which was signed in August 2014. PSOF 56. The State, however, included multiple poison-pill provisions in the IGA that made it impracticable to refer IDOC prisoners to the IDHS. ***First***, the IGA insisted on doctor-patient ratios for IDOC prisoners that were virtually guaranteed to be un-attainable. Chester had an average population of 284 maximum-security forensic mental health beds and was budgeted for four psychiatrists and three to four psychologists—a patient-psychiatrist and patient-psychologist ratio of 71:1 to 94:1, respectively. PSOF 60. In the IGA, however, the State provided that it would make the 10 beds available for IDOC patients *only* if two additional psychiatrists and one additional psychologist were first hired and dedicated to their care— a patient-psychologist ratio of 10:1 and patient-psychiatrist ratio of *5:1*. PSOF 61. The State

could offer no justification for insisting on such vastly different ratios for IDOC patients and the IDHS maximum-security patients at Chester. PSOF 62.

***Second***, the IGA provided that IDOC patients could only be referred to a single IDHS facility—Chester—even though the IDHS operated multiple additional facilities with hundreds of additional inpatient forensic beds. PSOF 59, 55. This compounded the barrier posed by the State's insistence on low IDOC patient-treater ratios, because it was notoriously difficult to recruit mental health professionals to work at Chester, which is located in a rural area. PSOF 61. At its Rule 30(b)(6) deposition, the State was unable to offer any justification for insisting Chester be the only facility to which IDOC patients could be referred. PSOF 59.

By October 2014, two months after it created the IGA, the State told the *Rasho* Court that it lacked any inpatient beds to treat severely mentally ill IDOC prisoners, and that it considered this situation to be an "emergency."  PSOF 63. By November 2014, however, the State reduced the patient-doctor ratio set out in the IGA even further, providing that in order for the IDHS to take just *three* inpatient IDOC prisoners, there would need to be one full-time psychologist and one part-time psychiatrist—a 3:1 patient-practitioner ratio. PSOF 64. The State, again, could offer no reason why it insisted on such vastly different patient-doctor ratios for IDOC patients compared with its non-IDOC forensic patient caseload. PSOF 62.

The upshot was that, with a single exception, no IDOC patients who needed inpatient mental healthcare were ever transferred to the IDHS for treatment. PSOF 65. The State adopted a stop-gap measure in 2016, creating a mental health "Standard Operating Procedure" ("SOP"). PSOF 66. This SOP *acknowledged* (1) that the IDOC incarcerated numerous "inpatient" mental health patients who required inpatient psychiatric hospitalization and (2) that the State was not providing hospitalization to these patients. PSOF 20, 66. The SOP provided, however, that such

patients would continue to receive mental healthcare while incarcerated in the IDOC, even the SOP itself acknowledged that this care was inadequate:

An Inpatient Level of Care is the most intensive level of care, involving an individual plan of active Psychiatric Treatment that includes 24 hour access to a full range of Psychiatric and Mental Health Staff. Offenders appropriate for this Level of Care require a level of treatment that exceeds the level of care that the Department is able to provide and results in commitment to a Psychiatric Hospital for a duration as considered clinically necessary by the offender's Treatment Team. Until such time as the Department identifies a Psychiatric Hospital, an Enhanced Treatment Protocol shall be implemented for all Inpatient Level of Care offenders which shall include:

- Weekly visits with a Psychiatrist.
- Individual Therapeutic Sessions with a Licensed Mental Health Professional (Licensed Clinical Psychologist), if the offender is able to tolerate such a schedule
- Enhanced out of cell structured activity.
- Weekly visits by a Mental Health Professional.

PX 36 at 27. No IDOC prisoners were hospitalized until the IDOC's Elgin facility finally came online in 2018. PSOF 127.

> **E.** Instead of being hospitalized, the IDOC's severely mentally ill prisoners were subjected to penological discipline by correctional staff over which mental health staff lacked control.

The difference between receiving care in a psychiatric hospital setting versus continued confinement on prison cell blocks was critical for severely mentally ill and psychiatrically disabled prisoners. That was because treatment of such mentally ill prisoners in a psychiatric hospital would be operated in a therapeutic setting controlled by mental health personnel, PSOF 2-3, whereas mental health patients in the IDOC were held in a correctional setting, with their lives controlled by the rules promulgated and discipline imposed by correctional staff.

Specifically, in contrast with psychiatric hospitals, the IDOC observed a "division of labor" in which, as the State's counsel framed it, "security deals with security, and mental health deals

with the treatment of mental health." PSOF 13; PX 16 at 35:13-16. In the State's own framing, this allowed mental health practitioners to "focus [their] attention on treatment and not with security issues[.]" PSOF 13; PX 16 at 35:19-20. In practice, however, this "division of labor" meant that correctional staff-imposed discipline on severely mentally ill and psychiatrically disabled prisoners for breaking prison rules, while mental health staff were given little to no say regarding the imposition of that discipline—even where the discipline itself, particularly the imposition of long-term disciplinary segregation, was psychologically harmful to their mentally ill patients. PSOF 24-30.

Segregation in prison generally refers to the confinement of prisoners for 22 hours or more per day in their cells, PSOF 166, and in the IDOC this often meant even 23 hours per day of confinement. PSOF 24. Prisoners who are placed in segregation are isolated from other human beings, PSOF 11, which is accomplished by confining them, alone, to small cells that are usually 7x9 or 7x10 feet in size. PSOF 11. Segregated prisoners spend virtually their entire days alone in their cells, and even their meals are consumed in isolation. PSOF 12.

Disciplinary segregation is intended to deter prisoners from breaking prison rules, and to punish them for doing so. PSOF 14. During the period Mr. Gay was imprisoned in the IDOC, the time a prisoner spent in segregation was determined by the length of time on the disciplinary ticket, PSOF 15, the imposition of time on different disciplinary tickets was cumulative, PSOF 14, and there were no temporal limits to the total time a prisoner could serve in disciplinary segregation. PSOF 15. The issuance of disciplinary tickets and the imposition of disciplinary segregation was a security determination, not a mental health determination, and was not a determination that mental health staff could make. PSOF 16, 18.

Importantly, for virtually all of Mr. Gay's incarceration in the IDOC, mental health staff did not have the ability to insist that a prisoner be transferred out of segregation, and mental health staff had no control over whether a prisoner was kept in segregation due to policies and customs set forth by the State and Wexford. PSOF 18, 16, 27.

As a result, mental health practitioners within the IDOC were often forced to provide mental health treatment to their patients while their patients remained in segregation—even when those same practitioners were of the opinion that segregation was detrimental to their patients' mental health. PSOF 19. Multiple mental health providers who treated Mr. Gay or oversaw his care while he was in the IDOC expressed the opinion that segregation is detrimental to the mental wellness of the mentally ill, PSOF 22, 21. These providers explained that while it is always difficult to stabilize severely mentally ill patients, it is much more difficult to do so when they are confined to a cell for much of the day. PSOF 25.

Mental health practitioners in the IDOC involved in Mr. Gay's care, and their supervisors, repeatedly expressed the opinion placing a seriously mentally ill person in prolonged segregation was detrimental to the mental health of their patients. PSOF 25, 26, 29, 30. And these mental practitioners were of the opinion that out-of-cell time had therapeutic benefits for mentally ill people and would ameliorate their symptoms. PSOF 21, 29. But during virtually all of Mr. Gay's incarceration, mental health staff within the IDOC did not have the authority to have a prisoner released from disciplinary segregation. PSOF 31, 34. And by 2000, Mr. Gay had already accumulated 177 years of time in disciplinary segregation. PSOF 16.

