E-FILED
Friday, 07 February, 2025  04:21:34 PM
Clerk, U.S. District Court, ILCD

44653/19344/JNR/JCS

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | |
|---|---|
| MAURISA GAY, as representative of the estate of ANTHONY GAY, deceased | |
| Plaintiff, | |
| v. | No. 19-cv-01133 |
| THE STATE OF ILLINOIS, JOHN BALDWIN, JEFF SIMS, SHANE REISTER, DR. DOE 1, MELVIN HINTON, SYLVIA BUTLER, KELLY ANN RENZI, WILLIAM PUGA, DR. CHESS, DR. NUNEZ, WEXFORD HEALTH SOURCES, INC., and DOES 2-5, | Judge Sue E. Myerscough  Magistrate Judge Eric I. Long |
| Defendants. | |

## REPLY TO PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendants, WEXFORD HEALTH SOURCES, INC., KELLY RENZI, PSY.D., and WILLIAM PUGA, M.D., by and through their attorney, Joseph Rupcich of CASSIDAY SCHADE LLP, and, pursuant to Federal Rule of Civil Procedure 56 and CDIL-LR 7.1(D), hereby submit their Reply to Plaintiff's Response to Motion for Summary Judgment, stating as follows:

## RESPONSE TO PLAINTIFF'S ADDITIONAL FACTS[1]

**I.      The State failed to create an inpatient psychiatric capacity within the IDOC.**

1.      It is inevitable that a correctional facility will have custody of mentally ill prisoners. PX 51 at 15.

---

[1] Plaintiff has done a combined Response to IDOC Defendants' and Wexford's Motions for Summary Judgment but has not indicated what Additional Material Facts are meant to be material to which Motion. Plaintiff has cited to the following Additional Material Facts in her argument against Wexford's Motion, which Wexford treats as the proposed Additional Material Facts pertaining to Wexford's Motion: 1, 4, 20, 23-29, 35, 37, 39, 41, 44-46, 66, 95-97, 100-104, 128-141, 144-145, 148, 154-156, 168, 172.

RESPONSE:  **Material and Undisputed**.

2.      Inpatient mental healthcare involves mental health treatment in a hospital setting, which makes a big difference from care provided in prison.  PX 3 at 31:16-34:4. Simply providing some inpatient services is not the same thing.  PX 3 at 36:24-37:6.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

3.      Inpatient psychiatric hospital settings have physical space dedicated to treatment, including a place for patient-prisoners to congregate in an open and communal milieu environment as they would in a mental hospital setting, which is lacking withing the IDOC's prison facilities.  PX 46 at 148:13-152:3. PX 19 at 62:12-24; PX 19 at 63:12-18.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

4.      In April 2014, for example, the State reported that of 48,655 IDOC prisoners, 10,891 were on the mental health caseload, including 9,418 male prisoners on the case load.  Of these, 3,894 were classified as seriously mentally ill.  Of these, 39 were classified as requiring an inpatient level of care.  PX 48 at 4.

RESPONSE:  **Material and Undisputed**.

5.      Director John Baldwin became director of the Iowa Department of Corrections in 2007 and retired in January 2015.  PX 3 at 11:15-24.  He became director of the Illinois Department of Corrections in June 2015 and left in May 2019. PX 3 at 11:22-12:8.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

6.      During Director Baldwin's tenure at the Iowa DOC, Iowa DOC had an inpatient mental health capacity as of at least 1977.  PX 3 at 10:14-11:3. When Baldwin arrived at the Illinois DOC in 2015, it did not have an inpatient mental health capacity.  PX 3 at 12:2-16; 13:18-22.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

7.      The departments of corrections in numerous other states long ago developed psychiatric inpatient care capacity as well. In the immediate area these included, at a minimum, Missouri, Kentucky, Indiana, Iowa, Wisconsin, and Mississippi. PX 48 at 8.  The Cook County Department of Corrections, which operates the Cook County Jail, also had a psychiatric hospital capacity.  See PX 48 at 9-10.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

8.      Prior to bringing the Elgin facility online in late 2018, the IDOC did not have an inpatient psychiatric hospital setting.  PX 46 at 148:13-152:3. Elgin was designed with the primary goal being providing a physical space where the overall mission of the facility would be focused on mental health treatment. Id. at 151:1-18.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

II.     **The State referred out prisoners with somatic medical needs for the care they required.**

9.      Medical staff within the IDOC affirmed that the medical care available within the IDOC's walls was limited because of staffing, equipment, and facilities, and that when a patient needed somatic medical care that exceeded what could be provided within the IDOC's four walls, it was important to send prisoners outside for the medical care they required. PX 29 at 42:17-433:15; ECF 161 at 32.  IDOC has and does make arrangements for prisoners who require hospitalization outside of the IDOC because of physical injuries or illnesses, to receive such outside hospitalization, or to receive effective care within the IDOC. ECF 161 at 32.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

10.     In addition to the IDHS, there are multiple private and public hospitals in Illinois with inpatient psychiatric settings. PX 48 at 7-8.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

11.     Segregation is the isolation of a prisoner alone in their cell where they are segregated from the rest of the population in prison. PX 4 at 15:1-23. Cells are typically 7x9 or 7x10 feet and features a bed and a toilet. PX 4 at 15:1-23.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

12.     The prisoners are otherwise isolated nearly the entire day in their cell, with even means consumed in isolation. PX 30 at 27:3-28:4.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

13.     IDOC long observed a "division of labor" in which security and mental health were separate, such that security would handle discipline of mentally ill prisoners without involving mental health considerations. PX 16 at 35:13-36:7.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC**

**Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

14.     In the IDOC, disciplinary segregation is designed to deter a prisoner when they break the rules. PX. 1 at 20:12-18. It is punishment for breaking prison rules, and the imposition of time in disciplinary segregation is cumulative. PX. 1 at 50:7-14, 52:6- 10.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

15.     During the time Mr. Gay was incarcerated in the IDOC, the limit to the time a prisoner could spend in disciplinary segregation was the length of time on the disciplinary ticket. PX. 1 21:10-19.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

16.    For most of the period of Mr. Gay's imprisonment within the IDOC until at least 2017, when a prisoner was placed in disciplinary segregation, mental health providers would be notified after the fact, PX 47 at 120:24-121:23, but the IDOC did not impose a requirement that mental health be consulted about the appropriateness of the discipline imposed. PX 47 at 122:17-123:1. The State's Rule 30(b)(6) witness stated it was possible there might be additional policies at individual institutions but was not aware of any. PX 47 121:24-122:16. By 2000, Mr. Gay had already accumulated more than 177 years in disciplinary segregation. PX 56. 17.  In 2012, Mr. Gay's "out" date was 12/27/01, as in 3001, and Mr. Gay's mental health provider testified that this was not the only offender on her caseload who she understood to have almost 100 years of segregation time. PX 18 at 132:12-133:10.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

18.    Mental health staff did not have the ability to insist that a prisoner be transferred out of segregation. PX 15 at 67:1-7. Segregation was a security determination, not a mental health determination, and is not one mental health could make. PX 15 at 68:15-69:4; PX 24 at 162:15-163:2; PX 29 at 49:9-50:2. Mental health staff did not have control over whether or not a prisoner was kept in segregation. PX 15 at 66:20- 23.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

19.    Mr. Gay's healthcare providers explained that even though they believed segregation harmed the mentally ill, masses of mentally ill prisoners were kept in segregation in prisons like Pontiac, because the IDOC had not yet begun to do mental health segregation reviews. PX 15 at 67:8-20.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

20.    In 2014 the IDOC adopted formal level-of-care definitions that it used for categorizing the mental health needs of its patient population. PX 48 at 3. This included outpatient, residential, crisis, and inpatient. PX 12 at bates 010021; PX 48 at 3-4. The "inpatient" level of care "presents the most intensive level of treatment, involving an individual plan of active psychiatric treatment that includes 24-hour access to a full range of psychiatric services in a mental health setting." PX 48 at 4. Between 2014 and 2018, IDOC Administrative Directives provided that IDOC patients "appropriate for this [inpatient] level of care require a level of treatment that exceeds the level of care that the Department is able to provide and results in commitment to outside facilities for a duration as considered clinically necessary by the offender's treatment team." PX 12 at bates 010021, -27.

