IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MAURISA GAY, as Special Representative of the Estate of ANTHONY GAY, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 19-CV-1133 |
| v. | ) ) | |
| JOHN BALDWIN, et al., | ) ) | Judge: Sue E. Myerscough |
| Defendants. | ) ) | |

**<u>IDOC DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT</u>**

Although Plaintiff Maurisa Gay's response brief is of extraordinary length, at the end she concedes – expressly – that nearly all of the defendants and all of her constitutional claims should be dismissed. With that, there remains only one IDOC-related issue for this Court to consider: Plaintiff's ADA and RA claims against Rob Jeffreys (in his official capacity, therefore referred to here as "IDOC"),[1] which are considered together. IDOC is entitled to summary judgment on those, too.

Plaintiff's claim is *not* that IDOC denied Gay *all* psychiatric care. Her claim is *not* that IDOC denied Gay physical healthcare. She no longer argues IDOC denied Gay extensive access to mental health care, basic necessities, group therapy and other types of human contact, or other similar programs and activity. Rather, her argument is singular: she claims IDOC discriminated against Gay and refused to reasonably accommodate his mental illness because it refused to refer Gay for inpatient psychiatric care at an outside hospital. Plaintiff points to no case in this circuit in which a plaintiff won judgment on such a theory. Research shows none. That stands to

---

[1] Latoya Hughes is the acting director of the IDOC.

reason, particularly based on the undisputed facts in this case.  Gay's mental health treaters *never ordered inpatient care*.

Plaintiff makes only one other substantive argument to the IDOC Defendants' motion in her response:  she maintains that her claims are not barred by the statute of limitations or the doctrine of *res judicata*.  Plaintiff, though, is complaining about a specific, singular issue:  Gay's mental health care providers declining to refer him for inpatient mental health care.  That is not a continuing violation, and cannot be used to extend the limitations period.

**ANSWER TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS.**

**I.    The State failed to create an inpatient psychiatric capacity within the IDOC.**

1.    It is inevitable that a correctional facility will have custody of mentally ill prisoners. PX 51 at 15.

     i.        Undisputed but immaterial.  Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

2.    Inpatient mental healthcare involves mental health treatment in a hospital setting, which makes a big difference from care provided in prison. PX 3 at 31:16-34:4. Simply providing some inpatient services is not the same thing. PX 3 at 36:24-37:6.

     i.        Disputed as written but material.  Defendant Baldwin testified in the cited excerpt that, in his opinion, inpatient mental healthcare is more like a hospital setting.  For further context, Baldwin testified that a hospital setting allows for various levels of treatment based on the severity of a patient's mental illness, which differentiates it from prison care, not that such treatment "*makes* a big difference from care provided in prison," as written. (emphasis added).  Plaintiff's implication about the effects of the difference in inpatient care versus prison care is improper argument.

3.    Inpatient psychiatric hospital settings have physical space dedicated to treatment, including a place for patient-prisoners to congregate in an open and communal milieu environment as they would in a mental hospital setting, which is lacking withing the IDOC's prison facilities. PX 46 at 148:13-152:3. PX 19 at 62:12-24; PX 19 at 63:12-18.

     i.        Disputed but material.  Undisputed that the cited testimony describes inpatient settings with characteristics such as those contained in Plaintiff's

fact, but disputed that such treatment or space was completely lacking in IDOC's facilities. Indeed, a portion of the cited testimony includes that "there are spaces available in other places" elsewhere in IDOC for such treatment. PX 46 at 151:19-151:3.

4.    In April 2014, for example, the State reported that of 48,655 IDOC prisoners, 10,891 were on the mental health caseload, including 9,418 male prisoners on the case load. Of these, 3,894 were classified as seriously mentally ill. Of these, 39 were classified as requiring an inpatient level of care. PX 48 at 4.

    i.    Undisputed but immaterial. Undisputed that the cited numbers reflect IDOC statistics as of April 3, 2014, as listed in the cited material. Immaterial because the statistics reflect a single snapshot in time over Anthony Gay's lengthy incarceration, and thus do not accurately reflect the nature of IDOC's population over the length of time at issue. The systemwide statistics are also irrelevant to Plaintiff's individual claims, as limited by the concessions in her response brief, which now only include alleged statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

5.    Director John Baldwin became director of the Iowa Department of Corrections in 2007 and retired in January 2015. PX 3 at 11:15-24. He became director of the Illinois Department of Corrections in June 2015 and left in May 2019. PX 3 at 11:22-12:8.

    i.    Undisputed but immaterial. Immaterial because John Baldwin's tenure in Iowa has nothing to do with Anthony Gay's care and treatment while confined in the Illinois Department of Corrections, Defendants' summary judgment arguments, or Plaintiff's pending claims, as limited by the concessions in her summary judgment response brief. *See, e.g.,* Dkt. 304 at 150.

6.    During Director Baldwin's tenure at the Iowa DOC, Iowa DOC had an inpatient mental health capacity as of at least 1977. PX 3 at 10:14-11:3. When Baldwin arrived at the Illinois DOC in 2015, it did not have an inpatient mental health capacity. PX 3 at 12:2-16; 13:18-22.

    i.    Undisputed but immaterial. Immaterial because John Baldwin's tenure in Iowa has nothing to do with Anthony Gay's care and treatment while confined in the Illinois Department of Corrections, Defendants' summary judgment arguments, or Plaintiff's pending claims, as limited by the concessions in her summary judgment response brief. *See, e.g.,* Dkt. 304 at 150.

7.    The departments of corrections in numerous other states long ago developed psychiatric inpatient care capacity as well. In the immediate area these included, at a minimum, Missouri, Kentucky, Indiana, Iowa, Wisconsin, and Mississippi. PX 48 at 8. The Cook

County Department of Corrections, which operates the Cook County Jail, also had a psychiatric hospital capacity. See PX 48 at 9-10.

    i.    Undisputed but immaterial.  Immaterial because other state and county facility operations have nothing to do with Anthony Gay's care and treatment while confined in the Illinois Department of Corrections, Defendants' summary judgment arguments, or Plaintiff's pending claims, as limited by the concessions in her summary judgment response brief. *See, e.g.,* Dkt. 304 at 150.

8.    Prior to bringing the Elgin facility online in late 2018, the IDOC did not have an inpatient psychiatric hospital setting. PX 46 at 148:13-152:3. Elgin was designed with the primary goal being providing a physical space where the overall mission of the facility would be focused on mental health treatment. *Id.* at 151:1-18.

    i.    Undisputed and material to the extent Plaintiff suggests that IDOC did not have a stand-alone psychiatric facility.  Immaterial to the extent Plaintiff suggests IDOC did not provide psychiatric care before Elgin, as the cited testimony noted that all services were previously "provided within other IDOC facilities."  PX 46 at 148:10-12.

## II.    The State referred out prisoners with somatic medical needs for the care they required.

9.    Medical staff within the IDOC affirmed that the medical care available within the IDOC's walls was limited because of staffing, equipment, and facilities, and that when a patient needed somatic medical care that exceeded what could be provided within the IDOC's four walls, it was important to send prisoners outside for the medical care they required. PX 29 at 42:17-433:15; ECF 161 at 32. IDOC has and does make arrangements for prisoners who require hospitalization outside of the IDOC because of physical injuries or illnesses, to receive such outside hospitalization, or to receive effective care within the IDOC. ECF 161 at 32.

    i.    Undisputed that prisoners may receive care and/or hospitalization outside IDOC's walls.  Undisputed that a staff member testified that IDOC resources may require outside care in emergency situations.  Immaterial because the cited material does not support any suggestion that any service limitations affected Anthony Gay's care.  Immaterial because the purported fact does not address the specific care of Anthony Gay while incarcerated, and is therefore irrelevant to Plaintiff's pending statutory claims, as limited by the concessions in her response brief.

10.    In addition to the IDHS, there are multiple private and public hospitals in Illinois with inpatient psychiatric settings. PX 48 at 7-8.

    i.    Undisputed that other hospitals in Illinois have inpatient psychiatric settings, but immaterial.  Immaterial because the cited evidence specifically indicates that IDOC personnel contacted a least four hospitals

throughout Illinois about assisting with IDOC's inpatient needs, but none of the facilities agreed to assist because of "insurmountable security risks," inability to address IDOC's needs, or lack of interest. Also immaterial because the hospital offerings at facilities throughout Illinois are irrelevant to Anthony Gay's care while incarcerated in IDOC.

11.    Segregation is the isolation of a prisoner alone in their cell where they are segregated from the rest of the population in prison. PX 4 at 15:1-23. Cells are typically 7x9 or 7x10 feet and features a bed and a toilet. PX 4 at 15:1-23.

    i.        Material but disputed that Plaintiff's definition of segregation represents or otherwise summarizes the entire definition contained the cited evidence. The cited testimony indicates that segregation "means that [a] patient has in some way broken the rules and reaches a certain point to where the rules have been broken enough or seriously enough that [a prisoner] is put into an area where they're segregated from the rest of the population." PX 4 at 15:18-23. Also disputed because the cited evidence does not include any reference to the physical features of segregation like cell size, beds, or toilets.

12.    The prisoners are otherwise isolated nearly the entire day in their cell, with even means consumed in isolation. PX 30 at 27:3-28:4.

    i.        Disputed and immaterial. Disputed because the cited material has nothing to do with segregation cell time, the length thereof, or anything related thereto. Further disputed because mental health staff testified that patients in segregation received group therapy, recreation time, soothing room access, and weekly individual therapy. PX 15 at 67:21-68:13. Immaterial because the purported fact does not address the specific care of Anthony Gay while incarcerated, and is therefore irrelevant to Plaintiff's pending statutory claims, as limited by the concessions in her response brief.

13.    IDOC long observed a "division of labor" in which security and mental health were separate, such that security would handle discipline of mentally ill prisoners without involving mental health considerations. PX 16 at 35:13-36:7.

    i.        Undisputed that IDOC has different staff focusing on different areas of facility operations and prisoner care. Disputed to the extent the cited material does not support Plaintiff's assertion that IDOC had "long" observed such a division of labor. Further disputed because the cited material does not support Plaintiff's assertion that IDOC security staff disciplined mentally ill prisoners "without involving mental health considerations." Immaterial because a generalized statement about IDOC divisions of labor does not address the specific care of Anthony Gay during his incarceration, and is therefore irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

14. In the IDOC, disciplinary segregation is designed to deter a prisoner when they break the rules. PX. 1 at 20:12-18. It is punishment for breaking prison rules, and the imposition of time in disciplinary segregation is cumulative. PX. 1 at 50:7-14, 52:6-10.

    i.        Undisputed and material.

15. During the time Mr. Gay was incarcerated in the IDOC, the limit to the time a prisoner could spend in disciplinary segregation was the length of time on the disciplinary ticket. PX. 1 21:10-19.

    i.        Undisputed and material.

16. For most of the period of Mr. Gay's imprisonment within the IDOC until at least 2017, when a prisoner was placed in disciplinary segregation, mental health providers would be notified after the fact, PX 47 at 120:24-121:23, but the IDOC did not impose a requirement that mental health be consulted about the appropriateness of the discipline imposed. PX 47 at 122:17-123:1. The State's Rule 30(b)(6) witness stated it was possible there might be additional policies at individual institutions but was not aware of any. PX 47 121:24-122:16. By 2000, Mr. Gay had already accumulated more than 177 years in disciplinary segregation. PX 56.

    i.        Disputed to the extent that the cited testimony establishes that individuals in need of restrictive housing may be immediately referred to a mental health profession if they appeared to be in an altered mental state. PX 47 at 120:24-121:23. Further disputed that the cited testimony establishes that mental health staff were, in fact, notified by policy about continued segregation status and that some IDOC facilities may have added a requirement to consult mental health professionals on continued segregation status as part of their institutional directives. PX 47 at 122:17-123:1. Disputed that the cited passage (PX 47 121:24-122:16) includes any request of the deponent for specific versions of directives, despite Plaintiff's representation that the witness was not aware of any. Undisputed that Plaintiff had accumulated segregation time by 2000. Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC, and this therefore irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

17. 17. In 2012, Mr. Gay's "out" date was 12/27/01, as in 3001, and Mr. Gay's mental health provider testified that this was not the only offender on her caseload who she understood to have almost 100 years of segregation time. PX 18 at 132:12-133:10.

    i.        Undisputed that an individual testified as much, but immaterial to the extent it suggests Plaintiff would not be released from IDOC until 3001, as shown by his release on parole in 2018. Defs.' Ex. 6 at 1.

