IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MAURISA GAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19-CV-01133 |
| | ) | |
| v. | ) | The Hon. Sue E. Myerscough |
| | ) | |
| JOHN BALDWIN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION TO COMPEL INSPECTION

Pursuant to Federal Rules of Civil Procedure 34 and 16, Plaintiff Maurisa Gay, by her undersigned attorneys, moves this Court to enter an order permitting Plaintiff's counsel to inspect, measure, photograph, and perform a 3D "scan" of Illinois Department of Corrections prison cells controlled by the State of Illinois in which Anthony Gay's was confined to segregation in the IDOC, or which are illustrative of such cells.

Plaintiff counsel has attempted for months to reach a compromise with counsel for the IDOC regarding this inspection through emails and telephone conferences, but the parties have been unable to reach agreement. This motion is therefore necessary.

## BACKGROUND

This action was originally brought by Anthony Gay in 2018.  Mr. Gay spent approximately 24 years incarcerated in the IDOC.  For about 22 of those years he was held in disciplinary segregation, in which he was confined alone in a cell.  The claims in this case arose from that extended confinement in disciplinary segregation.  Mr. Gay was diagnosed by the IDOC as seriously mentally ill and yet, he alleged, the IDOC confined him alone for years in a small cell, all to punish him for disciplinary infractions connected with his mental illness.  Mr.

Gay alleged that this extended, solitary confinement in a small cell for years on end drove him mad, causing him, among other things, to engage in sustained and terrible acts of self-mutilation.

As part of their discovery in this case, Plaintiff's counsel served a Rule 34 request to inspect, measure, and photograph cells in which Mr. Gay was housed in disciplinary segregation.[1] By agreement and with the Court's permission the parties waited to conduct this discovery until other fact discovery was complete and summary judgment briefing was underway.

The parties ultimately hit a snag, however. Counsel for the State did not dispute that Plaintiff's counsel could and should be allowed to take conventional measurements and photographs of the inside of Mr. Gay's cell. The parties disagreed, however, over an additional set of photographs and measurements that Plaintiff counsel sought to take: Plaintiff counsel proposed to perform a "scan" of the inside of a cell, using a Leica RTC360 3D laser scanner.

***The Leica 3D laser scanner***. The Leica three-dimensional scanner consists of two devices: a scanner, and a tripod. The Leica scanner is designed to capture a 3D image of its surroundings. To perform the scan, an operator places the scanner on its tripod and presses a button to begin the scan. The scanner then performs a "scan" of the desired location, using a laser to measure millions of points per second. These computerized measurements are then combined as a point-cloud image of the location being measured. Leica has prepared a

---

[1] The Rule 34 requests 49, 50, and 51 respectively ask the State to "Permit entry, inspection, photographing, and videotaping of [Menard / Pontiac / Dixon] Correctional Center and all cells therein where Anthony Gay was housed, provided mental health services, and/or received recreational time."

marketing video to show how the scanner works, how it is transported, and how it captures images, and how those images are used to create 3D images of an area.[2]

Plaintiff counsel has retained Knott Laboratory LLC, a firm that performs forensic imaging and animation, to perform the cell scan. To scan the interior of a prison cell, a single Knott technician would bring the scanner into the cell, set up the tripod, commence the scan, and then leave the cell, closing the door.

*A 3D scan enables virtual reality.* The 3D cell scan Plaintiff has proposed is different than photographs and conventional measurements that might be taken of the cells: the 3D scan enables the creation of a three-dimensional, virtual-reality image of the cell. The three-dimensional images of the cell would enable a juror, using a virtual reality headset, to view photorealistic images of a cell from the inside, approximating the experience of sitting or standing inside the cell. Leica has prepared a promotional video showing how scans can be used to create 3D virtual reality as well.[3] The virtual reality environment created by this 3D scan cannot be replicated through conventional photographs of a cell.[4]

*IDOC opposition to 3D scan.* Plaintiff counsel proposed the taking of a 3D scan of the cell in correspondence with counsel representing the IDOC. The communications regarding this proposal were somewhat elongated, both by defense counsel's need to consult repeatedly with the IDOC, and Plaintiff counsel's need to explore potential solutions to objections the IDOC raised. Ultimately, though, in telephone conferences and through correspondence, the IDOC has

---

[2] The video is available at this location: https://www.youtube.com/watch?v=V-WvFgJxA7Q&t=161s. *See* Declaration of Jason Evans, attached as **Exhibit 1** ¶ 3.

