E-FILED
Friday, 20 February, 2026  07:02:35 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| MAURISA GAY, as personal representative of THE ESTATE OF ANTHONY GAY, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:19-CV-01133 |
| v. | ) ) ) | Judge Sue E. Myerscough |
| JOHN BALDWIN, et al., | ) ) | Magistrate Judge Eric I. Long |
| Defendants. | ) ) ) | |

**PLAINTIFF'S RESPONSE TO WEXFORD'S
MOTION IN LIMINE CONCERNING THE *RASHO* LITIGATION**

Defendant Wexford Health Sources, Inc. ("Wexford") has filed a motion to bar all references to the *Rasho v. Baldwin* litigation. ECF No. 366. That motion should be denied.

**BACKGROUND**

Anthony Gay, Plaintiff's decedent, was confined in isolation—at the Tamms Supermax Prison, in segregation cells at various correctional facilities (including Menard, Pontiac and Dixon), in so-called "crisis cells" in various prisons, and in the segregation portions of the Residential Treatment Units at Pontiac and Dixon—for 22 years, from 1996 until Mr. Gay's eventual release from prison in 2018. For a number of those years, from 2011 to 2018, Wexford was the sole mental health provider for the Illinois Department of Corrections ("IDOC").

Plaintiff claims that Wexford had a policy of failing to take steps to remove seriously mentally ill prisoners, like Mr. Gay, from solitary confinement, to ameliorate the conditions of solitary confinement, or to provide seriously mentally ill prisoners in solitary confinement with appropriate treatment for their mental illness, including by transferring them offsite to a hospital setting. Plaintiff will contend at trial that these policies caused Mr. Gay's Wexford-employed

mental health treaters to violate Mr. Gay's Eighth Amendment rights to adequate mental health care and to protection from self-harm.[1]

Among the defenses that Wexford will assert in this case is that it did not believe and had no reason to know that the prolonged confinement of seriously mentally ill prisoners in isolated conditions can exacerbate their mental illness. For example, Wexford's witness list includes their retained expert Robert Morgan, who will testify that in many cases being placed in solitary confinement is not harmful to the mentally ill; Morgan plans to say that placement in solitary causes "mild to moderate physical and mental health effects that are comparable to the effects of incarceration generally." ECF No. 363-1 at 1. In their depositions, multiple Wexford mental health professionals insisted that there is no relationship between placement in segregation and exacerbation of mental illness. *See, e.g.*, Scott McCormick Dep. Tr. (PX 189, attached to this motion as Ex. A) at 94-96 (he is aware of no association between segregation and increased self-harm and believes segregation can be therapeutic); Cortney Meyer Dep. Tr. (PX 223, attached to this motion as Ex. B) at 56-57 (she has read no research suggesting segregation has a negative effect on seriously mentally ill prisoners' mental health); Andrea Moss Dep. Tr. (PX 239, attached to this motion as Ex. C) at 101-102 (she did not believe segregation cells were isolating and therefore never expressed a concern to anyone that a prisoner might be decompensating because of segregation).

The *Rasho* litigation, which is the subject of Wexford's motion, concerned IDOC's failure to provide adequate mental health care to mentally ill prisoners throughout the system. The

---

[1] Wexford's motion (at p. 8) incorrectly implies that Plaintiff's claim at trial will be limited to whether "Wexford violated Anthony Gay's rights by failing to provide inpatient-level mental health treatment within IDOC and by failing to transfer Mr. Gay offsite to receive inpatient psychiatric care." Plaintiff's claim against Wexford is the broader claim set forth above in text—and was clearly alleged in Plaintiff's First Amended Complaint against Wexford and the other since-dismissed defendants. *See* ECF 82 at ¶¶ 42(c)-45, 50.