F.     **In the IDOC, correctional administrators controlled the imposition of disciplinary segregation with little regard for mental illness or psychiatric disability.**

Prisoners could petition to be released from disciplinary segregation early. PSOF 119. However, it was a prison's correctional staff that would consider such petitions, and ***the assessment would focus on the prisoner's behavior in segregation leading up to their petition.*** PSOF 121. For virtually the entire period of Mr. Gay's incarceration, correctional staff gave little mind to the role mental illness played in disciplinary infractions and the continued confinement of mentally ill prisoners in segregation. The head of mental health care at Pontiac, for example, testified that there was a culture among correctional staff in which they did not believe in mental health treatment and were dismissive of mental illness a factor in discipline. PSOF 33. Indeed, this provider noted, it was common for correctional staff to engage in "countertransference," particularly with Axis II mentally ill prisoners, in which they would become actively antagonistic with such prisoners. PSOF 82. Another mental health provider at Pontiac could not recall a single instance in which correctional staff there had asked her to review the disciplinary segregation of a mentally ill prisoner. PSOF 32.

Segregation is not psychiatric inpatient therapy, yet mentally ill prisoners were considerably over-represented in disciplinary segregation—because they had difficulty following the rules enforced by correctional staff. PSOF 35, 156-160. A mental health provider at Dixon noted that while mental health had always been a consideration in disciplinary decisions on paper, it was barely given any consideration by correctional staff until the reforms forced by the *Rasho* litigation began to take hold, beginning around 2017. PSOF 124, 123.

The system in which seriously mentally ill prisoners could only earn their way out of segregation through "good behavior" led to a disproportionate amount of seriously mentally ill

prisoners residing in segregation, PSOF 35, and gave prisoners two choices: stop decompensating or stay in disciplinary segregation forever. For prisoners with serious mental illness and/or a psychiatric disability whose decompensation *could not* be reversed or mitigated while in isolation, this was impossible. PSOF 155. By failing to account for how an individual's behavior is impacted and driven by their psychiatric disability, the State gave no avenue for psychiatrically disabled prisoners to be released from isolation.

### G. The widespread imposition of disciplinary segregation on the mentally ill impeded the delivery of effective mental healthcare, resulting in more disciplinary segregation.

During the bulk of Mr. Gay's incarceration, the "division of labor" between correctional staff on the one hand and mental health on the other meant that severely mentally ill prisoners could be locked away in long-term disciplinary segregation precisely because their mental illness made it hard to follow prison rules, despite the opinions of their mental health providers, *supra*, that prolonged segregation of the mentally ill was psychologically harmful and contraindicated.

The State's April 2014 report to the Rasho monitor, which included a census of its mentally ill population, provides an example of the results. PSOF 4. Of the 48,000 prisoners in the IDOC at the time, the State identified 3,894 patients who it classified as being seriously mentally ill, or SMI. These SMI patients in turn were broken out into three categories: "inpatient" (the most severe), "residential" (the next most serious), and "outpatient" (the third most serious). PSOF 35. The report then listed the housing status of these patients: 100% of the "inpatient" patients were in disciplinary segregation; 97% of the "residential" patients were in segregation; and 69% of the "outpatient" patients were in segregation. PSOF 35.

Asked a few years later to explain "Why [] you have so many mentally ill people in segregation and so few regular population people in segregation," Dr. Hinton, the IDOC's director

of mental health, testified that mentally ill prisoners "tend to have more behavioral issues, in part because of their mental illness," and are confined to disciplinary segregation because "they don't follow the rules". PSOF 178.

In short, left unsaid in the State's April 2016 "SOP" substituting psychiatric hospitalization with "enhanced" mental healthcare inside the IDOC's walls (PSOF 66) was the virtual certainty that the patients receiving that care would be confined to disciplinary segregation. Dr. Schriro, Plaintiff's expert correctional administrator, offers the opinion that housing seriously mentally ill prisoners in a segregated setting knowing they will continue to engage in self-harm falls outside the standard of care. PX 174.

### H.    Disciplinary segregation of the mentally ill rendered mental health treatment ineffective.

What resulted was a system in which mental health treatment for prisoners with serious mental illness or psychiatric disability was delivered in segregation, rendering that care essentially ineffective and ensuring such that mentally ill prisoners got worse. Dr. Kupers offers the opinion that it is extraordinarily difficult to treat mental disorders caused or exacerbated by segregation while the patient remains in segregation. PSOF 148. As Dr. Kupers explains, segregation *causes* severe psychiatric harm that damages and exacerbates many mental illnesses. PSOF 147.

Mental health providers within the IDOC agree, explaining that placing mentally ill people in segregation caused those persons to become more symptomatic, leading to more mental illness and dysfunction, and an inability to act in a socially appropriate manner. PSOF 28. These mental health providers expressed the opinion that such worsening included mental "decompensation." PSOF 22, 29, 103. Decompensation means that a person's functioning breaks down. PSOF 102. It has a variety of manifestations, including refusing to eat, withdrawal and refusal to participate in group activities, and maladaptive behavior and self-harm. PSOF 102. Among other things, self-

harm by a person in segregation for the purpose of gaining social stimulation, such as contact with other people, can be a sign of decompensation resulting from segregation. PSOF 104. From a treatment perspective, the result of segregating the mentally ill and psychiatrically disabled is a situation in which therapists are always playing "catch-up," treating the mental health symptoms caused by segregation itself instead of reaching the patient's underlying mental illness. PSOF 148. The result is a cycle in which mentally ill prisoners, confined in disciplinary segregation by correctional officers because of misbehavior relating to their mental illness, face long odds of getting better despite the efforts of their mental health caregivers. PSOF 148

## II.    Wexford.

In 2011, the State entered into a contract with Wexford Health Sources, Inc. (Wexford) for the provision of both medical and mental health services. PSOF 132. Under that contract Wexford was responsible for delivering "comprehensive medical and mental health services" including "comprehensive and specialized mental health services," including crisis management services to "self-mutilating or decompensating" offenders. PSOF 138, 140. Wexford also undertook to make "arrangements with medical **and mental health providers** to provide services including . . . non-hospital and hospital services off-site . . . . when such services cannot be . . . adequately and cost-effectively delivered on-site, "arrange for services to offenders who require off-site hospitalization for routine admissions and for emergency situations" if a prisoner "requires care beyond the capability of the infirmary," to meet with representatives from external providers, such as hospitals, to coordinate referrals for offenders, and "maintain good working relationship with community medical **and mental health** providers in order to provide off-site services." PSOF 221, 133, 137. It was also Wexford's responsibility to physically transport prisoners from IDOC facilities in emergency situations. PSOF 136-137. Indeed, Wexford routinely referred prisoners to outside hospitals for treatment of physical injuries and somatic illnesses. PSOF 9.

Wexford was also bound by the policies set forth by IDOC, including administrative directives and standard operating procedures. Wexford SOF 60, 62-59. An IDOC Administrative Directive applicable for the entirety of Mr. Gay's incarceration provided that when a prisoner's mental health needs "exceeded the treatment capabilities of the [IDOC]," they would be "[t]ransfer[red] to a specialized mental health setting" or a "licensed mental health care facility." PSOF 39. *See also* State Def. SOF 32 (indicating such transfers were provided for "[s]ince at least 1987"). The Administrative Directive did not explain how such referrals would be carried out, but Wexford's contract did: Wexford was supposed to build relationships with community providers so that providers in the facility were able to refer prisoners out when their needs exceeded IDOC's capabilities. PSOF 133, 135. As such, Wexford undertook the State's duty to facilitate these referrals.

Wexford did not facilitate the necessary referrals for seriously mentally ill prisoners who need mental health treatment beyond what IDOC provided. Even though IDOC did not have the ability to provide an inpatient level of care, no arrangements had been made to provide access to a psychiatric hospital as of April 2016, PX 36 at 27, and 100% of inpatient prisoners remained in disciplinary segregation, PSOF 35. Wexford mental health providers operated with the understanding that they could not refer patients to psychiatric hospitals and there was no point in even trying. PSOF 44-46, 128 130. Indeed, Wexford could provide only one example of mental health professionals attempting to refer mentally ill prisoners to a psychiatric hospital prior to 2018; that attempted referral failed, and Wexford could not explain why. PSOF 208. Wexford did not train its employees that DHS could accept or house IDOC prisoners. PSOF 209. The unspoken policy accomplished by the State and Wexford tied the hands of mental health providers who knew their severely mentally ill patients lived in environments that were counterproductive to their

treatment goals but felt powerless to place those individuals in more therapeutic environments. Many of Mr. Gay's Wexford mental health providers believed that segregation did not generally comport with the treatment goals of the seriously mentally ill, PSOF 23-29, and at least one of his providers explicitly identified that Mr. Gay himself needed to be placed in a less restrictive environment. PSOF 100-102.