RESPONSE:  **Material and Undisputed**.

21.    Mr. Gay's mental health providers believed that out-of-cell time had a therapeutic benefit. PX 24 at 145:10-13.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC**

**Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

22.  IDOC mental health staff who treated Mr. Gay were of the opinion that segregation can have detrimental effects on those prisoners who are seriously mentally ill, including by causing decompensation. PX 1 at 21:23-3.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

23.  Dr. Nunez offered the opinion that while it is always difficult to stabilize severely mentally ill patients, it is much more difficult to do so when they are confined to a cell for much of the day. PX 19 at 76:5-20.

RESPONSE:  **Material and Undisputed Dr. Nunes said this**.

24.  Dr. Nunez, one of Mr. Gay's mental health treaters, offered the opinion in the correctional setting regular social stimulation is needed for good psychiatric health, PX 19 at 105:10-106:7, and that a patient, including Mr. Gay, who is locked in a cell for 23 hours a day in isolation will always do worse from a mental health perspective. PX 19 at 103:14-104:12.

RESPONSE:  **Material and Undisputed Dr. Nunes said this.**

25.  Dr. Jamie Chess, one of Mr. Gay's mental health treatment providers, was of the opinion that placing any person with serious mental illness in prolonged segregation was not in their best interest, and that it would have a negative impact on that person's serious mental illness. PX 2 at 159:8-18; 163:16-164:5.

RESPONSE:  **Material and Undisputed Dr. Chess said this.**

26.  Before 2018, Dr. Chess and her superiors in the IDOC were aware that placing mentally ill prisoners in prolonged segregation was detrimental to their mental health. PX 2 at 169:1-21; 170:11-171:2.

RESPONSE:  **Immaterial and Undisputed Dr. Chess said this.  Her opinion on what unidentified IDOC superiors knew about the impact of prolonged segregation on serious mental illness has no bearing on Wexford Defendants' Motion for Summary Judgment.**

27.  Dr. Marano, another of Mr. Gay's mental health providers, was of the opinion that isolating mentally ill people in segregation has negative effects on them. PX 15 at 56:8-18; 58:12-16. PX 15 at 66:2-10.

RESPONSE**:  Immaterial and Disputed as unsupported by cited evidence.  Dr. Marano's deposition ends at page 55.**

28.  Dr. Marano explained that mentally ill people in segregation tend to get more symptomatic, leading to more illness and dysfunction and an inability to act in a socially appropriate manner. PX 15 at 56:19-58:2.

RESPONSE:  **Immaterial and Disputed as unsupported by cited evidence.  Dr. Marano's deposition ends at page 55.**

29.  Dr. Renzi, the director of mental health services at Pontiac during part of Mr. Gay's incarceration there, PX 26 at 19:1-8, understood that disciplinary segregation was associated with a potential for decompensation in mentally ill prisoners, PX 26 at 32:4-10, whereas out of cell time could help stave off worsening symptom of decompensation in mentally ill people who were held in isolation. PX 26 at 33:2-9.

RESPONSE:  **Immaterial and Disputed as not supported by cited deposition testimony. Counsel attempted to get Dr. Renzi to agree that out of cell time could "help stave off"**

worsening symptoms of people decompensating in segregation. Doc. 300-26 at 10 (deposition of Kelly Renzi, pg. 33, ln. 3-9). Dr. Renzi disagreed with the question's premise and said it could "stave off symptoms for people prior to them showing signs of decompensation." *Id.*

30. Restriction of a person's social contact with others can exacerbate mental illness, and the effects are more pronounced in persons who are already mentally ill. PX 26 at 143:8-16.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

31. During Mr. Gay's incarceration, mental health staff did not have authority to have a prisoner released form disciplinary segregation. PX 1 at 88:18-21.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

32. Courtney Meyer, who had been a mental health provider at Menard correctional center, could not remember any instance in which prison security staff consulted with her to review the confinement of a seriously mentally ill prisoner, including Mr. Gay, in segregation. PX 17 at 136:5-

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

33.    Dr. Marano testified that among IDOC correctional staff there existed a culture in which they did not believe in mental health treatment and would deny mental health treatment to difficult patients like Mr. Gay, often for purportedly "discipline" reasons, claiming that he was not really mentally ill. PX 15 at 92:14-96:5.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

34.    Prisoners who were serving time for disciplinary segregation who were designated as requiring an inpatient level of care would not be removed from segregation. They would simply receive their "inpatient" care there. PX 28 at 36:1-17, 39:12-24.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

35.    As of April 2014, the State reported that of 48,655 IDOC prisoners, 10,891 were on the mental health caseload, including 9,418 male prisoners on the case load. Of these, 3,894 were classified as seriously mentally ill (SMI). And of these, 39 were classified as requiring an inpatient level of care. PX 48 at 4. Of the 39 male prisoners and 7 female prisoners designated as requiring an inpatient level of care, 100% were confined in disciplinary segregation. PX 48 at 5. There were 898 males, and 70 females designated at the next-highest level of treatment, Residential, of which

all the females and 97% of the males were in disciplinary segregation. PX 48 at 5-6. Of those SMI inmates on the lowest level of care, Outpatient, 69% of the males were in disciplinary segregation and the remainder were in protective custody. PX 48 at 5-6. 97% of the outpatient females within segregation. PX 48 at 5- 6.

RESPONSE:  **Material and Undisputed.**

36.    The State, through the Illinois Department of Human Services ("IDHS"), operates multiple psychiatric hospitals that provide inpatient mental health treatment and an inpatient level of care. PX 49; PX 48 at 8-9; PX 46 at 121:3-18.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

37.    Pursuant to 730 ILCS § 5/3-8-5, IDOC prisoners may be transferred to IDHS for mental health treatment.

RESPONSE:  **Immaterial and Undisputed.  The statute says addresses IDOC transferring its prisoners to IDHS.  Wexford has no statutory authority to do this.  Exhibit G, deposition of Cheri Laurent, pg. 82-83.  Moreover, IDHS never had beds available to take IDOC patients. Exhibit K, deposition of Melvin Hinton, pg. 208-209.**

38.    The State created the "inpatient" definition of care in 2014, PX 46 at 156:5-11, but at least through the entire relevant period of 1996 through 2018, the State had always incarcerated prisoners whose mental illness was sufficiently severe to have met the inpatient classification. PX 46 at 157:21-159:13.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

39.    At the latest in 1994 and throughout the relevant period of 1996 to 2018, the IDOC had written policies that contemplated transfer of mentally ill prisoners to IDHS for mental health treatment if they had "severe" mental health problems. PX 12 at Bates 010011-12, 010016-17, 010022-23, 010028-29; PX 13 at 2, 4; PX 42 at 2-3, 7, 12, 13, 18; PX 43 at 3-5. For example, one policy provided that mentally ill prisoners would receive "Transfer to a specialized mental health setting when intensive services are clinically indicated or transfer to a licensed mental health care facility when the offender's needs exceed the treatment capabilities of the Department." PX 12 at 010011.

RESPONSE:  **Immaterial and Undisputed.  The mechanism for IDOC to transfer IDOC patients to IDHS existed in IDOC's regulations and under Illinois law but IDHS never had bed space to take patients.  Exhibit K, deposition of Melvin Hinton, pg. 208-209.  Wexford staff generated referrals of IDOC patients at Logan, but the transfers did not happen.  AMF 144.**

40.    Mental health staff treating Mr. Gay believed that many IDOC prisoners would benefit from being transferred to outside psychiatric hospitals, including Mr. Gay. PX 15 at 70:14-71:11.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

41.    Between 1996 and 2018, there were no transfers of mentally ill prisoners from IDOC to IDHS for treatment, with the exception of a single patient in 2018. PX 10 at 30:7- 14.

RESPONSE:  **Material and Undisputed**.

42.    With the exception of a single prisoner transferred in 2018, the State is not aware of any communications in which the IDHS was ever approached about accepting IDOC prisoners between 1996 and 2018. PX 10 at 35:21-36:10.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

43.    Between 1996 and 2018, with a single exception, the State gave no consideration to the transfer of IDOC prisoners for outside psychiatric care. PX 10 at 37:1-9, 41:4-12. (That one exception was not Mr. Gay, but rather another prisoner. PX 10 at 30:7- 31:15; 36:16-21.) The State could give no policy reason for its failure even to consider such transfers during this time. PX 10 at 41:13-16.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

44.    Mental health provider Andrea Moss testified that mental health staff in IDOC could not refer their patients to an inpatient psychiatric hospital. PX 18 at 18:17-24.