18. Mental health staff did not have the ability to insist that a prisoner be transferred out of segregation. PX 15 at 67:1-7. Segregation was a security determination, not a mental health determination, and is not one mental health could make. PX 15 at 68:15-69:4; PX 24 at

162:15- 163:2; PX 29 at 49:9-50:2. Mental health staff did not have control over whether or not a prisoner was kept in segregation. PX 15 at 66:20-23.

       i.            Undisputed and material.

19.     Mr. Gay's healthcare providers explained that even though they believed segregation harmed the mentally ill, masses of mentally ill prisoners were kept in segregation in prisons like Pontiac, because the IDOC had not yet begun to do mental health segregation reviews. PX 15 at 67:8-20.

       i.            Disputed and immaterial. Disputed because the cited testimony, from a single provider, does not support the assertion that "masses of mentally ill prisoners were kept in segregation." Further disputed because the provider indicated that even while her patients were in segregation before IDOC began mental health segregation reviews, her patients received group therapy, recreation time, soothing room access, and weekly individual therapy. PX 15 at 67:21-68:13. Immaterial because a single provider's generalized opinion about IDOC prisoners systemwide is irrelevant to Plaintiff's individual claims, as limited by the concessions in her response brief, which now only include alleged statutory violations based on the care of a single individual in the Illinois Department of Corrections.

20.     In 2014 the IDOC adopted formal level-of-care definitions that it used for categorizing the mental health needs of its patient population. PX 48 at 3. This included outpatient, residential, crisis, and inpatient. PX 12 at bates 010021; PX 48 at 3-4. The "inpatient" level of care "presents the most intensive level of treatment, involving an individual plan of active psychiatric treatment that includes 24-hour access to a full range of psychiatric services in a mental health setting." PX 48 at 4. Between 2014 and 2018, IDOC Administrative Directives provided that IDOC patients "appropriate for this [inpatient] level of care require a level of treatment that exceeds the level of care that the Department is able to provide and results in commitment to outside facilities for a duration as considered clinically necessary by the offender's treatment team." PX 12 at bates 010021, -27.

       i.            Undisputed and material that IDOC maintained various written policies during the specified time period. Disputed to the extent the 2014 document at PX 48 is a proposal to a monitor and not a formal administrative directive. Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

21.     Mr. Gay's mental health providers believed that out-of-cell time had a therapeutic benefit. PX 24 at 145:10-13.

       i.            Material but disputed to the extent this additional fact, and the evidence cited therein, suggests a consensus among all of Anthony Gay's treaters

throughout his incarceration. The cited evidence is only the opinion testimony of a single provider.

22. IDOC mental health staff who treated Mr. Gay were of the opinion that segregation can have detrimental effects on those prisoners who are seriously mentally ill, including by causing decompensation. PX 1 at 21:23-3.

    i.    Disputed because the cited excerpt makes no mention of segregation causing any decompensation in Anthony Gay. Otherwise, undisputed that a single staff member testified as much. Immaterial to the extent the fact purports to describe any effect of segregation on Anthony Gay's care, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

23. Dr. Nunez offered the opinion that while it is always difficult to stabilize severely mentally ill patients, it is much more difficult to do so when they are confined to a cell for much of the day. PX 19 at 76:5-20.

    i.    Undisputed that Dr. Nunez testified as much. Immaterial to the extent the cited material makes no reference to any specifics about Anthony Gay's care, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

24. Dr. Nunez, one of Mr. Gay's mental health treaters, offered the opinion in the correctional setting regular social stimulation is needed for good psychiatric health, PX 19 at 105:10-106:7, and that a patient, including Mr. Gay, who is locked in a cell for 23 hours a day in isolation will always do worse from a mental health perspective. PX 19 at 103:14-104:12.

    i.    Undisputed that Dr. Nunez testified as much. Immaterial to the extent the cited material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

25. Dr. Jamie Chess, one of Mr. Gay's mental health treatment providers, was of the opinion that placing any person with serious mental illness in prolonged segregation was not in their best interest, and that it would have a negative impact on that person's serious mental illness. PX 2 at 159:8-18; 163:16-164:5.

    i.    Undisputed that Dr. Chess testified as much. Immaterial to the extent the cited material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

26. Before 2018, Dr. Chess and her superiors in the IDOC were aware that placing mentally ill prisoners in prolonged segregation was detrimental to their mental health. PX 2 at 169:1-21; 170:11-171:2.

      i.      Undisputed that Dr. Chess testified as much. Immaterial to the extent the cited material lacks any specificity about Anthony Gay's care while incarcerated or any indication about when exactly "Dr. Chess and her superiors" learned before 2018, making it vague and irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

27.   Dr. Marano, another of Mr. Gay's mental health providers, was of the opinion that isolating mentally ill people in segregation has negative effects on them. PX 15 at 56:8-18; 58:12-16. PX 15 at 66:2-10.

      i.      Undisputed that Dr. Marano testified as much, but immaterial because her generalized opinion—to the extent it is admissible opinion testimony at all—does not specifically relate to her care of Anthony Gay, and is therefore irrelevant to Plaintiff's individual claims, as limited by the concessions in her response brief, which now only include alleged statutory violations based on the care of a single individual in the Illinois Department of Corrections.

28.   Dr. Marano explained that mentally ill people in segregation tend to get more symptomatic, leading to more illness and dysfunction and an inability to act in a socially appropriate manner. PX 15 at 56:19-58:2.

      i.      Undisputed that Dr. Marano testified as much, but immaterial because her testimony does not specifically relate to her care of Anthony Gay, and is therefore irrelevant to Plaintiff's individual claims, as limited by the concessions in her response brief, which now only include alleged statutory violations based on the care of a single individual in the Illinois Department of Corrections.

29.   Dr. Renzi, the director of mental health services at Pontiac during part of Mr. Gay's incarceration there, PX 26 at 19:1-8, understood that disciplinary segregation was associated with a potential for decompensation in mentally ill prisoners, PX 26 at 32:4-10, whereas out of cell time could help stave off worsening symptom of decompensation in mentally ill people who were held in isolation. PX 26 at 33:2-9.

      i.      Undisputed that Dr. Renzi worked at Pontiac and testified that she believed disciplinary segregation was associated with a potential for decompensation in mentally ill prisoners. Disputed that she testified out-of-cell time could help stave off worsening symptoms of decompensation in mentally ill people who were held in isolation. The cited testimony indicates that Dr. Renzi believed out-of-cell time could "stave off symptoms for people prior to them showing signs of decompensation," and "was more of an effort … to prevent the symptoms from increasing in the first place," not after decompensation had already set in, as suggested in Plaintiff's statement. PX 26 at 32:22-33:9. Immaterial to the extent Dr. Renzi's generalized testimony has nothing to do with Anthony Gay's care

and confinement in IDOC, and is therefore irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

30. Restriction of a person's social contact with others can exacerbate mental illness, and the effects are more pronounced in persons who are already mentally ill. PX 26 at 143:8-16.

    i.      Undisputed that a single individual testified as much about her training and experience. Immaterial to the extent the cited material does not suggest any such result actually manifested in Anthony Gay, and is therefore irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

31. During Mr. Gay's incarceration, mental health staff did not have authority to have a prisoner released form disciplinary segregation. PX 1 at 88:18-21.

    i.      Disputed to the extent Plaintiff suggests the cited material supports her assertion that mental health staff lacked such authority throughout Anthony Gay's entire incarceration. The cited testimony does not have any temporal component. Otherwise, undisputed and material.

32. Courtney Meyer, who had been a mental health provider at Menard correctional center, could not remember any instance in which prison security staff consulted with her to review the confinement of a seriously mentally ill prisoner, including Mr. Gay, in segregation. PX 17 at 136:5-21.

    i.      Undisputed that Cortney Meyer testified as much, but immaterial as to any suggestion that Meyer's recollection, or lack thereof, meant that no IDOC staff ever consulted about Anthony Gay's care or confinement.

33. Mr. Marano testified that among IDOC correctional staff there existed a culture in which they did not believe in mental health treatment and would deny mental health treatment to difficult patients like Mr. Gay, often for purportedly "discipline" reasons, claiming that he was not really mentally ill. PX 15 at 92:14-96:5.

    i.      Undisputed that Dr. Marano testified as much, but immaterial because the cited excerpt of her testimony does not specifically relate to her care of Anthony Gay, and is therefore irrelevant to Plaintiff's individual claims, as limited by the concessions in her response brief, which now only include alleged statutory violations based on the care of a single individual in the Illinois Department of Corrections. Plaintiff has not asserted a *Monell* claim against any individual or entity, making any "culture" that exists among IDOC staff irrelevant to Plaintiff's individualized statutory claims. Also immaterial because Dr. Marano testified that even mental health professionals questioned whether, or did not believe, Anthony Gay was mentally ill. PX 15 at 95:1-96:5.

34.    Prisoners who were serving time for disciplinary segregation who were designated as requiring an inpatient level of care would not be removed from segregation. They would simply receive their "inpatient" care there. PX 28 at 36:1-17, 39:12-24.

    i.        Disputed to the extent Plaintiff argues or implies via an additional statement of fact the care offered to prisoners in segregation was somehow inadequate.  Otherwise, undisputed and material.

35.    As of April 2014, the State reported that of 48,655 IDOC prisoners, 10,891 were on the mental health caseload, including 9,418 male prisoners on the case load. Of these, 3,894 were classified as seriously mentally ill (SMI). And of these, 39 were classified as requiring inpatient level of care. PX 48 at 4. Of the 39 male prisoners and 7 female prisoners designated as requiring an inpatient level of care, 100% were confined in disciplinary segregation.  PX 489 at 5.  There were 898 males, and 70 females designated at the next-highest level of treatment, Residential, of which all the females and 97% of the males were in disciplinary segregation. PX 48 at 5-6. Of those SMI inmates on the lowest level of care, Outpatient, 69% of the males were in disciplinary segregation and the remainder were in protective custody. PX 48 at 5-6. 97% of the outpatient females within segregation. PX 48 at 5- 6.

    i.        Undisputed but immaterial.  Undisputed that the cited numbers reflect IDOC statistics as of April 3, 2014, as listed in the cited material. Immaterial because the statistics reflect a single snapshot in time over Anthony Gay's lengthy incarceration, and thus do not accurately reflect the nature of IDOC's population over the length of time at issue.  The systemwide statistics are also irrelevant to Plaintiff's individual claims, as limited by the concessions in her response brief, which now only include alleged statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

36.    The State, through the Illinois Department of Human Services ("IDHS"), operates multiple psychiatric hospitals that provide inpatient mental health treatment and an inpatient level of care. PX 49; PX 48 at 8-9; PX 46 at 121:3-18.

    i.        Undisputed and material.

37.    Pursuant to 730 ILCS § 5/3-8-5, IDOC prisoners may be transferred to IDHS for mental health treatment.

    i.        Undisputed that 730 ILCS 5/3-8-5 provides as much.  Immaterial because the cited statutory provision does not include or refer to any admissible evidence in the record.

38.    The State created the "inpatient" definition of care in 2014, PX 46 at 156:5-11, but at least through the entire relevant period of 1996 through 2018, the State had always incarcerated prisoners whose mental illness was sufficiently severe to have met the inpatient classification. PX 46 at 157:21-159:13.

i.        Undisputed that IDOC created a definition in 2014 and housed prisoners with many levels of mental illness, but immaterial because the cited evidence does not support any suggestion that prisoners, including Anthony Gay in particular, received deficient care, or that any such prisoners met all necessary qualifications for out-of-facility transfers, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief. Indeed, the cited testimony establishes that IDOC "has always recognized and accepted that mental health treatment needs to be provided to those that are within its custody," including at whatever level the individual required. PX 46 at 158:12-16.