[3] The video is available at this location: https://leica-geosystems.com/en-us/case-studies/reality-capture/transforming-reality-into-photorealistic-virtual-reality-with-laser-scanning. Evans Declaration Ex. 1 ¶ 4.

[4] Evans Declaration Ex. 1 ¶ 5.

objected to the performing of a 3D scan, though the IDOC's rationale has shifted over time as Plaintiff counsel made proposals to address the IDOC's objections.

*First*, the IDOC objected that its employees would not be controlling the images captured by the Leica scanner, which, it said, would pose a security risk. (Normally when photographs inside a prison are gathered in litigation, IDOC personnel take the photographs, which are then reviewed by IDOC administrators before being provided to counsel.) Plaintiff explained, however, that the images captured by the Leica scan would only be of the inside of a cell—a cell that could be photographed exhaustively in advance, with all images reviewed by IDOC administrators. Additionally, while the Leica scan could not be provided to IDOC administrators in the same way as a photograph, Plaintiff offered to have IDOC administrators review the scan images before they would be used publicly. The IDOC refused and stood on this objection.

*Second*, the IDOC objected that tripod on which the Leica scanner must sit posed a security risk because it could be seized by a prisoner and used as a weapon, and that the taking of the scan would cause a disruption in the prison. This objection was a principal focus of discussions between the parties. Plaintiff counsel first conferred with Knott Laboratory and was informed that the scanner could not function effectively unless it was mounted on a tripod. With that accommodation unavailable, Plaintiff counsel asked IDOC counsel how the tripod would pose a different security concern than a mop or broom handle, which presumably are in frequent use within prisons. The IDOC never answered this question, and instead simply reiterated without elaboration that the tripod posed a security risk.

To address the possibility of disruption, Plaintiff counsel noted that only a single technician would be necessary to perform the scan, and that the scanning equipment would

remain in carrying cases until it was inside the cell, and thus would not be visible to other prisoners. The IDOC maintained its opposition.

*Third*—Confronted with these objections, Plaintiff counsel made outside inquiries and learned that an entire wing of Pontiac Correctional Center had been closed and no longer housed prisoners at all.[5] Mr. Gay had principally been subject to segregation in three prisons—Tamms,[6] Menard, and Pontiac—so Plaintiff proposed that the scan be taken in a cell in the portion of Pontiac that had been closed. IDOC again objected. First, the IDOC objected for the first time that images of the interior of a cell were irrelevant to the case, because the case involved an ADA claim, and the claim "was not because of the conditions of his cell" but rather Mr. Gay's mental illness only, and that Plaintiff's claim was that "reasonable accommodations should have been made to remove him not only from segregation but from the Department of Corrections entirely. Since that is the basis of the claim, I fail to see how the size of the confines makes a difference."

IDOC counsel also stated that Mr. Gay had not spent significant time in the area Pontiac that had been closed since 2000, and thus that taking images of cells there would be irrelevant. IDOC counsel also stated that "IDOC is still uncomfortable with the potential security risks even in the closed wings." This time, IDOC counsel emphasized that allowing the scanner into the closed wings would lead to a "diversion of resources that would be required by your request."

---

[5] As an alternative, Plaintiff counsel also noted that Stateville Correctional Center had recently been closed entirely. Mr. Gay had spent relatively little time in Stateville, but it did contain disciplinary segregation cells. IDOC counsel rejected this proposal because Mr. Gay had not spend very much time at Stateville and it was unclear how Stateville was staffed.

[6] Tamms Correctional Center is entirely shut down and closed. From inquiries, however, Plaintiff counsel has learned that it is in such a state of disrepair that it is considered a hazard to enter.