litigation placed front and center the risks to mentally ill prisoners' mental health from placement in segregation settings. In 2011, the parties in the *Rasho* case[2] agreed that Fred Cohen and a team of qualified experts would conduct a comprehensive evaluation of the treatment of mentally ill persons in the IDOC system. Mr. Cohen and his team visited Tamms (where Mr. Gay was then housed), Pontiac, Menard, Dixon and other facilities. *See* PX 11, attached to this motion as Ex. E (*Rasho v. Walker* Investigation, Cohen Final Report). The Cohen Report was unsparing in its assessment of the effects of IDOC's segregation units on the seriously mentally ill:

> The situation for inmates with SMI [serious mental illness] in the IDOC is so dire that it should be termed an emergency. Large numbers of inmates with mental illness are simply locked down in segregation and with no acceptable treatment opportunities available. These men and women are wasting away and denied the treatment that the Constitution mandates.

*Id.* at 12.

> With regard to confining the mentally ill in segregation, some "sentences" are for such extended periods of time as to exceed the criminal sentence. The IDOC makes extensive, and constitutionally suspect, use of segregation for the mentally ill. They are confined often for behavior symptomatic of their illness. The duration and harshness of the confinement, and lack of minimally adequate treatment, contributes to the illness and needless suffering.
>
> There are far too many inmates with SMI in segregation for far too long and often without a semblance of care. This is a defining feature of IDOC; it represents a crisis and calls for urgent attention.

*Id.* at 27-28.

After the Cohen Report was received, in May 2013, the parties to *Rasho* entered into an Agreed Order whereby, among other things, IDOC agreed to review the long-term placement of

---

[2] Wexford was severed and removed as a party to *Rasho* in 2011. The case proceeded against IDOC alone. But from May 2011 forward, Wexford was IDOC's sole provider of mental health services throughout the IDOC system. *See* PX 348, attached to this motion as Ex. D (Wexford Contract). Wexford's actions and responsibilities were thus intimately bound up with the positions taken by IDOC in the *Rasho* case.

seriously mentally ill prisoners in segregation to determine whether those prisoners should remain in segregation. *See* PX 12, attached to this motion as Ex. F, at 5.

The *Rasho* Court appointed Dr. Raymond Patterson, a board-certified psychiatrist, upon the parties' joint recommendation, to conduct an assessment of "the progress being made to meet the conditions" in the May 2013 Order. Dr. Patterson conducted tours of Pontiac, Dixon, and Menard (where Mr. Gay was then housed; Tamms had been shut down by the time of Dr. Patterson's tours). Dr. Patterson's August 21, 2014 report (PX 387, attached to this motion as Ex. G) concluded that IDOC had not satisfied various provisions of that Order. Among other things, the Patterson Report identified the placement of seriously mentally ill prisoners in segregation as "a very serious national mental health concern." *Id.* at 6. The Report flagged that "the placement of inmates in segregation … as punishment for infractions … should not be utilized in lieu of adequate treatment of mental illness." *Id.* The Report noted that "[t]he practice of having crisis cells in segregation is not therapeutic and [is] contra-indicated for the care and treatment of inmates with increased mental health needs." *Id.*

In May 2016, the *Rasho* parties entered into a Settlement Agreement (PX 13, attached to this motion as Ex. H) that reaffirmed the earlier acknowledgements that long-term segregation of seriously mentally ill prisoners could be harmful. The Agreement therefore required, among other things:

- Consultation between security staff and mental health treaters before any prisoner could be placed in a segregation cell. *Id.* at 16-17.

- Enhanced therapy as necessary "to protect from decompensation that may be associated with segregation." *Id.* at 17.

- "Segregation rounds" by a mental health professional at least once every seven days. *Id.*

- Review of the segregation time of all SMI prisoners with more than 60 days of segregation time remaining to consider, among other things, whether the prisoner's segregation time should be reduced or eliminated. *Id.* at 18-19.

In addition, the Settlement Agreement obligated the IDOC to make inpatient treatment beds available for mentally ill prisoners who required inpatient psychiatric care, either through transfers of such prisoners to the Department of Human Services or through construction of facilities with such beds within the IDOC. *Id.* at 13.