Instead of taking steps to get seriously mentally ill prisoners to more therapeutic environments, Wexford continued to require mental health staff to provide treatment in segregation—where most SMI prisoners were housed. PSOF 35. This was a counterintuitive measure that prevented psychiatrically disabled prisoners who could not comply with their treatment plan while in segregation from ever earning their way out of segregation and ever mitigating or stopping the decompensation process. PSOF 148, 154-156. Wexford continued to allow its patients to be treated for severe mental illness in segregation which, for prisoners in prolonged segregation with little or no control over their self-destructive impulses, amounted to no treatment at all. PSOF 162.

## III.     Anthony Gay.

Anthony Gay was imprisoned in the IDOC in 1994 relatively short sentence. He would eventually be released from the IDOC in August 2018. IDOC Def. SOF 1. Over the course of his incarceration, Mr. Gay was diagnosed by mental healthcare providers within the IDOC as suffering from a variety of Axis II mental disorders, including borderline personality disorder, impulse control disorder, mood disorder not otherwise specified, depressive disorder, post-traumatic stress disorder, bipolar disorder, PTSD, and unspecified anxiety disorder. PSOF 72, 73.

### A.     Mr. Gay is subject to long-term disciplinary segregation.

In 1996 Mr. Gay was involved in a physical altercation for which he received a disciplinary ticket and was placed in disciplinary segregation. Mr. Gay quickly began to act out in segregation

and engaged in sustained maladaptive behavior for years on end. Wexford SOF 47-58. Many of these behaviors involved sustained and horrific self-mutilation. Wexford SOF 47-58, PSOF 74. Mental health providers and correctional administrators recalled, for example, Mr. Gay sewing parts of a fan motor into his scrotum, PSOF 68, stabbing a pen near his eye, and the like. PSOF 68 In one incident, Mr. Gay cut open his scrotum, pulled out his testicles, and held them in his hands. PSOF 81. In another he cut off one of his testicles and placed it on the bars of his cell to show passersby. PSOF 69. Mental health providers testified that Mr. Gay's self-harm was "extreme" and among the worst self-harm they had seen among mentally ill prisoners. PSOF 68, 69. Mr. Gay would engage in other behaviors as well, such as refusing to participate in medical or mental health services. PSOF 71, Wexford SOF 55. He tended to be seen by mental health staff more frequently than other prisoners, but this was because they triaged cases for severity, PSOF 70, and Mr. Gay's did not abate.

Mr. Gay's conduct resulted in a steady stream of disciplinary tickets that accumulated to what was, in effect, a life sentence in disciplinary segregation. PSOF 16. Sometimes he would receive multiple years-long disciplinary tickets in a single day. PX 56. By January 2000, he had accumulated approximately 177 years. PSOF 16. One mental health practitioner who was asked why, if she was treating Mr. Gay in 2012, had notes listing Mr. Gay's disciplinary segregation out-date as "12/27/01," and explained that the year notation "01" referred to a different century. PSOF 16. A 2015 mental health treatment plan identified one set of Mr. Gay's mental health problems as follows:

> Poor affect regulation, poor distress tolerance, poor impulse control when anxious / panicked / irritable, primarily due to emotional reasoning when his routine is altered or perceived rejection. These symptoms have directly resulted in a life sentence.

PSOF 83. *See also* PSOF 96 (grouping self-injurious and assaultive behavior as mental health symptoms resulting in a life sentence).

**B.     Mr. Gay's maladaptive behavior was a product of his mental illness and was not voluntary.**

Mr. Gay had a severe psychiatric disability due to his borderline personality disorder and related Axis II disorders. PSOF 152-154. Because of his severe mental illness and psychiatric disability, he was unable to function in segregation well enough to earn his way out through "good behavior." PSOF 160, 161. Mr. Gay would tell mental health providers that he used his maladaptive behavior to manipulate staff at the prisons to get things he wanted, presenting his self-harm and maladaptive behavior as rational. PSOF 75. But Mr. Gay's mental health providers viewed his attempts at manipulation as a product of his Axis II personality disorder. PSOF 77, 79, 90. In particular, they assessed his various "manipulative" actions as efforts to get his needs met that would not occur to persons who do not suffer from personality disorders, and a form of decompensation. PSOF 76, 78, 79. This included Mr. Gay's extreme self-injury and his inappropriate attachment to certain staff, both of which, Mr. Gay's treatment staff observed, were common symptoms of patients with Axis II borderline personality disorders. PSOF 80, 86.

Mr. Gay's own mental health providers were of the opinion that his self-mutilation was a result of his serious mental illness and a form of decompensation resulting from his long-term segregation. PSOF 76, 86, 102. Among other things, Mr. Gay's borderline personality disorder resulted in poor impulse control along with exaggerated feelings of abandonment. PSOF 85, 87. These mental health providers explain that while Mr. Gay did engage in self-harm to elicit a desired response in others, this did not indicate that his self-harming behavior was volitional. PSOF 89. These practitioners also likened Mr. Gay's self-harm to an addition in which Mr. Gay had "developed an automatic response to certain feelings and cannot control how far he will go once

he starts." PSOF 90. *See also* PSOF 91-93. Such self-injury, these practitioners explained, was the result of maladaptive responses to segregation being so built up in Mr. Gay's mind that they flowed out in the form of self-injury, without Mr. Gay's control, PSOF 91, which led to self-injury being a means for Mr. Gay to regulate his emotions. PSOF 94. On multiple occasions, involuntary psychotropic medication was approved for Mr. Gay based on an assessment that he would continue to self-harm as a result of his mental disorder. PSOF 88, 92. At one point during his confinement Mr. Gay was given an exceptionally low MGAF score of 20, indicating severely impaired functioning. PSOF 74. A treatment referral in 2016 reported, "Inmate Gay does not have the skills to disengage in self-harming behaviors and needs intensive treatment." PSOF 95. Mr. Gay was also designated as requiring an inpatient level of care, which called for referral outside the IDOC. PSOF 211. But, as one mental health provider explained, releasing Mr. Gay from disciplinary segregation could not be part of his treatment plan because Mr. Gay still had disciplinary segregation time. PSOF 129.

Dr. Kupers concurs with these assessments and offers the opinion that Mr. Gay's self-harming behavior was not entirely willful, but rather was compelled by intolerable feelings of abandonment and anxiety that are exaggerated by Mr. Gay's segregation, PSOF 168-170. This is a common feature of people subject to segregation in a person with Mr. Gay's mental health profile. PSOF 149. As Dr. Kupers points out, a wish to manipulate is not a credible motive to cause an individual to engage in acts of severe self-harm when it has been proven repeatedly to that individual that acts of severe self-harm will not result in his release from solitary or another therapeutic outcome. PSOF 168. Instead, Dr. Kupers explains, Mr. Gay was not able control of the maladaptive behavior that led to his self-harm and his continued confinement in disciplinary segregation. PSOF 155, 160-162.

C.     **Because of his mental illness, Mr. Gay needed to be removed from disciplinary segregation.**

Relatedly, Dr. Kupers offers the opinion that while many prisoners can earn early release from disciplinary segregation through pro-social behavior, PSOF 155-156, Mr. Gay, because of his severe mental illness, was unable to function well enough in segregation to become eligible for release—because his psychiatric disability made it impossible for him to control his behavior. PSOF 155-157, 160-162. Dr. Kupers explains that because of the mental illness of prisoners like Mr. Gay, any route out of disciplinary segregation that required Mr. Gay to exhibit pro-social behavior was doomed to fail because his psychiatric disability prevented him from engaging in those pro-social behaviors while in segregation. PSOF 157, 163. For such prisoners, removal from segregation must be the first step in treatment and return to social functioning. PSOF 158, 164. Similarly, Dr. Schriro, a former correctional administrator, concurs, offering the opinion that a prisoner exhibiting Mr. Gay's severe symptoms of self-harm in segregation should have been placed in a specialized treatment unit to address his mental illness. PSOF 177.