RESPONSE:  **Material and Undisputed.**

45.   Pontiac had units housing severely mentally ill prisoners, PX 18 at 24:18-25:8, but during the entire time mental health provider Andrea Moss worked at Pontiac, not a single mentally ill prisoner was transferred to an outside psychiatric hospital. PX 18 at 19:5-12.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

46.   Mental health staff could not refer mentally ill prisoners to outside treatment even if they had very serious mental health issues. PX 4 at 51:2-7. PX 15 at 68:15-22; 69:18-21. PX 16 at 22:3-20.

RESPONSE:  **Material and Undisputed to the extent "refer mentally ill prisoners to outside treatment" means send them for outside treatment and not merely recommend it.  *See* Exhibit H, deposition of Christian Gillespie, pg. 28-29.**

47.   IDHS houses two categories of mental health patients. In one category are civilians who are afflicted with mental illness, which is sufficiently severe that they must be hospitalized, but whose mental illness has not connected with criminal prosecution in the criminal justice system. These patients are referred to as "civil" patients. PX 10 at 48:16-24.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

48.    The remainder of IDHS patients are referred to as "forensic" patients, PX 10 at 48:16-49:6. The forensic patients all come to IDHS through contact with the criminal justice system, and they fall into several categories, which are described in the following paragraphs.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

49.    IDHS houses forensic patients who have committed a crime but must be restored to competency in order to stand trial. PX 10 at 46:19-47:6. This includes current IDOC prisoners: IDHS accepts from IDOC referrals of IDOC prisoners where the prisoner is awaiting charges in another criminal case but must first be restored to competency so that they can face the charges. PX 2 at 250:19-251:14.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

50.    A second portion of IDHS's forensic population are persons who have committed a crime but have been deemed not guilty by reason of insanity, or "NGRI". PX 10 at 47:6-13. NGRI patients include persons who have committed murder, rape, and other extremely violent crimes, PX 10 at 19-22, and they are committed to the custody of IDHS because they are considered too dangerous to be in the public. PX 10 at 14:18.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC**

Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.

51.     IDHS also accepts as "forensic" patients who had been serving prison sentences in the IDOC and who are referred from IDOC directly to IDHS at the end of their sentence. PX 10 at 48:2-15. Such transfers would be made for multiple reasons, including a conclusion by IDOC mental health staff that the outgoing IDOC prisoner's mental illness made them dangerous. PX 16 at 34:12-15.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

52.     During the relevant period IDHS housed forensic patients in four different facilities—Chester, Alton, McFarland, and Elgin. PX 10 at 15-20. Alton and McFarland are medium security facilities, while Chester is a medium- and maximum-security facility. PX 10 at 49:15-20

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

53.     IDHS could and did hire locum tenens mental health providers to deal with fluctuations in its caseload. PX 10 at 60:7-10.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC**

Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.

54. IDHS did have contraindications for admission to IDHS facilities, but these were largely medical in nature, such as a medical condition that would make it difficult for a person to live in a mental health facility. PX 10 at 62:12-63:22; PX 10 at 113:20- 115:20; PX 11.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

**III.    The State never implemented the 2014 IGA between IDOC and IDHS.**

55. As of April 2014, the IDOC represented to the Rasho monitor that it "recognized the immediate need for inpatient services for its SMI population." PX 48 at 6. The State represented that it would make 10 inpatient beds available at Chester, and with rotations would be able to treat approximately 40 prisoner-patients at Chester per year as mental health treatment in IDHS stabilized the prisoners. PX 48 at 9. That corresponded roughly with the 39 IDOC male prisoners identified as requiring an inpatient level of care. PX 48 at 4

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

56. The State testified that at a minimum, it would have considered the lack of inpatient beds to be an emergency when the State began engaging with the Rasho monitor. PX 46 at 166:12-167:17; 182:18-24; 183:2-10. The monitor was retained in September 2013. PX 48 at 2. The state also testified that the emergency consideration extended back minimally to 2012. 169:16-24.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

57.  The 2014 IGA is an "agreement" between two agencies of the State of Illinois, the IDOC and the IDHS, signed in August 2014. The agreement contemplates the periodic transfer of up to 10 IDOC prisoners to Chester for mental health treatment. PX 14.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

58.  Before the signing of the Inter-Governmental Agreement ("IGA") in 2014 the State is not aware of any consideration to the transfer of mentally ill IDOC prisoners to the IDHS for treatment. PX 10 at 74:15-20.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

59. The State also could not explain and did not know why the IGA only contemplated sending IDOC patients to Chester instead of the IDHS's other facilities around the state, which had 531 additional forensic beds among them. PX 14; PX 10 at 75:12- 24, 91:5-94:3.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

60. At Chester, the IDHS had four psychiatrists and three to four psychologists for 284 forensic patients, resulting in an approximate range of patient-to-psychiatrist / psychologist ratio of 71:1 or 94:1. PX 10 at 78:10-79:24.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

61. Despite these ratios, the IGA, which was signed in August 2014 required the IDOC to recruit two full-time psychiatrists and one full-time psychologist to Chester before accepting any of the IDOC patients—a ratio ranging from 5:1 or 10:1. PX 14; PX 10 at 80:1-5. The State insisted on this high ratio even though it was extremely difficult to recruit mental health staff to work at Chester, which is in a rural area. PX 10 at 79:7- 14, 88:9-16.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

62. The State could offer no reason why the IGA mandated such vastly different ratios for patients transferred from the IDOC for treatment. PX 10 at 84:7-86:8.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

63.  In an October 2014 filing in the Rasho case, the State conceded that the IDOC "currently lacks any hospital-level beds to provide adequate inpatient [mental health] treatment," and that the "IDOC has long recognized that the Department's lack of inpatient beds constitutes an emergency situation requiring immediate redress." PX 44 at 2. See also PX 48 at 6 ("The IDOC recognizes the immediate need for inpatient services for its SMI population.").

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

64. In November 2014, after the IGA was signed, the State insisted on even more stringent ratio and decreed that in order for the IDHS to take three inpatient IDOC prisoners, IDOC would need to provide one full-time psychologist and one part-time psychiatrist. PX 45.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

65. The State does not know why no prisoners were transferred from IDOC to IDHS between 1996 and 2018 for treatment. PX 10 at 28:23-29:8; 32:4-8.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

66. As of April 2016, the IDOC's Standard Operating Procedure recognized that prisoners who required an inpatient level of care that the IDOC could not provide, and instead required hospitalization at a psychiatric hospital. PX 36 at 27. But the SOP provided that until the IDOC identified a psychiatric hospital, referrals out would not occur—instead, prisoners needing an "inpatient" level of care would receive "enhanced" care instead. PX 36 at 27.

RESPONSE:  **Material and Undisputed.**

**IV.    In segregation, Mr. Gay could not control of his maladaptive behavior.**

67.    Dr. Renzi, one of Mr. Gay's mental health providers at Pontiac, agreed that Mr. Gay was severely mentally ill. PX 26 at 76:13-16.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

68.    One of Mr. Gay's mental health providers at Pontiac, Dr. Renzi, could recall horrific acts of self-harm, like sewing parts of a fan motor into his scrotum and stabbing a pen near his eye. PX 26 at 104:13-105:1. These were among the higher end of the scale of self-injurious behavior that Dr. Renzi had witnessed at Pontiac.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

69.     Mental health providers at Pontiac CC described Mr. Gay's level of self-harm as "extreme" and something that could not go easily overlooked, including incidents such as removing a testicle and placing it on the bars of his cell to show passersby. PX 24 at 61:17-21; 69:17-70:1.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

70.     Mental health staff triaged their caseload based on severity. PX 18 at 55:4-20, 62:8- 63:8. Mr. Gay was seen more frequently than other prisoners, but this was due to the complexity of his case. PX 17 at 102:1-3.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

71.     Refusal to participate in medical or mental health services can be a sign of decompensation. PX 24 at 102:19-23; PX 26 at 147:15-19.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC**

Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.