39.    At the latest in 1994 and throughout the relevant period of 1996 to 2018, the IDOC had written policies that contemplated transfer of mentally ill prisoners to IDHS for mental health treatment if they had "severe" mental health problems. PX 12 at Bates 010011-12, 010016-17, 010022-23, 010028-29; PX 13 at 2, 4; PX 42 at 2-3, 7, 12, 13, 18; PX 43 at 3-5. For example, one policy provided that mentally ill prisoners would receive "Transfer to a specialized mental health setting when intensive services are clinically indicated or transfer to a licensed mental health care facility when the offender's needs exceed the treatment capabilities of the Department." PX 12 at 010011.

i.        Undisputed and material that IDOC maintained various written policies during the specified time period. Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

40.    Mental health staff treating Mr. Gay believed that many IDOC prisoners would benefit from being transferred to outside psychiatric hospitals, including Mr. Gay. PX 15 at 70:14-71:11.

i.        Undisputed that a single individual testified as much, but immaterial without any specific evidentiary connection to Anthony Gay and his care while incarcerated in IDOC, or his qualifications, or lack thereof, for any transfer to an outside facility. Thus, the fact is irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

41.    Between 1996 and 2018, there were no transfers of mentally ill prisoners from IDOC to IDHS for treatment, with the exception of a single patient in 2018. PX 10 at 30:7- 14.

i.        Undisputed but immaterial because the statistics do not relate to Anthony Gay's care while in IDOC or his eligibility, or lack thereof, for any out-of-facility transfer, and are therefore irrelevant to Plaintiff's individual claims, as limited by the concessions in her response brief, which now only include alleged statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

42.     With the exception of a single prisoner transferred in 2018, the State is not aware of any communications in which the IDHS was ever approached about accepting IDOC prisoners between 1996 and 2018. PX 10 at 35:21-36:10.

      i.               Disputed and immaterial.  Disputed because the cited testimony does not support the factual assertion that the State's Rule 30(b)(6) witness was not aware of any communications between IDOC and IDHS about prisoner transfers besides a single transfer in 2018.  The cited testimony instead indicates that the witness had never attempted to determine whether such communications had occurred—not that such communication had, in fact, never occurred.  Immaterial because the referenced statistic does not relate to Anthony Gay's care while in IDOC or his eligibility, or lack thereof, for any out-of-facility transfer, and is therefore irrelevant to Plaintiff's individual claims, as limited by the concessions in her response brief, which now only include alleged statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

43.     Between 1996 and 2018, with a single exception, the State gave no consideration to the transfer of IDOC prisoners for outside psychiatric care. PX 10 at 37:1-9, 41:4-12. (That one exception was not Mr. Gay, but rather another prisoner. PX 10 at 30:7- 31:15; 36:16-21.) The State could give no policy reason for its failure even to consider such transfers during this time. PX 10 at 41:13-16.

      i.               Disputed and immaterial.  Disputed because the IDHS representative designated to provide Rule 30(b)(6) testimony said she was not prepared to testify on this topic despite saying she was not aware of any such considerations.  PX 10 at 37:10-12.  Immaterial because the referenced statistic does not relate to Anthony Gay's care while in IDOC or his eligibility, or lack thereof, for any out-of-facility transfer, and is therefore irrelevant to Plaintiff's individual claims, as limited by the concessions in her response brief, which now only include alleged statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

44.     Mental health provider Andrea Moss testified that mental health staff in IDOC could not refer their patients to an inpatient psychiatric hospital. PX 18 at 18:17-24.

      i.               Disputed and immaterial.  Disputed that the cited evidence supports the factual assertion, because the referenced testimony does not include any discussion of providers' ability to refer patients—just that transfers had not occurred between IDOC and an inpatient hospital during the witness's tenure.  Immaterial because the treatment of other prisoners does not relate to Anthony Gay's specific care while in IDOC or his eligibility, or lack thereof, for any out-of-facility transfer, and is therefore irrelevant to Plaintiff's individual claims, as limited by the concessions in her response brief, which now only include alleged statutory violations based on the

care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

45.    Pontiac had units housing severely mentally ill prisoners, PX 18 at 24:18-25:8, but during the entire time mental health provider Andrea Moss worked at Pontiac, not a single mentally ill prisoner was transferred to an outside psychiatric hospital. PX 18 at 19:5-12.

      i.    Undisputed that Andrea Moss testified as much, but immaterial because the cited evidence does not address IDOC operations throughout Anthony Gay's entire IDOC incarceration and instead only encompasses Moss's tenure and recollection.

46.    Mental health staff could not refer mentally ill prisoners to outside treatment even if they had very serious mental health issues. PX 4 at 51:2-7. PX 15 at 68:15-22; 69:18-21. PX 16 at 22:3-20.

      i.    Undisputed and material.

47.    IDHS houses two categories of mental health patients. In one category are civilians who are afflicted with mental illness, which is sufficiently severe that they must be hospitalized, but whose mental illness has not connected with criminal prosecution in the criminal justice system. These patients are referred to as "civil" patients. PX 10 at 48:16-24.

      i.    Disputed to the extent the cited material refers to three categories of patients.  PX 10 at 48:16-24.  Otherwise, undisputed but immaterial as Anthony Gay was never housed in IDHS as a civilian disconnected from the criminal justice system, making this fact irrelevant to his incarceration in IDOC and Plaintiff's pending claims, as limited by the concessions in her response brief.

48.    The remainder of IDHS patients are referred to as "forensic" patients, PX 10 at 48:16- 49:6. The forensic patients all come to IDHS through contact with the criminal justice system, and they fall into several categories, which are described in the following paragraphs.

      i.    Disputed that the remainder of IDHS patients fall into a single category. The cited evidence indicates the IDHS population is divided into three categories: forensic, civil, and people referred to IDHS from IDOC after completing their prison sentence but who remain too mentally ill to return to the general public.  PX 48:16-49:6.  Undisputed that forensic patients have had contact with the criminal justice system.  Immaterial because the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

49.    IDHS houses forensic patients who have committed a crime but must be restored to competency in order to stand trial. PX 10 at 46:19-47:6. This includes current IDOC prisoners: IDHS accepts from IDOC referrals of IDOC prisoners where the prisoner is

awaiting charges in another criminal case but must first be restored to competency so that they can face the charges. PX 2 at 250:19-251:14.

    i.      Undisputed that IDHS houses forensic patients that are being returned to competency to stand trial and that an IDOC prisoner may be housed at IDHS.  Disputed that the cited evidence (PX 2 at 250:19-251:14) establishes that IDOC prisoners were referred to IDHS while facing other charges—the cited evidence hypothesizes that judges may remand individuals to the custody of IDHS.  PX 2 at 251:6-14.  Immaterial because the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

50.    A second portion of IDHS's forensic population are persons who have committed a crime but have been deemed not guilty by reason of insanity, or "NGRI". PX 10 at 47:6-13. NGRI patients include persons who have committed murder, rape, and other extremely violent crimes, PX 10 at 19-22, and they are committed to the custody of IDHS because they are considered too dangerous to be in the public. PX 10 at 14:18.

    i.      Undisputed that IDHS's forensic population includes NGRI individuals who have committed offenses and may be a danger to the public. Immaterial because the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

51.    IDHS also accepts as "forensic" patients who had been serving prison sentences in the IDOC and who are referred from IDOC directly to IDHS at the end of their sentence. PX 10 at 48:2-15. Such transfers would be made for multiple reasons, including a conclusion by IDOC mental health staff that the outgoing IDOC prisoner's mental illness made them dangerous. PX 16 at 34:12-15.

    i.      Disputed that the cited evidence classifies post-IDOC referrals as "forensic" rather than its own separate group.  PX 48:16-49:6.  Undisputed that the cited testimony includes discussion about IDHS referrals for IDOC residents completing their sentences.  Immaterial because the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

52.    During the relevant period IDHS housed forensic patients in four different facilities— Chester, Alton, McFarland, and Elgin. PX 10 at 15-20. Alton and McFarland are medium security facilities, while Chester is a medium- and maximum-security facility. PX 10 at 49:15-20

      i.      Disputed that the cited evidence establishes that Elgin was one of the IDHS facilities housing forensic patients. The cited evidence mentions exclusively Chester, Alton, and McFarland as being such facilities. PX 10 at 49:13-16. Disputed that the cited evidence establishes that Chester was a medium-security facility; the testimony only notes Chester as a maximum-security facility. PX 10 at 49:15-20. Otherwise, undisputed but immaterial because the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

53.    IDHS could and did hire locum tenens mental health providers to deal with fluctuations in its caseload. PX 10 at 60:7-10.

      i.      Undisputed but immaterial because the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief. Nor does the cited evidence establish that Anthony Gay ever resided at IDHS.

54.    IDHS did have contraindications for admission to IDHS facilities, but these were largely medical in nature, such as a medical condition that would make it difficult for a person to live in a mental health facility. PX 10 at 62:12-63:22; PX 10 at 113:20- 115:20; PX 11.

      i.      Undisputed that IDHS's contraindications were largely medical in nature, but immaterial because the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief. Nor does the cited evidence establish that Anthony Gay ever resided at IDHS.

**III.    The State never implemented the 2014 IGA between IDOC and IDHS.**

55.    As of April 2014, the IDOC represented to the Rasho monitor that it "recognized the immediate need for inpatient services for its SMI population." PX 48 at 6. The State represented that it would make 10 inpatient beds available at Chester, and with rotations would be able to treat approximately 40 prisoner-patients at Chester per year as mental health treatment in IDHS stabilized the prisoners. PX 48 at 9. That corresponded roughly with the 39 IDOC male prisoners identified as requiring an inpatient level of care. PX 48 at 4

      i.      Undisputed and but immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

56.    The State testified that at a minimum, it would have considered the lack of inpatient beds to be an emergency when the State began engaging with the Rasho monitor. PX 46 at 166:12-

167:17; 182:18-24; 183:2-10. The monitor was retained in September 2013. PX 48 at 2. The state also testified that the emergency consideration extended back minimally to 2012. 169:16-24.

    i.        Undisputed that the cited testimony states as much, but disputed to the extent the witness's knowledge only dated back to 2012 when the witness assumed the role of IDOC chief of mental health services.  PX 46 at 170:23-171:7, 172:7-21.  Undisputed that the monitor discussed in PX 48 was retained in September 2013.  Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

57.    The 2014 IGA is an "agreement" between two agencies of the State of Illinois, the IDOC and the IDHS, signed in August 2014. The agreement contemplates the periodic transfer of up to 10 IDOC prisoners to Chester for mental health treatment. PX 14.

    i.        Undisputed and material.

58.    Before the signing of the Inter-Governmental Agreement ("IGA") in 2014 the State is not aware of any consideration to the transfer of mentally ill IDOC prisoners to the IDHS for treatment. PX 10 at 74:15-20.

    i.        Disputed to the extent that Plaintiff suggests the cited evidence establishes that no such consideration occurred.  Rather, the evidence establishes that the deponent did not know one way or another whether any such consideration had occurred.  Immaterial because the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.  Nor does the cited evidence establish that Anthony Gay ever resided at IDHS.

59.    The State also could not explain and did not know why the IGA only contemplated sending IDOC patients to Chester instead of the IDHS's other facilities around the state, which had 531 additional forensic beds among them. PX 14; PX 10 at 75:12- 24, 91:5-94:3.

    i.        Undisputed that the deponent in the cited evidence did not know certain considerations underlying the IGA.  Immaterial because the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.  Nor does the cited evidence establish that Anthony Gay ever resided at IDHS.

60.    At Chester, the IDHS had four psychiatrists and three to four psychologists for 284 forensic patients, resulting in an approximate range of patient-to-psychiatrist / psychologist ratio of 71:1 or 94:1. PX 10 at 78:10-79:24.

      i.          Undisputed that the deponent in the cited evidence testified to the referenced numbers. Immaterial because the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief. Nor does the cited evidence establish that Anthony Gay ever resided at IDHS.

61.    Despite these ratios, the IGA, which was signed in August 2014 required the IDOC to recruit two full-time psychiatrists and one full-time psychologist to Chester before accepting any of the IDOC patients—a ratio ranging from 5:1 or 10:1. PX 14; PX 10 at 80:1-5. The State insisted on this high ratio even though it was extremely difficult to recruit mental health staff to work at Chester, which is in a rural area. PX 10 at 79:7-14, 88:9-16.

      i.          Undisputed that the IGA required as much or that recruiting in Chester posed challenges. Disputed that the cited evidence establishes any reason for the IGA requiring certain ratios, including employee recruitment. Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief. Nor does the cited evidence establish that Anthony Gay ever resided at IDHS.

62.    The State could offer no reason why the IGA mandated such vastly different ratios for patients transferred from the IDOC for treatment. PX 10 at 84:7-86:8.

      i.          Undisputed that the deponent in the cited evidence did not personally know such a reason. Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief. Nor does the cited evidence establish that Anthony Gay ever resided at IDHS.

63.    In an October 2014 filing in the Rasho case, the State conceded that the IDOC "currently lacks any hospital-level beds to provide adequate inpatient [mental health] treatment," and that the "IDOC has long recognized that the Department's lack of inpatient beds constitutes an emergency situation requiring immediate redress." PX 44 at 2. See also PX 48 at 6 ("The IDOC recognizes the immediate need for inpatient services for its SMI population.").

      i.          Undisputed that a *Rasho* status report stated as much, but immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

64.    In November 2014, after the IGA was signed, the State insisted on even more stringent ratio and decreed that in order for the IDHS to take three inpatient IDOC prisoners, IDOC would need to provide one full-time psychologist and one part-time psychiatrist. PX 45.