5

Plaintiff responded to each of these objections, and the parties held a conference call. With respect to relevance, Plaintiff counsel noted that Mr. Gay's extended confinement in a small segregation cell was the core issue of the case. Plaintiff counsel pointed out that Plaintiff ultimately was not seeking to create a scanned image of each cell that Mr. Gay had been in, but rather to create an image of an exemplar cell or cells for the jury; in doing so Plaintiff asked IDOC counsel whether there were any differences in the dimensions of the cells in the closed and open wings of Pontiac, to which IDOC counsel responded that he did not know. And, Plaintiff noted, IDOC counsel's claim of a diversion of resources was implausible, given that IDOC had already offered to have staff accompany Plaintiff counsel's inspection and take photographs. IDOC counsel did not offer substantive responses to these observations, but rather stood on their objections.

After several months of attempting to reach an agreement as to this issue and with trial of this case approaching, the parties are effectively at impasse—despite their best efforts to resolve the matter without court intervention.

**ARGUMENT**

Under Federal Rule of Civil Procedure 34, a party may "serve on any other party a request . . . to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection and measuring, surveying, photographing, testing, or sampling the property or any designated object or operation thereon . . . ." Fed. R. Civ. P. 34(a)(2). The dispute between the parties is not whether Rule 34 permits this inspection, but rather whether Plaintiff should be allowed to perform the 3D scan of a cell that Plaintiff has proposed. None of the IDOC's objections to the scan withstand scrutiny.

***Disruption***.  The IDOC's disruption claims are unfounded.  Cell inspections are a routine feature of litigation involving prison conditions. *See, e.g.*, *Blanchard v. Hyatte*, No. 3:21-CV-160-RLM-MGG, 2023 WL 1961572, at *8 (N.D. Ind. Feb. 10, 2023) (granting plaintiff's motion for inspection of a prison cell); *see also*, *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 960 (2d Cir. 1983) (Friendly, J.); *G.H. v. Tamayo*, 339 F.R.D. 206, 208-09 (N.D. Fla. 2021) (granting plaintiffs' motion to compel entry into juvenile detention facilities for inspection); *Alvarez v. LaRose*, No. 3:20-cv-00782, 2020 WL 5594908, at *7-8 (S.D. Cal. Sep. 18, 2020). Any such inspection must create some level of disruption in that an inspection is a departure from normal prison life and involves third parties entering the prison facility.  But, as the cited cases reflect, such minimal disruption is a necessary and accepted part of the truth-gathering process in litigation.  The scan would not involve additional disruption over and above a typical photographs-only inspection. The scan would require no more than one person entering the facility while wearing a backpack with the equipment.  Prisoners would never see the scanning equipment, as it would be taken out of its casing and used only within the confines of a cell, and the scan would be performed with the door closed.

***Security***.  In months of correspondence, the IDOC never substantiated its objection that the scanner's tripod would propose an unacceptable security risk.  The IDOC's articulated concern is that, if the tripod somehow fell into the wrong hands, it could be used as a weapon.  As Plaintiff counsel pointed out, however, the tripod is of roughly the same dimension as a mop or broom handle, which are presumably in regular use in prisons throughout the state.  The IDOC never offered a rejoinder to this obvious point, except to reiterate that bringing in the scanner violated its policies. The scanning equipment, moreover, would be under escort by one or more correctional officers—just as every other kind of litigation inspection is performed under a

7

security escort. And it would be removed and exposed only once inside a cell. And of course, Plaintiff has offered to have the scan done in a closed wing of Pontiac prison—making any security concerns exceedingly remote. Plaintiff counsel has repeatedly offered to discuss other security precautions as well. Security is simply not a plausible reason for denying the scan Plaintiff proposes.

*Relevance—cells*. IDOC objected that the scan of a cell in the closed wings would not produce relevant evidence because Mr. Gay had not been in that wing for years. This argument suffers from multiple flaws. First, it is incorrect as a matter of law. A "posed photograph is admissible when it is shown that it represents a correct likeness of the scene, object or person that it purports to represent, and the sufficiency of the preliminary showing rests largely in the discretion of the trial judge." *Wetherill v. Univ. of Chicago*, 565 F. Supp. 1553, 1562 (N.D. Ill. 1983) (quotation omitted).