Dr. Pablo Stewart, a psychiatrist, was appointed to monitor IDOC progress in meeting the list of objectives set forth in the Settlement Agreement, including the ones listed above. Dr. Stewart prepared multiple reports, including three that are particularly relevant here..

The First Annual Report, dated May 17, 2017, was submitted following Dr. Stewart's visits to several IDOC facilities, including Pontiac, where Mr. Gay was then housed. Dr. Stewart assessed that the noisy, chaotic and filthy environments in the segregation units he visited were "inappropriate for housing the seriously mentally ill." PX 388, attached to this motion as Ex. I, at 55, 57. Mentally ill prisoners in segregation did not consistently continue to receive the treatment specified in their treatment plans. At Pontiac, where Anthony Gay was housed at the time of this report, access to group therapy was reportedly denied as a disciplinary measure. *Id.* Although the Settlement Agreement provided for minimal weekly out of cell time, Dr. Stewart found that this requirement was not being met. *Id.* at 61. At Pontiac, Mr. Gay's prison, mentally ill prisoners in North House (where records reflect that Mr. Gay was housed for intermittent periods between July 2000 and July 2015, PX 391, attached to this motion as Ex. J) mentally ill prisoners received

5

only one to one-and-a-half hours per week of structured out of cell time. *Id.* at 69. The "segregation rounds" required by the Settlement Agreement to assess the mental health of prisoners in solitary were "extremely cursory." *Id.* at 61. A number of seriously mentally ill prisoners who had been through the segregation review committee process under the Settlement agreement nonetheless still had lengthy periods of segregation remaining. *Id.* at 63. And there was not a reliable system to identify mentally ill offenders who were deteriorating due to continued placement in segregation. *Id.* at 67.

Dr. Stewart submitted a Midyear Report on November 22, 2017, after visiting Pontiac, where Mr. Gay was still confined, and other institutions. *See* PX 389, attached to this motion as Ex. K, at 8. This Report reiterated Dr. Stewart's assessment that the treatment of seriously mentally ill prisoners was incompatible with their confinement in segregation: "the segregation units were uniformly unfit for housing mentally ill offenders" because they were "oppressively loud and chaotic." *Id.* at 62. Dr. Stewart deemed those units "antitherapeutic." *Id.* at 60. The Report noted the deficiencies in out-of-cell time, particularly at Pontiac. *Id.* at 65. The Report observed that "[t]here is currently not a reliable system to identify mentally ill prisoners who are deteriorating due to continued placement in segregation." *Id.* at 71.

Dr. Stewart's submitted his Second Annual Report in June 2018—still months before Mr. Gay's release from prison and while Mr. Gay was housed in the segregation section of the Residential Treatment Unit at Dixon. PX 390, attached to this motion as Ex. L. That Report states, "The segregation units are countertherapeutic for the mentally ill offenders housed there. These units tend to be filthy, loud, chaotic and worsen the psychiatric and medical conditions of those offenders who are housed there. The mentally ill offenders should be removed from segregated housing." *Id.* at 57.

Plaintiff does not seek to introduce this evidence to suggest that other litigation produced any judicial determination as to the constitutionality of confining Mr. Gay or any other seriously mentally ill person in segregation or any other form of solitary. The lengthy procedural history of *Rasho* that Wexford recites in its Motion (at pp. 2-6) has no place in this trial. Plaintiff has no intention of suggesting that *Rasho* decided anything in Mr. Gay's favor.[3] What is relevant and admissible are the findings described above (and others) that show notice to those involved in the provision of mental health care to IDOC prisoners, including Wexford and its employees who will testify in this case, (a) that long term confinement of the seriously mentally ill in isolation is dangerous to their mental health; and (b) that the conditions of the segregation units at IDOC in particular were not conducive to treating serious mental illness.