Dr. Kupers explains that the longstanding failure to remove Mr. Gay from segregation, and his continued confinement in segregation despite his self-harming behavior, violated obvious standards of care. PSOF 164, 171. Mr. Gay did not receive effective mental health treatment, Dr. Kupers opines, largely because his segregation exacerbated his mental illness and worsened his prognosis, thereby rendering his mental healthcare ineffective. PSOF 172. By continuing to hold Mr. Gay in segregation, staff in the IDOC caused Mr. Gay to suffer more psychological harm and more self-mutilation. PSOF 173. Dr. Schriro offers the opinion that from a correctional standpoint, Mr. Gay's continued placement in segregation served no penological gain. PSOF 175. In failing to release Mr. Gay, the State also deprived him of the various other services available to prisoners in

the general population, including vocational courses college programming, and human contact with other people in the milieu of the general population. PSOF 213.

### D.    Mr. Gay is successfully removed from disciplinary segregation in 2018, before his release.

In 2018, a few months before the end of his sentence, the mental health treatment team at Dixon Correctional Center took the course in line with the opinions offered by Dr. Kupers and had Mr. Gay released from segregation. This release was successful: Mr. Gay improved markedly.

In early 2018, the reforms induced the IDOC's settlement of the *Rasho* litigation were taking hold and mental health staff had a greater say in releasing mentally ill prisoners from segregation. PSOF 123-125. Mr. Gay was transferred from Pontiac CC to Dixon CC. PSOF 100. Though Mr. Gay remained in segregation (at the time, he had been on crisis watch for more than a year, *see* PSOF 113), Pontiac's warden believed that Mr. Gay might benefit from a generally less restrictive environment at Dixon. PSOF 100, 105.

When Mr. Gay first arrived at Dixon, mental staff there were prepared to have him committed to the IDHS at the conclusion of his sentence. PSOF 106. However, shortly thereafter they assessed that Mr. Gay was being harmed by continued placement in segregation and was self-harming as a result, and they concluded that he should be transferred out. PSOF 108-114. Over his last few months in confinement, mental health staff at Dixon had him removed from segregation to see how he would react. PSOF 107, 115. When Mr. Gay was removed from segregation, he improved substantially. PSOF 116. Based on this improvement, mental health staff decided that Mr. Gay did not need to be transferred to the IDHS for civil commitment. PSOF 117. This conclusion included an assessment that Mr. Gay was at less risk of self-harm, and that he would not be a danger to others. *Id.* Mr. Gay was released a few months later, in August 2018. IDOC SOF 25. This was around the time that the IDOC's Elgin psychiatric hospital, which had been developed

to comply with *Rasho*, was finally coming online. PSOF 126, 127. Mr. Gay brought the present action in October 2018. ECF 1.

## LEGAL STANDARD

As the movants, Defendants bear the initial burden of showing that the case presents no genuine issues of material fact which require a trial to resolve. *Ponsett v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010). The moving party has the burden of either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim. *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016).

Once this burden is satisfied, the burden then shifts to Plaintiff to offer evidence showing a genuine issue for trial. *Id.* Plaintiff "need not . . . produce evidence in a form that would be admissible at trial, but she must go beyond the pleadings . . . to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013) (quotation omitted).

When deciding a motion for summary judgment, the Court must view the evidence identified by the parties in the light most favorable to Plaintiff, resolving all evidentiary conflicts in her favor. *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015); *Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013) (credibility issues must be given to a jury to decide). Plaintiff is entitled to every reasonable inference. *Hansen v. Fincantieri Marine Grp.*, LLC, 763 F.3d 832, 836 (7th Cir. 2014); *see also Miller v. Gonzalez,* 761 F.3d 822, 828 (7th Cir. 2014) ("Deciding which inference to draw from [a] conversation is the task of a fact finder."). Furthermore, circumstantial evidence is entitled to equal weight, especially in cases that "turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care." *Petties v.*

*Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

## DISCUSSION

**I.     Plaintiff met her burden against the State under the Americans with Disabilities Act & Rehabilitation Act.**

Plaintiff asserts claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") against the State of Illinois,[2] charging that the State discriminated against Mr. Gay. (Plaintiff will refer to these two claims as the ADA claims.) The State seeks summary judgment on these claims, *see* ECF 285 at 41-43, but its arguments either ignore the Court's existing rulings, misunderstand the ADA, or simply pretend evidence does not exist in this case that, in reality, has been gathered in abundance.

To establish discrimination under the ADA and RA, Plaintiff must show that (1) he suffered from a disability, (2) he was "otherwise qualified" to participate in the program or service in question, and (3) he was denied participation, by reason of his disability. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). Plaintiff charges that the State discriminated against Mr. Gay in two basic ways: ***First***, the State discriminated against Mr. Gay (and numerous other mentally ill prisoners) with respect to outside hospitalization: Plaintiff charges that the State routinely arranges for prisoners suffering from somatic ailments, like cancer, to be hospitalized outside when their treatment needs exceed the care available within the walls of the IDOC, but the State failed to arrange for any prisoners suffering from mental illness, like Mr. Gay, to receive

---

[2]    The initial complaint in this case sued the State of Illinois under the ADA and the RA. ECF 1 ¶¶ 10, 51-72. Judge Bruce nominally substituted the State with the IDOC's director, Baldwin, in his official capacity. ECF 44 at 10, The Court later made clear that while the "State of Illinois is not a named Defendant to this case [as a result of Judge Bruce's Order], a case proceeding against a state official is no different from a suit against the State itself." TEXT ORDER (June 15, 2023). As it is awkward to discuss the relevant conduct of the State of Illinois in the name of Latoya Hughes (the IDOC's current director), Plaintiff herein refers to the State of Illinois as the State.

psychiatric hospitalization when their mental health needs exceed treatment available within the IDOC. ECF 82 ¶¶ 3, 42, 68-70. ***Second***, the State failed to accommodate the disabilities brought on by Mr. Gay's mental illness by failing to provide any reasonable means by which he could end his long-term segregation. This, in turn, relegated Mr. Gay to solitary confinement for over twenty years as punishment for his psychiatric disability and prevented him from receiving the services offered to prisoners by the State, including comprehensive mental healthcare, since the mental healthcare he received in segregation was rendered ineffective by the iatrogenic psychological effects of the segregation itself. ECF 82 ¶¶ 36, 40-44, 66-71.

A.    **Plaintiff states a discrimination claim for the failure to refer Mr. Gay for outside treatment.**

The State's arguments current arguments for dismissal of Plaintiff's ADA claims (ECF 285 at 43-37) do not grapple directly with Plaintiff's first ADA theory: that the State discriminated against Plaintiff in that it routinely referred prisoners with somatic ailments hospitalization when their needs exceeded the care that could be provided within the IDOC's walls; whereas it refused to do the same for severely mentally ill prisoners who required psychiatric hospitalization.

That theory is set out in the complaint, ECF 82 ¶¶ 3, 42, 68-70, and it was a front-line topic in the litigation over the State's motion to dismiss at the outset of this case. *See* ECF 37, ECF 40, ECF 44. And in denying the State's dismissal motion, the Court unequivocally ruled that Plaintiff had stated a claim for discrimination under the ADA, holding that a "plaintiff state[s] a claim under the [ADA] by alleging that State Defendants denied [him] access to outside hospitalization but allowed inmates with physical injuries or illnesses to receive private care and instead, placed [him] in solitary confinement due to [his] mental disability." ECF 44 (citing *Andrews v. Rauner*, No. 18-cv-1100, 2018 WL 3748401, *5 (C.D. Ill. August 6, 2018)). Indeed, the Court in *Andrews* held that an IDOC prisoner stated a claim under the ADA when she alleged that the State "den[ied] her

access to [mental health] hospitalization outside of the prison but allowed prisoners with physical injuries or illnesses to receive outside hospitalization." *Id.* at *5. That rule governs here, and this Court's dismissal opinion, ECF 44, applies it unequivocally to this case.