72.     Mr. Gay received a number of mental health diagnoses over the course of his incarceration, including borderline personality disorder, adjustment disorder with cluster B features, antisocial personality disorder, borderline personality disorder with narcissistic features, impulse control disorder, mood disorder not otherwise specified, narcissistic personality disorder, depressive disorder, personality disorder not otherwise specified, post-traumatic stress disorder, bipolar disorder, unspecified anxiety disorder, and unspecified depressive disorder. PX 38; PX. 1 at 31:8-15.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

73.     Mr. Gay had been diagnosed with an Axis II borderline personality disorder and a psychosis accompanied by depression, PX 4 at 23:21-24:5, as well as PTSD. PX 15 at 17:15-19. PX 17 at 41:12-14. His Axis II constructs were considered by his mental health providers to be significant. PX 15 at 17:15-19.  Mr. Gay's mental health treaters considered him to be seriously mentally ill. PX 4 at 24:7-9.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

74.     During his segregation Mr. Gay's MGAF scores were recorded as low as 21, see PX 25 at 1, reflecting severe impairment in functioning. PX 25 at 5; PX 24 at 113:2-13. Dr. Renzi, who made the MGAF designation, testified that her designation of Mr. Gay in this range was consistent with his designation as being seriously mentally ill. PX 26 at 109:5-21. Andrea Moss, one of Mr. Gay's mental health treaters at Pontiac, viewed him as severely mentally ill characterologically, such that he struggled significantly under her care. PX 18 at 41:2-9.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

75. Mr. Gay would tell mental health providers that he used self - harm to get things he wanted and presented his self-harm as rational; while his mental health providers attempted unsuccessfully to show him that his self-harm had the opposite effect, and only made his situation worse. PX 24 at 150:24-152:11.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

76.     Mr. Gay's mental health treaters at Pontiac offered the opinion that Mr. Gay's events of self-harm indicated times at which he was decompensating. PX 24 at 101:8- 102:1.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC**

**Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants**
**incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

77.    Many of the behaviors that resulted in discipline for Mr. Gay, including "splitting,"
manipulation of others, and attempts to dictate his treatment were all symptoms of his Axis II
borderline personality disorder, and are considered a dysfunctional way of getting needs met that
is consistent with borderline personality disorder. PX 16 at 7:19-24, 51:14-52:9, PX 34.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section**
**of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC**
**Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants**
**incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

78.    Mr. Gay's treatment team saw his efforts at manipulation as an unhealthy means of trying to
advocate for himself and as part of his treatment they encouraged him to advocate appropriately.
PX 16 at 14:3-20; PX 35.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section**
**of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC**
**Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants**
**incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

79.    Clinical descriptions of Mr. Gay as "manipulative" did not have the same negative
connotation as its use by laypersons. Instead, the term is part of a group of diagnostic criteria for
multiple personality disorders, including borderline personality disorder. In this context, it referred
the use of various means to get their needs met that may not occur to persons without personality
disorders. PX 26 at 117:1-118:18.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

80.    Mental health staff reported that Mr. Gay engaged in "a lot" of "extreme" self-injury and inappropriate attachment to certain staff. PX 26 at 67:3-69:17. Mr. Gay's mental health treaters were of the opinion that his frequent improper personal attachments to female staff were a common symptom of patients with borderline personality disorders. PX 26 at 134:7-16.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

81.    In one incident while he was incarcerated at Menard, Mr. Gay cut his scrotum open, pulled his testicles out, and held them in his hands. PX 8 at 27:2-8.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

82.    Dr. Marano noted that she had observed many correctional officers responding to prisoners with Axis II disorders as engaging in "countertransference," meaning negative emotional reactions to the symptomatic behaviors of prisoners with Axis II personality disorders. PX 15 at 62:18-64:8.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC**

**Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

83.    By April 2015 Mr. Gay's mental health team prepared a mental health treatment plan for him that identified one set of his mental health problems as follows: "[p]oor affect regulation, poor distress tolerance, poor impulse control when anxious / panicked / irritable, primarily due to emotional reasoning when his routine is altered or perceived rejection. These symptoms have directly resulted in a life sentence." PX 41. The treatment goal for this problem included Mr. Gay reducing self-injurious behavior and thereby reducing crisis-watch placement, along with therapy sessions. PX 41.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

84.    Mr. Gay's April 2015 mental health treatment plan grouped "Long [history] of severe [self-injurious behavior] and assaultive behavior. These symptoms have directly resulted in a natural life sentence." PX 41

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

85.    Dr. Marano, a psychologist at Pontiac, agreed that Mr. Gay's self-harm to get things he wanted was not healthy, that Mr. Gay had problems with impulse control, and that while he was in segregation Mr. Gay was easily over-stimulated by noises and people. PX 16 at 53:3-54:8.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

86.     Mr. Gay's own mental health providers were of the opinion that his self-mutilation was a result of his serious mental illness and was a form of decompensation resulting from his long-term segregation. PX. 1 at 37:4-18.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

87.     Mr. Gay's borderline personality disorder resulted in exaggerated feelings of abandonment. PX 4 at 54:2-18.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

88.     On multiple occasions, including in November of 2016, Mr. Gay was given involuntary psychiatric medication because the mental health staff providing care for him were concerned that his condition in segregation would deteriorate and he would engage in further self-harm unless he was medicated. PX. 1 at 44:5:16. The review committee determined that as a result of Mr. Gay's mental disorder, he posed a likelihood of serious harm to himself or others. PX 1 at 45:1-15. PX 37.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

89.    One of Mr. Gay's mental health providers, Dr. Sylvia Butler, explained that while Mr. Gay did engage in self-harm to elicit a desired response in others, this did not indicate that his self-harming behavior was volitional. PX 1 at 83:20-84:10. As Dr. Butler explained it, Mr. Gay's self-harm behavior could not be characterized as volitional. Instead, Mr. Gay's self-harm was brought on by impulses resulting from mood swings brought on by his mental illness. PX 1 at 84:8-23.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

90.    Despite Mr. Gay's statements that he engaged in self-harm for secondary gain, Dr. Al Doyle, a psychologist at Dixon, assessed his behavior as resembling addition in which Mr. Gay had "developed an automatic response to certain feelings and cannot control how far he will go once he starts." PX 6 at 6.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

91.    Dr. Doyle's assessment was that due to his mental illness and post-traumatic stress disorder, Mr. Gay's maladaptive responses in segregation were so built up in his mind that they flowed out without Mr. Gay's control and would only get worse and worse if Mr. Gay were not stopped or helped in some way. PX 4 at 37:21-38:11.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

92.    Dr. Doyle's assessment of Mr. Gay's self-injury was the result of Mr. Gay being stuck in a mental pattern that he was unable to control. PX 4 at 38:16-21.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

93.    Mr. Gay's self-injurious behavior was assessed by his mental health providers as addictive and as the result of increasingly anxiety and release that would reach a breaking point with self-injury, and resembled persons with substance addictions. PX 4 at 39:14-40:16; 42:6-43:18. PX 5 at 2.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

94.    Mr. Gay's mental health providers diagnosed that Mr. Gay would self-mutilate as a way to regulate his emotions, meaning that he mutilated as a coping skill to help him regulate his emotions. PX 17 at 64:4-10. PX 38.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

95.    The 2016 residential treatment referral concluded, "Inmate Gay does not have the skills to disengage in self-harming behaviors and needs intensive treatment." PX 38.        Ms. Meyer reached the conclusion that Mr. Gay's mental illness was sufficiently severe that he could not reside in an outpatient setting. PX 17 at 84:16

RESPONSE: **Material and Undisputed.**

96. Mr. Gay was referred to an inpatient level of care. PX 17 at 64:21-65:1; 101:9-20; PX 38; PX 31. However, despite this assessment, even where IDOC mental health staff believed a prisoner like Mr. Gay needed psychiatric hospitalization, there was no mechanism through which they could refer such a patient to an outside psychiatric hospital. PX 17 at 159:14-22.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

97.    Ms. Meyer was able to refer seriously mentally ill patients, including Mr. Gay, from Menard to Dixon or Pontiac because those prisons offered some additional therapies, but hospitalization was not possible through such referrals. PX 17 at 159:6-13.

RESPONSE:  **Material and Undisputed**.