> i. Disputed that the cited evidence establishes that "the State" insisted on or decreed anything. Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief. Nor does the cited evidence establish that Anthony Gay ever resided at IDHS.

65. The State does not know why no prisoners were transferred from IDOC to IDHS between 1996 and 2018 for treatment. PX 10 at 28:23-29:8; 32:4-8.

> i. Undisputed that the deponent did not personally know about the reason for any transfers or lack thereof between 1996 and 2018. Immaterial because the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief. Nor does the cited evidence establish that Anthony Gay ever resided at IDHS.

66. As of April 2016, the IDOC's Standard Operating Procedure recognized that prisoners who required an inpatient level of care that the IDOC could not provide, and instead required hospitalization at a psychiatric hospital. PX 36 at 27. But the SOP provided that until the IDOC identified a psychiatric hospital, referrals out would not occur—instead, prisoners needing an "inpatient" level of care would receive "enhanced" care instead. PX 36 at 27.

> i. Undisputed except that the cited evidence does not explicitly establish that referrals would not occur or suggest that such prisoners would not receive appropriate care. Rather, the evidence establishes that all such offenders received an "Enhanced Treatment Protocol," which included weekly visits with psychiatrists and mental health professionals, individual therapeutic sessions with licensed clinical psychologists (if the prisoner was able to tolerate as much), and enhanced out-of-cell structured activity. PX 36 at 27. Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

## IV. In segregation, Mr. Gay could not control of his maladaptive behavior.

67. Dr. Renzi, one of Mr. Gay's mental health providers at Pontiac, agreed that Mr. Gay was severely mentally ill. PX 26 at 76:13-16.

> i. Undisputed and material.

68. One of Mr. Gay's mental health providers at Pontiac, Dr. Renzi, could recall horrific acts of self-harm, like sewing parts of a fan motor into his scrotum and stabbing a pen near his eye. PX 26 at 104:13-105:1. These were among the higher end of the scale of self-injurious behavior that Dr. Renzi had witnessed at Pontiac.

      i.        Undisputed and material with the caveat Dr. Renzi testified only that the fan motor incident ranked among the higher end of self-injurious behavior she observed. PX 26 at 105:11-18.

69.    Mental health providers at Pontiac CC described Mr. Gay's level of self-harm as "extreme" and something that could not go easily overlooked, including incidents such as removing a testicle and placing it on the bars of his cell to show passersby. PX 24 at 61:17-21; 69:17-70:1.

      i.        Material and undisputed that a single provider testified that Anthony Gay's level of self-harm was extreme and was not easily overlooked. Undisputed that Anthony Gay self-harmed his testicles. Defendants object to the description of a single incident in question as inadmissible hearsay, and therefore dispute the assertion, because the cited evidence is an individual testifying about what he heard from someone else.

70.    Mental health staff triaged their caseload based on severity. PX 18 at 55:4-20, 62:8- 63:8. Mr. Gay was seen more frequently than other prisoners, but this was due to the complexity of his case. PX 17 at 102:1-3.

      i.        Undisputed and material.

71.    Refusal to participate in medical or mental health services can be a sign of decompensation. PX 24 at 102:19-23; PX 26 at 147:15-19.

      i.        Undisputed but immaterial. Immaterial because neither of the cited deposition excerpts indicate that Anthony Gay's refusal to participate in medical or mental health services was caused by or the result of any decompensation.

72.    Mr. Gay received a number of mental health diagnoses over the course of his incarceration, including borderline personality disorder, adjustment disorder with cluster B features, antisocial personality disorder, borderline personality disorder with narcissistic features, impulse control disorder, mood disorder not otherwise specified, narcissistic personality disorder, depressive disorder, personality disorder not otherwise specified, post-traumatic stress disorder, bipolar disorder, unspecified anxiety disorder, and unspecified depressive disorder. PX 38; PX. 1 at 31:8-15.

      i.        Undisputed and material.

73.    Mr. Gay had been diagnosed with an Axis II borderline personality disorder and a psychosis accompanied by depression, PX 4 at 23:21-24:5, as well as PTSD. PX 15 at 17:15-19. PX 17 at 41:12-14. His Axis II constructs were considered by his mental health providers to be significant. PX 15 at 17:15-19. Mr. Gay's mental health treaters considered him to be seriously mentally ill. PX 4 at 24:7-9.

      i.        Undisputed and material that Anthony Gay had been diagnosed as such.

74.     During his segregation Mr. Gay's MGAF scores were recorded as low as 21, see PX 25 at 1, reflecting severe impairment in functioning. PX 25 at 5; PX 24 at 113:2-13. Dr. Renzi, who made the MGAF designation, testified that her designation of Mr. Gay in this range was consistent with his designation as being seriously mentally ill. PX 26 at 109:5-21. Andrea Moss, one of Mr. Gay's mental health treaters at Pontiac, viewed him as severely mentally ill characterologically, such that he struggled significantly under her care. PX 18 at 41:2-9.

   i.      Material and undisputed that Dr. Renzi recorded Anthony Gay's MGAF score as 21 based on serious impairments, and that she testified as much. Undisputed that Andrea Moss viewed Gay as severely mentally ill with struggles, but that "he was able to function independently." PX 18 at 41:6-9.

75.     Mr. Gay would tell mental health providers that he used self-harm to get things he wanted and presented his self-harm as rational; while his mental health providers attempted unsuccessfully to show him that his self-harm had the opposite effect, and only made his situation worse. PX 24 at 150:24-152:11.

   i.      Undisputed but immaterial. Immaterial because the cited additionally discusses the testimony indicates that a treater tried to help Anthony Gay, but he "didn't like taking responsibility" and admittedly self-harmed to achieve a reaction or desired response.

76.     Mr. Gay's mental health treaters at Pontiac offered the opinion that Mr. Gay's events of self-harm indicated times at which he was decompensating. PX 24 at 101:8- 102:1.

   i.      Undisputed that a single medical provider testified as much, but immaterial because the provider believed Anthony Gay was decompensating for "brief periods," and that Gay did "better" and "recuperated well" in follow-up meetings following self-harm. PX 24 at 101:8-102:1.

77.     Many of the behaviors that resulted in discipline for Mr. Gay, including "splitting," manipulation of others, and attempts to dictate his treatment were all symptoms of his Axis II borderline personality disorder, and are considered a dysfunctional way of getting needs met that is consistent with borderline personality disorder. PX 16 at 7:19-24, 51:14-52:9, PX 34.

   i.      Undisputed and material.

78.     Mr. Gay's treatment team saw his efforts at manipulation as an unhealthy means of trying to advocate for himself and as part of his treatment they encouraged him to advocate appropriately. PX 16 at 14:3-20; PX 35.

   i.      Undisputed and material with the caveat that the cited evidence reflects the opinion of a single medical provider, not a "team" as presented.

79. Clinical descriptions of Mr. Gay as "manipulative" did not have the same negative connotation as its use by laypersons. Instead, the term is part of a group of diagnostic criteria for multiple personality disorders, including borderline personality disorder. In this context, it referred the use of various means to get their needs met that may not occur to persons without personality disorders. PX 26 at 117:1-118:18.

  i.    Undisputed but immaterial to Anthony Gay's care while incarcerated in IDOC, and therefore irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

80. Mental health staff reported that Mr. Gay engaged in "a lot" of "extreme" self-injury and inappropriate attachment to certain staff. PX 26 at 67:3-69:17. Mr. Gay's mental health treaters were of the opinion that his frequent improper personal attachments to female staff were a common symptom of patients with borderline personality disorders. PX 26 at 134:7-16.

  i.    Undisputed that a single individual testified as much and material.

81. In one incident while he was incarcerated at Menard, Mr. Gay cut his scrotum open, pulled his testicles out, and held them in his hands. PX 8 at 27:2-8.

  i.    Undisputed that Anthony Gay harmed his scrotum and testicles, and material. Defendants object to the cited evidence and description of the incident in question as inadmissible hearsay testimony from an individual who received a phone call about the situation from a caller he did not remember.

82. Dr. Marano noted that she had observed many correctional officers responding to prisoners with Axis II disorders as engaging in "countertransference," meaning negative emotional reactions to the symptomatic behaviors of prisoners with Axis II personality disorders. PX 15 at 62:18-64:8.

  i.    Disputed and immaterial. Disputed because the cited evidence does not support Plaintiff's representation that Dr. Marano observed "many" instances of countertransference. Rather, Dr. Marano testified that countertransference was discussed in the mental health unit. Immaterial because, absent more, the purported observation of "many" instances of countertransference has nothing to do with Anthony Gay's individualized care. Also immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

83. By April 2015 Mr. Gay's mental health team prepared a mental health treatment plan for him that identified one set of his mental health problems as follows: "[p]oor affect regulation, poor distress tolerance, poor impulse control when anxious / panicked / irritable, primarily due to emotional reasoning when his routine is altered or perceived rejection. These symptoms have directly resulted in a life sentence." PX 41. The treatment goal for

this problem included Mr. Gay reducing self-injurious behavior and thereby reducing crisis-watch placement, along with therapy sessions. PX 41.

    i.       Disputed but material. Disputed because the treatment goal listed in Plaintiff's fact did not target the problem listed earlier in the fact. As explained in the cited document, the actual treatment goal for the problem Plaintiff identified was for Anthony Gay to not receive disciplinary infractions involving assaultive behavior for one year. PX 41 at 1.

84.    Mr. Gay's April 2015 mental health treatment plan grouped "Long [history] of severe [self-injurious behavior] and assaultive behavior. These symptoms have directly resulted in a natural life sentence." PX 41

    i.       Undisputed that the cited material reflects the quoted language. Disputed that Anthony Gay ever received a natural life sentence, given his release from IDOC on parole in 2018 and his movement and placement histories. Defs.' Ex. 6 at 1; Defs.' Ex. 7 at 1. Nor does Anthony Gay's lengthy IDOC disciplinary history reflect any natural life sentence. Defs.' Ex. 18.

85.    Dr. Marano, a psychologist at Pontiac, agreed that Mr. Gay's self-harm to get things he wanted was not healthy, that Mr. Gay had problems with impulse control, and that while he was in segregation Mr. Gay was easily over-stimulated by noises and people. PX 16 at 53:3-54:8.

    i.       Material but disputed to the extent that Dr. Marano testified that Anthony was could get overstimulated by noise and by certain not people, not that he "easily" did so. Otherwise, undisputed.

86.    Mr. Gay's own mental health providers were of the opinion that his self-mutilation was a result of his serious mental illness and was a form of decompensation resulting from his long- term segregation. PX. 1 at 37:4-18.

    i.       Disputed but material. Disputed because the cited evidence is the opinion of a single individual, who believed that some—not all—of Anthony Gay's self-mutilation resulted from his mental illness, as suggested in Plaintiff's additional fact.

87.    Mr. Gay's borderline personality disorder resulted in exaggerated feelings of abandonment. PX 4 at 54:2-18.

    i.       Undisputed and material.

88.    On multiple occasions, including in November of 2016, Mr. Gay was given involuntary psychiatric medication because the mental health staff providing care for him were concerned that his condition in segregation would deteriorate and he would engage in further self-harm unless he was medicated. PX. 1 at 44:5:16. The review committee determined that as a result of Mr. Gay's mental disorder, he posed a likelihood of serious harm to himself or others. PX 1 at 45:1-15. PX 37.

     i.       Undisputed and material.

89.    One of Mr. Gay's mental health providers, Dr. Sylvia Butler, explained that while Mr. Gay did engage in self-harm to elicit a desired response in others, this did not indicate that his self- harming behavior was volitional. PX 1 at 83:20-84:10. As Dr. Butler explained it, Mr. Gay's self- harm behavior could not be characterized as volitional. Instead, Mr. Gay's self-harm was brought on by impulses resulting from mood swings brought on by his mental illness. PX 1 at 84:8-23.

     i.       Disputed but material.  Disputed to the extent Plaintiff suggests none of Anthony Gay's behavior was volitional because the cited testimony reflects that Dr. Butler believed Anthony Gay's behavior was *partly* volitional, contrary to the suggestion in Plaintiff's additional fact.  PX 1 at 83:20-84:1.