Second, the IDOC's objections smack of bad faith: it has (dubiously) objected that performing scans in cells where Mr. Gay *was* confined would create a security concern, but when Plaintiff proposed that a scan be performed in nearby cells, the IDOC objected because Mr. Gay had not lived in those cells for some time. The IDOC simply cannot have it both ways.

Third, any cell images in this case will inevitably be illustrative of Mr. Gay's confinement, because he was housed in numerous cells. Mr. Gay's movement chart is in the docket at ECF 26-1. The chart is 50 pages long, and reflects hundreds upon hundreds of moves among different cells. Images of any one of these cells will necessarily be illustrative of others. The point of any such image is to show jurors what the inside of a solitary confinement cell is like: a room smaller than a parking space to which a person may be confined, alone, for decades.

***Relevance—legal theory.*** The IDOC's legal objection, that cells are irrelevant to Plaintiff's legal claims, is equally meritless. The heart of Plaintiff's case involves what segregation cells are and the effect of being confined in them. Certainly Mr. Gay would have been allowed to describe what a segregation cell is like. Certainly photographs of a segregation cell are relevant to help a jury understand where and in what type of setting Mr. Gay was confined for 20 years. Plaintiff's claim is that Mr. Gay should have been removed from segregation cells and that he should have been hospitalized—but that is precisely because of the nature of segregation cells and the conditions that solitary confinement imposes. What those conditions are—what a solitary cell is like—are central to those claims. The "picture" of a segregation cell painted by the scan Plaintiff proposes is relevant.

***Timing.*** The deadline to take inspection of Mr. Gay's cells was extended by the Court pursuant to motion. However, in a subsequent extension request it was inadvertently omitted. That omission was an oversight, but notably neither side realized the date had lapsed—both sides continued actively discussing alternatives and negotiating the cell inspection for months thereafter without realizing the date had lapsed.

Plaintiff respectfully submits this inadvertence should not bar the inspection she seeks. Plaintiff was in active negotiations while the motion to extend the deadline for inspection was inadvertently omitted from a motion and both sides continued active negotiations for months after. Ands taking this discovery now will not prejudice the defendants. The parties held off on the cell inspections until the end of the case precisely because the evidence gathered would not otherwise affect the parties' positions. Gathering that evidence now is no different—no party will be prejudiced in this litigation by the gathering of images illustrative of cells where Mr. Gay was confined.

9

The evidence, moreover, is critical to Plaintiff's jury presentation. Mr. Gay is dead. He cannot describe the interior of a segregation cell. The alternative to permitting jurors to view virtual reality evidence form the scans would be to have jurors travel to an IDOC prison during trial to inspect segregation cells in person—a process that would be exponentially more expensive, disruptive, and cumbersome than the imaging process Plaintiff proposes here.

Plaintiff has proposed an unobtrusive, efficient means of permitting jurors to experience the inside of a segregation cell to aid their understanding about the conditions in which Mr. Gay was confined. Plaintiff is willing to discuss reasonable means by which this inspection should occur, but the IDOC's blanket objection to it lacks merit. The inspection should be permitted.

## CONCLUSION

For the foregoing reasons, this Court should enter an order permitting Plaintiff to perform a 3D scan of prison cells in which Mr. Gay was confined (or a similar illustrative cells), in addition to conventional photography and measurement agreed to by the parties.

Alternatively, if the Court were to deny permission to conduct the scan, the Court should direct the parties to set a prompt date to conduct the conventional photography and measurement to which they have agreed.

Date: May 30, 2025

Respectfully submitted,

/s/ *Stephen H. Weil*

Jonathan Loevy
Locke Bowman
Loevy & Loevy
311 N. Aberdeen Street, Floor 3
Chicago, IL 60607
312-243-5900

Antonio Romanucci
Stephen Weil
Romanucci & Blandin, LLC
321 North Clark St., Suite 900
Chicago, IL 60654
(312) 458-1000
sweil@rblaw.net

***Attorneys for Plaintiff***