## ARGUMENT

### I.    THE *RASHO* DOCUMENTS ARE ADMISSIBLE TO SHOW NOTICE

The documents in issue in Wexford's motion undisputedly show that Wexford was on notice as early as 2012 that the long term confinement of seriously mentally ill prisoners in the conditions in IDOC's segregation units around the State posed grave risks to the mental health of those prisoners and that it was an urgent necessity to remove seriously mentally ill prisoners from those conditions in order to appropriately treat their mental illness. All of them are admissible for the non-hearsay purpose of establishing Wexford's deliberate indifference to Mr. Gay's needs for treatment and protection. *See generally Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (the deliberate indifference standard requires a "sufficiently culpable state of mind"

---

[3] Plaintiff's exhibit list includes the Second Amended Complaint in *Rasho.* PX 10, attached to this motion as Ex. M. But, as Plaintiff's exhibit list states, the inclusion of a document on that list is not Plaintiff's endorsement of its admissibility.

concerning excessive risks to the prisoner's health or safety). They are essential evidence in Plaintiff's case.

Wexford's motion readily concedes that, in a factual setting like the one presented here, reports from other litigation can be admitted, not for their truth, but to show that Wexford was on notice of the problems with its treatment of seriously mentally ill prisoners. *See* Motion at 6-7 ("hearsay evidence can provide notice of constitutional deficiencies where the plaintiff produces substantive evidence the noticed deficiencies actually existed") (citing *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 238 (7th Cir. 2021); *J.K.J. v. Polk Cty.*, 960 F.3d 367, 382 (7th Cir. 2020); *Daniel v. Cook Cnty.*, 833 F.3d 728, 735-36 (7th Cir. 2016); *see also Hildreth v. Butler*, 960 F.3d 420, 433 (7th Cir. 2020) ("reports would be admissible to show corporate knowledge of Wexford's policy failings and of the risks that inmates faced"); *Ryburn v. Obaisi,* 32020 U.S. Dist. LEXIS 120267, at *37 (N.D. Ill. July 9, 2020) (expert report is admissible "for the non-hearsay purpose of showing that Wexford was on notice of potentially serious shortcomings with its . . . policy, including the policy's effect on inmates' ability to obtain needed care").

Wexford relies on dicta from *Dean.* In that case, the plaintiff sought to introduce two reports prepared by a medical doctor who was monitoring Wexford's provision of medical treatment for purposes of the *Lippert* class action. The district court allowed both reports into evidence to show that Wexford had notice of the consequences of delays caused by its system for approval of offsite care. On appeal, the Seventh Circuit reversed as to the admission of one of the reports, because it post-dated the events in issue, and therefore could not have afforded notice. 18 F.4th at 221-22, 234. The court did not resolve the admissibility of the earlier-in-time report but noted that district courts should exercise caution in allowing such evidence because of the danger of unfair prejudice. *Id.* at 234. Among other things, the court observed that the doctor who had

prepared the reports was prohibited from testifying about them, which meant that Wexford had no ability to challenge the findings. *Id*. Moreover, the Seventh Circuit observed, the *Lippert* monitor had never visited the Taylorville Correctional Center, the location of the delay at issue in the *Dean* case, and that the *Lippert* monitor had acknowledged that his findings about delayed care were "somewhat facility specific." *Id.* at 233.

Neither concern applies here. The lead monitor from *Rasho*, Dr. Pablo Stewart, will be available to testify, and Plaintiff plans to call him. Nor is there any question that the *Rasho* findings about long term segregation of the seriously mentally ill apply specifically to the prisons where Mr. Gay was kept in solitary; all the monitors visited those sites (among others) before issuing their reports. In a very recent case in which the plaintiff sought to admit the same *Rasho* reports as evidence of Wexford's notice about the harm of crisis cells to mentally ill prisoners, this Court made note of *Dean*'s admonitions but concluded that the probative value of the *Rasho* evidence outweighed "its potential prejudicial dangers" and allowed the evidence. *See Andrews v. Rauner,* No. 18-cv-01101, slip op. (C.D. Ill. January 8, 2026) (copy attached as Ex. N). *Andrews* is indistinguishable. Its reasoning applies fully to this case.[4] The Court should adhere to its prior ruling and allow Plaintiff to use the *Rasho* reports for the limited purpose of showing that Wexford had notice of the harms to seriously mentally ill prisoners of long-term confinement in isolation.