The State appears obliquely to challenge the outside-referral theory in arguing that "[t]here is no evidence that [the State] denied Gay any reasonable accommodation for Gay's mental illness. Again, Gay did receive mental health care and treatment." ECF 285 at 43. To the contrary, Plaintiff has pointed to ample evidence that Mr. Gay's own mental health treaters believed his treatment was inadequate and even counterproductive *because* he required psychiatric hospitalization but could not receive it within the IDOC. PSOF 22-30, 99, 109-109, 110, 112. It was the State itself categorized Mr. Gay as requiring an "inpatient" level of care, which *the State's written* policies acknowledges was a level of care beyond what could be provided within the IDOC's walls and should have resulted in a referral for outside psychiatric hospitalization. PSOF 66. As the State readily concedes, it routinely referred out prisoners with physical ailments to outside treaters when their needs exceeded the care that could be provided within the IDOC's walls. PSOF 9. But going on for decades, the State failed to provide any IDOC prisoner (with one solitary exception) hospitalization for mental illness. PSOF 41-42, 45, 65.[3] The State's summary judgment motion never rebuts this. Summary judgment on Plaintiff's ADA claim should be denied for this reason alone.

---

[3] The state only changed its ways under the pressure of the *Rasho* litigation, building a psychiatric hospital for the IDOC that went online in 2018, too late to help Mr. Gay. PSOF 128.

**B.**    **Plaintiff states a failure-to-accommodate claim for failing to provide Mr. Gay with a means for removal from long-term disciplinary segregation.**

Plaintiff's ADA claim also charges that the State failed to provide reasonable accommodations for his disability with respect to Mr. Gay's continued confinement to disciplinary segregation itself. ECF 82 ¶¶ 36, 40-44, 66-71.

In asking the Court to dismiss this facet of Plaintiff's ADA claim, the State makes the following, basic argument: The State never held Mr. Gay in segregation *because* of his mental illness. ECF 285 at 42. To the contrary, it treated Mr. Gay like any other prisoner:  he broke prison rules that are neutrally applied to all prisoners, and in response correctional staff disciplined him in proportion to his misconduct, just like they would any other prisoner. *Id.* In Mr. Gay's case— because of the nature of his misconduct and his failure to display the good behavior in in segregation that might have resulted in his early release—this resulted in decades of solitary confinement. *Id.* But that is not the fault of the State, which was simply responding to Mr. Gay's misconduct in an evenhanded manner, and did not engage in "discrimination *based on [Mr. Gay's] mental health issues*" whatsoever. *Id.* (emphasis original).

This argument may be wrong on its own terms, as there is some evidence that prison correctional staff were hostile to Mr. Gay and *did* punish him because he was mentally ill. PSOF 33, 82. But the Court may set those facts aside, because even if the State's contention is accepted as factually correct, its argument "misses the point of a reasonable accommodation claim." *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006).

A Title II claim under the ADA "may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, *or* (3) the defendant's rule disproportionally impacts disabled people." *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999) (emphasis added).

135

These are distinct liability theories: "reasonable accommodation is a theory of liability separate from intentional discrimination." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 562 (7th Cir. 2003). *Intentional* discrimination—discrimination against Mr. Gay *because* he is mentally ill—is irrelevant to an accommodation claim. "[T]he crux of a reasonable accommodation claim," rather, "is a facially neutral requirement that is consistently enforced," which ***thereby*** deprives a disabled person from the provision of programs and services. *Wisconsin Cnty. Servs.*, 465 F.3d at 753 (quotation omitted).

That is what the State did to Mr. Gay: the IDOC imposed disciplinary rules on all prisoners that Mr. Gay was unable to follow because of his psychiatric disability, but instead of taking account of that disability and providing an accommodation in light of Mr. Gay's serious mental illness, the IDOC treated his rule-breaking as though it were that of any other sane and rational prisoner, and continued Mr. Gay's punishment in disciplinary segregation for decades. PSOF 28, 33, 82, 84-86, 169-172; State SOF 45-47. Notably, Plaintiff does not challenge the IDOC's disciplinary regime or the imposition of disciplinary segregation as a form of punishment—to the contrary, Plaintiff's ADA claim presumes that the IDOC's rules for disciplinary segregation serve otherwise valid penological purposes. Rather, Plaintiff's reasonable accommodation claim is that the State applied an otherwise legitimate disciplinary regime on Mr. Gay without making reasonable accommodations for his inability, due to his disability, to follow those rules in the manner that the IDOC prescribes. *Cf. Good Shepherd*, 323 F.3d at 562 ("[F]or the [ADA Title II] reasonable accommodation theory to be meaningful, it must be a theory of liability for cases where we assume there is a valid reason behind the actions of the [government], but the [government] is liable nonetheless if it failed to reasonably accommodate the handicap of the plaintiff."). It was that failure to accommodate that wrongfully resulted in decades of disciplinary segregation.

The foregoing principles guide the application of Plaintiff's reasonable accommodation claim to the *Jaros* ADA elements, *supra,* which the State purports to follow, *see* ECF 285 at 41.

### 1.    *Jaros* element 1: Mr. Gay suffered from a disability.

The State accepts that this element is established, *see* ECF 285 at 42 (State "assuming for the purposes of argument that Gay satisfies the first element – he is an individual with a disability"), but it never says what disability it concedes Mr. Gay to have. Plaintiff has presented evidence showing that Mr. Gay was disabled in that his mental illness caused rendering him unable to control his maladaptive behavior while he was segregated, resulting in accumulating discipline. *See, e.g.*, PSOF 153-154, 161-164, 169-171.[4]

### 2.    *Jaros* element 2:  Mr. Gay was "otherwise qualified" to participate in the program or service in question.

The State claims that this element cannot be satisfied, because it amounts to an "intertwined" claim that Mr. Gay "was discriminatorily *denied* mental health treatment *because of* his mental health disability."  ECF 285 at 42 (emphasis original) (citing *O'Guinn v. Nevada Dep't of Corr.*, 468 F. App'x 651, 653 (9th Cir. 2012). The State lifts this argument from *O'Guinn*, an unpublished decision from the Ninth Circuit. 468 F. App'x at 653. *O'Guinn*, however, merely stand for the well-settled rule that "the [ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners . . . . The ADA does not create a remedy for medical malpractice." That passage is drawn from *Simmons v. Navajo County Arizona*, 609 F.3d 1011, 1022 (9th Cir. 2010), which *O'Guinn* cites as presenting a "similar claim" the one O'Guinn was adjudicating. *O'Guinn*, 468 F. App'x at 653 (citing *Simmons*). As *Simmons* put it, "to the

---

[4]    By conceding that Mr. Gay was disabled, the State renders irrelevant much of its recitation of facts, which repeatedly imply that Mr. Gay was in control of his maladaptive behavior in segregation. *See* State SOF 45-47, 79-85, 89-92, 94, 96-98, 109. It was Mr. Gay's *lack* of control over this behavior that rendered him disabled.

extent that the [plaintiffs] argue that Navajo County violated the ADA by depriving [a prisoner] of 'programs or activit[ies] to lessen his depression,' such argument is not actionable under the ADA. The ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons*, 609 F.3d at 1022.

The evidence supporting Plaintiff's ADA claim is entirely different:  in failing to alter the application of the IDOC's *disciplinary* rules on Mr. Gay, the State failed to provide a reasonable accommodation for his disability, with the result that his disability relegated him to segregation until the State changed course and accommodated his disability in 2018. PSOF 120-121. Multiple courts have held that such evidence is sufficient to establish a failure-to-accommodate claim. *See, e.g.*, *Latson v. Clarke*, 249 F. Supp. 3d 838, 865-66 (W.D. Va. 2017) (person who claimed "increasingly severe and punitive conditions as a result of behavior that was a manifestation of his disabilities" stated claim under the ADA); *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1232 (M.D. Ala. 2017) (finding custody staff improperly punished incarcerated people with severe mental illness "without regard to the cause of the behavior"); *Biselli v. Cty. of Ventura*, No. 09-cv-8694, ECF 119 at 24, 2012 U.S. Dist. Lexis 79326, at **44-45 (C.D. Cal June 4, 2012) (placement in administrative segregation based on conduct specifically linked to mental illness, without input from mental health staff, may constitute a violation of the ADA); *Scherer v. Pennsylvania Dep't of Corr.*, No. 2004-cv-191, 2007 WL 4111412, at *44 (W.D. Pa. Nov. 16, 2007) (because the misconduct that resulted in his placement in segregation may have been "a result of his mental illness. . . . [T]he lack of modification of [prison's] disciplinary procedures to account for . . . his mental illness possibly resulted in a violation of Title II of the ADA . . . .").