98.    Even when Mr. Gay engaged in self-injurious behavior like cutting open his scrotum with a nail clipper, Ms. Meyer would not refer him to an outside psychiatric hospital because her understanding was that nobody was ever sent to an outside psychiatric hospital. PX 17 at 157:14-158:4.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

99.    In 2016, one of Mr. Gay's mental health providers, Courtney Meyer, reached the conclusion that Mr. Gay required a level of care that was beyond what Menard could provide and recommended that Mr. Gay be placed in a therapeutic environment to include hospitalization. PX 17 at 76:14-23; PX 38.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

### V.    Segregation harmed Mr. Gay, but until 2018 Mr. Gay's treaters were powerless to remove him from it.

100.    The quality of mental health care at Pontiac and Dixon was the same, however, Dixon was a very different environment from Pontiac in the sense that it was less restrictive, and Mr. Gay was transferred from Pontiac to Dixon with the idea that a "less restrictive environment . . . is probably the best plan of care for him." PX 2 at 181:21-185:12.

RESPONSE**:  Immaterial and Disputed as not supported by the cited deposition testimony. Dr. Chess said she was unaware of the quality of the mental health care Gay received at Pontiac but assumed it would be the same as at Dixon.  Doc. 3001 at 48 (deposition of Jamie Chess, pg. 184 ln 22-24 to 185 ln 2).  Her testimony about a less restrictive environment for Gay at Dixon was that "the hope was a little bit less restrictive environment as he transitions into the community is probably the best plan of care for him."  *Id.* at 185 ln 6-12.  She was clearly talking about the time immediately before Gay was to be released**.

101.    Mental health staff assessed that placing Mr. Gay in prolonged segregation was contrary to his mental health. PX 2 at 171:13-172:10.

RESPONSE:  **Immaterial and Disputed as not supported by the deposition testimony cited or admissible evidence.  The cited testimony is as follows:**

> **Q.  And throughout his treatment at his incarceration at the Department of Corrections, Department of Corrections staff would have been aware that continuing to do so was contrary to his mental health interests, correct?**
> **Mr. Rupcich:  object to the foundation, vague as to dates.**
> **Mr. Blandin:  Right?**
> **A.  ---so that probably came into effect at some point.  Doc. 300-2 at 44 (deposition of Jamie Chess, pg. 171, ln. 13 to 172 ln. 5).**

**This was counsel arguing with the witness with no foundation or specificity to the question that covered 24 years of mental health treatment.  This testimony does not stand for the proposition that mental health staff arrived at this "assessment."  If that was the case, Plaintiff would cite to the mental health record reflecting the assessment, not an argumentative line of questions.**

102.    One of Mr. Gay's mental health providers at Menard pointed to his November 2016 mutilation of his scrotum as a "clear example that Mr. Gay was in crisis and was decompensating. PX 1 at 73:4-10; 74:13-22. Decompensation means that a person starts not to function, and it has a variety of manifestations. Sometimes the person might not eat; sometimes they might withdraw and become depressed; sometimes they might try to harm themselves. PX. 1 at 22:4-10.

RESPONSE:  **Material and Undisputed Dr. Butler testified to this.**

103.    Decompensation can be a consequence of subjecting people who are seriously mentally ill to long-term segregation. PX. 1 at 22:11-16.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 103 is an opinion from a mental health provider, not a fact within the meaning of the Local Rules.  Defendants make no answer to opinion testimony asserted under the guise of an Additional Material "Fact."**

104.    Self-harm by a person in segregation for the purpose of gaining social stimulation can be a sign of decompensation. PX 24 at 103:13-18.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 104 is an opinion from a mental health provider, not a fact within the meaning of the Local Rules.  Defendants make no answer to opinion testimony asserted under the guise of an Additional Material "Fact."**

**VI.    In 2018 Mr. Gay's mental health team is able to remove him from segregation and he improves greatly.**

105.    Gay transferred from Dixon to Pontiac on March 8, 2018. PX 28 at 23:19-22. Pontiac's warden asked for Mr. Gay's transfer to Dixon because he was engaged in so much misbehavior and self-harm that he was "digging himself a hold he could not get out of," and might benefit from new surroundings. PX 27 at 33:6-34:8.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

106.    When Mr. Gay arrived at Dixon in 2018, mental health staff there were prepared to have him civilly committed to IDHS at the end of his sentence. PX 2 at 227:24- 228:13.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

107.    In 2018, the IDOC mental health staff at Dixon changed what we were doing with Mr. Gay to see how he would react. PX 2 at 227:24-228:13. This was part of an effort to determine whether continuing to house Mr. Gay in segregation was contrary to his self-interest. PX 2 at 178:6-179:10.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC**

**Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

108.   Dr. Nunez recommended that Mr. Gay be transferred out of segregation as a way of helping him psychologically, particularly for more treatment. PX 19 at 123:8-18; PX 20 at 2.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

109.   Mr. Gay's mental health providers at Dixon believed that placing Mr. Gay in segregation would increase the chance of self-harm and would be bad for him. PX 2 at 215:13-216:3.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

110.   Mental health treatment providers at Dixon believed that Mr. Gay's mental illness was causing to self-harm on an extensive basis in light of his extensive segregation. PX 2 at 181:3-15.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

111.   In April 2018, Dr. Doyle recommended that he be placed in a residential treatment unit. PX 4 at 31:21-32:2.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

112.    In April 2018, Dr. Nunez sent around an email to Mr. Gay's mental health team explaining that he did not believe it would be helpful to move Mr. Gay from crisis back to segregation and recommended therapeutic placement in population. PX 19 at 123:19-127:11; PX 21. It was not common for Dr. Nunez to make placement recommendations, but he did so for Mr. Gay because he had opened up his scrotum while in segregation. PX 19 at 127:12-21.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

113.    In June 2018, Dr. Nunez concluded from Mr. Gay's continued self-mutilation that he remained in a continued state of decompensation while on crisis watch and reached out to mental health supervisors to out of concern for his course of care. PX 19 at 127:4-130:18; PX 22. At this point Mr. Gay had been on crisis watch for more than 700 days, indicating that Mr. Gay was doing poorly in a setting designed for temporary placement. PX 19 at 130:19-132:24; PX 23.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

114.    Dr. Nunez told his superiors that he believed Mr. Gay's isolation in segregation was adversely affecting him. PX 19 at 1111:2-16.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

115.    In 2018, the IDOC mental health staff stepped Mr. Gay down from inpatient status to residential treatment status and had him released from restrictive housing status and constant monitoring by security staff. PX 2 at 228:21-229:13; PX 2 at 229:14-19. This meant Mr. Gay was no longer in segregation. PX 2 at 229:20-21.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

116.    During this time Mr. Gay received considerable time in the prison day room, and out- of-cell time alongside everyone else in his housing area, along with structured programs provided by mental health. PX 2 at 255:18-258:2. When Mr. Gay was removed from segregation by Dixon mental health staff, he did well, and his mental condition improved. PX 2 at 229:22-230:2.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

117. Removing Mr. Gay from restrictive housing in 2018 was part of an effort by Dixon mental health staff to gauge whether or not he could be successful in the community after his release. PX 2 at 228:21-229:13. The improvement was significant enough that Dixon mental health staff concluded that Mr. Gay did not need to be civilly committed at the end of his sentence and could instead be released into the community. PX 2 at 230:7-9. That included an assessment by Dixon mental health staff that Mr. Gay was at less risk for self-harm, and that he would not be a danger to others. PX 2 at 230:10-18.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

**VII.    Earlier release from segregation was reasonable.**

118. As of 2017 or 2018, there were no temporal limits on the use of disciplinary segregation for prisoners, PX 24 at 92:10-19; PX 26 at 6-16, whereas by 2022 segregation is limited to 29 days or less of continuous segregation. PX 24 at 93:8-16.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**

119. During this time period, the only way for a prisoner's time in disciplinary segregation to be reduced would be for the prisoner to file a petition asking for a reduction, or for a prison warden, in the exercise of discretion, to release the prisoner from their term of confinement. PX 47 at 129:9-130:18.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

121.    In the case of petitions for release by a prisoner in disciplinary segregation, consideration of such petitions would focus on the prisoner's behavior in segregation leading up to their petition. PX 47 at 130:19-140:19.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