90.    Despite Mr. Gay's statements that he engaged in self-harm for secondary gain, Dr. Al Doyle, a psychologist at Dixon, assessed his behavior as resembling addition in which Mr. Gay had "developed an automatic response to certain feelings and cannot control how far he will go once he starts." PX 6 at 6.

     i.       Undisputed and material.

91.    Dr. Doyle's assessment was that due to his mental illness and post-traumatic stress disorder, Mr. Gay's maladaptive responses in segregation were so built up in his mind that they flowed out without Mr. Gay's control and would only get worse and worse if Mr. Gay were not stopped or helped in some way. PX 4 at 37:21-38:11.

     i.       Disputed to the extent the cited evidence does not specify that Anthony's "maladaptive responses" were specific to segregation.  Otherwise, undisputed and material.

92.    Dr. Doyle's assessment of Mr. Gay's self-injury was the result of Mr. Gay being stuck in a mental pattern that he was unable to control. PX 4 at 38:16-21.

     i.       Undisputed and material.

93.    Mr. Gay's self-injurious behavior was assessed by his mental health providers as addictive and as the result of increasingly anxiety and release that would reach a breaking point with self-injury, and resembled persons with substance addictions. PX 4 at 39:14-40:16; 42:6-43:18. PX 5 at 2.

     i.       Undisputed and material with the caveat that only a single provider testified as much in the cited evidence.

94.    Mr. Gay's mental health providers diagnosed that Mr. Gay would self-mutilate as a way to regulate his emotions, meaning that he mutilated as a coping skill to help him regulate his emotions. PX 17 at 64:4-10. PX 38.

        i.           Undisputed that a single individual testified as much and material.

95.    The 2016 residential treatment referral concluded, "Inmate Gay does not have the skills to disengage in self-harming behaviors and needs intensive treatment." PX 38. Ms. Meyer reached the conclusion that Mr. Gay's mental illness was sufficiently severe that he could not reside in an outpatient setting. PX 17 at 84:16

        i.           Material and undisputed that a 2016 residential treatment referral partially concluded as much, in addition to noting Anthony Gay's refusal of psychotropic medications to help stabilize his moods. PX 38 at 7. Undisputed that Cortney Meyer concluded as much.

96.    Mr. Gay was referred to an inpatient level of care. PX 17 at 64:21-65:1; 101:9-20; PX 38; PX 31. However, despite this assessment, even where IDOC mental health staff believed a prisoner like Mr. Gay needed psychiatric hospitalization, there was no mechanism through which they could refer such a patient to an outside psychiatric hospital. PX 17 at 159:14-22.

        i.           Disputed that the cited evidence establishes that such a transfer mechanism existed rather than a single individual testifying that she was simply not aware of any such mechanism. PX 17 at 159:14-22. Otherwise, undisputed but immaterial to the extent the cited evidence does not fully discuss Anthony Gay's qualifications, or lack thereof, for transfer to other facilities, including those with an "inpatient level of care."

97.    Ms. Meyer was able to refer seriously mentally ill patients, including Mr. Gay, from Menard to Dixon or Pontiac because those prisons offered some additional therapies, but hospitalization was not possible through such referrals. PX 17 at 159:6-13.

        i.           Undisputed and material.

98.    Even when Mr. Gay engaged in self-injurious behavior like cutting open his scrotum with a nail clipper, Ms. Meyer would not refer him to an outside psychiatric hospital because her understanding was that nobody was ever sent to an outside psychiatric hospital. PX 17 at 157:14-158:4.

        i.           Material but disputed that Plaintiff's fact, and the evidence cited therein, accurately summarize Ms. Meyer's testimony. Ms. Meyer testified that she indeed would have referred someone to "medical" for cutting open his scrotum with a nail clipper because "that was a medical decision." PX 17 at 157:14-19.

99.    In 2016, one of Mr. Gay's mental health providers, Courtney Meyer, reached the conclusion that Mr. Gay required a level of care that was beyond what Menard could provide and recommended that Mr. Gay be placed in a therapeutic environment to include hospitalization. PX 17 at 76:14-23; PX 38.

      i.        Undisputed that Courtney Meyer concluded as much, but immaterial to the entire duration of Anthony Gay's incarceration and the care he received during his entire incarceration in IDOC, and therefore irrelevant to Plaintiff's claims, as limited by the concessions in her response brief.

**V.    Segregation harmed Mr. Gay, but until 2018 Mr. Gay's treaters were powerless to remove him from it.**

100.    The quality of mental health care at Pontiac and Dixon was the same, however, Dixon was a very different environment from Pontiac in the sense that it was less restrictive, and Mr. Gay was transferred from Pontiac to Dixon with the idea that a "less restrictive environment . . . is probably the best plan of care for him." PX 2 at 181:21-185:12.

      i.        Immaterial and disputed as to Plaintiff's characterization of Dr. Chess's testimony as indicative that Dixon was less restrictive than Pontiac. Dr. Chess's testimony regarding the less restrictive environment was in regards to his overall plan prior to being released. PX 2 at 185:6-12.

101.    Mental health staff assessed that placing Mr. Gay in prolonged segregation was contrary to his mental health. PX 2 at 171:13-172:10.

      i.        Disputed but immaterial. Disputed because the cited portion of Dr. Chess's deposition states only that Anthony Gay was "severely mentally ill" and "had prolonged periods of segregation for an extended period of time." PX 2 at 171:9-172:10.   Immaterial because the cited testimony does not create a correlation between Anthony Gay's segregation status and his mental health.

102.    One of Mr. Gay's mental health providers at Menard pointed to his November 2016 mutilation of his scrotum as a "clear example that Mr. Gay was in crisis and was decompensating. PX 1 at 73:4-10; 74:13-22. Decompensation means that a person starts not to function, and it has a variety of manifestations. Sometimes the person might not eat; sometimes they might withdraw and become depressed; sometimes they might try to harm themselves. PX. 1 at 22:4-10.

      i.        Undisputed and material that Dr. Butler testified as much.

103.    Decompensation can be a consequence of subjecting people who are seriously mentally ill to long-term segregation. PX. 1 at 22:11-16.

      i.        Defendants object to the contents of Paragraph 103, as it does not contain a fact within the meaning of the Local Rules. Defendants therefore make no response to the opinion testimony contained in Paragraph 103.

104.    Self-harm by a person in segregation for the purpose of gaining social stimulation can be a sign of decompensation. PX 24 at 103:13-18.

        i.      Defendants object to the contents of Paragraph 104, as it does not contain a fact within the meaning of the Local Rules. Defendants therefore make no response to the opinion testimony contained in Paragraph 104.

## VI. In 2018 Mr. Gay's mental health team is able to remove him from segregation and he improves greatly.

105.    Gay transferred from Dixon to Pontiac on March 8, 2018. PX 28 at 23:19-22. Pontiac's warden asked for Mr. Gay's transfer to Dixon because he was engaged in so much misbehavior and self-harm that he was "digging himself a hold he could not get out of," might benefit from new surroundings. PX 27 at 33:6-34:8.

        i.      Undisputed and material.

106.    When Mr. Gay arrived at Dixon in 2018, mental health staff there were prepared to have him civilly committed to IDHS at the end of his sentence. PX 2 at 227:24- 228:13.

        i.      Undisputed and material.

107.    In 2018, the IDOC mental health staff at Dixon changed what we were doing with Mr. Gay to see how he would react. PX 2 at 227:24-228:13. This was part of an effort to determine whether continuing to house Mr. Gay in segregation was contrary to his self-interest. PX 2 at 178:6- 179:10.

        i.      Undisputed and material.

108.    Dr. Nunez recommended that Mr. Gay be transferred out of segregation as a way of helping him psychologically, particularly for more treatment. PX 19 at 123:8-18; PX 20 at 2.

        i.      Undisputed and material.

109.    Mr. Gay's mental health providers at Dixon believed that placing Mr. Gay in segregation would increase the chance of self-harm and would be bad for him. PX 2 at 215:13-216:3.

        i.      Defendants object to Plaintiff's mischaracterization of Dr. Chess's testimony. Without waiving said objection, disputed and material. Disputed because Dr. Chess testified that Gay's "chance to self-harm would be increased *in any setting* other than crisis watch monitoring. (emphasis added) PX 2 at 215:20-22. Further, Dr. Chess testified that Gay should not return to segregation "if he required infirmary placement." *Id*. at 216:10-14.

110.    Mental health treatment providers at Dixon believed that Mr. Gay's mental illness was causing to self-harm on an extensive basis in light of his extensive segregation. PX 2 at 181:3-15.

        i.      Defendants object to Plaintiff's mischaracterization of Dr. Chess's testimony. Without waiving said objection, disputed and material.

Disputed because Plaintiff incorrectly frames Dr. Chess's answer as indicating that Gay's self-harm was caused by his segregation, when in fact Plaintiff's counsel's question merely stated that Gay "had spent the majority of his incarceration in segregation" and that Gay's "mental illness was causing him to self-harm on an extensive basis." PX 2 at 181:3-8.

111. In April 2018, Dr. Doyle recommended that he be placed in a residential treatment unit. PX 4 at 31:21-32:2.

    i.        Undisputed and material.

112. In April 2018, Dr. Nunez sent around an email to Mr. Gay's mental health team explaining that he did not believe it would be helpful to move Mr. Gay from crisis back to segregation and recommended therapeutic placement in population. PX 19 at 123:19-127:11; PX 21. It was not common for Dr. Nunez to make placement recommendations, but he did so for Mr. Gay because he had opened up his scrotum while in segregation. PX 19 at 127:12-21.

    i.        Undisputed and material.

113. In June 2018, Dr. Nunez concluded from Mr. Gay's continued self-mutilation that he remained in a continued state of decompensation while on crisis watch and reached out to mental health supervisors to out of concern for his course of care. PX 19 at 127:4-130;18; PX 22. At this point Mr. Gay had been on crisis watch for more than 700 days, indicating that Mr. Gay was doing poorly in a setting designed for temporary placement. PX 19 at 130:19-132:24; PX 23.

    i.        Undisputed as to Dr. Nunez's conclusions regarding Mr. Gay's self-mutilation indicated his continued state of decompensation. Immaterial because the cited testimony does not indicate any first-hand knowledge by Dr. Nunez regarding Mr. Gay's progress, or lack thereof, in crisis watch. PX 19 134:1-136:4.

114. Dr. Nunez told his superiors that he believed Mr. Gay's isolation in segregation was adversely affecting him. PX 19 at 1111:2-16.

    i.        Undisputed that Dr. Nunez testified as much. Immaterial because Dr. Nunez, when asked for the basis behind the decision to move Anthony Gay to the infirmary, testified that he "was not aware whether Mr. Gay was moved to the infirmary before or after he advised his superiors about the impact Mr. Gay's isolation had on his mental health." PX 19 at 112:1-5.

115. In 2018, the IDOC mental health staff stepped Mr. Gay down from inpatient status to residential treatment status and had him released from restrictive housing status and constant monitoring by security staff. PX 2 at 228:21-229:13; PX 2 at 229:14-19. This meant Mr. Gay was no longer in segregation. PX 2 at 229:20-21.

    i.        Undisputed and material.

116.  During this time Mr. Gay received considerable time in the prison day room, and out- of-cell time alongside everyone else in his housing area, along with structured programs provided by mental health. PX 2 at 255:18-258:2. When Mr. Gay was removed from segregation by Dixon mental health staff, he did well, and his mental condition improved. PX 2 at 229:22-230:2.

      i.           Undisputed and material.

117.  Removing Mr. Gay from restrictive housing in 2018 was part of an effort by Dixon mental health staff to gauge whether or not he could be successful in the community after his release. PX 2 at 228:21-229:13. The improvement was significant enough that Dixon mental health staff concluded that Mr. Gay did not need to be civilly committed at the end of his sentence and could instead be released into the community. PX 2 at 230:7-9. That included an assessment by Dixon mental health staff that Mr. Gay was at less risk for self-harm, and that he would not be a danger to others. PX 2 at 230:10-18.

      i.           Undisputed and material.