Wexford's remaining arguments all lack merit. Wexford contends that the *Rasho* reports somehow fail to furnish notice because there was never a finding in *Rasho* of a constitutional violation based on the long-term confinement of seriously mentally ill prisoners in solitary. But that is beside the point. The *Rasho* findings are evidence that Wexford knew that confining

---

[4] The same counsel who represented Wexford in the *Andrews* case also represent Wexford in this case. They are undoubtedly aware of the *Andrews* decision, and they make no attempt to distinguish it.

mentally ill prisoners in solitary on a long-term basis could cause the prisoners' mental health to deteriorate. The constitutional implications of that evidence are for the jury in this case to consider.

Wexford says that the *Rasho* reports (unlike the Department of Justice investigations in issue in *Daniel v. Cook Cnty.*, 833 F.3d at 735-36) are not the result of official government investigations that would qualify for the hearsay exception in Rule 803(8). That may be true, but it doesn't matter. Plaintiff acknowledges that the *Rasho* materials may be hearsay. But she offers them to show that Wexford had notice, not for their truth. For that non-hearsay purpose, the exceptions are not in issue. *Id.* at 743.

The Court should deny Wexford's motion *in limine* as to the admissibility of the *Rasho* materials.

## II.    DR. PABLO STEWART SHOULD BE PERMITTED TO TESTIFY

Plaintiff disclosed Dr. Stewart, who monitored the *Rasho* settlement agreement in 2017 and 2018, as a non-retained expert witness pursuant to Rule 26(a)(2)(C). The disclosure is attached as Ex. O. Dr. Stewart observed segregation units where Mr. Gay had been confined and reached opinions about the effect on the seriously mentally ill of confinement in those units, which are summarized in his Reports. Particularly since Mr. Gay is deceased and unable himself to describe the environments in which he was confined, Dr. Stewart's first-hand observations are critical evidence for Plaintiff's case.

Wexford does not contend that Dr. Stewart's testimony would be hearsay or that it should be excluded for any other evidentiary reason. Wexford's only argument is that Dr. Stewart should be barred because of language in the 2016 Settlement Agreement that that Agreement "may not be used as evidence of liability or lack of liability in any other legal proceeding." PX 13 (Ex. H)

10

¶ I(h). But Dr. Stewart will be testifying about his observations. He need not mention the Settlement Agreement. He can simply say that he was in the prisons on official business that required him to observe and report, among other things, on the conditions in the segregation units and the treatment of mentally ill and seriously mentally ill prisoners in those units. His testimony will not run afoul of the Settlement Agreement.

Dr. Stewart should be permitted to testify in accordance with his Report and Plaintiff's Rule 26(a)(2)(C) disclosure.

## CONCLUSION

For the foregoing reasons, the Court should deny Wexford's motion in limine relating to the *Rasho* materials on Plaintiff's exhibit list and the testimony of Dr. Pablo Stewart.

Respectfully submitted,

*/s/ Locke Bowman*
*One of Plaintiff's Attorneys*

Jon Loevy
Locke Bowman
Alison Leff
Maggie Filler
Gianna Gizzi
LOEVY & LOEVY
311 North Aberdeen Street,
Chicago, IL 60607
p. (312) 243-5900
e. locke@loevy.com

Paul McMahon
Stephen Weil
ROMANUCCI & BLANDIN, LLC
321 North Clark St., Suite 900
Chicago, IL 60654
p. (312) 458-1000
e. sweil@rblaw.net

11

Attorneys for Plaintiff

1:19-cv-01133-SEM-EIL   # 373   Filed: 02/20/26   Page 12 of 12