By stating that Plaintiff was not "otherwise qualified," the State argues that modifying the IDOC's disciplinary rules for Mr. Gay was not reasonable, because Mr. Gay posed a danger to

others in the prison.[5]  ECF 285 at 43. Plaintiff does not seek to minimize Mr. Gay's misconduct.[6]

But with respect to whether a reasonable accommodation could have been made, two facts are

salient. ***First***, Mr. Gay's years in disciplinary segregation were the result of accumulated sentences

imposed long in the past, not a dynamic assessment of his danger or means to mitigate it. By 2000,

for example, Mr. Gay had accumulated approximately 177 years in segregation. PSOF 16. Nobody

could assert this was based on a conclusion that Mr. Gay would be dangerous decades in the future,

or even one year hence.  The sentence was, rather, punishment for past conduct. ***Second***, in 2018

the State conducted what in effect was a natural experiment with Mr. Gay:  notwithstanding the

decades he had left to serve in disciplinary segregation, it let him out. PSOF 105-116; State SOF

24. By all accounts, instead of posing a danger he was released, Mr. Gay's conduct and symptoms

improved considerably, to the point that mental health staff decided not to seek a psychiatric

commitment for him upon his release, having concluded that his mental illness did not pose a

danger to others. PSOF 116-117. Out of segregation, Mr. Gay simply was not the ever-present

menace that the State portrays. In the argot of the ADA, releasing Mr. Gay from his life sentence

of disciplinary segregation was an accommodation of his disabilities that was "reasonable."  It is

---

[5]  The State's substitution of "otherwise qualified" for "reasonable accommodation" is a common conflation. As one court put it, arguments that an ADA plaintiff is not "otherwise qualified" to receive the benefits of a program or service are really the other "side[] of a single coin; the ultimate question is the extent to which a [covered entity] is required to make reasonable modifications in its programs for the needs of the handicapped." *Alexander v. Choate*, 469 U.S. 287, 300 n. 19 (1985). Thus "[t]he appropriate focus . . . is not whether [plaintiff] is "otherwise qualified" for [the service at issue], but the extent to which the defendants are required by the [ADA] to modify their programs" to accommodate his disability. *Doe v. Pfrommer*, 148 F.3d 73, 83 (2d Cir. 1998) (citing *Alexander*). *Accord Washington*, 181 F.3d at 847 (same, quoting *Alexander*).

[6]  As Dr. Kupers notes, however, "[i]t is difficult to assess the seriousness of assaults listed in Mr. Gay's Disciplinary File," nearly all of which "occurred while [Mr. Gay] was in segregation" itself, PX 50 at 10, and providing an assault example in which Mr. Gay received three months of segregation for kicking a chair that then made contact with a guard. *Id.* at 9.

Plaintiff's contention that this simple accommodation should have been provided to Mr. Gay many years before. PSOF 22-35, 146-153, 160-163, 169-173.[7]

### 3.    *Jaros* element 3: Mr. Gay was denied participation by reason of his disability.

The State argues that this element is not satisfied either, but it focuses on the provision of mental healthcare in the first instance. ECF 285 at 43. That fundamentally misunderstands Plaintiff's failure-to-accommodate claim. As an initial matter, the ADA's "by reason of" language merely states a causation requirement, meaning that but for the disability that the defendant failed to accommodate, the ADA plaintiff would have been able to access the services desired. *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 593 (7th Cir. 2018). That requirement is easily demonstrated here: Plaintiff has pointed to evidence showing that Mr. Gay's disability prevented him from following the disciplinary rules necessary for release from segregation, PSOF 22-35, 146-153, 160-163, 169-173, which is another way of saying that his disability prevented him from being released from disciplinary segregation because the only way to earn release from segregation was "good behavior." PSOF 104-105, 153-154. Because he remained confined to segregation because of his disability, Mr. Gay was unable to benefit from the panoply of programs provided by the State to prisoners in general population. PSOF 132.[8]   His confinement to

---

[7]    This fact distinguishes the case at bar from *Wallace v. Jeffreys*, No. 17-CV-576-DWD, 2023 WL 2138337 (S.D. Ill. Feb. 21, 2023), which the State quotes from at length. ECF 188-1 at 41-43. Judge Dugan rejected Plaintiff's accommodation claim in that case because "Plaintiff has not identified clear evidence of what accommodations might have been appropriate." 2023 WL 2138337, at *25. Here, Plaintiff has identified an appropriate accommodation, one that the State itself made for Mr. Gay, just far too late.

[8]    This includes human contact, which courts have recognized as a program or service afforded to prisoners under Title II. *See Reaves v. Dep't of Corrs.*, 195 F. Supp. 3d 383, 421 (D. Mass. 2016) (holding that prison officials who relegated a prisoner to his cell because of his quadriplegia "violated the ADA by not allowing him to socialize with his peers in the prisons' common areas.").

disciplinary segregation also prevented him from receiving effective mental healthcare for his mental illness, as the confinement to segregation itself interfered with the delivery of that care. PSOF 171-172.

Releasing Mr. Gay into a non-segregation setting within IDOC was not the only option. The State was capable of treating severely mentally ill and/or psychiatrically disabled IDOC prisoners at one of the multiple psychiatric hospitals operated by the Illinois Department of Human Services. PSOF 136-137. Indeed, IDHS was already providing care to "forensic patients," which were largely made up of people transferred from IDOC whom the State wanted to restore to mental competency to stand trial so that they could be prosecuted or needed to keep in state custody for treatment of their mental illnesses after they completed their sentences. PSOF 147-151. In 2014, the State assured the *Rasho* monitor that it would make at least 10 inpatient beds available to severely mentally ill IDOC prisoners. PSOF 55. At that time there were 39 male prisoners at IDOC who the State identified as being so severely mentally ill that they required inpatient hospitalization. PSOF 55-56. 100% of them were placed in disciplinary segregation. PSOF 35.

Those beds were never filled by IDOC prisoners. PSOF 56-63. Despite the availability of a more therapeutic setting, the severely mentally ill prisoners designated inpatient level of care remained in the least therapeutic setting possible—segregation. The IDOC recognized in a *written standard operating procedure manual* that they were unequivocally unable to provide the level of care necessary to inpatient prisoners like Anthony Gay. PSOF 66, PX 36 at 27. There were resources and space available via IDHS for these prisoners to be transferred to a space that actually could have facilitated comprehensive and effective treatment. Instead, the State continued to subject the most severely mentally ill patients in its custody—inpatient level of care prisoners—to an "enhanced" treatment regimen that it knew could not meet inpatient treatment needs. PSOF 66.

While the State routinely referred prisoners to the appropriate external medical facility when there was a somatic illness or physical injury at stake, those mentally ill prisoners who the State *knew* had needs extending beyond the capabilities of IDOC facilities were forced to take the best they could get—mental health treatment in solitary confinement. PSOF 9, 35, 66 .

Plaintiff has gathered evidence that will allow him to prove that the State violated the rights of Mr. Gay as a disabled person. The Court should deny the State's motion and allow Plaintiff to present this evidence to a jury.

## II.    Wexford is not entitled to summary judgement.

Wexford undertook the State's duty to provide comprehensive mental health services and refer inmates to external providers when IDOC facilities could not provide care within the IDOC's walls. "*Monell* governs Wexford's [a private corporation that contracts with Illinois to provide healthcare to Illinois prisoners] liability . . . because we, like our sister circuits, treat private corporations acting under color of state law as municipalities." *Dean v. Wexford Health Sources, Inc.*, 18 F. 4th 214, 235 (7th Cir. 2021). *See also Glisson v. Indiana Dept. of Corr's*, 849 F.3d 372, 378-79 ("As we and our sister circuits recognize, a private corporation that has contracted to provide essential government services is subject to at least the same rules that apply to public entities") (collecting cases).