121.    Mental health staff at Tamms did not have the ability to transfer a prisoner to an inpatient psychiatric hospital. PX 9 at 28:12-18.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

122.    Mental health staff at Pontiac did not have the option to transfer mentally ill prisoners outside of the IDOC for care. PX 26 at 51:7-18.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.   It is therefore immaterial to Wexford's Motion.   Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

**VIII.    Reform sparked by *Rasho* comes too late for Mr. Gay.**

123.    In 2018 IDOC policy changed, such that all mental health staff were involved in assessing all disciplinary tickets for the seriously mentally ill to determine culpability and could recommend alternatives to segregation for mentally ill prisoners. PX 2 at 166:23-168:24.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

124.    Mental health had technically previously been a consideration in disciplinary segregation, but it was taken into account "95 percent" more heavily, "[a] lot more heavily," after the Rasho settlement went into effect around 2018. PX 2 at 236:4- 238:16. Dr. Chess, an administrator at Dixon, suggested this might have been a factor explaining why Mr. Gay's serious mental illness did not result in a release from disciplinary segregation earlier in his incarceration. PX 2 at 234:11-238:16.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

125.    Before the changes implemented because of Rasho, there was no formal process to review segregation placements due to mental illness. PX 15 at 72:7-10. It was also only after Rasho that mental health staff retroactively reviewed past segregation tickets for adjustment. PX 15 at 71:13-24.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

126. The Elgin facility was designed for patients who could not receive sufficient care within the IDOC's existing mental health facilities. PX 2 at 33:2-14.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed**.

127. Eventually the IDOC opened a portion of the IDH Elgin treatment facility, but that was done only to comply with the Rasho settlement. PX 10 at 102:21-103:21; PX 2 at 29:3-6. The Elgin facility came online towards the end of 2018, around the time Mr. Gay was released from prison. PX 46 at 111:4-18.

RESPONSE: **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

IX. **Mr. Gay's mental health team believed segregation was harming him but they were powerless to recommend removal.**

129. Ms. Meyer understood that Mr. Gay was in disciplinary segregation for violation of prison rules. PX 17 at 93:3-12. Ms. Meyer did not recommend that Mr. Gay be removed from segregation, however, because it was not a recommendation she could make, and was never told by anyone that she had the ability to make such a recommendation. PX 17 at 87:2-17; 128:17-23.

RESPONSE:  **Material and Undisputed.**

129.    Releasing Mr. Gay from segregation was not part of his treatment plan because he had disciplinary segregation time. PX 28 at 37:20-38:1. PX 26 at 145:20- 146:10.

RESPONSE:  **Immaterial and Disputed as unsupported by cited deposition testimony.  When asked whether getting Gay released from segregation was ever part of his treatment plan, Dr. Stone said, "I can't say for certain."  Doc. 300-28 (deposition of Sheila Stone, pg. 37-38).**

130.    Dr. Chess explained that she and other mental health staff did not attempt to remove Mr. Gay from segregation earlier because disciplinary segregation was a security issue, and mental health was not meaningfully taken into account until the IDOC's policy changed as a result of Rasho. PX 2 at 238:18-240:16. PX 27 at 75:14- 17.

RESPONSE:  **Immaterial and Disputed as unsupported by cited deposition testimony.  The testimony from Dr. Chess' deposition at pages 238-240 is Plaintiff's counsel arguing with Dr. Chess, resulting in an incomprehensible colloquy.  At no point does the cited testimony appear.  Page 74, lines 14-17 of Ruskin's deposition contains this exchange:**

> **Q.  When did mental health start reviewing disciplinary tickets?  Wasn't that after the Rasho decision?**
> **A.  Yes, sir.  Doc. 300-27 (deposition of Emily Ruskin, pg. 75).**

131.    Individuals placed in IDOC general population have access to job opportunities, vocational courses, college programming, culinary arts courses, automotive courses, woodworking courses, educational programs, and access to the law library. PX 47 at 33:17-35:23. Individuals in general population participate in those programs within the milieu of the prison such that they are participating alongside other people in prison. Id.

RESPONSE:   **Immaterial and Undisputed this is generally true for general population inmates, depending on the security level of the prison, as Mr. Hammer made clear.  Doc. 301-**

**12 at 36 (deposition of Justin Hammers, pg. 35, ln 14-23).  Gay was never a general population inmate based on his extensive disciplinary history of violence.**

133.    The State contracted with Wexford to provide medical and mental health care to prisoners in IDOC custody. PX. 53 at 1-3.

RESPONSE:  **Material and Undisputed**.

133.    The contract imposed a duty on Wexford to "arrange for services to offenders who require off-site hospitalization for routine admissions and for emergency situations" if a prisoner "requires care beyond the capability of the infirmary." PX 53 at 5.

RESPONSE:  **Immaterial and Undisputed.  This comes from Section 2.2.3.6.1 of the contract under "Hospital Services," which is under Section 2.2.3, the "Comprehensive Medical Program."  This is distinct from Section 2.2.4, the "Comprehensive Mental Health Program" and is immaterial to this case.**

134.    All recommendations for hospitalization, with the exception of emergencies, were to be reviewed and approved by the IDOC on-site Medical Director. PX 53 at 9.

RESPONSE:  **Immaterial and Undisputed.  This comes from Section 2.2.3.6.1 of the contract under "Hospital Services," which is under Section 2.2.3, the "Comprehensive Medical Program."  This is distinct from Section 2.2.4, the "Comprehensive Mental Health Program" and is immaterial to this case.**

135.    The contract imposed a duty on Wexford to meet with hospital representative and other provider to coordinate the referral of offenders. PX 53 at 9.

RESPONSE:  **Immaterial and Undisputed.  This comes from Section 2.2.3.11 of the contract under "Coordination of Referrals," which is under Section 2.2.3, the "Comprehensive**

Medical Program." This is distinct from Section 2.2.4, the "Comprehensive Mental Health Program" and is immaterial to this case.

136.    The contract imposed a duty on Wexford to promulgate "policies and procedures concerning the emergency transfer and transportation of offenders." PX 53 at 9.

RESPONSE: **Immaterial and Undisputed. This comes from Section 2.2.3.12 of the contract under "On-site Emergency Care," which is under Section 2.2.3, the "Comprehensive Medical Program." This is distinct from Section 2.2.4, the "Comprehensive Mental Health Program" and is immaterial to this case.**

137.    The contract stated that Wexford "shall be responsible for emergency transportation of inmates for medical and mental health care." PX 53 at 6 (emphasis added). Such transportation included arrangements for the use of helicopter and ambulance. Id.

RESPONSE: **Immaterial and Undisputed. This comes from Section 2.2.3.19.1 of the contract under "Transportation," which is under Section 2.2.3, the "Comprehensive Medical Program." This is distinct from Section 2.2.4, the "Comprehensive Mental Health Program" and is immaterial to this case. Moreover, this is referring to transportation by ambulance or helicopter in an acute emergency. It is immaterial to Plaintiff's theory Gay should have been sent offsite to an inpatient mental health hospital for mental health treatment.**

138.    The contract imposed a duty on Wexford to "deliver effective and efficient mental health services on-site to offenders determined to be mentally or emotionally disturbed due to a chronic mental illness or situational stress." PX 53 a 10.

RESPONSE: **Material and Undisputed.**

139.    The contract imposed a duty on Wexford to ensure that its mental health services were delivered in compliance with mental health and healthcare related federal state statutes. PX 53 a 10.

RESPONSE:  **Material and Undisputed.**

140.    The contract imposed a duty on Wexford to "provide crisis management of behavioral and/or psychiatric emergencies, such as management of the suicidal, self-mutilating, or decompensating offender." PX 53 a 10.

RESPONSE:  **Material and Undisputed**.

141.    The contract provided that crisis management services were "to be provided in a manner consistent with that identified in the IDOC [Administrative Directives] an in the Office of Mental Health Management Procedure Manual." PX 53 a 10.

RESPONSE:  **Material and Undisputed**.

142.    The psychiatric services provided at DHS facilities did not occur in isolation, as patients were typically housed among 18-24 other patients at any given time. PX 54 at 1.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.    It is therefore immaterial to Wexford's Motion.    Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

143.    IDHS facilities could not replicate the isolated environment of segregation. PX 54 at 1.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC**

**Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this fact is disputed or undisputed.**

144. Wexford's 30(b)(6) witness testified that, at some point in approximately 2016, Wexford staff did recommend that some patients at Logan Correctional Center be transferred to the Department of Human Services, but that transfer did not occur, and the witness did not know why not. PX 7 at 2-22.