**VII.  Earlier release from segregation was reasonable.**

118.  As of 2017 or 2018, there were no temporal limits on the use of disciplinary segregation for prisoners, PX 24 at 92:10-19; PX 26 at 6-16, whereas by 2022 segregation is limited to 29 days or less of continuous segregation. PX 24 at 93:8-16.

      i.           Undisputed and material that IDOC maintained various written policies during the specified time period. Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

119.  During this time period, the only way for a prisoner's time in disciplinary segregation to be reduced would be for the prisoner to file a petition asking for a reduction, or for a prison warden, in the exercise of discretion, to release the prisoner from their term of confinement. PX 47 at 129:9- 130:18.

      i.           Undisputed and material that IDOC maintained various written policies during the specified time period. Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

121.  In the case of petitions for release by a prisoner in disciplinary segregation, consideration of such petitions would focus on the prisoner's behavior in segregation leading up to their petition. PX 47 at 130:19-140:19.

      i.            Undisputed and material that IDOC maintained various written policies during the specified time period.  Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

121.    Mental health staff at Tamms did not have the ability to transfer a prisoner to an inpatient psychiatric hospital. PX 9 at 28:12-18.

      i.            Undisputed and material that IDOC maintained various written policies during the specified time period.  Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

122.    Mental health staff at Pontiac did not have the option to transfer mentally ill prisoners outside of the IDOC for care. PX 26 at 51:7-18.

      i.            Undisputed and material that IDOC maintained various written policies during the specified time period.  Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC or his qualifications, or lack thereof, for an out-of-IDOC transfer, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

**VIII    Reform sparked by *Rasho* comes too late for Mr. Gay.**

123.    In 2018 IDOC policy changed, such that all mental health staff were involved in assessing all disciplinary tickets for the seriously mentally ill to determine culpability and could recommend alternatives to segregation for mentally ill prisoners. PX 2 at 166:23-168:24.

      i.            Undisputed but immaterial.  Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

124.    Mental health had technically previously been a consideration in disciplinary segregation, but it was taken into account "95 percent" more heavily, "[a] lot more heavily," after the Rasho settlement went into effect around 2018. PX 2 at 236:4- 238:16. Dr. Chess, an administrator at Dixon, suggested this might have been a factor explaining why Mr. Gay's serious mental illness did not result in a release from disciplinary segregation earlier in his incarceration. PX 2 at 234:11- 238:16.

      i.            Undisputed that IDOC revised its policies regarding segregation following the *Rasho* settlement. Immaterial to the extent that the cited testimony

references general policies implemented by IDOC, and Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not policies implemented by the Illinois Department of Corrections.

125.   Before the changes implemented because of Rasho, there was no formal process to review segregation placements due to mental illness. PX 15 at 72:7-10. It was also only after Rasho that mental health staff retroactively reviewed past segregation tickets for adjustment. PX 15 at 71:13- 24.

    i.        Undisputed that IDOC began revising its segregation policies following the *Rasho* settlement. Immaterial to the extent the cited evidence does not discuss Anthony Gay's care in IDOC, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

126.   The Elgin facility was designed for patients who could not receive sufficient care within the IDOC's existing mental health facilities. PX 2 at 33:2-14.

    i.        Undisputed but immaterial. Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

127.   Eventually the IDOC opened a portion of the IDH Elgin treatment facility, but that was done only to comply with the Rasho settlement. PX 10 at 102:21-103:21; PX 2 at 29:3-6. The Elgin facility came online towards the end of 2018, around the time Mr. Gay was released from prison. PX 46 at 111:4-18.

    i.        Undisputed but immaterial. Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

**IX.    Mr. Gay's mental health team believed segregation was harming him but they were powerless to recommend removal.**

128.   Ms. Meyer understood that Mr. Gay was in disciplinary segregation for violation of prison rules. PX 17 at 93:3-12. Ms. Meyer did not recommend that Mr. Gay be removed from segregation, however, because it was not a recommendation she could make, and was never told by anyone that she had the ability to make such a recommendation. PX 17 at 87:2-17; 128:17-23.

    i.        Undisputed and material.

129.    Releasing Mr. Gay from segregation was not part of his treatment plan because he had disciplinary segregation time. PX 28 at 37:20-38:1. PX 26 at 145:20- 146:10.

        i.    Disputed and immaterial as unsupported by the cited deposition testimony. Dr. Stone testified that she could not "say for certain" whether Anthony Gay's release from segregation was a part of his treatment plan. PX 28 37:20-22.

130.    Dr. Chess explained that she and other mental health staff did not attempt to remove Mr. Gay from segregation earlier because disciplinary segregation was a security issue, and mental health was not meaningfully taken into account until the IDOC's policy changed as a result of Rasho. PX 2 at 238:18-240:16. PX 27 at 75:14- 17.

        i.    Disputed that the cited testimony accurate reflects Dr. Chess's testimony. Dr. Chess testified that she did not "know the date (factoring mental health into segregation consideration) went into effect. It could have been 2018. It could have been before." PX 2 237 8-10. Material to the extent that disciplinary segregation was a security issue. Immaterial that IDOC's policies changed after *Rasho,* as Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

131.    Individuals placed in IDOC general population have access to job opportunities, vocational courses, college programming, culinary arts courses, automotive courses, woodworking courses, educational programs, and access to the law library. PX 47 at 33:17-35:23. Individuals in general population participate in those programs within the milieu of the prison such that they are participating alongside other people in prison. Id.133.

        i.    Undisputed but immaterial. Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

133.    The State contracted with Wexford to provide medical and mental health care to prisoners in IDOC custody. PX. 53 at 1-3.

        i.    Undisputed but immaterial. Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the contents of contractual obligations between Wexford and IDOC. Further immaterial because the cited material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief

133. The contract imposed a duty on Wexford to "arrange for services to offenders who require off-site hospitalization for routine admissions and for emergency situations" if a prisoner "requires care beyond the capability of the infirmary." PX 53 at 5.

    i.        Undisputed but immaterial. Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the contents of contractual obligations between Wexford and IDOC. Further immaterial because the cited material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief

134. All recommendations for hospitalization, with the exception of emergencies, were to be reviewed and approved by the IDOC on-site Medical Director. PX 53 at 9.

    i.        Undisputed but immaterial. Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the contents of contractual obligations between Wexford and IDOC. Further immaterial because the cited material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief

135. The contract imposed a duty on Wexford to meet with hospital representative and other provider to coordinate the referral of offenders. PX 53 at 9.

    i.        Undisputed but immaterial. Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the contents of contractual obligations between Wexford and IDOC. Further immaterial because the cited material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief

136. The contract imposed a duty on Wexford to promulgate "policies and procedures concerning the emergency transfer and transportation of offenders." PX 53 at 9.

    i.        Undisputed but immaterial. Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the contents of contractual obligations between Wexford and IDOC. Further immaterial because the cited material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief

137.   The contract stated that Wexford "shall be responsible for emergency transportation of inmates for medical and mental health care." PX 53 at 6 (emphasis added). Such transportation included arrangements for the use of helicopter and ambulance. Id.

    i.   Undisputed but immaterial.  Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the contents of contractual obligations between Wexford and IDOC. Further immaterial because the cited material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief

138.   The contract imposed a duty on Wexford to "deliver effective and efficient mental health services on-site to offenders determined to be mentally or emotionally disturbed due to a chronic mental illness or situational stress." PX 53 a 10.

    i.   Undisputed but immaterial.  Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the contents of contractual obligations between Wexford and IDOC. Further immaterial because the cited material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief

139.   The contract imposed a duty on Wexford to ensure that its mental health services were delivered in compliance with mental health and healthcare related federal state statutes. PX 53 a 10.

    i.   Undisputed but immaterial.  Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the contents of contractual obligations between Wexford and IDOC. Further immaterial because the cited material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

140.   The contract imposed a duty on Wexford to "provide crisis management of behavioral and/or psychiatric emergencies, such as management of the suicidal, self-mutilating, or decompensating offender." PX 53 a 10.

    i.   Undisputed but immaterial.  Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the contents of contractual obligations between Wexford and IDOC. Further immaterial because the cited

material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

141.   The contract provided that crisis management services were "to be provided in a manner consistent with that identified in the TDOC [Administrative Directives] an in the Office of Mental Health Management Procedure Manual." PX 53 a 10.

    i.    Undisputed but immaterial. Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the contents of contractual obligations between Wexford and IDOC. Further immaterial because the cited material lacks any specificity about Anthony Gay's care while incarcerated, making it irrelevant to Plaintiff's pending claims, as limited by the concessions in her response brief.

142.   The psychiatric services provided at DHS facilities did not occur in isolation, as patients were typically housed among 18-24 other patients at any given time. PX 54 at 1.

    i.    Undisputed but immaterial. Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

143.   IDHS facilities could not replicate the isolated environment of segregation. PX 54 at 1.

    i.    Undisputed but immaterial. Immaterial because Plaintiff's claims, as limited by the concessions in her response brief, now only allege statutory violations based on the care of a single individual in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

144.   Wexford's 30(b)(6) witness testified that, at some point in approximately 2016, Wexford staff did recommend that some patients at Logan Correctional Center be transferred to the Department of Human Services, but that transfer did not occur, and the witness did not know why not. PX 7 at 2-22.

    i.    Disputed and immaterial. Disputed because the Wexford representative designated to provide Rule 30(b)(6) testimony was unable to testify as to why inmates at Logan Correctional Center were not transferred to DHS. PX 7 at 2-22. Immaterial because the referenced testimony does not relate to Anthony Gay's care while in IDOC or his eligibility, or lack thereof, for any out-of-facility transfer, and is therefore irrelevant to Plaintiff's individual claims, as limited by the concessions in her response brief, which now only include alleged statutory violations based on the care of a single individual

in the Illinois Department of Corrections—not the treatment of mentally ill prisoners systemwide.

145.  Wexford did not direct its staff that DHS could accept or house DOC patients. PX 7 at 75:21-76:7.

     i.  The contents of this paragraph contain allegations against the Wexford Defendants and is therefore immaterial as it does not pertain to IDOC Defendants' Motion. Defendants incorporate Wexford Defendants' Response as to whether this fact is disputed or undisputed.

## X.  Opinions of Dr. Kupers.

146.  Segregation causes severe psychiatric damage and exacerbates serious mental illness in individuals like Mr. Gay who have a history of prior trauma. PX 50 at 3, 45.

     i.  Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

147.  Segregation units are a problematic environment for the delivery of mental health and psychiatric treatment because it causes many symptoms and disabilities— including suicide and self-harm—and precludes mental health staff from forming a trusting, therapeutic relationship with their patients. PX 50 at 50.

     i.  Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

148.  It is extraordinarily difficult to treat mental disorders caused or exacerbated by segregation while the patient remains in segregation. PX 50 at 49. Instead of treating a patient's underlying mental illness, therapist is forced to play "catch-up," trying to lessen ongoing mental health symptoms caused by solitary confinement.

     i.  Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

149.  Severe anxiety and panic attacks are the most common symptoms in individuals subject to segregation. PX 50 at 45.

     i.  Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

150.    Severe anxiety in prisoners in segregation can build to an extreme level, cause the prisoner to feel like he cannot breathe or like the walls are closing in on himself, and ultimately lead to the prisoner engaging in self-harm to relieve the unbearable anxiety. PX 50 at 45.

      i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

151.    Mr. Gay's disability associated with his psychiatric illnesses, such as Borderline Personality Disorder and PTSD, was significant and manifested by severe symptoms. PX 57-58.

      i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

152.    Borderline Personality Disorder is often a cause of very serious long-term psychiatric disability. PX 50 at 59.

      i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

153.    Borderline Personality Disorder is a cause of severe psychiatric disability in Mr. Gay. PX 50 at 58.

      i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

154.    A phase program, which is often incorporated into treatment plans of mentally ill prisoners in segregation, is a system by which prisoners earn amenities, freedoms, programs, and, ultimately, release from segregation, by exhibiting pro-social behaviors. PX 50 49-50.

      i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

155.    While many prisoners in segregation can earn release from segregation by exhibiting pro-social behaviors, successful movement through a phase program is not possible for a small group of prisoners due to psychiatric disability. PX 50 49-50.

> > i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

156.    There is a subgroup of prisoners in segregation who have such severe psychiatric disability that they are unable to function well enough in segregation to accomplish the steps designated in their treatment plan to earn release from segregation. PX 50 at 48.

> > i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

157.    Treatment plans that offer incremental increases in privileges and freedom for inmates who engage in pro-social behavior are typically ineffective for inmates whose psychiatric disability prevents them from functioning in segregation well enough to earn those privileges and freedoms. PX 50 at 47.

> > i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

158.    For inmates with psychiatric disability that prevents them from progressing through the phase program in segregation, another treatment plan and a different series of phases must be created to enable them release from segregation. PX 50 at 47-48.

> > i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

159.    If an inmate continues to fail to gain rewards and eventual release from segregation, the treatment plan must be reconsidered and include a first step of releasing the inmate from segregation. PX 50 at 48.