To prove a *Monell* claim, a plaintiff must show that he was deprived of a federal right, and "must trace the deprivation to some municipal action (*i.e.*, a 'policy or custom'), such that the challenged conduct is 'properly attributable to the municipality itself.'" *Dean*, 18 F.4th at 235 (quoting *La Porta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021)). The Seventh Circuit interprets *Monell* as creating three "bases for municipal liability: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and

142

well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019).  Additionally, "*Monell* liability is possible even if no individual officer is found deliberately indifferent." *Miranda*, 900 F.3d at 344. Seventh Circuit case law has long held that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Thomas v. Cook Cty Sheriff's Dept.*, 604 F.3d 293, 305 (7th Cir. 2010).

"For all intents and purposes, ignoring a policy is the same as having no policy in place in the first place." *Woodward v. Correctional Med. Servs. of Ill. Inc.*, 368 F.3d 917, 929 (7th Cir. 2004). Wexford simply did not follow the *written* policies set forth by the State in favor of a practice and custom endorsed by the State. The State had written policies that when a prisoner has a medical *or mental health* need that cannot be met by an IDOC facility, that prisoner should be referred to an external provider. PSOF 20, 39. Wexford facilitated no such referrals for prisoners whose unmet medical needs involved mental illness until 2018, *see* PSOF 44-46, even though it undertook a duty to arrange those referrals via contract with the State. PSOF 132-141.[9] Wexford continued to provide treatment to the vast majority of seriously mentally ill prisoners in segregation despite recognition that segregation was counterproductive to treatment plans and without processes to allow prisoners to receive treatment in more therapeutic settings. PSOF 23-29, 35, 95-97, 100-102, 103-104, 148, 154-156, 168. They did this even though they were required by IDOC policy to refer those patients out, PSOF 66, and had a duty under contract, delegated by

---

[9] Wexford faults Plaintiff for not specifying these claims in a response to a contention interrogatory, but the evidence Plaintiff offers against Wexford here arises from Wexford's contractual obligations it undertook with the State and has been set out almost word-for-word even in Plaintiff's original complaint. *See* ECF 1 ¶¶ 36(c).  Ther is no prejudicial surprise.

the State of Illinois, to develop relationships with outside providers such that those referrals could take place. PSOF 133-134, 137-138.

"The critical question under *Monell*, . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 379. Wexford uniformly failed to provide the comprehensive mental health treatment delegated by the State by failing to refer prisoners out to the necessary external providers for treatment of their mental illness. Dozens of the most severely mentally ill prisoners required hospitalization under the IDOC's own policies, which Wexford had contracted to follow. PSOF 20, 35. But for decades not a single such prisoner was sent out for such care. PSOF 41. But Wexford's policy was that mentally ill prisoners would not be referred out for treatment of their severe mental illness. PSOF 44-46, 129, 131, 144-145. Wexford agents unobtrusively carried out this mission, and inpatient prisoners remained in segregation. PSOF 35, 128, 129-130. "[I]f institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Glisson*, 849 F.3d at 378.

Wexford undertook the State's duty to provide comprehensive mental health services. PSOF 132-141. A material part of those services was the coordination with outside providers and the arrangement for prisoners to be referred to those providers when IDOC could not provide services that were adequate in relation to an individual's mental health need. PSOF 133. Even though numerous prisoners were so mentally ill they required psychiatric hospitalization under the IDOC's own policies, *see* PSOF 1, 4, 37, only *one* attempt by Wexford staff at trying to refer prisoners out to a psychiatric hospital, which was unsuccessful. PSOF 144.

Put simply, Wexford failed to facilitate the referral of severely mentally ill prisoners in their care to providers who could provide the necessary inpatient care even though they had explicitly

undertaken the duty to do so. Because of this, inpatient prisoners like Mr. Gay received treatment in segregation, PSOF 96, and the location of that treatment was wholly ineffective. PSOF 172. Mr. Gay suffered for years as a result.

## III.    Plaintiff's claims are not procedurally barred.

### A.    Plaintiff's claims arising from his confinement are not cut off at 2016.

Mr. Gay was held in segregation from 1996 until 2018, shortly before his release from prison, and asserted claims covering the entire period; he filed this case in October 2018, shortly after his release. ECF 1. At the Rule 12 stage, the defendants argued that Plaintiff's claims should go back no further than October 2016, applying the default two-year statute of limitations applicable to Section 1983 claims in Illinois. *See* ECF 37.

The Court rejected those arguments and held instead that Mr. Gay's claims should go back to cover the entire period of roughly two decades when Mr. Gay was held in segregation. ECF 44 at 12. This was so, the Court held, because the years-long segregation of Mr. Gay constituted a continuing violation that tolled the statute of limitations. ECF 44 at 11 (applying *Heard v. Sheahan*, 253 F.3d 316 (7th Cir. 2001). The Court also rejected a subsequent argument that the various *pro se* lawsuits Mr. Gay had filed over the course of his incarceration should change this analysis, holding that the continuing violation doctrine still applied. ECF 116. Now at summary judgment, the defendants renew their contentions that the claims in this case should be cut in 2016. The defendants now ask the Court to revisit Judge Bruce's dismissal ruling. They do not dispute that Mr. Gay was held continuously in segregation; rather, they argue, Plaintiff's claims should be cut off for other reasons. ECF 285 at 23-27; ECF 286 at 35. None of the defendants' arguments withstand scrutiny, however, because the continuing nature of the violations at issue in this case has not changed.

As it was at the outset of this case, *Heard* is the controlling decision in this Circuit regarding the application of claim accrual to continuing violations. In *Heard*, a plaintiff-prisoner had been suffering from a hernia that jail doctors ignored for years; the district court held that the statute should begin to run when the plaintiff realized he had a medical problem that required attention. 253 F.3d at 317. The Court of Appeals explained that was incorrect: the suit alleged defendants inflicted cruel and unusual punishment on the plaintiff by refusing to treat his condition. *Id.* This refusal continued for as long as the defendants had the power to do something about his condition, which is to say until he left the jail. *Id.* Every day that they prolonged his agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew. *Id*. at 318.

*Heard* went on to distinguish between claims arising from the effects of a single event and those based on a continuing course of misconduct. It explained that "[w]hen a single event gives rise to continuing injuries, the plaintiff can bring a single suit based on an estimation of his total injuries . . . ." *Id*. at 319 (citation omitted). "But in this case every day that the defendants ignored the plaintiff's request for [hernia] treatment increased his pain." *Id*. This Court held that *Heard* was closely analogous to the indifference shown to Mr. Gay during the course of his confinement. ECF 44 at 10. The defendant's efforts to get around *Heard* all fail. Plaintiff reviews them in turn.

**First**, the Court can dispense with the State's citation to *Isby v. Brown*, 856 F.3d 508 (7th Cir. 2017) and *Wallace*, 2023 WL 2138337. Those decisions, which both involved segregation, imposed an accrual period shorter than the entire segregation period—so, the State argues, a shorter period should apply in this case. ECF 285 at 24 (citing *Isby* and *Wallace*). But those decisions applied a shorter accrual period because the violation at issue was entirely different: plaintiffs in both cases alleged a violation of their procedural due process rights, which arose from the manner

in which particular hearings were (or should have been) conducted. As such, both courts tied the accrual period to the hearings, since the conduct of the hearings involved a discrete act, albeit one with continuing consequences. *Isby*, 856 F.3d at 513 n.2; and *Wallace*, 2023 WL 2138337, at *10 (citing *Isby*).[10] That is not the situation here. Plaintiff's Eighth Amendment and ADA claims do not arise from any discrete act like an improper hearing. Rather, they arise from a continuing failure to accommodate Mr. Gay's disability and provide him the mental health care he needed.