RESPONSE: **Material and Undisputed.**

145. Wexford did not direct its staff that DHS could accept or house DOC patients. PX 7 at 75:21-76:7.

RESPONSE: **Material and Undisputed.**

## X.    Opinions of Dr. Kupers.

146. Segregation causes severe psychiatric damage and exacerbates serious mental illness in individuals like Mr. Gay who have a history of prior trauma. PX 50 at 3, 45.

RESPONSE: **Objection. Defendants object as Additional Material Fact 146 is an opinion from an expert witness, not a fact within the meaning of the Local Rules. Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact." Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

147.    Segregation units are a problematic environment for the delivery of mental health and psychiatric treatment because it causes many symptoms and disabilities— including suicide and self-harm—and precludes mental health staff from forming a trusting, therapeutic relationship with their patients. PX 50 at 50.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 147 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed**.

148.    It is extraordinarily difficult to treat mental disorders caused or exacerbated by segregation while the patient remains in segregation. PX 50 at 49. Instead of treating a patient's underlying mental illness, therapist is forced to play "catch-up," trying to lessen ongoing mental health symptoms caused by solitary confinement.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 148 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."**

149.    Severe anxiety and panic attacks are the most common symptoms in individuals subject to segregation. PX 50 at 45.

RESPONSE: **Objection. Defendants object as Additional Material Fact 149 is an opinion from an expert witness, not a fact within the meaning of the Local Rules. Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact." Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed**.

150.    Severe anxiety in prisoners in segregation can build to an extreme level, cause the prisoner to feel like he cannot breathe or like the walls are closing in on himself, and ultimately lead to the prisoner engaging in self-harm to relieve the unbearable anxiety. PX 50 at 45.

RESPONSE: **Objection. Defendants object as Additional Material Fact 150 is an opinion from an expert witness, not a fact within the meaning of the Local Rules. Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact." Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

151.    Mr. Gay's disability associated with his psychiatric illnesses, such as Borderline Personality Disorder and PTSD, was significant and manifested by severe symptoms. PX 57-58.

RESPONSE: **Objection. Defendants object as Additional Material Fact 151 is an opinion from an expert witness, not a fact within the meaning of the Local Rules. Defendants make**

no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact." Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.

152.    Borderline Personality Disorder is often a cause of very serious long-term psychiatric disability. PX 50 at 59.

RESPONSE: **Objection. Defendants object as Additional Material Fact 152 is an opinion from an expert witness, not a fact within the meaning of the Local Rules. Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact." Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed**.

153.    Borderline Personality Disorder is a cause of severe psychiatric disability in Mr. Gay. PX 50 at 58.

RESPONSE: **Objection. Defendants object as Additional Material Fact 153 is an opinion from an expert witness, not a fact within the meaning of the Local Rules. Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact." Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to**

**IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

154.    A phase program, which is often incorporated into treatment plans of mentally ill prisoners in segregation, is a system by which prisoners earn amenities, freedoms, programs, and, ultimately, release from segregation, by exhibiting pro-social behaviors. PX 50 49-50.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 154 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."**

155.    While many prisoners in segregation can earn release from segregation by exhibiting pro-social behaviors, successful movement through a phase program is not possible for a small group of prisoners due to psychiatric disability. PX 50 49-50.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 155 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."**

156.    There is a subgroup of prisoners in segregation who have such severe psychiatric disability that they are unable to function well enough in segregation to accomplish the steps designated in their treatment plan to earn release from segregation. PX 50 at 48.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 156 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make**

no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."

157.    Treatment plans that offer incremental increases in privileges and freedom for inmates who engage in pro-social behavior are typically ineffective for inmates whose psychiatric disability prevents them from functioning in segregation well enough to earn those privileges and freedoms. PX 50 at 47.

RESPONSE: **Objection. Defendants object as Additional Material Fact 157 is an opinion from an expert witness, not a fact within the meaning of the Local Rules. Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact." Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

158.    For inmates with psychiatric disability that prevents them from progressing through the phase program in segregation, another treatment plan and a different series of phases must be created to enable them release from segregation. PX 50 at 47-48.

RESPONSE: **Objection. Defendants object as Additional Material Fact 158 is an opinion from an expert witness, not a fact within the meaning of the Local Rules. Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact." Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants**

incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.

159.    If an inmate continues to fail to gain rewards and eventual release from segregation, the treatment plan must be reconsidered and include a first step of releasing the inmate from segregation. PX 50 at 48.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 159 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed**.

160.    Mr. Gay was among the subgroup of prisoners whose psychiatric disability is so severe that he is unable to function in segregation well enough to accomplish the steps designated in his treatment plan that would allow him a way out of segregation. PX 50 at 47-48.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 160 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants**

incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.

161.     Mr. Gay was unable to earn his way out of segregation by exhibiting certain pro- social behavior while in solitary because of psychiatric disability. PX 50 at 49-50.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 161 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

162.     Mr. Gay's psychiatric disability prevented him from advancing through the phase system that would have allowed him to earn his way out of segregation by exhibiting pro-social behavior while in solitary. PX 50 at 48.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 162 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

163.    Any plan that required Mr. Gay to exhibit pro-social behavior to earn his release from segregation was doomed to fail because his psychiatric disability prevented him from engaging in those pro-social behaviors while in segregation. PX 50 at 48.  Mr. Gay's segregation was the most important contributing factor in his self- harming. PX 50 at 50

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 163 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

164.    Mental health standards require that people who commit serious acts of self-harm while anxious and plagued by other disturbing symptoms in segregation be removed from segregation and provided mental health treatment in a less restrictive setting. PX 50 at 45-46.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 164 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

165.    The first time Anthony ever self-harmed was in segregation. PX 50 at 43.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

166.    Segregation is the confinement of prisoners for twenty-two hours or more per day without meaningful human contact. PX 50 at 46.

RESPONSE:  **This proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

167.  Mr. Gay's brief contact with his mental health professionals was not "meaningful human contact." PX 50 at 47.

RESPONSE:  **Objection.  Defendants object as Additional Material Fact 167 is an argumentative opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

168.    A wish to manipulate is not a credible motive to cause an individual to engage in acts of severe self-harm when it has been proven repeatedly to him that acts of severe self-harm will not result in his release from solitary or another therapeutic outcome. PX 50 at 54-55. Mr. Gay's self-harming behavior was not entirely willful, but rather compelled by intolerable feelings like anxiety an abandonment that are exaggerated and compounded by segregation. PX 50 at 55.

RESPONSE:   **Objection.  Defendants object as Additional Material Fact 168 is an opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."**

169.    The notion that Mr. Gay's self-harm is entirely voluntary, and manipulative is overly simplistic, very callous, and tends to obfuscate investigation into the complex and multi-faceted reasons for Mr. Gav's self-harm. PX 50 at 61.

RESPONSE:   **Objection.  Defendants object as Additional Material Fact 169 is an argumentative opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

170.    By at least 2012, Mr. Gay's self-harming behavior was so engrained that he could not stop cutting if he wanted to. PX 50 at 55.

RESPONSE:    **Objection.    Defendants object as Additional Material Fact 170 is an argumentative opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed**.

171.    It is not acceptable to return a chronically self-harming and self-mutilating individual to segregation, where the self-harm and self-mutilation will almost certainly result in more self-harm and self-mutilation. PX 50 at 60.

RESPONSE:    **Objection.    Defendants object as Additional Material Fact 171 is an argumentative opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

172.    Mr. Gay did not receive the mental health treatment that his mental illness required largely because his segregation exacerbated his mental illness and worsened his prognosis. PX 50 at 61.

RESPONSE:    **Objection.    Defendants object as Additional Material Fact 172 is an argumentative opinion from an expert witness, not a fact within the meaning of the Local**

Rules. Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."

173. Service providers at the IDOC, including officers and mental health staff, rendered Mr. Gay's treatment iatrogenic by responding to his repeated acts of self-harm by repeatedly placing him in the same conditions—segregation—where they know it is likely that he will engage in the acts of self-harm. PX 50 at 61.