> > i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

160.    Mr. Gay was among the subgroup of prisoners whose psychiatric disability is so severe that he is unable to function in segregation well enough to accomplish the steps designated in his treatment plan that would allow him a way out of segregation. PX 50 at 47-48.

i.   Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

161.   Mr. Gay was unable to earn his way out of segregation by exhibiting certain pro- social behavior while in solitary because of psychiatric disability. PX 50 at 49-50.

i.   Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

162.   Mr. Gay's psychiatric disability prevented him from advancing through the phase system that would have allowed him to earn his way out of segregation by exhibiting pro-social behavior while in solitary. PX 50 at 48.

i.   Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

163.   Any plan that required Mr. Gay to exhibit pro-social behavior to earn his release from segregation was doomed to fail because his psychiatric disability prevented him from engaging in those pro-social behaviors while in segregation. PX 50 at 48.  Mr. Gay's segregation was the most important contributing factor in his self- harming. PX 50 at 50.

i.   Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

164.   Mental health standards require that people who commit serious acts of self-harm while anxious and plagued by other disturbing symptoms in segregation be removed from segregation and provided mental health treatment in a less restrictive setting. PX 50 at 45-46.

i.   Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

165.   The first time Anthony ever self-harmed was in segregation. PX 50 at 43.

i.   Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

166.    Segregation is the confinement of prisoners for twenty-two hours or more per day without meaningful human contact. PX 50 at 46.

       i.     Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

167.    Mr. Gay's brief contact with his mental health professionals was not "meaningful human contact." PX 50 at 47.

       i.     Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

168.    A wish to manipulate is not a credible motive to cause an individual to engage in acts of severe self-harm when it has been proven repeatedly to him that acts of severe self-harm will not result in his release from solitary or another therapeutic outcome. PX 50 at 54-55. Mr. Gay's self- harming behavior was not entirely willful, but rather compelled by intolerable feelings like anxiety an abandonment that are exaggerated and compounded by segregation. PX 50 at 55.

       i.     Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

169.    The notion that Mr. Gay's self-harm is entirely voluntary, and manipulative is overly simplistic, very callous, and tends to obfuscate investigation into the complex and multi-faceted reasons for Mr. Gay's self-harm. PX 50 at 61.

       i.     Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

170.    By at least 2012, Mr. Gay's self-harming behavior was so engrained that he could not stop cutting if he wanted to. PX 50 at 55.

       i.     Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

171.    It is not acceptable to return a chronically self-harming and self-mutilating individual to segregation, where the self-harm and self-mutilation will almost certainly result in more self-harm and self-mutilation. PX 50 at 60.

       i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

172.    Mr. Gay did not receive the mental health treatment that his mental illness required largely because his segregation exacerbated his mental illness and worsened his prognosis. PX 50 at 61.

       i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

173.    Service providers at the IDOC, including officers and mental health staff, rendered Mr. Gay's treatment iatrogenic by responding to his repeated acts of self-harm by repeatedly placing him in the same conditions—segregation—where they know it is likely that he will engage in the acts of self-harm. PX 50 at 61.

       i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

## XI.    Opinions of Dr. Schriro.

174.    Housing seriously mentally ill inmates in a segregated setting knowing they will continue to engage in self-harm falls outside the standard of care. PX 51 at 15.

       i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

175.    Mr. Gay's continued placement in segregation served no penological gain.  PX 51 at 16.

       i.    Objection to this paragraph containing an expert witness's opinion, which is not a fact within the meaning of the Local Rules. Defendants make no answer to expert opinion testimony asserted as an "Additional Material Fact."

## ARGUMENT

**I.  Preliminary Matters Regarding Claims and Defendants No Longer At Issue.**

First and foremost, it is important to note the claims and Defendants that Plaintiff has specifically acknowledged are no longer at issue.  Count I of Plaintiff's first amended complaint was brought against 16 individual defendants and Wexford under the Eighth Amendment, and alleged constitutional violations related to deliberate indifference and the conditions of Gay's confinement.  (Doc. 82 at 19).  In her summary judgment response, Plaintiff concedes that she "does not contest dismissal against the individual defendants (with the exception of Dr. Nunez)." Therefore, this Court should enter an order granting judgment in favor of all of the IDOC Defendants against whom Plaintiff alleged Count I:  John Baldwin, Jeff Sims, Shane Reister, Dr. Melvin Hinton, Sylvia Butler, Dr. Jamie Chess, Michael Melvin, Terri Kennedy, Emily Ruskin, John Varga, Justin Wilks, and Sonja Nicklaus.  (*See* Doc. 304 at 150).  The only remaining defendants against whom Plaintiff alleged Count I are Wexford and Dr. Nunez, with whom Plaintiff states she has reached a settlement.  (Doc. 304 at 150, n. 13).  Because Plaintiff has conceded Count I as to all of the IDOC Defendants, they do not address Count I in this reply.

Plaintiff's Count IV alleged a Fourteenth Amendment procedural due process claim against six IDOC Defendants – Melvin, Kennedy, Ruskin, Varga, Wiks, and Nicklaus.  Plaintiff also concedes that claim on summary judgment.  (Doc. 304 at 150).  Therefore, those IDOC Defendants are entitled to judgment on Count IV, too.

With that, Plaintiff's remaining claims involving IDOC are brought under the Americans With Disabilities Act, 42 U.S.C. § 12132 (the ADA), and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the RA); and are alleged against Mr. Jeffreys in his official capacity,

42

only.  (Doc. 82 at 21-24).  Those counts of the first amended complaint, and facts related to those claims, are the only matters relevant to this summary judgment reply.[2]

## II.  IDOC Is Entitled to Summary Judgment on Plaintiff's ADA and RA Claims.

As noted above, Plaintiff's ADA and RA claims are coextensive and, therefore, addressed together (and, in these papers, as the "ADA claims").  *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012); *Wallace v. Jeffreys*, 2023 U.S. Dist. LEXIS 28725, *73 (S.D. Ill. Feb. 21, 2023).  According to Plaintiff, IDOC failed to provide a reasonable accommodation for Gay's mental disabilities – specifically, "inpatient intensive psychiatric treatment."  (Doc. 82 at 22-23).  To state ADA claims, a plaintiff must show:

> (1) he is a qualified person (2) with a disability (3) the Department of Corrections denied him access to a program or activity because of his disability.

*Jaros*, 684 F.3d at 672 (defining the requirements under the RA); *see Wallace*, 2023 U.S. Dist. LEXIS 28725, *73 (stating same).  "Refusing to make reasonable accommodations is tantamount to denying access[.]" *Jaros*, 684 F.3d at 672.  As IDOC explained in its motion for summary judgment, Plaintiff cannot establish the first or third requirements.  Nothing in Plaintiff's response shows otherwise.

## A.    Medical Treatment Decisions Are Outside the Scope of the ADA.

Although there are issues with different elements of Plaintiff's ADA claim, it fails for a more straightforward and fundamental reason:  because hers is a complaint that Gay required *different* treatment, not that Gay received *no* treatment.  That is plain from the many pages of argument Plaintiff makes about IDOC policies in general.  Although much of Plaintiff's response

---

[2] Plaintiff also does not dispute that she is not entitled to punitive damages under the ADA or the RA either. *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).  Her punitive damages claim should be stricken.

focuses on general claims about IDOC policies and the scope of mental health care IDOC made available to inmates, none of that is dispositive (or even relevant) *here*, in *this* case, which is now *only* about an ADA claim. Indeed, even Plaintiff concedes that hers is a case about the *type* of care given, not the *lack* of care: "Plaintiff does not assert that Mr. Gay received *no* medical care; rather, the evidence is that Mr. Gay's mental healthcare was ineffective because it was administered while he remained in disciplinary segregation." (Doc. 304 at 148, emphasis in original).

What care, and where and how it was given, were decisions made by Gay's treaters, not by IDOC. (SOF ¶71). It is undisputed: at no time did any medical or mental health treater recommend that Gay be transferred to a facility outside of IDOC. (SOF ¶74). Inpatient treatment outside of IDOC is neither something Gay's treaters recommended, nor is it something IDOC refused. IDOC officials deferred to and relied on Wexford professionals' judgment and clinical recommendations. (SOF ¶70). They created and administered Gay's mental health, behavioral, and crisis treatment plans, and none recommended that Gay be transferred outside of IDOC or receive any other type of mental health treatment not available from Wexford or through IDOC. (SOF ¶¶70-74).

Plaintiff ignores that distinction between healthcare providers and prison officials. But, the problem with her argument becomes clear based on the language she uses to define her ADA claim. As she explains, her first theory is "that the State discriminated against [Gay] in that it routinely referred prisoners with somatic ailments [to] hospitalization when their needs exceeded the care that could be provided within the IDOC's walls; whereas it refused to do the same for severely mentally ill prisoners who required psychiatric hospitalization." (Doc. 304 at 133). IDOC does not refer patients for treatment. Physicians and treaters do. IDOC does not routinely refer somatic patients for inpatient hospital care because IDOC officials are not medical

providers.  IDOC similarly does not decide the proper course of treatment for mentally ill inmates because IDOC officials do not provide mental health care.  IDOC, then, cannot have improperly discriminated against Gay based on his disability by refusing to refer him for inpatient care – that is not a decision made by IDOC officials.  And regardless, Plaintiff cannot point to any refusal by IDOC.

To the extent Plaintiff disagrees with the scope of treatment those mental health professionals ordered, she has an avenue through which to bring claims against them – for medical malpractice, not discrimination based on a disability.  *Morris v. Wexford Health Sources, Inc.*, 2024 U.S. Dist. LEXIS 11175, *15 (Jan. 22, 2024) (dismissing a complaint following review under 28 U.S.C. § 1915A).  "[I]t is also worth noting that an inmate cannot pursue an ADA claim based on allegedly inadequate medical treatment. . . .  To the extent Plaintiff seeks to proceed under the ADA for malpractice or the denial of *specific* medical treatment, such a claim would fail."  *Morris*, 2024 U.S. Dist. LEXIS 11175, *15 (emphasis added, citing *Johnson v. Redmond*, 2017 U.S. Dist. LEXIS 217568, *6-7 (N.D. Ill. Oct. 30, 2017)).

On that basis alone, IDOC is entitled to summary judgment on Plaintiff's ADA claims.

**B.      Gay Is Not a Qualified Person Under the ADA.**

In addition to that overarching problem, Plaintiff's ADA claims also fail because she cannot satisfy every required element to bring them.  As explained in IDOC's motion for summary judgment, not every individual with a disability is "qualified" to bring an ADA claim – that is why the "qualified person" requirement is separate from the "person with a disability" requirement.  *See Jaros*, 684 F.3d at 672.  The ADA does *not* allow a claim for disability discrimination where the disability at issue was purportedly *caused* by the allegedly discriminatory conduct.

45

That, though, is what Plaintiff alleged. "The effects of social isolation and dehumanization of his conditions of solitary confinement were worsened by the Defendants' deprivation of Anthony's access to mental health programs and services to counteract the effect of the solitary confinement." (Doc. 82 at 23). It is a claim Plaintiff has made consistently throughout this litigation: "The widespread imposition of disciplinary segregation on the mentally ill impeded the delivery of effective mental healthcare, resulting in more disciplinary segregation." (Doc. 304 at 121). That circular argument – that mental illness leads to segregation which exacerbates mental illness which leads to misconduct which leads to segregation – is exactly what the *Wallace* court found to preclude the application of the ADA in these circumstances:

> [Plaintiff] argues that the Defendants created his mental disability by placing him in prolonged segregation, and then they failed to accommodate his dwindling mental health by keeping him in segregation *because of* his mental health. Plaintiff was originally placed in segregation for discipline and to maintain safety and security. Plaintiff has not identified any specific evidence that shows he was kept in segregation because of his mental health, either when he was first placed or later when he was kept segregated. Thus, Plaintiff was not housed in segregation *because* of his disability, and he was not deprived of services or programs *based on* his disability.

*Wallace*, 2023 U.S. Dist. LEXIS 28725, *74-75 (emphasis in original).

IDOC discussed *Wallace*, which involved similar claims by a seriously mentally ill inmate in the IDOC system, at length in its motion for summary judgment. Plaintiff makes no mention of *Wallace* in response, other than in a footnote referring to *Wallace's* finding on a different point of law: that plaintiff failed to explain *what* accommodations might have been appropriate. (Doc. 304 at 140 n.7). To be sure, Plaintiff's case suffers that same deficiency too, but that is not why Plaintiff fails to satisfy the "qualified individual" requirement of the ADA. Gay cannot be a qualified individual where the discrimination claim is inextricably linked to his

disability – i.e., he was denied mental health treatment because of his mental health disability. *Wallace*, 2023 U.S. Dist. LEXIS 28725, *75 n.31.