**Second**, the defendants argue that the continuing violation claim should not apply to Mr. Gay's Eighth Amendment (and ADA) claims because while Mr. Gay may have been in disciplinary segregation for two decades, the circumstances of his confinement do not constitute a violation: throughout Mr. Gay's incarceration, the defendants argue, Mr. Gay received appropriate medical care and often rejected it. ECF 285 at 25-26. That cannot state a continuing violation, defendants argue, which involves a situation where the plaintiff received *no* care. *Id.* Therefore, they say, the continuing violation doctrine does not apply. *Id.*

This argument misunderstands the law and the relevant facts. Deliberate indifference is not triggered only when *no* care is provided; it also occurs "where a prison official persists in a course of treatment known to be ineffective." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016). That includes circumstances where the provision of ineffective treatment is continuing. *See, e.g.*, *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (continuing to treat severe vomiting with antacids over three years created material fact issue of deliberate indifference). Plaintiff does not

---

[10] The Court can also dispense with the State's citation to *Wilson v. Giesen*, 956 F.2d 738 (7th Cir. 1992) for the proposition that "[c]ivil rights claims . . . accrue when the plaintiff knows or should know that his or her constitutional rights have been violated." 956 F.2d at 740. *See* ECF 285 at 24 (quoting *Wilson*). As subsequent decisions have noted, *Wilson* was overruled by *Heard* for purposes of analyzing accrual of continuing violations. *Pedrote-Salinas v. Johnson*, No. 17-cv-5093, 2018 WL 2320934, at *3 (N.D. Ill. May 22, 2018).

assert that Mr. Gay received *no* medical care; rather, the evidence is that Mr. Gay's mental healthcare was ineffective because it was administered while he remained in disciplinary segregation. *See, e.g.*, PSOF ⁋ 157. That is a continuing violation.

**Third**, Defendants contend that a continuing violation ends when a prisoner is released or transferred and point out that Mr. Gay was transferred among multiple facilities. *See* ECF 285 at 27 (citing *Bernard v. Scott*, 501 F. Supp. 3d 611 (N.D. Ill. 2020) (finding "the alleged violation is one that continues until [d]efendants remedy the error or [p]laintiff leaves their custody"). *Bernard* simply concerns a different situation, where the plaintiff did leave the custody of the relevant defendants at different times. *Id.* at 618. Every IDOC facility where Mr. Gay was housed during his incarceration is operated by the State (certainly defendants do not claim otherwise). Mr. Gay was continually in the State's custody from the 1990s until 2018. His transfers do not cut off his claims. During that time, it remained within State's power to remedy Mr. Gay's condition. The continuing violation doctrine applies.

**Finally**, the State makes a policy argument, contending that allowing Mr. Gay to sue for such a long period frustrates the Prison Litigation Reform Act, which is designed to shunt prisoner complaints into grievances rather than lawsuits. ECF 285 at 27. This is a meritless. Mr. Gay was not incarcerated when this lawsuit was filed, *see* ECF 1 ⁋ 9, so the PLRA does not apply. *See Witzke v. Femal*, 376 F.3d 744, 750 (7th Cir. 2004) ("In determining whether a plaintiff is a 'prisoner confined in jail[]' [under the PLRA,] we must look to the status of the plaintiff at the time he brings his suit."). The State's argument is also at war with *Heard* itself, which involves a jail detainee who sued for a continuing violation while he was incarcerated. The Court should decline the State's invitation to rewrite the law.

**B.      Res judicata does not apply.**

The defendants also argue that Plaintiff's claims should be cut off in 2012 because Mr. Gay filed a number of pro se lawsuits against various prison doctors and officials about various aspects of his incarceration. ECF 285 at 27-29. The defendants, however, have simply failed to substantiate this affirmative defense.

*Res judicata* bars a cause of action where all three of the following elements are present in a prior action: overlapping claims, overlapping parties, and a final judgment on the merits. *Kilburn-Winne v. Town of Fortville,* 891 F.3d 330, 332-33 (7th Cir. 2018). The State lists a number of lawsuits filed by Mr. Gay, but it does not explain how any of them satisfy these prerequisites. The State identifies no previous judgment on the merits of the same claim with the same parties. *See Licari v. City of Chicago,* 298 F.3d 664, 666 (7th Cir. 2002).

Plaintiff, here, brings Eighth Amendment claims against individual IDOC Defendants and an ADA claim against the IDOC covering the entire 20 years of Mr. Gay's confinement to disciplinary segregation. Although Mr. Gay brought Eighth Amendment claims in lawsuits previously, this is the first time he has brought an ADA claim, and the first time he has challenged anything but particular acts or omissions of particular prison employees or contractors. Defendants have not shown that these individual Defendants have been sued by Plaintiff previously and Mr. Gay has not brought any previous claims against the Illinois Department of Corrections directly under the American Disability Act.

Instead of indicating which specific cases were previously brought against named Defendants, Defendants broadly argue that Mr. Gay has brought "more than 30 civil rights cases" against "IDOC and IDOC-affiliated medical professionals related to the conditions of his confinement and his mental health care". ECF 285 at 28. Defendants specifically cite to two

matters: *Gay v. Chandra,* 682 F.3d 590, 591-592 (7th Cir. 2012) and an evidentiary hearing in *Gay v. Carol Blackman* and *Claudia Kachigian*. State Ex. 77. But the *Chandra* matter has no overlapping Defendants with the current case[11] and deals specifically with mental health care and conditions at the IDOC Tamms Facility, specifically Mr. Gay's anti-anxiety medication. The *Blackman* case has no overlapping Defendants[12] either, and deals specifically with an acute failure for prison staff to respond to several discrete acts of self-harm. Although both matters came to judgment on the merits against Mr. Gay, they were not overlapping parties, nor do they involve overlapping claims, as this case involves the continuing injury that Mr. Gay suffered by being confined by overarching policies that the State and Wexford imposed on IDOC prisoners, including Mr. Gay, over the course of many years.

## IV.    Uncontested claims and defendants.

Plaintiff does not contest dismissal of her Due Process claim, ECF 82 Count IV, ¶¶ 79-81.  Plaintiff also does not contest dismissal against the individual defendants (with the exception of Dr. Nunez).  ECF 82 ¶¶ 11-20, 22-28.[13]  Discovery in this case has made plain that Mr. Gay's mistreatment was driven in large part by the policies adopted by the State and by Wexford that were broadly and deliberately indifferent to the plight of severely mentally ill people in prison like Mr. Gay, and that Mr. Gay suffered for decades as a result of these policy choices.

---

[11] The defendants in the *Chandra* matter include Dr. Chandra, Dr. Claudia Kachigian, and Katherine Clove, none of whom are named in the present lawsuit. *Gay v. Chandra,* 682 F.3d 590, 591-592 (7th Cir. 2012).

[12] The Defendants in the *Blackman* matter are Carol Blackman and Claudia Kachigian, neither of whom are named here.

[13]  Plaintiff has reached an agreement to settle this action with defendant Dr. Nunez, named as a defendant at ECF 82 ¶ 21.  Dr. Nunez did not move for summary judgment. While that settlement is finalized Plaintiff does not seek his dismissal from this action.

## CONCLUSION

For the reasons set forth in this memorandum, the defendants' motions for summary judgment should be denied.  Plaintiff should be permitted to present to a jury her claim that the defendants' decision to allow a severely mentally ill man to languish in solitary confinement for 20 years violated both his rights as a disabled person and his right to be free from cruel and unusual punishment.

Date: December 15, 2024                     Respectfully submitted,


                                            /s/ Stephen H. Weil


Jon Loevy                                   Antonio Romanucci
Loevy & Loevy                               Bhavani Raveendran
311 N. Aberdeen Street, Floor 3             Stephen H. Weil
Chicago, IL 60607                           Sam Harton
312-243-5900                                Romanucci & Blandin, LLC
weil@loevy.com                              321 North Clark St., Suite 900
                                            Chicago, IL 60654
                                            (312) 458-1000
                                            aromanucci@rblaw.net
                                            b.raveendran@rblaw.net
                                            sweil@rblaw.net
                                            sharton@rblaw.net

                                            *Attorneys for Plaintiff*