RESPONSE: **Objection. Defendants object as Additional Material Fact 173 is an argumentative opinion from an expert witness, not a fact within the meaning of the Local Rules. Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact." Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's Motion. Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed**.

## XI. Opinions of Dr. Schriro.

174. Housing seriously mentally ill inmates in a segregated setting knowing they will continue to engage in self-harm falls outside the standard of care. PX 51 at 15.

RESPONSE: **Objection. Defendants object as Additional Material Fact 174 is an argumentative opinion from an expert witness, not a fact within the meaning of the Local Rules. Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact." Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion. It is therefore immaterial to Wexford's**

**Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed**.

175.    Mr. Gay's continued placement in segregation served no penological gain. PX 51 at 16.

RESPONSE:    **Objection.   Defendants object as Additional Material Fact 175 is an argumentative opinion from an expert witness, not a fact within the meaning of the Local Rules.  Defendants make no answer to medical opinion testimony asserted under the guise of an Additional Material "Fact."  Moreover, this proposed additional material fact is not cited or referenced in the section of Plaintiff's Response concerning Defendant Wexford and appears to pertain to IDOC Defendants' Motion.  It is therefore immaterial to Wexford's Motion.  Defendants incorporate IDOC Defendants' Response as to whether this opinion is disputed or undisputed.**

## ARGUMENT

In Response to Wexford's Motion, Plaintiff relies substantially on Wexford's contract she says shows "Wexford undertook the State's duty to provide comprehensive mental health services and refer inmates to external providers when IDOC facilities could not provide care within the IDOC's walls."  Doc. 304 at 142.  Plaintiff's argument is inconsistent with the contract's plain language and IDOC and Wexford's understanding and performance of it.  As Defendants pointed out, IDOC's corporate representative and Director of Mental Health unequivocally testified IDOC did not expect Wexford, as part of its contract, to send patients off-site facilities for mental health treatment."  Doc. 286 at 29-30; Exhibit K, deposition of Melvin Hinton, pg. 235-36.

Regarding the contract's language, Plaintiff repeatedly cites Section 2.2.3 of the IDOC/Wexford contract as establishing Wexford's contractual obligation to send patients for inpatient mental health treatment.  *See* AMF 133-134 (Section 2.2.3.6.1), AMF 134 (2.2.3.11);

AMF 136 (2.2.3.12); AMF 137 (2.2.3.19.1).  But review of the contract shows Section 2.2.3 is the "Comprehensive Medical Program."  Doc. 301-18 at 6.  This is distinct from the "Comprehensive Mental Health Program," which begins at Section 2.2.4.  Doc. 301-18 at 12.  Plaintiff's citation to sections of the "Comprehensive Medical Program" that address "Hospital Services" (2.2.3.6.1), "Coordination of Referrals" (2.2.3.11), "On-site Emergency Care" (2.2.3.12), and "Transportation" (2.2.3.19.1) are irrelevant, where there is an entirely separate section of the Contract that lays out the "Comprehensive Mental Health Program."  Indeed, the "Comprehensive Mental Health Program" states "Vendor shall deliver effective and efficient mental health services *on-site* to offenders determined to be mentally or emotionally disturbed, due to a chronic mental illness of situational stress." (Emphases added).  Doc. 301-18 at 12.  The "Comprehensive Mental Health Program" contains none of the mechanisms for offsite referral that are in the "Comprehensive Medical Program."  Plaintiff's reliance on the contract's medical program as establishing a duty to send patients offsite for mental health treatment when the mental health program refers only to "on-site" care is inapposite.

Plaintiff cites to Section 2.2.3.19.1, the "Transportation" section of the "Comprehensive Medical Program" because it states, "Vendor shall be responsible for emergency transportation of inmates for medical and mental health care."  Doc. 301-18 at 12.  But this section refers to acute emergencies that require use of an ambulance or helicopter and is intended to convey that Wexford pays for the cost of those transports.  There is no issue in this case as to whether Gay required an emergency transport due for acute medical or mental health care.  This section does not support an argument that the contract includes an obligation to send IDOC patients offsite for inpatient mental health treatment.

Moreover, Plaintiff argues Wexford "did not follow the written policies set forth by the State in favor of a practice and custom endorsed by the State." Doc. 143 at 151. Plaintiff cites to IDOC's administrative directives, which contemplate "transfers to a specialized mental health setting when intensive services are clinically indicated or transfer to a licensed mental health facility when the offender's needs exceed the treatment capabilities of the Department." Doc. 300-12 at 3. But IDOC's Standard Operating Procedure for Mental Health recognizes that, with respect to offenders needing inpatient level of care, "[u]ntil such time as the Department identifies a Psychiatric Hospital, an Enhanced Treatment Protocol shall be implemented for Inpatient Level of Care offenders…" Doc. 301-1 at 29; UMF 81-82. Gay received inpatient level care pursuant this enhanced treatment protocol. UMF 46.

## CONCLUSION

Plaintiff's *Monell* claim against Wexford is based on the incorrect assumption Wexford had a contractual duty to send IDOC patients offsite for inpatient mental health treatment, a theory inconsistent with the Contract's plain language, the parties' understanding of it, and the course of its performance. No basis exists to find Wexford maintained an unconstitutional practice by not sending patients offsite for mental health treatment when it undertook no duty to do so, and, in fact, had absolutely no authority. Wexford employees could make recommendations for inpatient transfer where clinically appropriate, something none of Gay's hundreds of mental health providers ever saw fit to do. Plaintiff's theory that inpatient hospitalization services should, in an ideal world, have been available in IDOC for the last 25 years, implicates no Eighth Amendment rights. Wexford's duty to provide mental health care, as delegated to it by IDOC, was limited to onsite services. Wexford is entitled to summary judgment.

WHEREFORE, for the above reasons, Defendants respectfully requests this Honorable Court grant their Motion for Summary Judgment and grant such further relief as deemed appropriate.

Respectfully Submitted,

CASSIDAY SCHADE LLP

By:  /s/ Joseph N. Rupcich

One of the Attorneys for Defendants,
WEXFORD HEALTH SOURCES, INC.,
KELLY RENZI, PSY.D., and WILLIAM PUGA,
M.D.

Joseph N. Rupcich
6283899
CASSIDAY SCHADE LLP
2040 West Iles Avenue, Suite B
Springfield, IL  62704
(217) 572-1714
(217) 572-1613 (fax)
jrupcich@cassiday.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 7, 2025, I electronically filed the foregoing Reply to Plaintiff's Response to Motion to for Summary Judgment, with following receiving electronic notice through the Court's ECF system.

Antonio M. Romanucci, Stephan D. Blandin
Bhavani Raveendran, Javier Rodriguez, Jr.
Samantha A. Harton, Stephen Weil
Romanucci & Blandin, LLC
321 N. Clark Street, Suite 900
Chicago, IL 60654
aromanucci@rblaw.net
sblandin@rblaw.net
b.raveendran@rblaw.net
jRodriguez@rblaw.net
sharton@rlaw.net

Jon Loevy
Arthur Loevy, Locke E. Bowman
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago IL 60607
arthur@loevy.com
jon@loevy.com

Christopher J. Bergin
Still Law Group
1101 North Broadway, Suite 102
Oklahoma City OK 73103
cbergin@fulmersill.com

Alan Remy Taborga
Assistant Attorney General
1776 E. Washington Street
Urbana IL 61802

Phillip W. Rehani
Assistant Attorney General
100 W. Randolph, 13th floor
Chicago, IL  60601
Phillip.Rehani@ilag.gov

Stetson F. Atwood, Laura Ieremia
Scott Kater, Monica L. Smit
Brian P. O'Kane
Donohue Brown Mathewson & Smyth, LLC
131 South Dearborn Street, Suite 1600
Chicago, IL 60603
stetson.atwood@dbmslaw.com
shelly.harders@dbmslaw.com
ieremia@dbmslaw.com
becker@dmbslaw.com
okane@dbmslaw.com

Robert T. Shannon, Thomas L. O'Carroll,
Stephen Mehr, John W. Anders
Hinshaw & Culbertson LLP
151 North Franklin Street
Suite 2500
Chicago, IL 60606
Telephone: 312-704-3000
Facsimile: 312-704-3001
Counsel for IDOC Defendants

13138734

/s/ Joseph N. Rupcich