### C. Plaintiff Failed to Show a Lack of Reasonable Accommodation or Denial of Access to Any Programs Or Activities Because Of Gay's Mental Health Issues.

In addition to Plaintiff's inability to satisfy the "qualified person" requirement, she cannot establish the third element of an ADA claim:  that IDOC discriminated against Gay by denying him access to a program or activity because of his disability.  *Jaros*, 684 F.3d at 672.

Disability discrimination under the ADA can be established in one of three different ways:  (1) a showing that a defendant intentionally acted on the basis of the disability; (2) a showing that the defendant refused to provide a reasonable modification; or (3) a showing that the defendant's denial of benefits disproportionately affects disabled individuals.  *Cooper v. Sch. City of Hammond*, 2023 U.S. Dist. LEXIS 160062, *33 (N.D. Ind. Sept. 8, 2023).  Plaintiff maintains that IDOC discriminated against Gay in two ways:  by not referring Gay for outside hospitalization, despite referring those with somatic ailments for outside hospitalization (Doc. 304 at 132-34) – now framed as an intentional discrimination argument; and by failing to "alter the application of the IDOC's disciplinary rules" to accommodate Gay's disability (*id*. at 138) – now framed as a reasonable accommodation argument.

#### 1. Plaintiff's Intentional Discrimination Claim.

First, Plaintiff maintains that IDOC discriminated against Gay for failing to refer him for inpatient mental health care at an outside-of-IDOC facility.  (Doc. 304 at 133-34).  In her complaint, Plaintiff's theory is alleged as a reasonable accommodation claim, and she maintains that IDOC failed to reasonably accommodate Gay's disability by "failing to provide him with access to human contact, rehabilitation opportunities, group therapy, adequate mental health treatment," and other programs and services, as well as the inpatient psychiatric treatment.  (Doc.

82 at 22-23). She adds that IDOC makes "arrangements for other prisoners, who require hospitalization outside of the IDOC because of physical injuries or illnesses, to receive such outside hospitalization, or to receive effective care within the IDOC," and that *all* of those accommodations would have enhanced his quality of life. (Doc. 82 at 22).

To the extent this claim is still to be treated as a reasonable accommodation one, that argument fails for the reasons discussed below. But, Plaintiff seems to have reframed it as intentional discrimination premised entirely on IDOC's alleged failure to refer Gay for inpatient psychiatric care, while IDOC "routinely referred out prisoners with physical ailments to outside treaters when their needs exceeded the care that could be provided within the IDOC's walls." (Doc. 304 at 134). As discussed, IDOC was not responsible for making decisions about Gay's required level of care. Further, it is not inherently discriminatory to refer patients in need of some types of medical care to outside facilities, while treating others within IDOC's facilities. It may be discriminatory to *refuse* treatment, but not to evaluate the level of care needed and to provide that care accordingly. That is what Gay's treaters did here. Gay received aggressive and extensive mental health care within IDOC's facilities. IDOC had no reason to disagree with the course of care directed by Gay's treaters, and nothing about their conduct indicates any deliberate indifference to his needs. That his care was not in an outside hospital facility does not mean his treatment was inadequate or inappropriate. Nothing about it constitutes discriminatory conduct under the ADA.

### 2. Plaintiff's Reasonable Accommodation Argument.

Plaintiff's reasonable accommodation argument is premised on a novel, previously-unexplained theory: that IDOC failed to reasonably accommodate Gay's mental health because it refused to relax its disciplinary standards for him. There are three issues with Plaintiff's reasonable accommodation argument. First, the Plaintiff conceded that IDOC did not

*intentionally* discriminate against him by imposing disciplinary segregation – a required element in order to recover compensatory damages. Second, Plaintiff failed to show Gay was denied access to any program or activity because of his disability. Unlike mental health care or various other forms of human interaction and services, segregation is not a program or activity. Third, Plaintiff fails to specifically identify what accommodation would have been appropriate and reasonable, beyond those already being provided to Gay.

First, Plaintiff maintains that it makes no difference whether IDOC's discriminatory conduct was *intentional*. (Doc. 304 at 136). The only requirement for a reasonable accommodation claim, Plaintiff claims, is a facially neutral requirement that is consistently enforced and, in the process, deprives the disabled person from the provision of programs and services. (Doc. 304 at 136). Plaintiff is incorrect. She seeks compensatory damages for her claims, and to be awarded compensatory damages for *any* ADA claim, a plaintiff is required to show the defendant acted with deliberate indifference. *Lacy v. Cook County*, 897 F.3d 847, 862-63 (7th Cir. 2018); *see also Cooper*, 2023 U.S. Dist. LEXIS 160062, *33-34.

That, she cannot show. Plaintiff *admits* that IDOC imposed discipline on Gay because of his extreme misconduct and not because of his disability. (Doc. 304 at 135). Plaintiff also concedes that IDOC imposed that discipline consistently on inmates and for valid reasons related to safety and security:

> Plaintiff does not challenge the IDOC's disciplinary regime or the imposition of disciplinary segregation as a form of punishment – to the contrary, Plaintiff's ADA claim presumes that the IDOC's rules for disciplinary segregation serve otherwise valid penological purposes. Rather, Plaintiff's reasonable accommodation claim is that the State applied an otherwise legitimate disciplinary regime on Mr. Gay without making reasonable accommodations for his inability, due to his disability, to follow those rules in the manner that IDOC prescribes.

(Doc. 304 at 136). And, she offers no evidence that IDOC *knew* both that Gay was likely to be harmed by IDOC's actions or purported failure to accommodate. On the contrary, IDOC

officials had every reason to believe *they*, or other inmates, could be harmed if Gay's misconduct were not addressed.  There was no deliberate choice to harm Gay.  IDOC sought to appropriately administer discipline in a consistent way that could keep order and safety in its facilities.

Second, Plaintiff failed to identify any programs, services, or activities to which he was denied access on the basis of his disability.  Plaintiff's argument is that IDOC should have relaxed its disciplinary rules, not that Gay should have been given access to some sort of programs, activities, or services.  As the *Jaros* court observed, "incarceration is not a program or activity[.]"  684 F.3d at 672.  Rather, things like "meals and showers made available to inmates are."  *Id*.  That same logic applies here.  Segregation is not a program or activity.  Placing Gay in segregation did not *deny him access* to some sort of program or activity.  Denying him mental health care or other activities while in segregation *might* meet that standard – indeed, the cases Plaintiff cites in her response brief all involve the deprivation of some sort of activity such as social interaction, hygiene, or mental health care (*see* Doc. 304 at 138) – but that is not this case.  It is undisputed that Gay's treaters gave him regular and frequent mental health counseling and care, attempted to treat him with appropriate medication, and issued him treatment plans based on their evaluations and observations.  (SOF ¶¶68, 72-77, 87-88, 93, 95).

Third, Plaintiff runs afoul of the same problem as that described in *Wallace*, 2023 U.S. Dist. LEXIS 28725, *75:  she fails to identify "clear evidence of what accommodations might have been appropriate."  She argues for the alteration of disciplinary rules, but that is not an accommodation, nor is it reasonable to suggest that an aggressive and dangerous inmate should be released into the general prison population despite having been found guilty of misconduct on *hundreds* of occasions.  She claims Gay could have benefitted "from the panoply of programs provided by the state to prisoners in the general population," including human contact, but even in segregation Gay was allowed to participate in group therapy sessions, had contact with mental

50

health staff, could converse with inmates in adjoining cells, and had access to life's basic necessities like shelter, food, hygiene, and exercise. And, she maintains, IDOC could have referred Gay to a psychiatric hospital – a "more therapeutic setting[.]" (Doc. 304 at 141). The ADA does not guarantee access to a more therapeutic setting, or to the most therapeutic setting. It guarantees general access to programs or activities available to inmates, which Gay received here.

In short, Plaintiff's ADA claims are inadequate. There have been no ADA or RA violations. Jeffreys is entitled to summary judgment.

### III. Plaintiff's Claims Are Barred by the Statute of Limitations and *Res Judicata*.

As explained in IDOC's motion for summary judgment, Plaintiff's claims are barred by the applicable two-year statute of limitations; the continuing violation doctrine does not apply in this case; and many of Plaintiff's claims are barred by *res judicata*.

No one disputes that the applicable statute of limitations is two years. *Rutledge v. Illinois Dep't of Human Servs.*, 878 F.3d 258, 260 (7th Cir. 2015). Plaintiff focuses her response entirely on the continuing violation doctrine. (Doc. 304 at 145-47). She first points to this Court's order denying IDOC's motion to dismiss, arguing that the court already rejected these arguments and IDOC merely asks this Court to revisit that ruling. (Doc. 304 at 145). Not so. As IDOC observed in its motion for summary judgment, the court specified that its ruling that the statute of limitations did not bar Plaintiff's claims, and the continuing violation doctrine tolled them, that "further discovery may prove otherwise[.]" (Doc. 44 at 12). Further discovery, and Plaintiff's own arguments in response to IDOC's motion for summary judgment, have done exactly that.

This is no longer a case involving constitutional claims, and an argument alleging various deprivations that started as soon as Gay's time in segregation began. Rather, Plaintiff's

argument now is that IDOC violated the ADA when it failed to transfer Gay to an inpatient facility or alter its disciplinary rules to accommodate Plaintiff's mental illness. However, Plaintiff does not explain *when* IDOC should have made those determinations; or when, medically, Gay's physicians should have ordered them. Gay never specifically *asked* for some sort of ADA-related accommodation. And, Plaintiff does not dispute that Gay was receiving ongoing mental healthcare. This is not analogous to *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001) – there was no ongoing refusal to treat Gay's condition. There was not even a consistent, ongoing, specific level of mental illness involved; on the contrary, Gay's mental health sometimes improved, sometimes regressed, and varied depending on his willingness to undergo treatment. There was no point at which, as Plaintiff now argues, Gay's treatment became ineffective such that the ongoing treatment created an issue of fact about deliberate indifference. This is not a continuous violation case.

Plaintiff also disregards *Bernard v. Scott*, 501 F.Supp.3d 611 (N.D. Ill. 2020), which found that a continuing violation necessarily ends on transfer to a different facility, as inapplicable. According to Plaintiff, *Bernard* only applies if an inmate leaves the custody of a specific agency. (Doc. 304 at 148). In fact, *Bernard* specifies that an inmate's claims accrue at least when transferred from a specific *facilities*. 501 F.Supp.3d at 622. The logic behind that ruling is clear: the inmate is no longer in the same location and no longer under the supervision of the same individuals. It is a logical break-point, and an inmate does, or should, know of the accrual of a claim at that point in time. Here, Gay repeatedly transferred to different facilities, after which he came under the care of different healthcare providers and the supervision of different prison officials. With each transfer, he understood that the conditions of his confinement, and the limitations or accommodations on that confinement, would change. The

same is true of his alleged ADA violations: on transfers to different facilities, his needs and the possibility of accommodation changed, and past claims accrued.

As for the doctrine of *res judicata*, Plaintiff argues it cannot apply here because Gay's earlier claims alleged constitutional violations, not violations of the ADA. (Doc. 304 at 149). That, though, ignores well-settled law: that *res judicata* applies both to claims that were brought in a previous action, and claims that *could have been litigated* in a previous action. *Kilburn-Winnie v. Town of Fortville*, 891 F.3d 330, 332-33 (7th Cir. 2018). If, as Plaintiff now maintains, he was being discriminated against based on his disability throughout his time in IDOC's custody, he knew about, and could have litigated, those claims as part of his more than 30 cases brought against IDOC and various IDOC medical professionals related to his mental health care and treatment. He did not. The time to bring those claims has now passed. Plaintiff's claims before October 28, 2016 are barred.

## CONCLUSION

WHEREFORE, the IDOC Defendants ask that this Court enter summary judgment in their favor on all counts of the instant First Amended Complaint, and for any additional relief that this Court deems just and proper.

RESPECTFULLY SUBMITTED,

/s/ *Robert T. Shannon*
Robert T. Shannon
*Counsel for IDOC Defendants*

Robert T. Shannon
Thomas L. O'Carroll
Ambrose V. McCall
Stephen D. Mehr
Christian J. Michalik
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500

Chicago, Illinois 60606
(312) 704-3000
rshannon@hinshawlaw.com
tocarroll@hinshawlaw.com
amccall@hinshawlaw.com
smehr@hinshawlaw.com
cmichalik@hinshawlaw.com

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on February 10, 2025, he electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Central District of Illinois using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

<em>/s/ Robert T. Shannon</em>